**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

NOV 1 2 2021

TAMMY H. DOWNS, CLERK
By: _____
DEP CLERK

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## DELTA DIVISION

**CLEARWATER PAPER CORPORATION**                                      **PLAINTIFF**

**vs.**                          Case No. 2:21-cv-150-BSM

**UNITED STEEL, PAPER AND FORESTRY,**                                 **DEFENDANT**
**RUBBER, MANUFACTURING, ENERGY,**
**ALLIED INDUSTRIAL AND SERVICE**
**WORKERS, LOCAL UNION 1532**          This case assigned to District Judge Miller
                                        and to Magistrate Judge Volpe
**On behalf of**

**LINDA GRAYS**                                                        **GRIEVANT**

## PETITION TO VACATE ARBITRATION AWARD

Petitioner Clearwater Paper Corporation (Clearwater), by and through its attorneys, and for

its Petition to Vacate the Arbitration Award, states:

## PARTIES AND JURISDICTION

1.      Clearwater is a for-profit corporation incorporated under the laws of Delaware and

with its principal place of business in Spokane, Washington. Clearwater is registered to do business

in the State of Arkansas and operates a Pulp and Paperboard Mill at McGehee, Arkansas (Mill).

Clearwater is and was at all times material herein an "employer" as defined in the National Labor

Relations Act (NLRA), 29 U.S.C. § 152(2).

2.      Defendant, United Steel, Paper and Forestry, Rubber, Manufacturing, Energy,

Allied Industrial and Service Workers, Local Union 1532 (Union) is an unincorporated labor

association which is a "labor organization" as defined in the NLRA. The Union transacts business

and its duly authorized officers or agents engage in representing or acting on behalf of its members

and bargaining unit employees at the Mill.

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under Section 301(a) of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, and the Federal Arbitration Act, 9 U.S.C. §§ 1–16.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391. Venue is also proper pursuant to Sections 301(a) and 301(c) of the LMRA, as amended.

<strong><u>COLLECTIVE BARGAINING AGREEMENT</u></strong>

5.      Clearwater and the Union negotiated a collective bargaining agreement, effective August 1, 2020 through July 31, 2021 (Agreement or CBA). The CBA is between Clearwater and the Union under 29 U.S.C. § 185.

6.      The CBA involves interstate commerce and employee activities which affect interstate commerce. A copy of the CBA is attached hereto as Exhibit A.

7.      Under Article 1 of the CBA, the "general purpose of the Agreement is, in the mutual interest of the employer and employee, to provide for the operation of the [Mill], under methods which will further, to the fullest extent possible, *the safety, health, and welfare of the employees*." Exhibit A.

8.      Under Article 5 of the CBA, Clearwater "retains the right to promote, transfer, demote, discipline, and suspend employees, and to *discharge employees for just cause*[.]" Exhibit A.

9.      Under Article 8(c) of the CBA, Clearwater "has the right to create or modify rules designed to maintain discipline and proper personal standards of conduct such as the Company's Mill Rules. The employees agree to comply with the Company's Mill Rules." Exhibit A.

10.    Accordingly, Clearwater properly promulgated its Mill Rules, which both explicitly prohibit workplace violence and also incorporate Clearwater's more specific Workplace Violence Policy by reference. A copy of the Workplace Violence Policy is attached hereto as Exhibit B.

11.    Under Article 23 of the CBA, "[t]he Company retains the right to take unilateral action to ensure workplace safety whenever necessary." Exhibit A.

12.    Under Article 7(c) of the CBA, an:

> arbitrator's authority shall be limited to the terms of the Agreement or any written supplemental agreement. He shall not have authority to add to, take from, nullify or modify any terms of this Agreement or any written supplemental agreement, and he shall consider and render a decision concerning only such issues as are directly raised by the written grievance, which shall not be in any way materially changed or amended after it is presented to the Company[.] . . . [T]he arbitrator shall make no award outside the scope of his authority outlined in this Agreement, or effecting a change, modification, elimination, addition to, or nullification of any term/provision of this Agreement . . .

Exhibit A.

13.    Under the Workplace Violence Policy, "[c]onduct that interferes with operations, discredits the Company, or is offensive to customers or co-workers will not be tolerated[.]" Exhibit B. "Any act of violence which impacts the workplace will be cause for investigation and subject to action by the Company." Exhibit B.

14.    Consistent with these standards, the Workplace Violence Policy provides an illustrative list of prohibited conduct that may lead to disciplinary action, up to and including termination, which includes, *inter alia*: (1) the use of "profanity or abusive language"; (2) "[f]ighting or assault on a co-worker"; and (3) "[t]hreatening or intimidating co-workers." Exhibit B.

3

15.    The Workplace Violence Policy also prohibits, among other things: (1) causing physical injury to another person; (2) "[m]aking threatening remarks"; (3) possessing a "weapon while on Company property"; and (4) "[a]ggressive or hostile behavior that results in a reasonable fear of injury and/or emotional distress." Exhibit B.

## FACTS

16.    On September 12, 2020, Linda Grays ("Grays") falsely accused Clearwater employee Larry Simmons ("Simmons") of stealing cooking oil to Supervisor Justin White ("White").

17.    On September 13, 2020, at shift change, Grays falsely boasted to oncoming day shift employees, Operator Alisha Wilson ("Wilson") and Assistant Shane Rogers ("Rogers"), that Larry Simmons made them witnesses to a theft and that she had reported the same to White.

18.    Theft is a violation of Clearwater policy and a terminable offense.

19.     On September 14, 2020, when Simmons and Grays crossed paths during shift change, Grays accused Simmons of theft. An argument ensued between Simmons and Grays. The argument quickly escalated, with Grays pulling a large knife as Simmons was being escorted from the room by a coworker. Grays then taunted Simmons with a racial slur before threatening him that she planned to have her husband "take care of this."

20.    On October 2, 2020, following an investigation into the incident, Clearwater terminated Grays for violation of the Mill Rules, including the Workplace Violence Policy, for pulling a knife on Simmons during the argument.

21.    Simmons was also reprimanded for engaging in the argument. Specifically, he received a three-week suspension and executed a last-chance agreement.

22.    On October 5, 2020, Grays filed her Grievance Form, alleging that she was terminated "after having a conflict with another employee" in violation of Article 8, Sections (a), (b), and "all other applicable language" of the CBA.

23.    After Clearwater considered and denied the grievance, the Union Staff Representative requested arbitration pursuant to Article 7(c) of the CBA.

24.    On March 18, 2021, Grays filed a Charge with the Equal Employment Opportunity Commission (EEOC), alleging that Clearwater suspended and terminated her because of her race and sex and discharged her in retaliation for a "report regarding pay" in 2017. A copy of Plaintiff's EEOC Charge is attached as Exhibit C. In the Charge, she admits that "On September 14, 2020, I had an altercation with a Coworker. During the altercation, I picked up a knife." Grays does not allege that she acted in self-defense in picking up the knife.

25.    On May 19, 2021, the Parties appeared at a hearing conducted before Arbitrator Paul Barron. A copy of the Arbitration Hearing Transcript is attached as Exhibit D.

26.    At the hearing, and in post-hearing briefs, Clearwater stated that Grays picked up a knife during her argument with Simmons, which is a violation of the Workplace Violence Policy and subjected Grays to termination. A copy of Clearwater's Post-Hearing Brief is attached as Exhibit E.

27.    On June 17, 2021, after receiving her right-to-sue letter, Grays filed a complaint in federal court, *Linda Grays v. Clearwater Paper Corporation*, Eastern District of Arkansas Case No. 2:21-cv-00064-DPM (E.D. Ark. 2021) (*Grays Pro Se Lawsuit*), in which she alleges that she was terminated in retaliation for a "2017 [] report regarding pay" and terminated because of her race and sex, in violation of Title VII. *See id.* (ECF No. 1, ¶¶ 8–9). Factually, in the *Grays Pro Se*

*Lawsuit*, Grays alleged, among other things, that: (1) she picked up a knife; and (2) Simmons and Grays were "over 20 feet apart" when she did so. *See id.* (ECF No. 1, ¶ 9).

28.     A day later, on June 18, 2021, Grays filed a complaint in the Circuit Court of Chicot County, Arkansas, *Linda Grays v. Clearwater Paper Corporation*, Case No. 09CV-21-42-2[1] (*Grays ACRA Lawsuit*), in which she alleged that she was terminated in retaliation for "her previous grievance filed in 2017," which was purportedly related to "disparity in pay," and because of her gender and her age, in violation of the Arkansas Civil Rights Act (ACRA). *See Grays ACRA Lawsuit*, Case No. 2:21-cv-00099-LPR (E.D. Ark. 2021) (ECF No. 2, ¶¶ 15, 22–24, 27–32).

29.     The allegations in Grays' EEOC Charge, *Grays Pro Se Lawsuit*, and *Grays ACRA Lawsuit*, all allege that she was terminated because of a 2017 "report" or "grievance" she purportedly submitted to Clearwater "regarding pay." This allegation is contrary to the Grievance submitted by Grays to Clearwater, which claimed that she was terminated "after having a conflict with another employee."

30.     All of the information regarding Grays' allegations and her inconsistent positions pertaining to her termination that occurred after the arbitration hearing, including the EEOC Charge, *Grays Pro Se Lawsuit*, and *Grays ACRA Lawsuit*, were provided to the Arbitrator prior to issuance of the Arbitrator's Opinion.

31.     An Opinion was issued by Arbitrator Paul Barron on August 14, 2021. A copy of the Opinion is attached as Exhibit F.

---

[1] Clearwater removed Plaintiff's Complaint based on diversity of citizenship jurisdiction and the case is currently pending in the Delta Division of the United States District Court for Eastern District of Arkansas, and styled: *Linda Grays v. Clearwater Paper Corporation*, Case No. 2:21-cv-00099-LPR. For ease of reference and accessibility of pleadings, citations to *Grays ACRA Lawsuit* refer to the federal lawsuit.

32.    The Arbitrator acknowledges that Grays picked up a knife during the argument with Simmons but proceeds to dissect the argument between Grays and Simmons separate from Grays picking up the knife during the argument. *See* Exhibit F. Ultimately, the Arbitrator concluded:

> Clearly, the Grievant's [Grays] action was not premeditated. Rather, it was instinctual. Further, this happened in a very short amount of time. If there had been more time, she would have had been able to think through her action and not grab the knife. But she did not.

> Based on all of the evidence above, I have concluded that the Grievant's action to grabbing the knife was not a basis for discipline and the grievance must be sustained.

*See* Exhibit F.

## CLAIM I: VACATION OF ARBITRATOR'S AWARD

33.    Plaintiff's admission that she was over 20 feet away from Simmons, *see Grays Lawsuit* (ECF No. 1, ¶ 9), belies the Arbitrator's conjecture that she pulled the knife in self-defense, *see* Exhibit F.

34.    While the Arbitrator seeks to divine Grays' intent, the relevant factual finding is that she picked up a knife during an argument with a co-employee—Simmons.

35.    Grays assaulted a co-worker with a weapon, which, under the Workplace Violence Policy, is prohibited and may lead to disciplinary action, *at management's discretion*, up to and including termination. *See* Exhibit B.

36.    Clearwater is entitled under the CBA to "create or modify rules designed to maintain discipline and proper personal standards of conduct such as the Company's Mill Rules" and "employees agree [under the CBA] to comply with the Company's Mill Rules." Exhibit A. Clearwater properly promulgated the Workplace Violence Policy. *See* Exhibit B. The Mill Rules, including the Workplace Violence Policy, were agreed to by both parties to the CBA—Clearwater

*and* the Union, and incorporated by reference into the CBA. Per the CBA, Clearwater employees are expected to fully comply with the Mill Rules, including the Workplace Violence Policy, as a condition of employment and an obligation under the CBA. At all times relevant to Grays' grievance and the underlying factual circumstances, Grays was a beneficiary of the CBA and required to fully comply with the Mill Rules, including the Workplace Violence Policy.

37.    The Arbitrator's finding that Grays pulled a knife during an argument with Simmons, but that discipline was inappropriate because he surmised (with conflicting evidence) that she did not start the argument and that she *could* "have been afraid that she was in danger," is a deviation from the terms of the Parties' CBA that gives the Company the right to discipline employees, up to and including termination, when just cause exists. Specifically, Clearwater has the right to promulgate rules and regulations governing employee conduct during work under Article 8(c) of the CBA, which Clearwater did when it promulgated the Workplace Violence Policy. This Policy prohibits, among other things: (1) fighting or assault on a co-worker; (2) threatening or intimidating co-workers; (3) possession of a weapon while on Company property; and (4) aggressive or hostile behavior that results in a reasonable fear of injury and/or emotional distress. *See* Exhibit B. Thus, the Award does not draw its essence from the lawful provisions of the CBA because Grays' conduct was just cause for termination.

38.    The Award of the Arbitrator should be vacated and set aside for the following reasons:

a.    The Arbitrator's Award does not draw its essence from the lawful provisions of the CBA, and the Arbitrator exceeded his powers by going beyond the limits of his authority in the CBA.

b.    The Arbitrator instilled his own personal standards of industrial justice.

8

WHEREFORE, Plaintiff Clearwater Paper Corporation moves the Court for an Order vacating the Arbitrator's Award; upholding its termination of Grays; and for such other and further relief as the Court deems just and proper.

DATED: November 11, 2021                    Respectfully Submitted,

**M. Kimberly Hodges**
AR Bar No. 2019018
Attorney for Plaintiff Clearwater Paper
Corporation
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
International Place Tower II
6410 Poplar Avenue, Suite 300
Memphis, TN  38119
Telephone:  901.767.6160
Facsimile:  901.767.7411
Email: kim.hodges@ogletreedeakins.com

49266914.1

# EXHIBIT A

# LABOR AGREEMENT

## BY AND BETWEEN

## CLEARWATER PAPER CORPORATION
## CYPRESS BEND MILL
## MCGEHEE, ARKANSAS

## AND

## UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION ON BEHALF OF LOCALS 13-1532 AND 13-1533

## EXPIRATION DATE
## JULY 31, 2021

1



# **<u>TABLE OF CONTENTS</u>**

Adjustment of Complaints (Article 7)…………………………………………………………7

Call Time (Article 15) ……………………………………………………………………25

Continuous Operations (Article 4)……………………………………………………....5

Contravention of Law (Article 25)…………………………………………………36

Definitions (Article 6)………………………………………………………………6

Disciplinary Action (Article 8)…………………………………………………………10

Employee Benefits (Article 21)……………………………………………………30

Funeral Pay (Article 18)…………………………………………………………26

General Purpose of Agreement (Article 1)……………………………………………….3

Holidays (Article 19)…………………………………………………………………27

Hours of Work (Article 10)…………………………………………………………18

Jury Duty Pay (Article 17)…..…………………………………………………26

Leaves of Absence (Article 11)…………………………………………………19

Miscellaneous (Article 24)……………………………………………………34

Operating Control (Article 5)………………………………………………………6

Overtime (Article 14)……………………………………………………………23

Recognition (Article 2)………………………………………………………………3

Reporting Pay (Article 16)………………………………………………………26

Retirement Plans (Article 22)……………………………………………………31

Safety (Article 23)…………………………………………………………………32

Seniority (Article 9)………………………………………………………………11

Shift Differential (Article 13)……………………………………………………23

Terms of Agreement (Article 26)……………………………………………………36

Union Payroll Deductions and Reports (Article 3)…………………………………5

Vacations (Article 20)……………………………………………………………28

Wages (Article 12)………………………………………………………………20

## LABOR AGREEMENT

This Agreement is by and between CLEARWATER PAPER CORPORATION, McGehee, Arkansas, referred to in this Agreement as the Company, and the UNITED STEEL, PAPER AND FORESTRY, RUBBER, MANUFACTURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORKERS INTERNATIONAL UNION, its affiliated Local No. 13-1532, and its affiliated Local No. 13-1533, collectively referred to in this Agreement as the Union.

## ARTICLE 1
### General Purpose of Agreement

(a) The general purpose of the Agreement is, in the mutual interest of the employer and employee, to provide for the operation of the Pulp and Paperboard Mill at McGehee, Arkansas, under methods which will further, to the fullest extent possible, the safety, health, and welfare of the employees, economy of operation, quality and quantity of output, cleanliness of plant, and protection of property. It is recognized by this Agreement to be the duty of the Company, the Union, and the employees to cooperate fully, individually, and collectively for the advancement of said conditions. The Company, the Union and the employees will cooperate in support of continuous improvement concepts.

(b) There shall be no discrimination against any present or future employee because of race, color, creed, national origin, sex, disability, age, union membership, or any other characteristic protected by law, including, but not limited to, claims made pursuant to Title VII of the Civil Rights Act, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the Arkansas Civil Rights Act, or any other similar laws, orders, rules, or regulations. All such claims shall be subject to the grievance and arbitration procedures (Article 7). Arbitrators shall apply appropriate law in rendering decisions based upon claims of discrimination.

(c) The Local Union will seek authorization from the International Union Representative or his designated representative prior to filing any charges against the Company or its management, including charges or actions filed pursuant to the National Labor Relations Act or section (b) of this Article.

(d) The parties agree to take whatever action is necessary to comply with the aforementioned laws, orders, rules or regulations.

## ARTICLE 2
### Recognition

(a) The Company recognizes the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union as the sole and exclusive collective bargaining agent in respect to wages, hours of work, working conditions, and other conditions of employment for all production and maintenance employees including truck drivers, but excluding office clerical employees, professional employees, guards and supervisors, as defined in the National Labor Relations Act.

3

(b) Local Union No. 13-1532 and Local Union No. 13-1533 shall constitute one single unit for all the purposes of collective bargaining between the parties to this Agreement.

(c) There shall not be any private understanding or agreement between any member of the Company and any individual employee or group of employees which is in conflict with this Agreement.

(d) The Company agrees that, if during the life of this Agreement, it sells the operations (or any portion thereof) covered by this Agreement, the Company shall require the Buyer, as a condition of the sale, to recognize the Union as the collective bargaining representative of the employees employed in the operations covered by this Agreement, to maintain in effect the terms and conditions of employment in effect at the time of the sale, and to negotiate in good faith with the Union regarding the terms and conditions of the employees employed in the operations covered by this Agreement which are sold to the Buyer.

(e) While employees outside of the bargaining unit, including supervisors, are not subject to the provisions of this Agreement, it is distinctly understood that those employees may be asked to help out doing bargaining unit work as business needs and efficient operations may require; provided, that such an employee shall not be used to replace permanently or cause the permanent layoff of a bargaining unit employee.

(f)      (1)      (i) Bargaining unit employees may be reassigned by the Company from time to time on a temporary basis for periods of one (1) week (seven (7) calendar days) or less to perform duties other than their usual and customary duties. A reassigned employee will be paid at the rate that he would have been paid had he not been reassigned.

(ii) A bargaining unit employee who is temporarily reassigned by the Company to a Maintenance Helper job during an outage will be paid at his current scheduled rate or the Maintenance Helper rate, whichever is higher.

(2) Bargaining unit employees may be reassigned by the Company from time to time on a temporary basis to perform projects that do not involve replacing another employee's permanent job, including employee involvement projects, such as PRIDE, lockouts, and other types of special projects. If the reassignment lasts for periods of one (1) week or less, the employee will be paid in accordance with section (f)(1) of this Article. If the reassignment lasts for periods of more than one (1) week, the Company will seek input from the Union about the selection of the employee for reassignment and the employee selected will be paid an additional one dollar and seventy-five cents ($1.75) per hour over his current scheduled rate. In the event the Company chooses to post a position described in this paragraph and chooses to select an applicant from the posting, this rate may be adjusted upward upon the written approval of the Mill Manager.

4

## ARTICLE 3
### Union Payroll Deductions and Reports

(a) When an employee voluntarily signs a form authorizing the deduction of Union dues from his pay, the Company agrees to honor such authorization during the life of this Agreement in accordance with the terms of the authorization, provided copies of said assignments are provided to the Company. The authorization referred to in this paragraph shall be in a form submitted by the Union.

(b) The Company will continue to make deductions for mutual benefit funds and disability plans provided by the Union. The Company will not agree to make any deductions in addition to those in place at the execution of this Agreement.

(c) The Union and all bargaining unit employees agree to indemnify and hold the Company harmless from any and all liabilities arising out of the authorization deductions made pursuant to this Article. This includes executing any and all documents required by the Company to reflect said waivers and indemnifications.

(d) The Company agrees to furnish the following bargaining unit employee information electronically to Don Davies or his successor and his administrative assistant:

(1) every six (6) months:
1. Name;
2. Address;
3. Phone number(s) provided by the employee;
4. Gender;
5. Race;
6. Union membership status;
7. Employee status (active or non-active);
8. Department;
9. Date of hire; and
10. Date of birth.

(2) each pay period:
1. USW form R-115.

## ARTICLE 4
### Continuous Operations

(a) There shall be no strikes, slowdowns, work stoppages, pickets, sitdowns, sympathy strikes, boycotts, including secondary boycotts (i.e., attempting to cause third parties to stop doing business with the Company), walkouts, or other interruptions of work during the life of this Agreement.

There shall be no activity of the type characterized in the previous paragraph upon the termination of this Agreement until there has been an express and specific sanction of the Union.

Participation by any employee or employees in an act violating or encouraging the violation of this section shall result in immediate discharge.

It is agreed that there shall be no lockouts by the Company during the life of this Agreement.

The employees will be expected to cross all picket lines at the facilities or operations covered by this Agreement, regardless of the employer or Union involved. If an employee refuses, the Union will instruct said employee to cross

5

said picket line and work. Refusal to cross will be grounds for immediate discharge. In the case Local 13-1532 or Local 13-1533 sets up a picket line at any facility owned or operated by any business other than Clearwater Paper Corporation, the employees covered by this Agreement may choose not to cross that picket line without violating this Agreement.

(b) In the event that there is a violation of the provisions of Section (a) of this Article, neither the International Union nor the Local Union shall be subject to financial liability for such violation, provided that the International Union and the Local Union involved shall, immediately after becoming aware of such violation, have declared such action a violation of this Agreement, and, in utmost good faith, used their best efforts to terminate such violation.

If any Union official or steward who is an employee is involved in actions in violation of this Article, or if in the event of a violation, any such Union official or steward fails to take the action required of him under this Article, then he has waived the right to be free of harsher penalties.

### ARTICLE 5
### Operating Control

Except as limited by the express provisions of this Agreement, the Company reserves and retains all of its inherent rights to manage the business, including, but not limited to the following: the hiring and direction of the work force; the right to plan, direct, and control, as well as to discontinue, establish, alter, in whole or in part, all plant operations, including the number, location and type of its operations and the methods, processes, and materials to be employed; standards, jobs, including their performance by employees, departments and lines of progression; the scheduling of work and the assignment of employees to such work; the selection and assignment of work to contractors; the establishment, modification or elimination of work or shift schedules, the number of hours and shifts to be worked each day and week by each employee, starting and quitting times, and the assignment of employees to shifts; the right to relieve employees from duty because of lack of work or for other legitimate reasons; the right to establish, change, or abolish reasonable policies, rules, practices and procedures, methods, job duties and crew sizes; and the determination of quality and quantity of work produced. The Company also retains the right to promote, transfer, demote, discipline, and suspend employees, and to discharge employees for just cause; and the right to control and regulate the use of machinery, equipment and other property of the Company, including changing, updating, modifying and eliminating machinery and equipment as well as adding new equipment and machinery; to designate employees to operate the new or modified equipment and/or machinery as well as their classification and rates of pay (subject to the provisions of Article 12b).

### ARTICLE 6
### Definitions

Whenever used in this Agreement, including exhibits, the male noun or pronoun is used to include the female noun or pronoun, where applicable, and:

1. The word EMPLOYEES means all production and maintenance employees of the Company employed in the Mill covered by this

Agreement for whom the Union is recognized as the sole collective bargaining agent.

2. The words REGULAR EMPLOYEE mean an employee who has completed his probationary period of one hundred twenty (120) calendar days. An employee shall accumulate no seniority during the period of probation. If the employee is retained in the employ of the Company after the end of the probationary period, Plant Seniority shall be the date of last hire. The probationary period may be extended by agreement between the Company and the Union in individual cases. Employees will be eligible for medical benefits sixty (60) calendar days from the date of last hire.

3. STUDENTS who may be employed during their vacation periods or on a part-time basis shall not accrue seniority nor shall they be employed in such a manner to deprive regular employees of work, recall, or promotion rights. Application of this provision shall be limited to one hundred and twenty (120) working days per calendar year. Service crew and clerical student positions will be filled by children of bargaining unit and non-bargaining unit employees whenever possible.

4. The words TOUR WORKERS mean employees working shifts that rotate between days and nights. All other employees are considered DAY WORKERS.

5. The word MILL means the Pulp and Paperboard Mill at McGehee, Arkansas.

6. The words LOCAL UNION mean the Local(s) of the International Union which shall act as the representative of the employees in the performance of those provisions of this Agreement which provide for action by a Local Union.

7. The words UNION GRIEVANCE COMMITTEE mean a committee of not more than four (4) members for Local 13-1533 and not more than five (5) members for Local 13-1532 selected by each Local Union in order to represent the Local Union concerned in the performance of those provisions of this Agreement which provide for action by a Union Grievance Committee. The names of the Union Grievance Committee shall be certified to the Company by the Local Union.

## ARTICLE 7
### Adjustment of Complaints

(a) Should there be any dispute or complaint as to the interpretation of any of the clauses of this Agreement, or any grievance arising out of the operation of this Agreement, the employee or employees will continue to work under the conditions that are the subject of the dispute, complaint, or grievance (collectively referred to in this Agreement as "grievance").

The written record of the grievance as it is processed will be made as clear as practicable by both the Company and the Union.

Both the Company and the Union shall make strong efforts to resolve the difference throughout the grievance procedure.

7

(b) The Company reserves the right to object to the validity of any grievance not in compliance with section (a) of this Article.

(c) Grievances are defined in Section (a) of this Article and may only be brought by, or on behalf of, the aggrieved employee(s). Grievances may be settled in the following manner:

Step 1. The employee and/or his steward shall discuss the grievance with the immediate supervisor within five (5) days following the date the incident occurred. If the employee was on an excused absence and he had no knowledge of it until his return to work, the five (5) day period shall begin on his first scheduled work day following the return from the absence. The supervisor shall reply to the employee within five (5) days of the date the grievance was brought to his attention.

Step 2. An appeal of the supervisor's verbal answer may be made by reducing the grievance to writing on the form provided by the Company, signed by the employee and/or a Union steward, and placing it in the hand of the supervisor for referral to the department manager within ten (10) days of the date the verbal answer was given. The department manager and/or designated representatives shall meet with the President of the Union Local involved, and/or designated representatives, at a mutually agreed to time and date within ten (10) days of the date the written grievance was received. The written answer shall be transmitted via electronic mail to the Departmental Chief Steward and Local Union President within ten (10) days of the date of the meeting.

Step 3. An appeal of the department manager's answer must be transmitted via electronic mail to the Human Resources Manager or his designated representative within ten (10) days of the date of the department manager's answer. Within ten (10) days of the date the appeal notice was received, a meeting shall be scheduled with the Mill Manager and/or designated representatives together with the International Union Representative and/or his designated representative, and the Union Grievance Committee. A written answer shall be transmitted via electronic mail by the Mill Manager or designated representative to the Local Union President and the International Representative or his designated representative within fifteen (15) days of the date of the meeting.

Step 4. Should there be no satisfactory settlement as a result of the Mill Manager's answer, the Local Union may appeal the grievance to arbitration by notifying the Human Resources Manager or his designated representative via electronic mail within fifteen (15) days of the date of the Mill Manager's answer. Otherwise, the Mill Manager's decision shall be final and binding.

Only grievances regarding matters occurring during the term of this Agreement shall be subject to adjustment under the terms of this Agreement. Any grievances regarding matters occurring outside the term of this Agreement shall not be subject to adjustment under the terms of this Agreement.

If proper notice is given, including confirmation by the International Representative of the Union or his designated representative, the following provisions shall apply:

1. Within five (5) days after notification that the Union elects to arbitrate, the Company shall ask the Federal Mediation and Conciliation Service (FMCS) to furnish the parties with a panel of seven (7) qualified arbitrators. Within twenty (20) days after receipt of the list of arbitrators, the parties shall alternately strike one of the submitted names until one (1) name remains. Then, within five (5)

working days, the FMCS shall be informed by the Company of the selected arbitrator with a request for available dates for the hearing. Upon receipt of available meeting dates from the arbitrator, the two (2) parties shall select an agreeable date to arbitrate. If none of the provided dates are acceptable to either party, the process will be repeated until a mutually agreeable date is secured.

2. The arbitrator's authority shall be limited to the terms of this Agreement or any written supplemental agreement. He shall have no authority to add to, take from, nullify or modify any terms of this Agreement or any written supplemental agreement, and he shall consider and render a decision concerning only such issues as are directly raised by the written grievance, which shall not be in any way materially changed or amended after it is presented to the Company in Step 2 above. The decision of the arbitrator on all matters properly submitted to him shall be final and binding on both parties to this Agreement; provided, however, that the arbitrator shall make no award outside the scope of his authority outlined in this Agreement, or effecting a change, modification, elimination, addition to, or nullification of any term/provision of this Agreement and shall confine himself strictly to facts submitted in the hearing, the evidence before him, and the express terms and provisions of this Agreement.

3. After the close of the hearing, the arbitrator shall render a decision in writing within thirty (30) calendar days of the close of the hearing or the mailing date of written briefs, whichever is later.

4. The parties, upon mutual agreement only, may arbitrate multiple grievances at one time providing that such grievances are at the arbitration level at the time the panel is requested.

5. Each party to any case submitted to arbitration (1) shall bear the expense of preparing and presenting its own case, including witnesses, and (2) shall pay one-half of the charges of the arbitrator incurred in the arbitration of the case.

6. Either party may engage a reporter to prepare a stenographic record of the proceedings at its own expense for its use in preparing a brief. The other party may request a copy of the transcript from the reporter at its own expense.

 (d) The exclusive remedy for a grievance regarding a missed work opportunity shall be the opportunity to work an equal number of hours otherwise missed, along with any additional compensation which would have been associated with the missed work opportunity. The Local Union will advise the Human Resources Manager or his designated representative of repeated missed work opportunities. The Company will investigate the issue and take action when appropriate.

 (e) Officers or Stewards may make investigations during working hours concerning an alleged violation of this Agreement provided that permission is requested and received from their supervisor. It is understood that the supervisor shall not withhold permission unreasonably provided that the Company determines that the privilege is not being abused.

 (f) Both parties will make every effort to schedule grievance meetings outside of the Union Grievance Committee members' scheduled shifts. Members of the Union Grievance Committee will be paid when required to attend grievance meetings that occur

9

on their scheduled shift. The Company will not change an employee's schedule to avoid payment for attendance at a grievance meeting.

(g) Time Limits

(1) If a grievance is not presented or appealed within the time limits allowed or the extension of time set forth below, it shall be deemed withdrawn and not subject to arbitration. If a reply to the Union's presentation of appeal of a grievance is not received on time, the appropriate representative of the Union may elect to appeal the grievance within the time specified.

(2) Any of the time limits provided in the second, third, and fourth steps of the foregoing grievance and arbitration procedures may be extended by mutual written agreement of the Company and Union prior to the expiration of the time limit. Requests for extension of time will be sent via electronic mail to the Human Resource Manager or his designated representative or to the Local Union President or his designated representative. "Days" in this Article shall mean calendar days, excluding Saturdays, Sundays and holidays.

(h) The Union Grievance Committee for Local 13-1533 will not exceed four (4) and for Local 13-1532 will not exceed five (5) in number and these committees shall be duly authorized and empowered at all times to represent employees and the Union in their respective Local in handling grievances with the Company.

(i) A reasonable number of additional persons may attend grievance meetings when requested by the Company or the Union when deemed necessary.

(j) Time for attendance at an arbitration by any employee representatives, Union Grievance Committee members, or witnesses on behalf of the Union will not be compensated by the Company.

## ARTICLE 8
### Disciplinary Action

(a) If disciplinary action is to be taken, an employee may request a Union representative be present. All disciplinary actions shall be recorded on a "Memo of Record" form and a copy shall be given to the employee and scanned and sent to the appropriate Local Union President. If an employee receives such discipline, the employee will sign a copy of the Memo of Record acknowledging receipt of same, but such a signature is not necessarily an indication that the employee is in agreement with the disciplinary action. Written warnings will be disregarded at the end of twelve (12) months from the date of each infraction with respect to applying any future discipline, except it may be used in the case of future violations of the same nature or when the written warning was given through leniency in lieu of suspension, probation or termination. In any event, any and all discipline issued to an employee may be presented before an arbitrator, even if not used in issuance of the discipline that is the subject of a grievance.

(b) If a regular employee claims to have been discharged or suspended in violation of this Agreement during the term of this Agreement, such person must within three (3) calendar days refer the matter to the Local Union, which may within four (4) additional calendar days file a written grievance under Step 3 of the grievance procedure in Article 7 of this Agreement and it shall be processed as provided in that Article.

(c) The Union and Company agree that the Company has the right to create or modify rules designed to maintain discipline and proper personal standards of conduct

10

such as the Company's Mill Rules. The employees agree to comply with the Company's Mill Rules.

**ARTICLE 9**
**Seniority**

**Section 1. Types of Seniority**

a. For the purpose of this Agreement all regular employees shall have four (4) types of seniority.

(1) Job Seniority—Length of time in a job classification commencing from the date the employee is assigned to that job on a permanent basis.

(2) Line of Progression Seniority—Length of time commencing from the date the employee is assigned to that line of progression on a permanent basis.

(3) Department Seniority—Length of time commencing from the date the employee is assigned to a department on a permanent basis.

(4) Plant Seniority—Date of last hire at the McGehee, Arkansas, Mill. Employees hired on the same calendar day shall randomly draw to determine seniority between them. The letter "A" shall be senior.

b. New employees other than student employees shall be considered probationary employees for one hundred twenty (120) calendar days following the date of last hire, unless the period is extended pursuant to paragraph 2 of Article 6. If the employee is retained in the employ of the Company after the end of the probationary period, Plant Seniority shall be the date of last hire. The discharge of a probationary employee shall not be subject to the provisions of Article 7, Adjustment of Complaints. This paragraph is not applicable to temporary employees, including student employees, who are not subject to Article 7, Adjustment of Complaints.

c. All employees hired on the jobs above the starting job in any line of progression shall be regarded as having reached that job through the line of progression.

**Section 2. Promotions and Transfers**

a. Seniority shall be applied in promotions, transfers, the filling of vacancies, the reduction of the working force and recall from layoff after a reduction of force as set out in this Agreement. The following factors of employee qualifications shall be considered by the Company:

1.  Seniority;
2.  Overall skills and abilities to perform the job; and
3.  Overall work record.

The Company and the Union recognize the sensitivity of seniority to its workers. Consequently, the Company and the Union agree that seniority will be the determining selection factor. If, however, the Company determines that the remaining factors justify the non-promotion or non-transfer of a senior candidate, prior to making the promotion or transfer of a non-senior candidate, the Company will seek input from a joint Union-Management committee, which will consist of Management representatives, the Local Union President or his designated representative, and up to two (2) additional members that he may appoint. After receiving input from the committee, the Company will advise the Local Union

11

President or his designated representative of its decision before the employee is notified. In the case of a cross department bid situation, if the senior candidate is not selected pursuant to the terms of this Section, he shall be ineligible to bid for that position for twelve (12) months, unless approval to bid at an earlier date is granted in writing by the Human Resource Manager or his designated representative. The Company may reassign tour workers to shifts with input from the Union.

(1) Seniority means first preference shall be given to job seniority. If job seniority is equal, then line of progression seniority shall prevail. If job and line of progression seniority are equal, then department seniority shall prevail. If job, line of progression, and department seniority are equal, then plant seniority shall prevail.

(2) When an employee is promoted around a job in a line of progression, the employee shall begin to accumulate job seniority in all bypassed classifications at the time the employee begins to accumulate seniority on the job to which the employee is promoted.

(3) The Company and the Union recognize that employees will be expected to progress as far as their abilities and opportunities will permit. When an employee in a line of progression declines a promotion, he must request approval in writing from the Human Resources Manager or his designated representative, listing the legitimate reasons for the request. Prior to approving or denying the request, the Company will seek input from the Union. If the request is approved, the employee forfeits his right to all future promotions or setups until he requests reinstatement in writing in the line of progression and then one more employee moves around the employee in the line of progression by permanent promotion. The maximum percentage of employees allowed to block a job will vary from job to job and may be adjusted over time. If an employee cannot progress in his line of progression, and is approved by the Company to block a job after July 1, 2016, the Company may set the employee back one or two jobs in order to allow the employee to setup to the blocked job, or to allow other employees to setup around him at the discretion of the Company.

(4) Disqualification

(a) Employees, once promoted or transferred to a permanently assigned job in a line of progression or on a setup, where training is necessary for qualification for that job, shall not be deemed unqualified before receiving reasonable training necessary to perform the job. Reasonable training is defined as up to thirty (30) working days. The exact number of days will vary depending on the nature of the job and the experience of the employee. A subsequent probationary training period may be granted upon the mutual agreement of the Company and the Union. The Union will engage in all efforts to assist the employee to become qualified.

(b) If a situation develops where the employee is considered unqualified, the Company and Union shall meet to discuss the reasons for considering disqualification. The Company will return the employee to his former position. Said employee will be ineligible for future

consideration for that position for eighteen (18) months unless approval to bid at an earlier date is granted in writing by the Human Resources Manager or his designated representative.

b. Entry Level / New Job Openings

(1) In the event a permanent opening occurs: (a) in any existing job at the bottom of a line of progression or an existing job not in a line of progression; or (b) in a new job at the bottom of a line of progression or a new job not in a line of progression, a notice will be posted for ten (10) calendar days. The Local Union President will be advised of the job posting. Job posting will be accomplished and the qualified employees (using the criteria in Article 9 Section 2.a.) will be assigned as provided for in the following rules:

    a. Each job posting will be numbered in ascending order as permanent openings occur in bottom level jobs.

    b. Each permanent opening will be posted under a separate job posting number.

    c. The candidate selected for the position will be scheduled to the posted opening within thirty (30) days from the date the job posting has been taken down. The thirty (30) day period may be extended by the Company after receiving input from the Union.

    d. The candidate selected will be assigned a new job and department seniority date on the date of the selection.

    e. An employee interested in bidding on an opening in another department is encouraged to visit and observe the job/department on his own time before bidding.

(2) When an employee has transferred from one (1) department to another, he shall have the right to transfer back to the department from which he originally transferred within ten (10) working days without loss of seniority, if during that time the employee or the Company has determined that he is not suited for the new line of endeavor. The ten (10) working day period may be extended up to an additional ten (10) working days upon mutual agreement of the Company and the Union. However, should the employee transfer back, he may not be selected for that job for a period of one (1) year or for another opening for a period of six (6) months. If an employee transfers back to his former department pursuant to this subsection, the Company will select the next most qualified candidate (using the criteria in Article 9 Section 2.a.) without reposting the position, unless the original posting is more than ninety (90) days old.

(3) The Company may fill any openings created by expansion of operations by direct hire when employees with the necessary qualifications are not available within the Mill. The Company will meet with the Union regarding the implementation of this paragraph.

(4) Employees selected to fill any full-time salaried classification not in the bargaining unit retain seniority rights for a maximum of six (6) months. If, during the six (6) month period, the employee chooses to return to the bargaining unit, or the Company determines that the employee should be returned to the bargaining unit, he shall be placed in his previous position. If any employee

returns to the bargaining unit from a salaried classification, the employees who are affected by the return will be returned to their former job without loss of seniority.

All Company decisions pursuant to subsection 3, and the selection of candidates as it relates to moving into and out of the bargaining unit in subsection 4, of this Section are without recourse to the grievance and arbitration provisions of this Agreement.

**Section 3. Temporary Openings**

a. Setups shall be used to fill temporary non-mechanic vacancies, should the Company determine there is a need to fill the vacancies. Examples of such vacancies include, but are not limited to, those caused by training, vacations, sickness, and injuries. Setups to a temporary vacancy anticipated to be more than three (3) weeks will be assigned pursuant to the criteria set forth in Article 9 Section 2.a.

b. Job seniority will not accrue when an employee is temporarily assigned to a job.

c.      (1) A temporary shift mechanic vacancy of two (2) working days or less, should the Company determine there is a need to fill the vacancy, will be filled by a shift mechanic in the manner described in Article 14 Section h.

(2) A temporary shift mechanic vacancy which exceeds two (2) working days, or a longer period if deemed necessary, should the Company determine there is a need to fill the vacancy, will be filled by the senior qualified employee from the day crew. If the senior employee(s) decline(s) the opportunity to fill the vacancy, the junior qualified mechanic will fill the vacancy. If the Company determines there is a hardship on a mechanic due to a lack of volunteers from the day crew to fill a shift mechanic vacancy, the Company will seek input from the Union regarding possible alternatives. The Company may then select another junior qualified mechanic to fill the vacancy. The Company may choose, at its discretion, to fill a shift mechanic vacancy which exceeds two (2) working days or longer with a shift mechanic.

**Section 4. Layoffs or Reduction in Force**

a. In case of layoffs or reduction in force, employees, other than mechanics, will be demoted in descending order of their line of progression according to applicable job, line of progression, department and plant seniority. When a non-mechanic employee does not have enough plant seniority to hold a bottom rated level job in his line of progression, he will be demoted into Service Crew and layoffs will be made from the Service Crew on the basis of plant seniority.

b. Employees, other than mechanics, who are laid off because of lack of work or reduction in force and who have been employed for more than sixty (60) working days, shall have the right of reinstatement to the Service Crew without loss of seniority except as noted in this Article, provided they report in person or by certified mail to the Human Resources Office once each calendar month following such layoff, to signify their continued interest in returning to work, and to provide up-to-date contact information (i.e., mailing address, email address, and phone number).

**Section 5. Recalls**

Employees who were laid off from the Service Crew pursuant to Article 9 Section 4 above, shall be recalled to the Service Crew in the reverse order in which they were laid off. Should an employee be moved from his former position due to a reduction in force, the employee will be recalled to his former position in reverse order when an opening occurs unless the Company and the eligible employee agree otherwise.

**Section 6. Terminating Seniority**

Seniority, including recall rights, may be broken by one of the following:

(1) The employee quits.

(2) The employee fails to return to work upon the expiration of a leave of absence pursuant to Article 11.

(3) The employee fails to return from a layoff within the prescribed time when notified by registered mail sent to the employee's last known address.

(4) The employee is laid off for over twelve (12) months or is away from work for over twelve (12) months unless the employee and the Company reach a mutually suitable agreement in writing.

(5) The employee fails to satisfactorily complete his first one hundred twenty (120) calendar days and any extension thereto (known as the probationary period) since his last date of hire.

(6) The employee is discharged for just cause.

**Section 7. Other**

a. It is understood by the parties involved that the Company shall be obligated to meet with the Union Grievance Committee thirty (30) days prior to establishing, modifying, or eliminating lines of progression to fully discuss changes and gather input before implementation.

b. The Company will furnish the Union with a copy of up-to-date permanent job classification lists upon request at six (6) month intervals. A copy of the permanent job classification list will be posted on the Bulletin Board.

**Section 8. Maintenance**

a. If the Company determines that the need exists for a "B" Mechanic, the Company may select qualified candidates from inside the Mill pursuant to the factors listed in Article 9 Section 2a., or from outside the Mill. This may be done with or without posting the position inside the Mill. In order for a candidate to be considered to fill the "B" Mechanic position, the candidate must be able to perform proficiently, on his own, in a primary craft at a level acceptable to the Company, which may be determined based upon factors including, but not limited to, experience, education, and/or testing (both written and practical) at the discretion of the Company. The candidate must also be able to perform as a knowledgeable helper in all other recognized primary crafts.

The Company may choose to select a candidate who does not meet the qualifications of a "B" Mechanic as a "C" Mechanic. For a "C" Mechanic to be considered for advancement to a "B" Mechanic position, the "C" Mechanic must have served at least one year as a "C" Mechanic and performed all tasks at a level acceptable to the Company, and successfully demonstrated the ability to perform proficiently, on his own, in at least one Company-selected primary craft

15

at a level acceptable to the Company. The candidate must also pass a Company-approved outside vocational technical course based on Company-selected primary craft curriculum taken during non-working time, and pass a written and practical qualification test in the same primary craft. Timing for testing is at the discretion of the Company, but shall occur no more than once a quarter. A "C" Mechanic who fails to meet the qualifications for advancement to a "B" Mechanic position during his first two (2) years of employment as a "C" Mechanic shall be subject to termination or transfer to the Service Crew at the discretion of the Company.

If the Company determines that the need exists for an "A" Mechanic, the Company may hire qualified applicants from outside the Mill without posting the position inside the Mill. If the Company chooses to promote a "B" Mechanic, it will use the selection criteria in Article 9 Section 2.a. to select the most qualified candidate for promotion to an "A" Mechanic position. For a "B" Mechanic to be considered for advancement to fill an "A" Mechanic position, the employee must have served at least one year as a "B" Mechanic and performed all tasks at a level acceptable to the Company, and successfully demonstrated the ability to perform proficiently on his own, in at least two Company-selected primary crafts at a level acceptable to the Company. The candidate must also pass a Company-approved outside vocational technical course based on the second Company-selected primary craft curriculum taken during non-working time, and pass a written and practical qualification test in the second primary craft. If he fails to pass the initial written test, he may take the written test a second time after three (3) months. If he fails the second written test, or passes it and then fails the practical qualification test, he may not be considered for an "A" Mechanic position for a period of eighteen months thereafter.

An "A" Mechanic will be required to perform proficiently on his own, in at least two of the recognized primary crafts and will perform as a knowledgeable helper in all of the other recognized primary crafts. He will also be required to burn and weld as accessory skills (not necessarily certified welding, which is recognized as a primary craft).

If the Company determines that the need exists for a "AA" Mechanic, the Company may hire qualified applicants from outside the Mill without posting the position inside the Mill. If the Company chooses to promote an "A" Mechanic, it will use the selection criteria in Article 9 Section 2.a. to select the most qualified candidate for promotion to a "AA" Mechanic position. In addition, for an "A" Mechanic to be considered for advancement to fill a "AA" Mechanic position, the Class "A" Mechanic must have served a minimum of one year as an "A" Mechanic and performed all tasks at a level acceptable to the Company, and successfully demonstrated the ability to perform proficiently, on his own, in at least three Company-selected primary crafts at a level acceptable to the Company. The candidate must also pass a Company-approved outside vocational technical course based on the third Company-selected primary craft curriculum taken during non-working time while an "A" Mechanic, and pass a written and practical qualification test in the third Company-selected primary craft. If he fails to pass the initial written test, he may take the written test a second time after three (3)

months. If he fails the second written test, or passes it and then fails the practical qualification test, he may not be considered for a "AA" Mechanic position for a period of eighteen months thereafter.

A "AA" Mechanic will be required to perform proficiently on his own, in at least three of the recognized primary crafts, and perform as a knowledgeable helper in all of the other recognized primary crafts. He will be required to burn and weld as accessory skills (not necessarily certified welding).

The primary crafts will be as follows:
Electrical
Instrument
Pipe Fitter
Mill Wright
Machinist (including, but not limited to, roll grinding)
Certified Welder
Auto and Diesel Mechanic
Electronics

b. In the event of a mechanic lay off, reductions will take place from the lowest classification first pursuant to the provisions of Article 9 Section 2a. Laid off mechanics will have the option, pursuant to the provisions of Article 9 Section 2a., to enter the Service Crew or accept direct lay off from the Mill. A laid off mechanic, whether or not he entered the Service Crew, will be recalled to his former position, pursuant to the provisions of Article 9 Section 2a., if an opening exists, provided he reports in person or by certified mail to the Human Resources Office once each calendar month following such layoff, to signify his continued interest in returning to work, and to provide up-to-date contact information (i.e., mailing address, email address, and phone number).

c. The Company may require maintenance training during or outside the employee's regular shift. The Company will advise the trainee(s) of the times and dates for any and all training. Mechanics choosing to take vocational technical courses for mechanic advancement will do so during non-working time and will not be compensated by the Company for their time, but the Company will pay the tuition and course material expenses in advance upon approval by the Company. If the mechanic fails to pass the course (i.e., with a grade of C or higher), the mechanic must pay the tuition and course material expenses if he desires to take the course again.

d. The Company will assign oiling duties within the maintenance force if volunteers cannot be obtained.

e.      (1) When mechanics are assigned to both rotating and non-rotating shifts, senior qualified mechanics may twice each calendar year exercise their seniority for assignment to a permanent rotating shift. This election may be made at least two (2) weeks prior to January 1 or July 1, or when a permanent opening occurs on a rotating shift.

(2) In order to be qualified to fill an opening on a rotating shift, a mechanic must be classified "AA" and have at least two (2) years of experience in the Cypress Bend Mill, or be classified "A" in the Cypress Bend Mill for at least two (2) years. A mechanic with less than the required experience may be

17

assigned to a rotating shift for extra coverage or training purposes. Members of the Predictive Maintenance Crew are exempt from filling permanent or temporary shift mechanic openings or vacancies.

## ARTICLE 10
### Hours of Work

(a) Daily and weekly work schedules will be established, eliminated, and assigned by the Company. The daily and weekly work schedules may be modified, for legitimate business reasons, by the Company. Generally, schedules are based on operating requirements, shutdown schedules, fluctuations in demand for products, or to meet other conditions. In no event shall any of the provisions of this Article be construed as a guarantee of the number of hours of work per day, the specific hours to work in a day, the number of days of work per week or the specific days of work in the week, or the number of hours per year, or the number of work days or weeks in the year.

(b) The work week begins on Monday at 7:00 a.m. or at the hour of the employee's shift nearest to 7:00 a.m. The work day begins at 7:00 a.m. or at the hour of the employee's shift nearest to 7:00 a.m. and ends twenty-four (24) hours later.

(c) Both the Company and Union recognize that working overtime is not desirable but agree that overtime worked to fulfill operational requirements and other provisions of this Agreement will be paid for as provided in Article 14, Overtime. However, nothing in this section shall be considered a guarantee of any number of hours worked in any one (1) day or week.

(d)     (1) All employees shall be clocked in and at their respective posts ready to begin work at their scheduled starting time and shall not leave until their designated quitting time and/or they are properly relieved, at which time they must immediately clock out.

(2) On those occasions when an employee is unable to come to work or report on time, the employee must notify first aid at least four (4) hours or, in the case of a personal emergency, as soon as possible prior to the employee's scheduled starting time so that arrangements can be made, if necessary, to replace the employee. Depending on the circumstances and duration of the absence, it may be required by the Company, at its discretion, to have a doctor certify the employee's ability to return to work. In any case, an absence in excess of three (3) working shifts due to medical reasons must be medically substantiated.

An employee who will be absent for more than one (1) working shift must call first aid at least twelve hours prior to his next regular shift to be scheduled back to work.

An employee absent for three (3) consecutive working shifts without prior permission from his supervisor or without having given proper notice to first aid, will be deemed to have quit and will be removed from the payroll.

(e)     (1) Day workers are normally scheduled from 7:00 a.m. to 3:00 p.m., Monday through Friday.

(2) Day Workers will receive one (1) paid thirty (30) minute break each day at some time typically between 11:00 a.m. and 1:00 p.m. The exact time of the break will depend upon the circumstances with the approval of the supervisor.

(f)     (1) Weekly work schedules will be posted by 2:00 p.m. Thursday for the following week. All hours of work, daily and weekly work schedules, shift schedules, etc.

18

may be changed, adjusted or eliminated by the Company. The Union will be notified of any changes, adjustments or eliminations as soon as practical. Any change in weekly work schedules will be for legitimate business reasons.

(2) Employees will be paid bi-weekly. The pay date will be every other Friday. Each employee will receive his pay through direct deposit unless he notifies the Human Resource Manager or his designated representative in writing that he would prefer to receive a check via U.S. Mail. Pay stub information will be accessible electronically. There will be no distribution of paper paychecks or pay stubs at the Mill.

(3) The Company retains the right to modify the current methods for recording work time and the right to implement any new or modified pay system. The Company will notify the Local Unions of any such adjustments as soon as possible.

(g) The Company may schedule mandatory meetings or training during scheduled work days or scheduled off days. Employees are required to attend all scheduled mandatory meetings or training. The Company will not schedule mandatory training of less than four (4) hours on scheduled off days.

## ARTICLE 11
### Leaves of Absence

(a) Leaves of absence for personal reasons of up to ninety (90) days may be granted by the Company for good cause shown, and may be extended up to an additional thirty (30) days if prior approval is granted by the Company not less than ten (10) days before the original leave expires. No such leave will be considered unless the Company receives notice from the employee in writing at least seven (7) days prior to the requested leave date specifying the reason for the request and the length of time off required. No leave will be granted if the Company determines that said leave would interfere in any way with its operations. Any such leave granted under this provision that would also qualify as leave time under the Family and Medical Leave Act shall be considered as leave under both this provision as well as under the Family and Medical Leave Act. The Union will be notified in writing of any such leave in excess of fourteen (14) days. Employees who seek to engage in compensable work during the course of this leave must specifically identify the nature of the compensable work and receive written authorization from the Human Resources Manager or his designated representative prior to the leave being granted. Employees who violate the terms or conditions of their leave of absence shall have no claim to re-employment at the expiration of such leave.

(b) A leave of absence for purposes of working for the International Union may be granted one (1) employee from each Local provided that the request is in writing from the International Union and is for a period not to exceed one (1) year (which may be extended by mutual agreement). The leave of absence must be requested at least one (1) week before the effective date of the leave. The Company must be notified at least one (1) week before the return date of the employee on leave of absence.

(c) Requests for time off for Union Business must be approved in writing by the Human Resources Manager or his designated representative at least one (1) week in advance of the requested absence or immediately after becoming aware of the need, if less than one (1) week. Requests will not be denied unless business needs dictate.

(d) Employees will be granted a leave of absence to serve in the Armed Forces of the United States and will be restored to employment in accordance with provisions of

19

Federal law. Employees will request such leave in writing at least two (2) weeks prior to the beginning of the leave, if possible.

(e) An employee who uses a leave of absence as a subterfuge, who engages in compensable work not contemplated in the previous sections of this Article, or obtains other employment while on leave of absence, who fails to provide the notices required under the leave of absence, or who fails to report to work upon the expiration of a leave, shall forfeit all seniority rights as well as his job without recourse to the grievance and arbitration provisions of this Agreement.

## ARTICLE 12
### Wages

a. The following wage rate schedule is effective in the first full pay period beginning after August 1, 2019:

|  | Effective August 2019 | Effective August 2020 |
|---|---|---|
| **MAINTENANCE:** | | |
| AA Mechanic ............... | 37.20 | 37.94 |
| A Mechanic ................. | 34.72 | 35.42 |
| B Mechanic ................. | 32.29 | 32.94 |
| C Mechanic ................. | 29.66 | 30.25 |
| Tool Room Attendant ... | 30.94 | 31.56 |
| Maintenance Helper ... | 23.16 | 23.63 |
| | | |
| **UTILITIES:** | | |
| Operator A ................. | 37.20 | 37.94 |
| Operator B ................. | 32.88 | 33.54 |
| Operator C ................. | 30.11 | 30.71 |
| Operator D ................. | 27.26 | 27.81 |
| Operator E ................. | 23.60 | 24.07 |
| Department Utility........ | 21.35 | 21.78 |
| | | |
| **PULP MANUFACTURING:** | | |
| Pulping Operator ............... | 37.20 | 37.94 |
| Pulping Asst Operator ........ | 32.88 | 33.54 |
| Chemical Plant Operator*... | 32.35 | 33.00 |
| Chemical Plant Operator ... | 30.59 | 31.20 |
| Woodyard Operator .......... | 23.64 | 24.12 |
| Pulp Utility ................... | 21.35 | 21.78 |
| Recaust Plant Operator ...... | 30.59 | 31.20 |
| Recaust Asst Operator ...... | 28.24 | 28.81 |
| Recaust Utility ................. | 21.35 | 21.78 |
| Material Handler* ............... | 28.09 | 28.65 |
| Material Handler ................. | 25.74 | 26.26 |

20

|  | Effective<br>August 2019 | Effective<br>August 2020 |
|---|---|---|
| **BOARD MANUFACTURING:** | | |
| Machine Tender A  ........ | 37.20 | 37.94 |
| Machine Tender B  ........ | 37.20 | 37.94 |
| Back Tender  ……….... | 33.48 | 34.15 |
| Coater Operator  ........... | 31.83 | 32.47 |
| Rover  ........................... | 30.18 | 30.79 |
| Quality Tester  .............. | 28.12 | 28.68 |
| Winder Operator .......... | 27.54 | 28.09 |
| Winder Asst ................ | 27.03 | 27.57 |
| Fifth Hand  ................. | 26.19 | 26.71 |
| Sixth Hand  ................... | 23.45 | 23.92 |
| Seventh Hand  ............. | 23.19 | 23.66 |
| Eighth Hand  ................. | 22.01 | 22.45 |
| Machine Furnisher  ....... | 30.60 | 31.21 |
| Machine Furn. Asst. ...... | 26.17 | 26.70 |
| Department Utility  …….. | 21.35 | 21.78 |
| | | |
| **EXTRUDER & SHIPPING:** | | |
| Extruder Operator  ....... | 30.04 | 30.64 |
| Extruder Asst. Op.  ...... | 28.08 | 28.64 |
| Extruder 1st Helper  .... | 26.41 | 26.94 |
| Extruder 2nd Helper .... | 25.40 | 25.91 |
| Extruder 3rd Helper  .... | 23.00 | 23.46 |
| Department Utility–Ext.. | 21.35 | 21.78 |
| Shipper  ....................... | 28.98 | 29.56 |
| Shipper 1st Helper ....... | 25.40 | 25.91 |
| Shipper 2nd Helper ...... | 22.80 | 23.25 |
| Department Utility-Ship.. | 21.35 | 21.78 |
| | | |
| **STORES:** | | |
| Issue/Receiving Clerk ... | 27.02 | 27.56 |
| Department Utility  ....... | 21.35 | 21.78 |
| | | |
| **SERVICE CREW:** | | |
| Service Crew A ............. | 18.40 | 18.77 |
| Service Crew B ............. | 15.92 | 16.24 |
| Student  ......................... | 13.96 | 14.24 |

* Applies only to employees who transferred to the department prior to August 1, 2012.

b. When a new job is created, the Company shall meet with the Union involved to discuss the new job and receive from the Union their suggestions as to the appropriate rate of pay and crew size. The rate then agreed to or the highest rate offered by the Company at that time shall be made retroactive as the Company and Union shall agree and it shall become a part of the wage schedule. If no agreement is reached, the rate set by the Company will be paid until the next contract negotiations. If a change is then negotiated in the rate, retroactive applications will be as agreed upon by the parties. In either instance of retroactivity the proper adjustment will be made to all employees who have worked on the job. The establishment of wage rates, adjustments, or wages will not be a subject for arbitration.

c. Rates When Moved From Regular Job.

(1) Except as described in section d. of this Article, whenever employees are moved from their regular job to a higher rate job, they shall receive the higher rate. Employees shall be deemed to be moved to a higher rate job when they take over the duties and responsibilities of that job without the guidance of the employee who is breaking them in, and they shall then receive the higher rate. While the employees are being broken in and another employee is on the job and carrying the responsibility for the job, the employees being broken in shall receive the hourly rate of their regular job.

(2) Except in the situation described in paragraph (3) of Article 9 Section 2a., when an employee is temporarily moved from his regular job to a lower rate job, the employee shall receive his regular job rate during that period.

d. Service Crew Jobs.

(1) A probationary Service Crew employee will be paid the Service Crew B rate while working in the Service Crew. If a probationary Service Crew employee is assigned to a department, he will be paid the Service Crew A rate, including when the employee is set up to the bottom job in the line of progression. A post-probationary Service Crew employee will receive the Service Crew A rate, whether the employee is working in the Service Crew or is assigned to a department, including when the employee is set up to the bottom job in a line of progression. A Service Crew employee with ten (10) months of service or more with the Company as a permanent employee will be paid as if he were permanently assigned to the Department where he is working, if he is assigned to a Department.

(2) If the Service Crew employee is set up more than one job above Utility in a Department, and he takes over the duties and responsibilities of that job without the guidance of the employee who is breaking him in, he will be paid at the rate of the higher job.

e. Board Manufacturing Line of Progression Jobs.

Article 9 Section 2.b.(1)(c) will not be applicable to employees above the Sixth Hand position. Instead, if employees in those positions bid out of the Department, the Company will release at least three (3) employees who bid out per twelve (12) month rolling period to move to those positions in accordance with Article 9 Section 2.a.

## ARTICLE 13
### Shift Differential

(a) Employees working an assigned shift other than twelve (12) hour shall be paid a shift differential of thirty cents ($.30) per hour for the second shift and forty-five cents ($.45) per hour for the third shift.

(b) Employees working a twelve (12) hour shift shall be paid a shift differential of eighty-five cents ($.85) effective in the first full pay period after ratification of this Agreement, and ninety cents ($.90) effective in the first full pay period beginning after August 1, 2018, for work on the night shift.

(c) Shift differential shall be paid only on hours actually worked and shall be used in calculating premium pays.

## ARTICLE 14
### Overtime

a. Time and one-half shall be paid for the following:

(1) All time worked in excess of the employee's scheduled shift.

(2) All time worked by Day Workers consecutively in excess of eight (8) hours.

(3) All time worked by Tour Workers consecutively in excess of twelve (12) hours.

(4) All time worked in excess of forty (40) hours in any one (1) work week.

(5) All time worked on the recognized holidays as listed in this Agreement.

(6) The first shift following a change in the employee's starting time where the employee did not receive at least fifteen (15) hours notice.

b. Overtime will be paid on the basis of Section a.(1), (2), (3), (4), (5) or (6), whichever is greatest, but will not be paid on more than one.

c. The Company will not reschedule an employee to avoid the payment of overtime.

d. It is the intent of the Company that no employee work in excess of sixteen (16) hours consecutively. However, if any employee is asked to work in excess of sixteen (16) consecutive hours, the employee will have the option to accept or reject the work assignment.

e. The Company and the Union recognize the maintenance work load is a variable factor and, to maintain the Mill and equipment, mechanics are required to work a reasonable amount of overtime and accept call-outs.

f. With regard to maintenance call-outs, the following shall apply:

1. In order to ensure coverage of call-outs throughout the work week, as defined in Article 10(b), the Company will create multiple lists of mechanics during the first week of April each year, taking into account the vacations scheduled pursuant to section f of Article 20. Each week, the mechanics on one (1) of the lists shall be required to accept call-outs. The lists shall rotate each week throughout the year. Mechanics will be allowed to trade positions on the lists with supervisor approval. A shift mechanic may opt out of the pager list when he accepts a permanent rotating shift.

2. A phone number or Company provided pager at which each of the listed employees may be reached at any time must be provided by each

23

employee on the list. Employees on the list will receive two hours of straight time pay for the week. Employees on the list who fail to respond and accept a call-out within twenty-five (25) minutes of the call shall be subject to discipline.

3. In the event that the Company's needs are not met after calling each employee on the pager list, the Company will call the remaining mechanics until its needs are met. When the Company determines a specific need exists, the Company will call mechanics who meet the specific need. In a situation of general need, the Company will call mechanics in order based on the criteria listed in paragraph g. of this Article. If, after calling all mechanics one (1) time, the Company's needs are still not met, the Company may call other employees or outside contractors without regard to the requirements of Article 24.

4. The caller will identify himself when using the phone to call out mechanics.

g. With regard to scheduled and unscheduled overtime, the following general guidelines shall apply:

1. Mechanics shall be assigned to one of the following four (4) areas: Utilities, Board Mill, Pulp Mill and General. Assignment changes will be communicated to the Union in advance. In each group, mechanics are qualified in two (2) categories: Mechanical, and Electrical and Instrument (E&I).

2. In each area, if overtime is required that cannot be filled with qualified area volunteers, it will be assigned to the qualified area mechanic(s) that has worked the least amount of overtime hours. If additional mechanics are required to fill the overtime that cannot be filled with qualified millwide volunteers, it will be assigned to the qualified millwide mechanic(s) that has worked the least amount of overtime hours. The hours calculation will be zeroed effective the first week of each quarter.

3. These guidelines are not intended to cover every specific situation. There may be a need to deviate from these guidelines due to shutdown preparation or work, specific knowledge or skills, or the need to adjust to an individual's circumstances. Deviations will be communicated to the Union.

h. Twelve (12) hour production Tour Worker vacancies, deemed necessary to fill, which cannot be filled per Article 9 Section 3a., and temporary shift mechanic vacancies of two (2) days or less, deemed necessary to fill, will be filled with overtime, as follows:

1. The short off employee returning to the job where the vacancy exists will be responsible for covering vacancies known about in time to be scheduled. In the event of a scheduling conflict, such as the overtime occurring on nights when the short off employee is to begin days the next day, the long off employee returning to the job will be required to cover the vacancy (the long off is considered the employee who is off for the long time period (seven (7) days), and the short off is off the lesser time). No short off employee will be eligible to fill the vacancy if said scheduling conflict would prevent them from working their own shift.

2. Vacancies not known about in time to be scheduled will be filled using the following procedure:

a. First, the employee not receiving relief will be offered the opportunity to work sixteen (16) hours.

b. Next, the short and then the long off employee returning to the job where the vacancy exists will be offered the opportunity to fill the vacancy.

c. Next, the short and then the long off employees who are qualified to perform the vacant job in descending order from where the vacancy exists.

d. Next, the supervisor will notify the shift employee designated by the Local Union to help fill the vacancy. In the case of a shift mechanic vacancy, the on-duty person will call in a mechanic from the pager list.

e. Finally, there will be at least one employee in each production line of progression assigned a pager on his seven (7) day off time period. The employee(s) will change each month starting with the top job and going down the line in descending order. The employee(s) carrying the pager will fill the vacancy. This pager system will not be used unless the Company determines it is necessary.

In the event of a scheduling conflict, such as the overtime occurring on nights when the short off employee is working days, the short off employee can only be called in case of emergency if working the overtime would prevent said employee from completing his regularly scheduled shift without going over sixteen (16) consecutive hours. This paragraph applies not only to filling vacancies, but also for extra help. Employees cannot be scheduled or called in more than four (4) hours before their regularly scheduled twelve (12) hour shift absent an emergency. In emergency situations in which employees with a scheduling conflict must be called, they should be called in descending order from the job being vacated.

All employees are required to remain on the job until they have received a relief or worked sixteen (16) hours.

## ARTICLE 15
## Call Time

a. A Day Worker who is called in to work at a time other than his scheduled reporting time, or after having punched out with authorization from his supervisor or his supervisor's designated representative shall receive two (2) hours straight time pay in addition to the time paid for the actual hours worked [minimum of four (4) hours straight time]. A mechanic, when called to work, may be assigned to additional work in the area of the Mill which he was called. The areas include Utilities, Board Mill, Pulp Mill, Shipping/Extruder, and General. A maximum of one (1) additional two (2) hour straight time payment will be made to the mechanic if he is assigned additional work outside the area of the Mill to which he was originally called.

b. A Tour Worker who is called in to work pursuant to Article 14h.2. will receive five (5) hours straight time pay in addition to the time paid for the actual hours worked for the night shift and three (3) hours straight time pay in addition to the time paid for the actual hours worked on the day shift.

c. Day and Tour Workers called in for extra help on any shift will receive two (2) hours straight time pay in addition to the time paid for the actual hours worked.

25

d. When called in to work, the Company has the right to assign an employee to any work needed while at work.

e. Tour Workers required to attend meetings scheduled on off days pursuant to Article 10(g), with less than one (1) week notice, will be paid three (3) hours call time.

f. Only actual hours worked will be counted as time worked for the purpose of computing overtime.

g. With the exception of sections b. and e. above, Call Time pursuant to this Article shall not be paid in cases where at least fifteen (15) hours notice has been given to report.

## ARTICLE 16
### Reporting Pay

An employee reporting for scheduled work when no work is provided shall receive four (4) hours pay at the straight time hourly rate unless notified at least two (2) hours prior to the beginning of the scheduled shift or unless notice has been posted prior to the end of the employee's last scheduled shift. Employees reporting for work and actually commencing work shall receive not less than four (4) hours pay at the straight time hourly rate. Only hours worked will be used in computing overtime. In the case that the lack of work is due to conditions beyond the control of the Company there shall be no reporting pay.

## ARTICLE 17
### Jury Duty Pay

a. A regular employee who is required to perform jury duty or subpoenaed as a witness not adverse to the Company will be reimbursed at the straight-time hourly rate of his scheduled job for hours necessarily lost as a result of serving on a jury or as a subpoenaed witness not adverse to the Company. Such reimbursement shall not exceed the employee's scheduled hours for that day or forty (40) hours for that work week, less the pay received for jury duty or witness service.

b. An employee to be eligible for pay under this Article must report to the Company immediately upon being released at any time from jury or witness service in order to be assigned the next reporting time for the resumption of his working schedule.

c. An employee serving jury duty or witness service who is required to report to court and is released for any reason on the same day shall not receive more than one shift off work.

d. The employee is required to furnish a signed statement from a responsible officer of the court as proof of jury or witness service and jury duty or witness pay received.

e. The Company retains the right to request that the employee be excused from performance of jury duty.

f. Any pay hours received pursuant to this Article shall be counted as hours worked for the purpose of computing overtime.

## ARTICLE 18
### Funeral Pay

When death occurs to a member of a regular employee's immediate family, the employee shall be granted an appropriate leave of absence and shall be compensated at his scheduled straight time rate of pay for his scheduled hours of work for three (3)

consecutive days, one (1) day of which must be the day of the funeral, subject to the following limitations:

1. Members of an employee's immediate family are limited to the employee's mother, mother-in-law, father, father-in-law, brothers, sisters, grandparents, spouse's grandparents, grandchildren, brothers-in-law, sisters-in-law, sons-in-law, daughters-in-law, step-mother, step-father, and stepchildren. Proof of relationship may be required.

2. No compensation will be granted when the employee does not attend the funeral.

3. Scheduled hours not worked shall be counted toward computing weekly overtime.

4. Pay will be granted for only those days which were lost from the regular schedule and the employee was not receiving pay under another provision of this Agreement.

5. In the event of the death of an employee's child, stepchild or spouse, the maximum compensated leave of absence will be for five (5) consecutive days. All of the other provisions of this Article are considered applicable to this situation.

If an employee needs additional time off due to the death of a family member, the Company will consider additional time off pursuant to the terms of Article 11 of this Agreement.

## ARTICLE 19
### Holidays

a. The following fourteen (14) holidays are designated as paid for Regular Employees:

| | |
|---|---|
| New Year's Day | Day After Thanksgiving |
| Easter Sunday | Day Before Christmas |
| Memorial Day | Christmas Day |
| Independence Day | Day After Christmas |
| Labor Day | Personal Floating Holidays (4) |
| Thanksgiving Day | |

Regular Employees will be scheduled off on these holidays consistent with the Mill schedule and the needs of their respective departments, except as noted below.

Request for the Personal Floating Holiday must be made in writing by the employee at least thirty-six (36) hours in advance unless the employee and the Company agree to schedule such holiday on shorter notice. All requests are subject to the approval of the supervisor. It is understood that Personal Floating Holidays will not take precedence over full week vacations. If an employee is required to work on a Personal Floating Holiday after a date has been approved for such holiday, the employee shall be paid time and one half for such work and will then be entitled to take the said holiday with pay at a later date to be mutually agreed upon.

b. Regular Employees will receive scheduled hours holiday allowance at the straight time hourly rate of his scheduled job classification for Personal Floating Holidays.

c. Regular Employees will receive eight (8) hours holiday allowance pay at the straight time hourly rate of his current job classification, unless he is scheduled to work the holiday as of the posting of the schedule on Monday at 7:00 a.m. of the holiday work

week, in which case he will receive the rate of the job listed on that schedule (see Article 12.a.), for the remaining holidays provided that:

(1) The employee is on the payroll as of the date of the holiday; and

(2) The employee worked his scheduled workday before and his scheduled work day after such holiday unless the employee is prevented from doing so (i) because of a leave of absence occasioned by an industrial accident at our Mill, which is recognized as such by the Arkansas Workers' Compensation Commission, and is drawing temporary total disability payments on the holiday in question, or (ii) the employee is (a) off due to an approved vacation, (b) off on a leave of absence for Funeral Leave or Jury Service, or (c) excused by the Company.

d. Holiday hours paid but not worked by Day Workers shall count as hours worked for the purpose of computing weekly overtime, provided the holiday falls on the employee's scheduled work day.

## ARTICLE 20
### Vacations

a. A basic requirement for eligibility for vacation is the working of a minimum of 1040 hours during the year preceding the employee's last vacation anniversary date. During the first year of absence due to time lost as a result of a compensable injury in our Mill and recognized as such by the Arkansas Workers' Compensation Commission an employee shall be credited for eight (8) hours per day with a maximum of forty (40) hours per week toward the 1040 hours.

Hours of pay received as jury duty pay, vacation pay, funeral pay, and holiday pay shall be counted in computing the 1040 hours. Union business, as agreed to by the Company, up to an employee's scheduled hours not worked, will be counted in computing the 1040 hours.

The vacation anniversary date is the anniversary of the employee's last date of hire.

The following schedule shows the relationship between years of continuous service since last date of hire and vacation weeks:

| Years of Service | Weeks Vacation |
|---|---|
| 1 year | 1 week |
| 3 years | 2 weeks |
| 8 years | 3 weeks |
| 12 years | 4 weeks |
| 18 years | 5 weeks |
| 25 years | 6 weeks[1] |

b. Vacation pay will be forty-seven (47) hours or 1.7% of total wages in the preceding calendar year, whichever is greater, per vacation week at the employee's regular straight-time hourly rate of pay for his job classification (see Article 12.a.). No shift differential shall be included in this calculation. Any vacation time taken will not constitute hours worked for the purposes of calculating overtime. Vacation pay will be paid in the pay period immediately following the beginning of the vacation period.

---

[1] All employees hired after July 31, 2009 shall not be eligible for vacation in excess of five (5) weeks per year.

c. Any employee who is absent from work due to disability and qualifies for Workers' Compensation benefits or Weekly Indemnity benefits under the Company's insurance program may request in writing and shall receive vacation pay entitlement for all unused vacation for which he was eligible up to the last vacation anniversary date.

d.      (1) Vacations may not be carried over from vacation year to vacation year. If an employee has reached an anniversary date and met other qualifications but has not taken vacation, the employee will be paid for the unused vacation.

(2) Vacation pay for employees who terminate for retirement, death, permanent or total disability or military service or who give a minimum of two (2) weeks notice of voluntary termination will be that proportionate part of the vacation pay accumulated during the current year. Employees who are discharged or who voluntarily terminate without providing a minimum of two (2) weeks notice, not to include vacation time, are not covered under this paragraph.

e. Although the Company retains the right to schedule all vacations, the intent of the vacation policy is to give employees a choice of vacation times. Vacation may be taken from Monday to Monday or shift to shift providing they do not overlap on the same shift. Vacation weeks may be granted consecutively if operational requirements allow.

All workers may schedule up to two (2) weeks of vacation to be taken one (1) day at a time. The employee will receive pay for an individual vacation day in the pay period in which it is taken. It is understood that one day vacations will not take precedence over full week vacations.

Request for these vacation days must be made in writing by the employee at least seven (7) days in advance, but prior to noon on Thursday of the preceding week, unless the employee and the Company agree to schedule such vacation on shorter notice. All requests are subject to the approval of the supervisor. The requesting employee shall receive written notice of the disposition of the request approximately seventy-two (72) hours prior to the day requested.

f. Employees must schedule their seniority vacations between January 1 and March 1 of the year in which they desire to take the vacation. The Company has the right to schedule a shutdown(s) for any reason, maintenance or otherwise. The Company will attempt to provide as much notice to the Union and the employees as possible. The Company reserves the right to schedule vacation during said shutdown(s) for some or all employees. An employee will be allowed to exercise his seniority on only one (1) vacation per year, which must be at least one full week, but not more than two (2) consecutive weeks. The employee may choose to protect the off days either preceding or following this one vacation. Seniority may be exercised on one (1) additional vacation each year only after all other employees in the department have had an opportunity to exercise their preference by the above procedure. A bargaining unit employee's vacation will not be canceled by a supervisor's vacation.

It is understood that the word "seniority" in the above paragraph means that the vacations will be scheduled as follows:

Production Employees
1—Department seniority, and if equal, by
2—Job seniority, and if equal, by
3—Plant seniority.
Maintenance Employees

1—Job seniority, and if equal, by

2—Plant seniority.

g. After the closure date of March 1, available vacation time will be scheduled on a first come, first served basis rather than the basis of seniority. If an employee fails to schedule his vacation prior to sixty (60) days of his anniversary date, the Company may schedule the vacation.

h. An employee is allowed to take vacation pay in lieu of time off for all vacation eligibility in excess of two weeks.

## ARTICLE 21
### Employee Benefits

The Company will offer eligible employees a choice of medical benefits programs as outlined in the benefits summary. The Company may select alternate medical providers so long as there is no overall reduction in benefit levels. The Union will be advised of any changes prior to implementation. The Company may also make additional plan options available to employees, after receiving input from the Union. The Company will notify the union in advance of any necessity to implement plan changes or additional plans to comply with administrative requirements and/or legal requirements in accordance with the Patient Protection and Affordable Care Act, as amended (PPACA), or to avoid excise taxes called for under PPACA.

The initial "Base Plan" will be a high deductible preferred provider organization (HDHP PPO) plan. Employees will be allowed to "buy up" to a traditional deductible PPO plan by paying the difference between the cost of the lower deductible plan and the "Base Plan". The initial plans will be a four (4) tier structure and will include a spousal surcharge ($75 per month for Base Plan, $125 per month for traditional deductible plan) for working spouses with other coverage options.

Employees with other coverage options (e.g., coverage under a spouse's or parent's plan) may choose to "opt out" of the Company medical benefit program by providing proof of coverage under another plan. An employee who chooses to opt out will receive a $200 monthly stipend from the Company upon a showing of such proof of coverage in accordance with Company requirements. Each year, the Company reserves the right to modify or discontinue this provision if it is determined to be creating a negative impact on the remaining employees in the Plans.

The employee contributions will be as follows:

| Plan | Employee Premium Share |
|---|---|
| High Deductible Health Plan (Base) | 13% |
| Traditional Deductible Plan | 20% |

Medical costs will be reviewed each year and adjusted January 1 each year of the Agreement per this schedule. The Company will review these costs with the Union prior to open enrollment during the fall of each year. Premium payments will be withdrawn on a pretax basis.

The Company will provide a life and accidental death and dismemberment insurance policy with a benefit of $51,000. The Company will provide Accident and Sickness (A&S) Weekly Indemnity benefit of $420 per week. Beginning in January 2017,

30

the benefit will increase to $435 per week. Beginning in January 2019, the benefit will increase to $445 per week. Employees will be allowed a maximum of 26 weeks off in a rolling 52 week period. The Company will provide a 60% long-term disability insurance benefit to employees who are not participating in the Company pension plan.

The Company will provide employees access to optional, employee-paid flexible spending accounts and supplemental life and accidental death and dismemberment insurance, through payroll deduction as described in a separate document. The Company agrees to make payroll deduction for a single optional employee-paid supplemental A&S policy chosen by the Union. The Company will provide access to an optional, employee-paid 60% long-term disability insurance policy to employees who remain in the Company pension plan.

### ARTICLE 22
### Retirement Plans

1. Pension:

The Company will maintain the current pension program for all remaining participating employees subject to the terms and conditions of the Pension Plan. The benefit level will remain at $50 per month per year of credited service through July 31, 2009. The benefit level will remain at $45 per month per year of credited service beyond August 1, 2009.

All remaining participants will have a one-time opportunity to opt out of the pension program on January 1, 2018 by making such election on or before September 1, 2017. For those remaining participants who opt out of the pension program, their benefit accrual will be frozen as of December 31, 2017 at $50 per month per year of service thru July 31, 2009 and $45 per month per year of credited service from August 1, 2009 thru December 31, 2017. Remaining participants will continue to accrue age and service for purposes of vesting and early retirement eligibility only.

2. 401(k) Savings Plan:

a.   A participating employee who remains in the current pension program will receive a Company matching contribution to the 401(k) Savings Plan of 55% of a maximum of 6% of the employee's contribution. A participating employee who chooses to opt out of the pension program will receive a Company matching contribution to the 401(k) Savings Plan of 55% of a maximum of 6% of the employee's contribution until December 31, 2017, at which point he will transition to the program described in paragraph b. of this Section.

b.   A participating employee who chose to opt out of the pension program in 2012, all employees hired after August 1, 2012, and, effective January 1, 2018, a participating employee who chose to opt out of the pension program in 2017, will receive the following 401(k) benefit:

1.   The Company's matching contribution to the 401(k) Savings Plan will be 70% of a maximum of 6% of the employee's contribution;

2.   The Company will make an automatic contribution (regardless of the employee's contribution, if any) of three and one half percent (3.5%) of the employee's compensation; and

c.   Company contributions will be 100% vested once the participant has two (2) years of vesting service with the Company.

31

      d.      An eligible participant may make a pre-tax contribution to the 401(k) plan in one percent (1%) increments of his compensation, up to twenty-five percent (25%) of his compensation.

      e.      The 401(k) Savings Plan will permit one loan at a time and hardship withdrawals per IRS regulations on the employee's contributions. The 401(k) Savings Plan will not permit loans or hardship withdrawals on Company contributions.

      f.      The 401(k) Savings Plan will offer a Roth option.

      g.      A new hire employee will be automatically enrolled in the 401(k) Savings Plan with a three percent (3%) employee contribution after ninety (90) calendar days of employment, unless the employee opts to change or eliminate his contribution.

## ARTICLE 23
## Safety

The Company and the Union recognize the desirability and importance of a safe work place. To further this:

**Section A – General Obligations**

1. The Company will provide safe conditions of work for its employees, and will comply with all applicable laws and regulations concerning the safety of employees at work. The Company, the Union, and the employees will cooperate in preventing occupational injuries. The Company retains the right to take unilateral action to ensure workplace safety whenever necessary.

2. Reasonable efforts will be made by all to maintain all equipment in safe condition.

3. All employees will comply with established safety rules and safe operating procedures.

**Section B – Safety Committees**

1. There shall be a Joint Safety Committee (JSC) in order to promote and improve safety performance at the Mill. The JSC will be composed of one (1) hourly employee from each Production area (i.e., Board, Pulp, Extruder/Shipping, and Utilities) of the Mill and from Maintenance, as well as an equal number of designated members from Management. The JSC will meet at least monthly. The JSC will designate monthly meeting dates and times. Special JSC meetings may be scheduled when circumstances warrant. The Departmental Safety Committee (DSC) chair from each area, or his designated representative from that DSC, will be the representative on the JSC and will be required to attend all meetings. The Mill Manager and the Local Union Presidents may serve as ex-officio members of the JSC at their discretion.

2. There shall be Departmental Safety Committees (DSCs) that will meet at least monthly to resolve departmental safety issues and improve departmental safety efforts. The DSCs will report and make recommendations to the JSC when needed. The hourly members of the DSCs, including the chair, will include a representative from each shift (or in the case of Maintenance, from each crew), and will be required to attend each meeting, or to designate an alternate employee who will be required to attend in the place of the member in the event that member is unable to attend. The Department Superintendent, or his designated representative, shall attend the meetings. Special meetings of the DSC may be scheduled when circumstances warrant.

3. Minutes will be taken at all DSC and JSC meetings by the respective Committee chair or his designated representative. DSC Minutes will be jointly distributed by the Department Superintendent and the DSC Chair. JSC Minutes will be jointly distributed by the Safety Manager and the JSC Chair. The Minutes will include any recommended action items.
4. The Company will make available to the JSC, upon request, all non-protected/non-confidential information needed to perform their responsibilities.
5. The Local Union President or his designated representative and/or the DSC Chair will be advised of any reported accidents and/or injuries as soon as possible and will participate in investigations of those incidents.
6. All time spent on DSC and/or JSC committee-related activities approved by the Company will be considered hours worked and compensated by the Company.
7. The Local Union Presidents will appoint the hourly members to each DSC.

**Section C – Workplace Safety Audits**
1. The Company, through its committee system, conducts various audits in an effort to provide a safe work place. The JSC will provide input regarding the selection of audit team members.
2. Audit results will be available to the JSC and the Local Union Presidents upon request.
3. Upon the completion of audits, the Department Superintendent, or his designated representative, will make priority assignments after the DSC chair or his designated representative has been provided an opportunity to provide input.
4. Random audits, including departmental, may be conducted under the direction of the JSC.

**Section D – Unsafe Conditions, Reporting Injuries, Incidents, or Accidents**
1. An employee is required to report unsafe conditions, injuries, incidents, or accidents to a supervisor as soon as he becomes aware.
2. Should an employee raise a concern about a safety issue due to working on a new or modified piece of equipment, or while following a new operating procedure, the employee should unilaterally bring this to the attention of his supervisor and the Safety Manager. The Safety Manager or his designated representative will look into the situation to resolve the issue. The Local Union President will also be advised of this situation. All employees are expected to comply with the Safety Manager's determination.
3. The Company will not discipline or discriminate against an employee just because the employee suffered and/or reported an injury or accident. This provision shall not prevent or protect employees from discipline for rule and/or policy violations or for failure to report an injury or accident on a timely basis.

**Section E – Personal Protective Equipment**
1. The Company will provide necessary personal protective equipment when required by law or regulation, or when necessary to protect employees from illness or injury.
2. Safety glasses and safety shoes will be provided as follows:
    a. Plain safety glasses will be provided to those employees who do not require prescription glasses.

33

    b.  The Company will provide prescription safety glass for those employees who require them per the Prescription Safety Glasses guidelines.

    c.  The Company will pay for replacement glasses (1) if the prescription changes or (2) if there is reasonable proof that the glasses were damaged in the performance of duties at the plant.

    d.  The Company shall pay up to $5.00 for the cost of the initial adjustment of prescription safety glasses purchased through the Company.

3.  Each employee will receive a maximum allowance of $200 per year on the purchase of safety shoes purchased through the Company-sponsored system. Beginning in August 2017, the maximum allowance will be $210.

## ARTICLE 24
### Miscellaneous

(a) The Local Unions shall furnish the Company with a written list of Union offices, officers, stewards, and committee persons.

(1) The Company recognizes the right of the Union to designate job stewards for each shift. Stewards shall not leave their work station without approval of their supervisors. Stewards are governed by the same rules of conduct as any other employee at any time when, or any place where, the Company is conducting business. In that regard, stewards who are acting in that capacity, such as in the processing of a grievance, must comply with all Company policies, rules and regulations, including refraining from the use of abusive language or other inappropriate behavior. In the event an employee desires to have a steward present during a disciplinary meeting, the Company agrees that it will grant such request.

(b) Bulletin Boards. The Company shall provide a bulletin board in each department which will be used by the Union for posting official notices of Union meetings, Union elections and the election results, and notices of recreational and social events. Employees shall not post items or any other information or messages in any manner at any other location on Company owned or leased property. Employees may, however, attach USW logos to their personal property (e.g., tool boxes, hard hats, lunch boxes).

(c) Union Officers' Access to Plant.

(1) Local Union officers, shop stewards, and committee persons may enter the Mill premises at times other than their regular working hours whenever the business of the Union shall require, provided that they shall not interfere with the Company's business or operations. Said employee shall be required to obtain approval from the Human Resources Manager or his authorized representative.

(2) International Representatives of the Union shall be permitted to visit the Mill upon request to and approval of the Human Resources Manager or his authorized representative.

(d) Routine maintenance work which is normally performed by Mill maintenance personnel will not be contracted out provided the number of qualified Mill maintenance personnel, the necessary skills, and the necessary tools and equipment to do the maintenance work in the time required are available in the Mill. In the event that work is contracted out for lack of skill or necessary tools, the Company may assign Mill maintenance personnel with the contractor for the purpose of training to perform this work

34

if the work is of a nature which could reasonably be expected to be performed by Mill maintenance personnel in the future.

If an outside contractor is working on the Mill site, it is understood that, in the performance of its contracted work, the outside contractor may be called upon to perform some duties that could or normally may be performed by Mill maintenance personnel, provided the contractor will not work more hours than the area mechanics are offered for that work week. In the case of a shutdown, the contractor will not work more hours than the area mechanics are offered for that work day. The Company will make every effort to notify the Union as soon as practical if a contractor will be working at the Mill.

(e) While it is not considered work of a maintenance nature, the Company may choose to require that small jobs of installing additional equipment be performed by Mill maintenance personnel where we have the number of qualified Mill maintenance personnel and the necessary tools and equipment to perform the work within the time limits required. Otherwise, such work may be contracted to outside contractors.

(f) Shift Trading—Tour workers may, with the consent of the supervisors, mutually agree upon an exchange of shifts or a part of a shift for their mutual convenience. Day workers may, with the consent of the supervisors, trade shifts or part of a shift with themselves for mutual convenience. Shift trading shall not result in the payment of overtime and shall be accomplished within the same week.

(g) The Company recognizes its responsibility to train employees in each line of progression for the purpose of filling Company designated openings and making promotions in accordance with Article 9 Section 2.a.

(h) Production employees may do maintenance work and maintenance employees may do production work if the Company determines that such crossover of employees is desired for efficiency or other legitimate business related reasons and the employee is deemed capable to perform the assignment.

(i) An employee upon request may review, in the presence of a representative of Human Resources, his complete personnel record. The employee may request that a Local Union representative be present.

(j) The Company will reimburse eligible maintenance mechanics up to $265 per calendar year beginning in January 2017 for each mechanic for the purchase of tools necessary to perform their duties at the mill. Eligibility is determined based upon a review of each mechanic's tools by each mechanic's supervisor. In addition, to be eligible for reimbursement, each employee must purchase the tool(s) from a source other than the Company and must provide a detailed receipt for each tool purchased to his supervisor. When tool(s) purchased under this subsection require replacement because of loss of or damage to the tool(s) due to the employee's negligence, the employee who purchased the tool(s) will acquire such replacement at his own expense.

(k) All items received through Storeroom shall be unloaded first by Storeroom personnel if Storeroom personnel are on site and deemed available by the Company. Otherwise, the Company may require other employees to unload items.

(l) The Company may install and use video cameras in the workplace for the purposes of monitoring equipment, processes, security, and for environmental purposes, including in areas where employees may frequently be present. Cameras will not be installed in areas so as to violate the privacy rights of employees, such as restrooms and breakrooms. The Company and Union agree that the Company may install and the parties

35

may use the video cameras, videotape, or images for disciplinary purposes for the following violations: physically threatening another person, fighting, theft of property, significant damage to Company property, or sabotage. If such a situation occurs, the Union will be notified of the violation. The Company, after discussions with the Union, may expand the installation and/or use of video surveillance for disciplinary purposes for other specific reasons or incidents that may be discovered and considered by the Company to be severe in nature. Video cameras and recordings may be used by the parties to assist in correcting unsafe conditions, investigating injuries, accidents, near misses and/or to help improve working conditions throughout the Mill. Both parties agree to work together in that regard. The parties agree that there will be certain situations involving video that are best left to the Union to handle.

The Company agrees that it will not use the video cameras, videotape, or images, for the purpose of surveillance of employees engaged in protected activities.

## ARTICLE 25
### Contravention of Law

If any provision of this Agreement is in contravention of the laws or regulations of the United States or of the State of Arkansas, such provision shall be superseded by the appropriate provisions of such law or regulations so long as the same is in force and effect but all other provisions of this Agreement shall continue in full force and effect. If the parties are unable to agree as to whether or not any provision hereof is in contravention of any such laws or regulations, the provisions hereof involved shall remain in effect until the disputed matter is settled by the court or other authority having jurisdiction in the matter.

## ARTICLE 26
### Terms of Agreement

(a) This Agreement is hereby extended by mutual agreement between the parties and is in full force and effect up to and including its expiration date, July 31, 2021. This Agreement shall be automatically renewed each year thereafter unless notice to terminate is given by either party as provided in this Agreement; and all matters which are within the scope of collective bargaining are closed for the same period, except as provided in this Section.

(b) All notices given under this Section on behalf of the Union shall be given by the International Union Representative. Similarly, notices on behalf of the Company shall be given by the designated official of the Company or his representative.

(c) Should either party desire to amend or terminate this Agreement at its expiration date, said party, by certified mail, shall give written notice to the other party, at least sixty (60) days before the expiration date.

(d) When notice of desire for modification has been given, the Union and the Company shall arrange to have their respective representatives meet on mutually satisfactory dates for the purpose of collective bargaining in regard to modifications desired by either party.

(e) In the event negotiations conducted in accordance with this Section are unsuccessful, either party may terminate this Agreement upon the expiration of ten (10)

days notice in writing, mailed by certified mail or hand delivered to the other party at its respective address, at any time after the Agreement, as provided in subsection (c) of this Article, has expired. During this ten (10) day period, all the provisions of the Agreement shall remain in full force and effect until the specified time has elapsed. During this period, there shall be no strikes or lockouts.

(f) The parties to this Agreement agree that this instrument constitutes the entire agreement between them and that no amendment or modification shall be effective unless reduced to writing and approved by the signatories to this Agreement or their successors. The parties further agree that all rights, obligations and duties set forth in this Agreement shall automatically cancel and terminate completely at the time the Agreement is terminated. The parties agree further that neither party for the duration of this Agreement will be required to bargain collectively with respect to any subject or matter referred to or covered in this Agreement or with respect to any new matter not specifically referred to or covered in this Agreement, whether or not such subject matter was proposed, discussed or bargained upon in the negotiations which preceded the signing of this Agreement.

(g) If the parties have not reached an agreement on or before the expiration date, all provisions of this Agreement shall remain in effect until specifically terminated in accordance with the provisions of this Article.

IN WITNESS WHEREOF, the parties have caused these presents to be executed by their duly authorized representatives.

ON BEHALF OF
CLEARWATER PAPER CORP.

_William Home_
William Home
Mill Manager

Tom Schneider
Sr. Mgr., Employee and Labor Relations

Rosario Garrido-Calloway
Human Resources Manager

Chris Davis
HR / Labor Representative

Malcolm Massey
Pulp & Utilities Manager

Michael Riley
Finished Products Manager

Kenneth Roberts
Maintenance & Engineering Manager

UNITED STEEL, PAPER AND FORESTRY,
RUBBER, MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE WORKERS
INTERNATIONAL UNION (USW)
ON BEHALF OF LOCALS 13-1532 & 13-1533

Leo Gerard                      November 18, 2016
International President          Ratification Date

Stanley Johnson
Int'l Secretary-Treasurer

Thomas Conway
Int'l Vice President Administration

Fred Redmond
Int'l Vice President Human Affairs

Ruben A. Garza
Director District 13

Don Davies
Sub-District Director

Mark Dunn, President Local 13-1532

Jason Savage, President Local 13-1533

Walter Cooper

Robert Chatham

Aaron Humphries

38

# EXHIBIT B

CLEARWATER PAPER CORPORATION
CYPRESS BEND
**APRIL 2018**

# MILL RULES

I.   PURPOSE

To have an orderly and efficient operation of the mill, it is necessary that all personnel maintain discipline and proper personal standards of conduct at all times. This is necessary to protect the health and safety of all employees, to maintain uninterrupted operation, to make secure jobs, and to protect the property and good will of the Company. These rules apply to all employees of the Cypress Bend Mill. Failure to comply with these Rules may lead to discipline, such as documented oral warnings, written warnings, written warnings given in lieu of suspension or termination, suspensions, etc. up to and including immediate termination.

II.  GENERAL SAFETY RULES FOR CYPRESS BEND EMPLOYEES

1.   Report all injuries no matter how slight to your supervisor or to first aid personnel immediately or before the end of the shift on which the injury occurs.

2.   Wear appropriate personal protective gear at all times as required by the safety rules of the department in which you work.

3.   Refrain from smoking in areas other than those specifically identified as "smoking areas." This includes discarding matches, cigarettes or other incendiary items in any place except in authorized containers.

4.   Comply with the Company's Substance Abuse Policy.

5.   Refrain from engaging in any conduct or practice, including horseplay or other violation of departmental safety rules that creates or could create a safety hazard to you or others.

6.   Comply with the Company's lockout procedure.

7.   Report unsafe conditions, tools, equipment or acts to your supervisor immediately. Do not operate equipment until guards have been replaced.

8.   Never use compressed air on yourself or others.

9.   Keep walkways, aisles, stairways, fire fighting equipment, safety equipment and exits clear and accessible at all times.

10.  Do not spray water on unsealed electrical equipment, motors, controls, switches or switch boxes.

1



EXHIBIT
B
tabbies

11. Employees working in production and maintenance areas are not permitted to wear rings. Wrist or pocket watches may be worn in these areas.

12. Comply with the Company's safety policies as well as those of the department in which you are working.

13. Employees taking any medications, regardless of whether the medications may impact the employee's ability to safely perform job-related functions, may provide a list of those medications to first aid for use in an emergency situation, such as when the employee needs medical treatment. Providing a list is voluntary. See attachment 1.

III.    WORK PRACTICE RULES

1. Engaging in conduct which damages the reputation of the Company, including making false and slanderous accusations against the Company or any employee, is prohibited.

2. Employees are expected to perform their job in an acceptable manner, including compliance with the Company's Attendance Policy.

3. Violation of the Company's Harassment, Workplace Violence, and/or Handgun Policies is prohibited.

4. Employees must comply with all posted work schedules and assignments, unless the supervisor requests changes due to operating conditions or requirements.

5. The following behaviors, actions and activities are prohibited:

    a. Flagrant disrespectful conduct toward management or a co-worker;
    b. Insubordinate conduct;
    c. Deliberate restriction of output;
    d. Destruction of property, tools or equipment;
    e. Sabotage;
    f. Destruction or misuse of property, product supplies, records or other material of this Company or another;
    g. Unauthorized operation of machinery, tools or equipment;
    h. Gambling on Company premises;
    i. Falsification of information, including, but not limited to, personal or medical absences, claims for work-related injuries, work orders, production and maintenance records, etc.;
    j. Immoral or indecent conduct, including but not limited to vulgarity, use of profane, abusive or threatening language or indecent exposure;
    k. Theft and/or dishonesty, or any attempt thereof;
    l. Disrespectful conduct toward a customer, vendor or other non-employee;
    m. Fighting, inciting or participating in physical violence of any nature on Company property or threatening the use of physical violence;

2

n. Sleeping while on duty;
o. Removal of any Company property or records or that of another without management's written approval;
p. Walking off the assigned job, leaving your job without being properly relieved or without your supervisor's permission, or leaving the mill without your supervisor's permission during working hours;
q. Offering or accepting a bribe of any kind.

IV.   SECURITY

1. Possession of or bringing firearms (excluding concealed handguns locked in a storage compartment within a private vehicle on a Company parking lot), weapons or explosives on mill property is prohibited.  All employees are to comply with the Company's Harassment, Workplace Violence, and Handgun Policies.

2. Entering a locker, tool box, or personal vehicle other than your own without the owner's permission and/or presence is not permitted.

3. Refusal to permit guards or management to inspect lunch boxes, sacks, boxes, etc. when entering or leaving the mill is prohibited.

4. Any person driving a vehicle on Company property is expected to comply with posted speed limits.

5. Off-duty employees may bring non-employee visitors to tour the mill provided they secure permission from their supervisor and the Human Resources Department. Tours must be done during daylight hours.  Children under the age of 12 are not permitted to tour for safety reasons.

V.   MISCELLANEOUS RULES

1. Creating or contributing to unsanitary conditions, littering, or failing to clean up work area when job is complete or as directed by your supervisor or otherwise required, is not acceptable conduct.

2. Soliciting on Company premises is not permitted except as authorized by your supervisor.

3. Having your wages garnished or assigned more than one time may result in disciplinary action.

4. Notices may be posted on Company bulletin boards in designated areas with the approval of the Human Resources Department or supervisor.

IMPORTANT NOTE

3

The above listed rules are not intended to be all inclusive of an employee's required conduct, personal standards or discipline. With proper notice to all employees, management may add to, take from or change these rules at any time.

4

**Attachment 1**

**This voluntary form may be completed and submitted to First Aid for use only in a medical emergency.**

**MEDICATION LIST**

I, _____, hereby freely, voluntarily, and without coercion of any kind, notify Clearwater Paper Corporation that I am taking the following medication(s) that may affect treatment in an emergency situation:

| NAME OF MEDICATION | DOSAGE | FREQUENCY TAKEN |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

Employee Name: (Print or Type)_____

Signature: _____        Date: _____

5

APRIL 2018

**HARASSMENT POLICY**

It is the policy of the Company to treat all employees equally in their terms and conditions of employment. The harassment of any employee based upon protected status is contrary to this policy and may be considered a violation of federal law and will be considered justification for disciplinary or other appropriate action. This policy applies to all employees, supervisors, and non-employees who have contact with employees during working hours.

Harassment is an annoying, persistent act or actions that singles out an employee to that employee's objection or detriment, because of race, sex, color, age, religion, ancestry, national origin, disability, or any other legally protected status. Harassment may include any of the following:

1.      Verbal abuse or ridicule. This includes epithets, derogatory comments, slurs or unwanted advances, or comments based upon protected status.

2.      Interference with an employee's work. This includes physical contact such as assault, blocking normal movement, or interference with work directed at an individual because of his/her sex or other protected status.

3.      Displaying or distributing offensive materials based upon protected status. This includes derogatory posters, cartoons, drawings or gestures.

4.      Discriminating against any employee in work assignments or job-related training due to an individual's protected status.

5.      Intimate and/or unwelcome physical contact.

6.      Making protected status innuendos.

7.      Indecent exposure towards anyone.

8.      Demanding favors (sexual or otherwise), explicitly or implicitly, as a condition of employment, promotion, transfer or any other term or condition of employment.

9.      Retaliation for having reported harassment.

It is every employee's responsibility to ensure that his or her conduct does not include or imply protected status harassment in any form. If, however, such harassment or suspected harassment has or is taking place, the following may apply:

1.      Any protected status harassment or suspected harassment should be reported to the person's supervisor. If the harassment involves the supervisor, then the harassment should be reported to Human Resources. A written statement by the complainant setting forth all pertinent facts may be required.

2.      Any supervisor who receives a report of or has knowledge of such harassment shall promptly inform Human Resources, who will then determine whether further investigation is warranted.

3.      Each complaint shall be investigated and a determination of the facts will be made on a case-by-case basis. Appropriate action up to and including discharge may then be taken.

4.      The results of the investigation shall be sought to be kept confidential and provided only to those on a need-to-know basis.

5.      The investigative files, including the complaint, shall be maintained by Human Resources. Any disciplinary action taken will also be documented in the employee's personnel file.

6.      The Company will not tolerate protected status harassment or any form of retaliation against an employee who has either instigated or cooperated in an investigation of alleged harassment. Violation of this provision may result in discharge.

230163

APRIL 2018

## WORKPLACE VIOLENCE POLICY

It is the policy of the Company that rules and regulations regarding behavior in the workplace are necessary for the efficient operation of the Company and for the benefit and safety of all employees. Management cannot prevent violence in our workplace alone. This must be a joint effort by every employee. The Company encourages all employees to report possible problems to management.

Conduct that interferes with operations, discredits the Company, or is offensive to customers or co-workers will not be tolerated whether conduct is that of an employee, customer or visitor. Any act of violence which impacts the workplace will be cause for investigation and subject to action by the Company. Violence is defined as any act of aggression or any statement, which could be perceived as intent to cause harm to the Company or an individual, whether personal, such as physical or emotional, or impersonal, such as property damage or theft.

The following conduct is prohibited and may lead to disciplinary action, up to and including termination:

1.      The use of profanity or abusive language;

2.      The possession of firearms, explosives, weapons (including hunting weapons), on Company property (excluding concealed handguns locked in a storage compartment within a private vehicle on a Company parking lot);

3.      Fighting or assault on a co-worker, customer, security staff, or visitor;

4.      Threatening or intimidating co-workers, security staff, customers, or visitors;

5.      Retaliation for having reported inappropriate conduct or for having cooperated in an investigation of inappropriate conduct; and,

6.      Theft, destruction, defacement, or misuse of Company property or of the property of an employee, customer, or visitor.

This list is illustrative of the type of behavior that will not be permitted. It is not intended to be an all-inclusive listing. Any violation of the Company's policies or any conduct considered inappropriate or unsatisfactory may, at management's discretion, subject the employee to disciplinary action, up to and including termination.

### Workplace Violence Policy Reporting Procedures

It is every employee's responsibility to ensure that his or her conduct does not include or imply breach of this policy. Furthermore, it is every employee's responsibility to report suspicions of such behavior, whether by employee or non-employee, to an appropriate member of management. If, however, violence, threats of violence or suspected violence to a person or property has taken place or is taking place, the following may apply:

1.      Any violence, threat of violence or suspected violence to person or property should be reported to a supervisor. If the threat or action involves the supervisor, then it must be reported to Human Resources. An oral or written statement setting forth all pertinent facts will be required.

2.      Should an employee receive a bomb threat, the employee should notify a supervisor immediately. The supervisor must notify Human Resources immediately.

3.      Any supervisor who receives a report of, has knowledge of, or suspects the occurrence of violence or threats of violence, should promptly assess the most important action to be taken first. That action may involve notifying Human Resources, or other action to ensure the direct safety of personnel or property. In all cases, Human Resources should be notified as promptly as possible.

4.      Human Resources will work with the supervisor investigating the report and determine the appropriate action and/or discipline to be taken with the offender up to and including termination.

230163

APRIL 2018

5.  Human Resources will work with employees who report they have been subjected to violence and support any and all efforts to eliminate potential harm.

6.  Appropriate confidentiality and documentation of each report should be maintained.

## Prohibited Conduct

We do not tolerate any type of workplace violence committed by or against employees. Employees are prohibited from making threats or engaging in violent activities.

The following list of behaviors provides examples of conduct that is prohibited. It is not exhaustive.

- Causing physical injury to another person
- Making threatening remarks
- Intentionally damaging employer property or property of another employee
- Possession of a weapon while on company property or while on company business
- Committing acts motivated by, or related to, sexual harassment or domestic violence
- Aggressive or hostile behavior that results in a reasonable fear of injury and/or emotional distress

## Reporting Procedures

Any potentially dangerous situation must be immediately reported to a supervisor or Human Resources. Reports can be made anonymously. *All* reported incidents will be investigated. Reports or incidents warranting confidentiality will be handled appropriately and information will be disclosed to others only on a need-to-know basis. All parties involved in a situation will be counseled and the results of investigations will be discussed with them. The Company will actively intervene at any indication of a possibly hostile or violent situation.

While we do not expect employees to be skilled at identifying potentially dangerous persons, employees are expected to exercise good judgment and to inform the supervisor or Human Resources if any employee exhibits behavior that could be a sign of a potentially dangerous situation. Such behavior may include:

- Discussing weapons or bringing them to the workplace (excluding concealed handguns locked in a storage compartment within a private vehicle on a Company parking lot),
- Displaying overt signs of extreme stress, resentment, hostility or anger,
- Making threatening remarks,
- Sudden or significant deterioration of performance,
- Displaying irrational and/or inappropriate behavior,
- Increased use of alcohol and/or illegal drugs,
- Unexplained increase in absenteeism and/or vague physical complaints,
- Increased severe mood swings, and noticeably unstable or emotional responses, and
- Increasingly talks of problems at home.

Threats, threatening conduct and any other acts of aggression or violence in the workplace will not be tolerated. Any employee determined to have committed such acts will be subject to disciplinary action up to and including termination and the incident will be reported to proper authorities if warranted. Non-employees engaged in violent acts on the employer's premises will be reported to the proper authorities and fully prosecuted.

230163

APRIL 2018

# EXHIBIT C

EEOC Form 5 (11/09)

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act
Statement and other information before completing this form.

| | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| | ☐ FEPA | |
| | ☒ EEOC | 493-2021-00778 |
| | | and EEOC |

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| **Linda Grays** | | **1963** |

| Street Address | City, State and ZIP Code |
|---|---|
| **500 North Main Street, Dermott, AR 71638** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe
Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| **CLEARWATER PAPER CORPORATION** | **Unknown** | **(870) 730-2300** |

| Street Address | City, State and ZIP Code |
|---|---|
| **5082 Hwy 4 North, Arkansas City, AR 71630** | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN

☐ RETALIATION  ☒ AGE  ☐ DISABILITY  ☐ GENETIC INFORMATION

☐ OTHER (Specify)

| DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|
| Earliest | Latest |
| **09-15-2020** | **10-02-2020** |

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

I was hired on March 7, 1988. On September 14, 2020, I had an altercation with a Coworker. During the altercation, I picked up a knife. On September 14, 2020, I was placed on suspension. I was discharged on October 2, 2020.

I believe I was placed on suspension and discharged because of my race, African American; sex, female; and in retaliation for a 2017, report regarding pay, in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| X 3-8-21    X Linda Grays | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date            Charging Party Signature | |

**EXHIBIT**

**C**

# EXHIBIT D

Transcript of the Testimony of

# Linda Grays Arbitration

**Date:** May 19, 2021

## Case:

**Bushman Court Reporting**
Ronda Dodd-Brown
Phone:  (501) 372-5115
Fax: (501) 378-0077
<www.bushmanreporting.com>


EXHIBIT
D

Linda Grays Arbitration 5/19/2021                                    v.

Page 1

A R B I T R A T I O N

USW LOCAL 1532                                                   UNION

Vs.              Case FMCS No. 211218-02453

Clearwater Paper Corporation                                 EMPLOYER

- - - - - - - - - - - -

Linda Grays, Termination
Taken May 19, 2021, at 9:00 a.m. via videoconference

APPEARANCES:                                          ON BEHALF OF:

MR. CHAD VINCENT cvincent@usw.org
MR. PAUL RANEY praney@usw.org
UNITED STEELWORKERS SUB-DISTRICT 2 OFFICE
206 WEST CARPENTER STREET                             THE UNION

MR. J. BRUCE CROSS bcross@cgwg.com
MR. JOSEPH M. KRASKA jkraska@cgwg.com
CROSS, GUNTER, WITHERSPOON & GALCHUS, P.C.
500 PRESIDENT CLINTON AVENUE, SUITE 200
LITTLE ROCK, AR  72201                                THE EMPLOYER

ALSO PRESENT:
Ms. Rosario Garrido-Calloway, HR Manager, Clearwater Paper
Mr. Kevin Reed, Local Union President

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                              Page 2

 1                     TABLE OF CONTENTS

 2
```
```
    Caption Page...............................................1
 3  Table of Contents..........................................3
    Joint Exhibit Numbers 1, 2, 3, 5, 6, 7, 9, 10 admitted.....26
 4  Joint Exhibit Numbers 11, 12, 13, 14 admitted..............32
    Opening Statement Mr. Kraska...............................33
 5  Opening Statement Mr. Vincent..............................34
    EXAMINATION OF DEXTER MADISON:
 6      Direct by Mr. Kraska...................................39
        Cross by Mr. Vincent...................................61
 7  Union Exhibit Number 2 admitted............................74
        Redirect by Mr. Kraska.................................74
 8  EXAMINATION OF LARRY SIMMONS:
        Direct by Mr. Kraska...................................83
 9      Cross by Mr. Vincent..................................110
    EXAMINATION OF JUSTIN WHITE:
10      Direct by Mr. Kraska..................................114
        Cross by Mr. Vincent..................................122
11  Union Exhibit Number 3 admitted...........................128
        Redirect by Mr. Kraska................................128
12      Recross by Mr. Vincent................................129
    EXAMINATION OF ROSARIO GARRIDO-CALLOWAY:
13      Direct by Mr. Kraska..................................133
    Company Exhibit Number 3 admitted.........................139
14  Company Exhibit Number 4 admitted.........................151
        Cross by Mr. Vincent..................................154
15      Redirect by Mr. Kraksa................................169
        Recross by Mr. Vincent................................172
16      Redirect by Mr. Kraska................................174
    EXAMINATION OF LINDA GRAYS:
17      Direct by Mr. Vincent.................................177
    Union Exhibit Number 1 admitted...........................191
18      Cross by Mr. Kraska...................................192
    Company Exhibit Numbers 1, 2 admitted.....................196
19  Certificate of Reporter...................................200
```
```
20

21

22

23

24

25
```

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                         Page 3
 1          MS. PATTERSON:  Okay.  So I've got Chad Vincent
 2     with the Union and Union representative.  I've got a
 3     Cypress Bend but no one --
 4          MR. KRASKA:  I believe that is going to be the
 5     witness room.
 6          MS. PATTERSON:  The testifying room?
 7          MR. KRASKA:  I believe so.  That or the Company
 8     Representative.
 9          MR. ARBITRATOR:  Is Mr. Raney -- is he her?
10          MS. PATTERSON:  Who?
11          MR. ARBITRATOR:  Mr. Raney.
12          MS. PATTERSON:  He's not in the room with you, is
13     he, Mr. Vincent?
14          MR. VINCENT:  Yes.  He's sitting -- he's sitting
15     right here.
16          MS. PATTERSON:  Okay.  There you are.
17          MR. ARBITRATOR:  I just yelled out.  Mr. Raney,
18     wave your hand.
19          MR. RANEY:  (Complied.)
20          MR. ARBITRATOR:  Good.  Okay.  All right.  Go
21     ahead, Ms. Patterson.  Let's make sure that we've got
22     everything going in the way we want it going.
23          MS. PATTERSON:  Yes, of course.  So I have
24     here -- for Company, I've got Mr. Kraska, Mr. Cross.
25     Rosie, here, is with the Company.  And then I've got
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                               v.

Page 4

1       the Union here as well.  So and then we have Mrs.

2       Brown, the court reporter?

3              THE COURT REPORTER:  Yes, ma'am.

4              MS. PATTERSON:  And then we've got Cypress Bend

5       here that's labeled.  That's going to be the Company

6       testifying room.

7              MR. ARBITRATOR:  Where is -- where is the one for

8       the Union?

9              MS. PATTERSON:  Yes.  Mr. Vincent, do you guys

10      have a separate room set up for the testifying

11      witnesses?

12             MR. VINCENT:  We're -- so we're going to

13      sequester -- we're only going to have two witnesses.

14      One of them is Mrs. Grays, which she'll be allowed to

15      stay in here --

16             MS. PATTERSON:  Okay.

17             MR. VINCENT:  -- the whole time.  And so what

18      we're going to ask is that Mr. Madison, he's going to

19      just sit out in the vehicle.  But this is the room

20      we're going to use, so when we call the witness, I'm

21      probably just going to slide over to the side here and

22      the witness is going to sit here in front of the

23      camera.

24             MS. PATTERSON:  Okay.

25             MR. VINCENT:  And I'll sit beside them.

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Page 5

1           MR. ARBITRATOR:  Mr. Cross, you wanted to say
2      something?
3           MR. CROSS:  Yeah.  That's -- I'm not, I mean,
4      that's -- that was the issue that was raised the other
5      day.  And we were supposed to have separate witness
6      rooms for each witness apart from where the questioners
7      were and even the Company or Union or the Union
8      representatives were going to be.
9           And as was stated on Thursday, as best I recall,
10     the last Thursday, the Union was going to have Mr.
11     Chatham and Mr. Reed present for the Union, along with
12     Mrs. Grays, of course; but that if Dexter Madison was
13     going to be testifying, that he would be in a separate
14     room from them when he testified, just like Mrs. Grays
15     would be in a different room when she was testifying,
16     just like I would have, you know, the Company witnesses
17     in a separate room.  You know, so that was my
18     understanding and not that there would be somebody in
19     the same room.
20          MR. ARBITRATOR:  That was my understanding.
21     Vincent, are you handling it for -- this for the Union?
22     Is that correct?
23          MR. VINCENT:  Yes.  I'll be sitting first chair,
24     Mr. Arbitrator.  You know, when you do a virtual group,
25     we're doing the best we can.  We had to rent a room to

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Page 6

1          have video capabilities.  This is no different than a

2          standard arbitration where I'm going to sit here.  I'm

3          going to sit in view of the camera.  I'll be sitting

4          right here where Mrs. Grays is sitting, in view of the

5          camera, asking questions.

6              It would be no different than if we're in a

7          standard, normal arbitration where everybody is in

8          person.  Mr. Madison will be sequestered.  He will not

9          be sitting in this room when anybody else is

10         testifying, only when he testifies.  And everybody that

11         testifies will sit right here in this chair.

12             MR. ARBITRATOR:  Mr. Cross, are you comfortable

13         with this?

14             MR. CROSS:  No.  I mean, I already stated my

15         position.  That was my concern from the get-go and that

16         was the position that I have.  And it was my

17         understanding that, and especially you made it very

18         clear in your email, that that was kind of how it would

19         be handled.  And you know, we had to make -- made

20         preparations to do it that way, specifically.

21             And you know, I understand the Zoom problems that

22         exist but that's, you know, I've had to deal with this

23         before and unions have been able to accommodate that.

24         And you know, I'm sure they have a -- and they have a

25         conference room, but I'm sure they probably have

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Page 7

1         another room there which probably has another computer

2         where they could set that up for that individual to be

3         able to testify.

4              I mean, I clearly understand with Mrs. Grays

5         being in there.  She's, you know, there as the grievant

6         and so she certainly has a right to sit in and listen

7         to everything and be in there with Mr. Vincent when

8         he's asking questions.  That's certainly under-

9         standable.  I'm not objecting to that.  I mean, we've

10        got our Company representative who would be sitting in

11        listening, you know, throughout but she's in a

12        different room.  She's in a different location than we

13        are.  But you know, if we were all together, I would

14        expect the same thing from that perspective.  But we're

15        just talking -- we're talking about witnesses at this

16        point.

17             MR. ARBITRATOR:  Well, we have two possibilities.

18        One possibility is we just stop until the Union can get

19        another room.  Mr. Vincent, how long would that take

20        for you to do?

21             MR. VINCENT:  I'll be honest with you, Mr.

22        Arbitrator.  I understand Mr. Cross's objection but

23        it's, I mean, to me, it's a senseless objection.  We've

24        said that Mr. Madison won't be in this room.  He's

25        going to sit out -- he's going to have to actually sit

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

Page 8

1          in the car -- his vehicle while this hearing goes on.

2          This town that we're in is a small town.  We had to

3          scramble to find a location that has suitable Wi-Fi and

4          a room where we could actually set a camera up and have

5          a TV so we could actually do this hearing.

6                So as far as getting another room, I mean, I

7          don't know.  It might be -- I don't know how long it

8          would take.  I mean, we scrambled to get this thing

9          here set up because of the rural location and the

10         availability of Wi-Fi.  So Mr. Madison's going to be in

11         his car until we call him as a witness.  He's going to

12         sit right here in front of the camera.  And I'm going

13         to sit right here to the side, in clear view of

14         everybody that's viewing the camera.  So I'm not for

15         sure -- I'm not for sure what the issue is.

16               MR. ARBITRATOR:  Well, Mr. Cross, you are correct

17         that I had asked for a separate room.  And I

18         certainly -- excuse me.  I understand what you've said

19         and I certainly agree that that is what I've said.  My

20         only question is the whole point of it, of course, was

21         that there could be no coaching.

22               And as long as anyone who could -- I mean, part

23         of the problem, too, Mr. Vincent, is we don't know who

24         is behind -- I'm not suggesting there is anyone.  I

25         don't want to suggest that.  But the point of all of

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                    Page 9
 1          this was to make sure that there -- that there would be
 2          no possibility of coaching.
 3               If the three of you are willing to affirm that
 4          you will be the only people in the room except when the
 5          witness -- I've lost the name again -- in the room,
 6          that may take care of that problem, that issue.  That
 7          doesn't change the question of whether we should have
 8          another room.  Mr. Cross, how do you feel about this?
 9               MR. CROSS:  Well, part of my problem is that,
10          number one, as I indicated, we have asked to call him
11          in our case in chief.  And we would expect to be able
12          to do so.  We're not calling the grievant.  And I
13          understand that that would be an objection, you know,
14          and I've seen those objections before where some
15          arbitrators have granted or denied where you want to
16          call the arbitrary case in chief because it's our case
17          to put on first.
18               But Mr. Madison is a witness and we certainly
19          have a right to call a witness, just as they do.  And
20          they can call him in their case, but we wish to call
21          him in our case.  And you know, that also concerns me
22          when he's in front of the Union in this setting where
23          we're not present.  We're not sitting there.
24               I know they had indicated that Mr. Reed and Mr.
25          Chatham would be present as representatives for the
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Page 10

1        Union.  They're going to be sitting around.  Or at

2        least Mr. Reed was a representative from the Union.  I

3        believe he's the officer.  And Mr. Chatham was going to

4        be present.

5             So I have concerns from that perspective, you

6        know, how we resolve this.  I understand, you know, Mr.

7        Vincent's difficulty in terms of getting Wi-Fi access.

8        I certainly can appreciate that for sure.  But he's

9        obviously in a building where there is a conference

10       room.  I'm not sure what building he's in and where

11       they're located.  But he's somewhere, I'm guessing down

12       in the McGehee, Arkansas, city area.

13            And I don't know if he's at the Union at all or

14       some place else, but I would presume that there would

15       be a second room.  It looks like there would be.  That

16       looks like a conference room setting to me, so I didn't

17       know if there would be a second room in that building

18       which would have a second computer.  There appears to

19       be -- you know, I don't know if they only have one

20       computer.  So I'm just trying to figure out how we

21       might be able to accomplish this or how we might be

22       able to do this.

23            MR. ARBITRATOR:  Well, the only other concern,

24       Mr. Vincent, that I have is that it is very difficult

25       for me -- I can see you as a person and I can kind of

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

Page 11

1          see your face.  But one of the advantages of such a

2          room is that the witness is actually very close and one

3          can see.  I mean, one of the advantages when you have

4          the hearing in person is I can look at the witness.

5          And so to be able to see the grievant and this other

6          witness, that's far away.  I lose that ability.  And

7          that's one of the advantages of the separate room,

8          because that setup would normally just be a computer

9          that's got Zoom on it and would have the ability for me

10         to then see, closely, the witness.

11             So I understand Mr. Cross's concern as well.  So

12         I guess my question is we have one of two choices.  We

13         have one of three choices.  You know, maybe two.  One

14         is we take the time to see if you can get another room.

15         If you can't get another room, then we're going to have

16         to have another date.  Or we can stop right now and

17         reset this for a time when you can have two rooms.  So

18         Mr. Vincent, I think it's on you to make the

19         determination.  Are you going to -- are you going to

20         find -- do you feel possible getting a room so we wait

21         whatever time it takes to do that?

22             MR. VINCENT:  Well, Arbitrator Barron, I will --

23         we can stop right now.  I'll see if I can talk to the

24         location where we've acquired this room at and see if

25         there's another -- I don't know if there's another room

Linda Grays Arbitration 5/19/2021                           v.

```
                                                    Page 12
 1          or not.  We've acquired this one room.  I can go ask
 2          and then we'll have to figure out electronics.
 3              But I just want to say one thing is that when I
 4          put an arbitration on, I come here to tell the truth
 5          and have integrity; not to play games or make some kind
 6          of somebody hide behind the camera and tell somebody
 7          what to say.  So I want everybody to be on the same
 8          page with that.
 9              I will move the camera toward the witness and we
10          will work on acquiring another room.  Because we're
11          here to tell the truth and get the facts on the record.
12          And so if you want to pause now, I'll go talk to this
13          location and see if there's another room that we can
14          use and so we can proceed forward today.  Because we've
15          already got -- the Union has a lot of money invested in
16          this with hotel rooms, stays, with this room we have
17          now, and lost time.  So we don't want to pause or
18          prolong the arbitration any longer, plus Mrs. Grays is
19          ready to go back to work.
20              MR. ARBITRATOR:  Okay.  Part of the problem, too,
21          is -- I seem to have something in my throat.  I
22          apologize -- by looking at the witness list for the
23          Company, there are a lot of them.  I really do
24          apologize.  My question is how much time -- because I'm
25          concerned about getting this done in one day.  Mr.
```

Page 13

```
 1        Cross, what's your sense of how long your witnesses are
 2        going to -- I know there's going to be cross.  We don't
 3        know that for sure.  But it would be helpful to have a
 4        sense of that, because that has -- that's important.
 5        You're muted.
 6             MR. KRASKA:  And just so you know, Mr.
 7        Arbitrator, Bruce and I are in the same room and so
 8        we're using a similar microphone.  So I will unmute so
 9        that he can talk and we don't get the feedback.
10             MR. ARBITRATOR:  Okay.
11             MR. CROSS:  Yes.  Mr. Arbitrator, yeah, I mean,
12        obviously, we will do everything in our power.  I mean,
13        we could make the decision that, I mean, as always, we
14        give you the witness list, but we could always choose
15        not to call everybody.  So that would be helpful in
16        terms of moving this thing along.  We certainly will
17        make every effort.
18             We don't -- we agree with Mr. Vincent that we
19        want the facts to come out and for everyone to hear all
20        the facts and for you to be able to do that so you can
21        make the right decision.  But you know, we will do
22        everything in our power to keep this as short and
23        expeditious as possible, to just get -- make sure you
24        get the facts.  So we're not here to prolong it in any
25        way but to try to get the thing through.
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

Page 14

1            So you know, if Mr. Vincent can check and see

2       whether or not that's doable there at that facility

3       where he's -- where he's staying at the hotel or, you

4       know, if that's doable, I think that should be our

5       first step.  And let's see where we are and then we can

6       decide from there.

7            MR. ARBITRATOR:  Okay.  All right.  Well, what I

8       would suggest then is that we pause.  Mr. Vincent, you

9       can see what you can achieve.  I'd like to see where

10      the camera would be at the time someone is going to

11      be -- see, it continues to create a problem.  Because

12      if someone is only in front of one -- and again, I do

13      not want to suggest that I think anyone would do

14      anything inappropriate.  But I think we need to make

15      sure that there never is a question about what

16      happened.  And as a result, if you move the camera

17      close to one person, then we can't see the other

18      people.

19           So I think the most important thing -- the thing,

20      at this point, as I think about it, is I think that we

21      really need another room.  So why don't you see what

22      you can do, Mr. Vincent.  Let's -- everyone can go

23      about their business if they'd like, but once you let

24      us know and Ms. Patterson knows, she'll then try and

25      reach everybody else.  You've got email numbers for the

Linda Grays Arbitration 5/19/2021                                    v.

Page 15

```
1        others, Ms. Patterson, in case -- I mean, cell numbers?
2             MS. PATTERSON:  Well, yes.  Everyone, if you need
3        to get ahold of me, so you have --
4             MR. BARRON:  No, I'm talking about if they go
5        off.  I mean, we can do this how -- I don't know how
6        long this is going to take.
7             MS. PATTERSON:  I suspect that I won't need
8        everyone's cell numbers.  I don't necessarily have them
9        all.  But I think either Mr. Vincent or Mr. Raney will
10       probably leave this conference room, go talk to the
11       building management, and then you'll come back and tell
12       us if you were able to secure a separate room.
13       Correct?
14            MR. VINCENT:  Ms. Patterson, we have your number
15       from the Zoom link that you sent.  So if we want to get
16       off here for a minute and when we come up with
17       something, I can call you and let you know.  And then
18       maybe you can send a mass email out letting everybody
19       know that we either were successful or weren't
20       successful and this is the time we're going to start
21       back.  Does that sound reasonable?
22            MS. PATTERSON:  Well, what I would suggest is
23       that everyone remain online.  You can turn off the
24       video.  You can mute your mic.  But we're all connected
25       at the moment, so I would suggest just let's remain
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Page 16

```
1          logged on while one of the two of you go and make

2          arrangements, if you can.  If you find a separate room,

3          come back, let me know.  I will admit that room into

4          the Zoom meeting.  If not, if you'll come back and let

5          us know and then you guys can discuss alternate dates,

6          I suppose.

7               MR. VINCENT:  Okay.

8               MR. ARBITRATOR:  Let's do that and let's see how

9          well we can do with this, Mr. Vincent.

10               MR. VINCENT:  Yes, sir, Mr. Arbitrator.

11               MS. PATTERSON:  Okay.  So everyone, if you want

12          to turn off your video, mute your mic, and walk away

13          and get some coffee while Union works on the room

14          situation, let's do so.

15   (WHEREUPON, a break was taken.)

16               MR. VINCENT:  Arbitrator Barron, this is Chad

17          Vincent with the Union.  We were able to actually --

18          this place we're using, they've asked somebody to leave

19          their office and we're going to turn their office into

20          where the witnesses will testify at.  And so Mr. Raney

21          has carried his laptop in there.  We're going to use it

22          for the witnesses.  He's going to go ahead and get on

23          the link, so Ms. Patterson should see him come on.  And

24          then we'll kind of need to see where to sit the

25          computer at in that room.  So I'm going to have him to
```

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                    Page 17
 1        get on.  So when he gets on, Ms. Patterson, you'll see

 2        Mr. Raney's computer come up.  And then we'll try to

 3        move it on the desk to make sure it's we're Arbitrator

 4        Barron can see the witness.

 5            MS. PATTERSON:  Sure thing.  Let's -- I will

 6        admit him when I see him log on and then we'll get the

 7        camera situated so that it's trained on whoever is

 8        testifying, and then sounds like we'll be able to move

 9        on.

10            MR. ARBITRATOR:  Okay.  That sounds good.

11            MS.  PATTERSON:  All right.  So you can hear me

12        okay?

13            MR. VINCENT:  Yes.  Sorry.  Mr. Raney had left

14        the room.

15            MS. PATTERSON:  Oh, no, that's fine.  Mr. Barron,

16        is that sufficient for the camera position?

17            MR. ARBITRATOR:  Yeah, that's fine.

18            MS. PATTERSON:  Okay.

19            MR. VINCENT:  The Union will be in another room

20        down the hall.  And so what will happen is when it

21        comes Mrs. Grays' turn to testify, she will leave our

22        room and come down to this room.  Mr. Madison is still

23        going to sit in his vehicle outside in the parking lot

24        until it's -- until I guess Mr. Cross is going the call

25        him maybe, maybe not, whatever.  But he's going to sit
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                              v.

```
                                                    Page 18
 1         out in his vehicle.  And so when it comes that time,
 2         we'll go out to the parking lot and get him.
 3              MS. PATTERSON:  Okay.
 4              MR. ARBITRATOR:  That works.
 5              MR. VINCENT:  Okay.  Is this -- will be fine?
 6              MR. ARBITRATOR:  Why don't the three of you who
 7         were in the main room, we can go there now.  That's no
 8         problem.  Mr. Cross, did you -- did you hear all of
 9         this?
10              MR. CROSS:  I just picked up part of that.  It
11         sounds like Chad has been able to work out
12         arrangements, from what I could gather, on another room
13         at the hotel or place, from what I understand.
14              MR. ARBITRATOR:  Yeah.
15              MS. PATTERSON:  Yes.
16              MR. ARBITRATOR:  Go ahead, Ms. Patterson.
17              MS. PATTERSON:  Yes.  Just to recap, so Mr.
18         Vincent and Mr. Raney are going to be in that first
19         conference room when --
20              MR. ARBITRATOR:  And Mrs. Grays.
21              MS. PATTERSON:  And Mrs. Grays.  Right.  But
22         whenever someone is testifying -- so if Mrs. Grays is
23         testifying, she will come to this now Union testimony
24         room where Mr. Vincent is currently positioned.  And
25         then Mr. Madison, when he is called, he will come in
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Page 19

1        from his vehicle, and again, be in that Union

2        testifying room directly in front of the camera.  So

3        they'll be in a separate room from Mr. Vincent and Mr.

4        Raney.

5             MR. CROSS:  Okay.  Just a quick question to get

6        clarification is if you remember, Mr. Arbitrator, the

7        Union said that they were just going to have a couple

8        of -- they were going to have Mr. Chatham and Mr. Reed

9        sitting in.  Are they going to be in that same room

10       that, I assume, with Mr. Raney and Mr. Vincent and Mrs.

11       Grays?

12            MR. VINCENT:  Mr. Reed is here.  Mr. Chatham is

13       not here.  Mr. Reed will be here.  So in the room with

14       me will be the grievant, Mrs. Grays; Paul Raney; and

15       Mr. Reed.  That will be -- that will be who's in the

16       room.

17            MR. CROSS:  Okay.  All right.  I appreciate that.

18       And I do appreciate, Chad, your efforts in getting the

19       separate room.

20            MR. ARBITRATOR:  Okay.  We've got the -- we've

21       got Mrs. Brown.  She's here.  So I think that all we

22       need at this point is to put -- to recreate the larger

23       group, pull everything up online.

24            MR. VINCENT:  Okay.

25            MR. ARBITRATOR:  Then at that time, we will -- we

Linda Grays Arbitration 5/19/2021                              v.

Page 20

```
 1        will commence.
 2              MR. VINCENT:  Okay.  I'm going to just mute this
 3        computer in here --
 4              MR. ARBITRATOR:  Yes.
 5              MR. VINCENT:  -- in this room.
 6              MR. ARBITRATOR:  Yes.
 7              MS. PATTERSON:  Okay.
 8              MR. VINCENT:  Mr. Arbitrator, are you wanting to
 9        move this camera closer to me?
10              MR. ARBITRATOR:  Who am I talking to?
11              MS. PATTERSON:  That's Mr. Vincent.  He's
12        returning to the conference room.  And I believe --
13        correct me if I'm wrong -- you really want the close-up
14        camera for you to be when people are testifying, not so
15        much for the attorneys?  Mr. Vincent is asking in the
16        conference room if the camera position is okay.
17              MR. ARBITRATOR:  Well, you could -- if that group
18        could be a little closer, it would be helpful but not
19        critical.
20              MS. PATTERSON:  I think they've got a television,
21        something like a larger screen set up in that
22        conference room.  So positioning -- I don't know if
23        that will be --
24              MR. VINCENT:  I can move the -- I've got a camera
25        on a base.  I can move it a little closer down the
```

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                        Page 21

  1        table.

  2             MS. PATTERSON:  Okay.

  3             MR. ARBITRATOR:  If you could, that would be

  4        helpful.  Let's see what that does.  Take it back just

  5        a little so we see everyone.  We need to see Mrs. Grays

  6        for sure.  Okay.

  7             MS. PATTERSON:  Well, when Mrs. Grays is

  8        testifying, she will be in that separate room.

  9             MR. ARBITRATOR:  Yes.  Yeah, I just want to be

 10        able to --

 11             MS. PATTERSON:  Sure.

 12             MR. ARBITRATOR:  -- to see her during the

 13        hearing.  I think that's -- I think that's perfect, Mr.

 14        Vincent.

 15             MR. VINCENT:  Okay.

 16             MR. ARBITRATOR:  Okay.  Why don't you bring them

 17        in, as well, and then we think we're ready to get

 18        started.

 19             MR. VINCENT:  Are you going to swear all the

 20        witnesses in at once or individually?

 21             MR. ARBITRATOR:  Well, do you want -- the

 22        question is, Mr. Cross, are all of your witnesses in a

 23        single place?

 24             MR. CROSS:  Obviously not because Mr. Dexter is

 25        in his car and we've kind of separated everybody out.
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                      Page 22
 1          They're all at the location.  I don't know if you --
 2          makes it easier just to swear in the witness as they
 3          come.  I would think -- I think it would be a lot
 4          easier just for you to swear them in one at a time.
 5              MR. ARBITRATOR:  That's perfectly fine.  We're
 6          waiting for Mr. Raney?
 7              MR. VINCENT:  Yes, Mr. Arbitrator.
 8              MR. ARBITRATOR:  Okay.  Mr. Vincent, do you have
 9          a sense of when Mr. Raney is going to be back?
10              MR. VINCENT:  I thought he was just stepping out
11          the door to grab -- they must have went outside.  I
12          can -- let me go out there and see what's going on.
13              MR. ARBITRATOR:  If you could, thank you, so we
14          can get going.
15              MR. VINCENT:  We're present, Arbitrator Barron.
16              MR. ARBITRATOR:  Okay.  I think that Mrs. Brown
17          would like everybody to state their name and, if
18          necessary, spell it.  Obviously, Mrs. Brown, you know
19          who I am.  So as I'm looking around, someone who's
20          indicated as Rosie?  You want to unmute and state your
21          name?
22              MS. GARRIDO-CALLOWAY:  Yes.  Hello, my name is
23          Rosario Garrido-Calloway.  I'm the HR manager for the
24          location.  I go by Rosie.
25              MR. ARBITRATOR:  Mrs. Brown, would you like that
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                        Page 23
 1        to be spelled?

 2             THE COURT REPORTER:  Ms. Patterson has spelled it

 3        for me.  Thank you.

 4             MR. ARBITRATOR:  Great.  Thank you.  Mr. Kraska?

 5             MR. KRASKA:  It's Kraska.

 6             MR. ARBITRATOR:  I'm sorry, Mr. Kraska.

 7             MR. KRASKA:  Yep.  No problem.  Joe Kraska.  I'm

 8        here on behalf of the Company.

 9             MR. ARBITRATOR:  Go ahead, Mr. Cross.

10             MR. CROSS:  Yeah, this is J. Bruce Cross.  I'm

11        here on behalf of the Company as well.

12             MR. ARBITRATOR:  Okay.  For people in Mr.

13        Vincent's room, why don't the three of you -- actually,

14        there's another person in that room.  Right?

15             MR. VINCENT:  There's Mr. Reed, the Local Union

16        president; Mr. Raney; myself; and Mrs. Grays.

17             MR. ARBITRATOR:  Okay.  You want to just each one

18        of them announce their names.  That's all.

19             MRS. GRAYS:  Linda Grays, G-R-A-Y-S.

20             MR. ARBITRATOR:  Thank you.

21             MR. VINCENT:  Chad Vincent, V-I-N-C-E-N-T.

22             MR. ARBITRATOR:  Mr. Raney?

23             MR. RANEY:  Yes.  Paul Raney, R-A-N-E-Y.

24             MR. ARBITRATOR:  Okay.  All right.  I think we

25        are ready to start.  And I'm assuming that everyone
```

Linda Grays Arbitration 5/19/2021                              v.

```
                                                    Page 24
 1        will remain muted other than Mr. Vincent and Mr. Cross.
 2        And then we will have -- and obviously me.  And anybody
 3        else that's going to speak, unmute and then we can have
 4        them speak.  That way we're not going to have any
 5        confusion about who's talking and what's going on.  Is
 6        that okay?
 7             MR. CROSS:  Yeah.  One thing, Mr. Arbitrator --
 8        this is Bruce Cross.  I didn't hear Mr. Reed's name.  I
 9        just -- maybe I'm -- maybe I didn't hear well or if my
10        volume --
11             MR. ARBITRATOR:  Oh, I'm sorry.
12             MR. CROSS:  And maybe I missed that.  That just
13        could have been a possibility.
14             MR. ARBITRATOR:  Mr. Vincent?
15             MR. REED:  Yeah.  Kevin Reed, R-E-E-D.
16             MR. CROSS:  Okay.  Thank you.
17             MR. ARBITRATOR:  Okay?
18             MR. CROSS:  I just wanted to make sure I had my
19        spelling correctly.
20             MR. ARBITRATOR:  Okay.  Yeah.
21             MR. KRASKA:  One other thing, Mr. Arbitrator.
22        Mr. Kraska, who's going to do a lot of the examination
23        today, so I wanted you to know that.
24             MR. ARBITRATOR:  That's fine.  Just however we're
25        going to do it.  Let's just try and keep people muted
```

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                      Page 25
 1          unless we really need to have people.  All right.

 2          Let's start.  My name is Paul Barron.  I'm the

 3          arbitrator in this matter.  The hearing is taking place

 4          May 19, 2021.  This hearing is a Zoom meeting.

 5          Initially, some initial issues.  First, the parties

 6          have agreed to sequester the witnesses, and they will

 7          testify in the appropriate witness room when they are

 8          called.

 9              I'd like to go through the joint exhibits,

10          because I think that I know where things stand, but I

11          think it would be helpful to do that.  I'll go through

12          the list I think is correct and then -- excuse me --

13          and then you can tell me if I'm wrong.  I have, as

14          Joint 1, the contract; Joint 2, the termination

15          document; Joint 3, the grievance.  Joint 4 has been

16          removed.  Joint 5 is the extension.  I'm sorry?

17              MR. CROSS:  I'm sorry, Mr. Arbitrator.  You kind

18          of cut out on our video after Number 1.  I apologize.

19              MR. ARBITRATOR:  Sure.  Number 2 is the

20          termination document.  Joint 3 is the grievance.  Joint

21          4 has been removed.  Joint 5 is the extension.  Joint 6

22          is the third step answer.  Joint 7 is the response to

23          the third step answer.  8 has been removed as well.  9

24          is the mill rules.  And 10 is the harassment policy.

25          Is that correct?
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                    Page 26
1               MR. KRASKA:  The harassment policy is also
2          inclusive of the workplace violence policy.
3               MR. ARBITRATOR:  I'm sorry.  Say that again.
4               MR. KRASKA:  Joint 10 -- Joint Exhibit 10 is the
5          harassment policy.  It also includes the workplace
6          violence policy.
7               MR. ARBITRATOR:  Okay.  Mr. Vincent, are you
8          comfortable with this list?
9               MR. VINCENT:  Could we repeat 8 and 9?  The video
10         kind of broke up a second.
11              MR. ARBITRATOR:  8 has been removed.
12              MR. VINCENT:  Okay.  So what is 9?
13              MR. ARBITRATOR:  9 is the mill rules.  10 is the
14         harassment policy and Mr. Kraska has added -- go ahead,
15         Mr. Kraska.
16              MR. KRASKA:  I just indicated that it's also
17         inclusive of the workplace violence rule.
18              MR. ARBITRATOR:  Oh, okay.
19              MR. VINCENT:  I'm okay with that, Arbitrator
20         Barron.
21    (WHEREUPON, Joint Exhibit Numbers 1, 2, 3, 5, 6, 7, 9, and 10
22    were admitted into evidence.)
23              MR. ARBITRATOR:  All right.  Okay.  I believe
24         that the parties have not gotten an agreement as to the
25         issue.  So what I would like to do at this point is for
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

Page 27

1          the Company to articulate their version of the issue

2          and then I'll ask the Union to do the same.  And it is

3          my understanding then that I will make a determination,

4          at the time I write the opinion, to determine what the

5          issue should be used.  So why don't we start out with

6          the Company for the statement of the issue.

7              MR. KRASKA:  Thank you, Mr. Arbitrator.  The

8          statement of -- the Company statement of the issue is

9          did Linda Grays violate Company policy when she pulled

10         a weapon on a coworker.  The reasoning for this, Mr.

11         Arbitrator, is if you look to Exhibit 1, page 9, it's

12         under Step 4, subparagraph 2, specifically talks about

13         the arbitrator's authority.  And one, two, three --

14         about the fourth line down, in the second sentence,

15         starts out with, speaking about the arbitrator, "shall

16         have no authority to add to, take from, nullify or

17         modify any terms of this Agreement or any written

18         supplemental agreement, and he shall consider and

19         render a decision concerning only such issues as are

20         directly raised by written grievance, which shall not

21         be in any way materially changed or amended after it is

22         presented to the Company in Step 2 above."

23              So then if you look over to the grievance form,

24         specifically, the issue -- the nature of the grievance

25         is employee was terminated after having a conflict with

Page 28

1           another employee.  It cites to Article 8, Section A, B,

2           and all other applicable language.  Article 8, the

3           Company feels like the "all other applicable language"

4           and, obviously, the reference to Article 8 includes

5           Subsection C, which is "The Union and Company agree

6           that the Company has the right to create or modify

7           rules designed to maintain discipline and proper

8           personal standards of conduct such as the Company's

9           Mill Rules.  The employees agree to comply with the

10          Company's Mill Rules."

11               The Company's mill rules, which is in Exhibit 9,

12          specifically reference to the Company's workplace

13          violence policy.  Therefore, as stated in the grievance

14          form, the employee was terminated after having a

15          conflict with another employee that gets to the

16          employee's conduct which is governed by the mill rules,

17          which includes the workplace violence policy.

18               MR. ARBITRATOR:  Okay.  Mr. Kraska, it seems

19          to -- first, before I say that, Mr. Vincent, why don't

20          you state the language and the issue from the Union's

21          side.

22               MR. VINCENT:  Well, Mr. Arbitrator, we think it's

23          simple.  We're not trying to muddy the water and delve

24          too deep and try to tell you what you can and can't do.

25          The Company has to have just cause, according to the

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Page 29

1          collector bargain agreement, to terminate somebody.  So

2          the issue the Union would raise is did the Company have

3          just cause to termination Mrs. Grays?  And if not, what

4          is the proper remedy?

5               MR. ARBITRATOR:  Okay.  Is it seems to me, Mr.

6          Kraska -- I keep getting your name incorrectly and I

7          apologize.

8               MR. KRASKA:  Kraska.  No problem.

9               MR. ARBITRATOR:  Kraska.  Mr. Kraska, you

10         basically made an argument as to the limitations of

11         what I can or cannot do.  And if I were to give -- and

12         at that time, I assume in your brief, you will make

13         that argument.  Is that correct?

14              MR. KRASKA:  That's correct, Mr. Arbitrator.

15              MR. ARBITRATOR:  Okay.  So I will have your

16         argument in front of me for purposes of not only my

17         formulating the issue as I see it, but to understand in

18         rendering my opinion the limitations that has -- that

19         have been raised by the Company.  Okay?

20              MR. KRASKA:  Understood.

21              MR. ARBITRATOR:  Mr. Vincent, okay?

22              MR. VINCENT:  Yes, sir, Mr. Arbitrator.

23              MR. ARBITRATOR:  Okay.  I'd like a stipulation

24         that the matter is before me both procedurally and

25         substantively.  Is that correct?

Linda Grays Arbitration 5/19/2021                                          v.

```
                                                                Page 30
 1              MR. KRASKA:  Mr. Arbitrator, can you repeat that,
 2         please?
 3              MR. ARBITRATOR:  Can you stipulate that the
 4         matter before me is properly before me as to procedural
 5         or substantive issues?
 6              MR. KRASKA:  Yes, Mr. Arbitrator.  I do want to
 7         make one more point just about the exhibits, but we can
 8         get to that whenever you're ready.
 9              MR. ARBITRATOR:  Well, let's -- Mr. Vincent, do
10         you so stipulate?
11              MR. VINCENT:  Yes, sir, Mr. Arbitrator.  It's
12         properly before you.
13              MR. ARBITRATOR:  Okay.  Go back to your -- the
14         issue you're wanting to raise with an exhibit.
15              MR. KRASKA:  I just wanted to see if the Union
16         had received the pictures and videos we sent and
17         whether or not those were going to be considered joint
18         exhibits as well.
19              MR. ARBITRATOR:  Mr. Vincent?
20              MR. VINCENT:  Whatever safety videos -- we did
21         receive the pictures and videos.  To expedite the
22         process, we have no issues with making those joint
23         exhibits instead of, you know, making the Company put
24         them in one by one through a witness.  We'll just make
25         them joint exhibits to -- we probably need to number
```

Linda Grays Arbitration 5/19/2021                                    v.

Page 31

1         them.

2                 MR. ARBITRATOR:  Fine.  Give a number, Mr.

3         Kraska.

4                 MR. KRASKA:  Well, what are -- we end with 10?

5         The pictures will be Exhibit Number 11 if that's all

6         right.

7                 MR. ARBITRATOR:  Fine.

8                 MR. KRASKA:  And let me see what the specific

9         names of the -- Number 12 will be the video labeled

10        video from door.  Number 13 will be the video labeled

11        video from front of desk.  And Number 14 will be

12        labeled video of desk to cabinet.

13                MR. VINCENT:  Can you repeat that last part?

14        Desk to what?

15                MR. KRASKA:  Desk to cabinet.

16                MR. ARBITRATOR:  Cabinet?

17                MR. KRASKA:  Cabinet.  Yes.  Sorry.

18                MR. ARBITRATOR:  Is that it?

19                MR. KRASKA:  Yes.  The pictures, which is Number

20        11, do you want those individual pictures labeled as

21        separate or just can it all be one exhibit?

22                MR. ARBITRATOR:  Let's make a single one.

23                MR. KRASKA:  Single one.  Okay.  Then yes.

24                MR. ARBITRATOR:  Well, and why don't we do this:

25        When you -- when you use them, why don't we label them

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                        Page 32
 1          by A, B, C, whatever it is, as you go through them.

 2                  MR. KRASKA:  Okay.  As we go.

 3                  MR. ARBITRATOR:  So if we need to refer back to

 4          look for a particular photograph, we'll know which one

 5          we're referring to.

 6                  MR. KRASKA:  Okay.

 7                  MR. ARBITRATOR:  Okay?

 8                  MR. KRASKA:  Yes, sir.

 9  WHEREUPON, Joint Exhibit Numbers 11, 12, 13, and 14 were

10  admitted into evidence.)

11                  MR. ARBITRATOR:  All right.  Normally, I will

12          retain -- ask you to allow me to retain jurisdiction

13          for 60 days if I issue an award for the Union, simply

14          for retaining jurisdiction for the meaning or

15          implementation of such an award.  Is that agreeable to

16          the parties?

17                  MR. KRASKA:  Yes, Mr. Arbitrator.

18                  MR. ARBITRATOR:  Union?

19                  MR. VINCENT:  Yes, Mr. Arbitrator.  I'm actually

20          going to ask for that as well.

21                  MR. ARBITRATOR:  Okay.  All right.  I don't think

22          I've forgotten anything.  I think we're ready for an

23          opening unless someone has something else you want to

24          raise initially.  Carry on.  Let's have the Company

25          opening.
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                        Page 33
 1            MR. KRASKA:  Thank you, Mr. Arbitrator.  This
 2       matter is a narrow one.  It ultimately revolves around
 3       a two- to three-minute period, and more specifically,
 4       an approximate 15- to 20-second window within that
 5       period and the actions of two Union members in the
 6       bargaining unit.  The grievant will claim she was
 7       acting in self-defense when she pulled a knife on her
 8       fellow Union member, Larry Simmons.  However, the facts
 9       will show that the grievant did not pull a knife in
10       self-defense at all.  Instead, the grievant pulled a
11       knife as she continued to provoke Larry, who confronted
12       her about the falsehoods she had been spreading about
13       him in the plant.
14            She was not scared or frightened.  Instead, she
15       was seeing how far she could push him and even told
16       him, "Come at me inward."  This action was investigated
17       and it revealed that Mrs. Grays did not act out of
18       self-defense and was never in danger.  Thus, per
19       Company's properly promulgated mill rules and workplace
20       violence policy, she was terminated.
21            MR. ARBITRATOR:  Thank you.  Union, you want to
22       open now or do you want to wait until later?
23            MR. VINCENT:  I'll have an opening statement at
24       this time, Mr. Arbitrator.
25            MR. ARBITRATOR:  Okay.  Great.
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

Page 34

```
1              MR. VINCENT:  We appreciate your time here today,

2         Mr. Arbitrator.  The case before you is a termination

3         case.  On September 15 of 2020, the Company suspended

4         Ms. Linda Grays.  Then on October 2, the Company took

5         the most aggressive and most damaging disciplinary

6         action against Mrs. Grays and discharged her.  This has

7         been called by -- in legal scholars as the industrial

8         death penalty.  Mrs. Grays has given 33 years of her

9         life to this company.

10             The facts of this case are almost undisputed.  A

11        female employee with 33 years of service and a clean

12        record without a blemish of discipline has worked or

13        was working in her work area when a male coworker came

14        into the control room where she was preparing to start

15        her work.  She was confronted by him.  He was upset.

16        He was belligerent.  And despite her repeated pleas for

17        him to leave the control room, he persisted in his

18        verbal assault against his female coworker.

19             When Mrs. Grays was left no choice but to call

20        for her supervisor, who come and rescued her from this

21        serious event, this worker became so crazy and unhinged

22        that a fellow employee had to jump up and physically

23        restrain him.  Despite employee's attempt, he made

24        repeated lunges to physically confront Mrs. Grays.  She

25        was terrified and feared for her safety.  She continued
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Page 35

1        to back away from him.

2              Finally, as Mrs. Grays was backed up against a

3        counter and the only way to egress was blocked by this

4        enraged and out-of-control coworker, her hand found a

5        work knife.  Mrs. Grays never pointed it or made any

6        threatening gesture.  She just picked it up as a last

7        line of defense, Mr. Arbitrator.

8              It should be noted this was not a long and drawn-

9        out assault on Mrs. Grays.  This was a very quick and

10       violent one.  Mrs. Grays was in flight mode as she

11       feared for her wellbeing, her safety, and was cowering

12       from this attacker.

13             Despite these undisputed facts, the employer

14       terminated Mrs. Grays and charged her with a violation

15       of Clearwater Paper's workplace violence policy.  The

16       possession of a weapon includes the use of objects

17       intended for the use of harm and making threats to

18       others.  This so-called weapon was a kitchen knife that

19       had been in the breakroom area for decades, as you will

20       hear through testimony today.

21             The Company failed Mrs. Grays in terminating her.

22       She was the victim here.  The Company either lacks the

23       ability to do a proper and thorough investigation, or

24       for some unknown reason to the Union, has issues with

25       Mrs. Grays.  Mr. Arbitrator, we ask that you overturn

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

Page 36

1           this injustice and right this travesty that the Company

2           has imposed upon Mrs. Grays and her family.  We ask

3           that you sustain the grievance and make Mrs. Grays

4           whole and that you retain your jurisdiction in your

5           award.

6                MR. ARBITRATOR:  Okay.  Company want to call its

7           first witness?

8                MR. KRASKA:  Yes, Mr. Arbitrator.  We'd like to

9           call Dexter Madison.

10               MR. VINCENT:  Mr. Raney has gone to retrieve Mr.

11          Madison from his vehicle.

12               MR. ARBITRATOR:  Sure.  Okay.

13               MR. VINCENT:  Mr. Arbitrator, I guess for the

14          Union purpose, people that have backgrounds that are

15          not actually where they're at, could they take those

16          backgrounds down so we could see what's behind them?  I

17          think Ms. Calloway has a background up of the mill.

18          It's quite distracting.

19               MR. ARBITRATOR:  You view that as -- I didn't

20          understand.

21               MR. CROSS:  Rosie, can you take -- I think I

22          understand the question from Mr. Vincent.  You have a

23          picture of it looks like the mill in the background.

24          Is that a screenshot or that an actual photo that you

25          have behind you?

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                          Page 37
 1              MS. GARRIDO-CALLOWAY:  It's just a picture but
 2         I'll see if I can remove it.
 3              MR. CROSS:  If you can --
 4              MS. GARRIDO-CALLOWAY:  Give me a few minutes.
 5              MR. CROSS:  -- so we can see what's behind you.
 6              MS. GARRIDO-CALLOWAY:  Yeah, give me a few
 7         minutes.
 8              MR. CROSS:  Is that what you were saying, Mr.
 9         Vincent?  I just want to make sure I'm getting it
10         right.
11              MR. VINCENT:  That's correct.
12              MS. GARRIDO-CALLOWAY:  I may have to disconnect
13         and reconnect.  I cannot find the button where to turn
14         it off.
15              MR. KRASKA:  I think, Rosie, too, we might need
16         someone to go mute the microphone in the Company's
17         testimony room too.
18              MS. GARRIDO-CALLOWAY:  It will turn off in just a
19         moment.
20              MS. PATTERSON:  All right.  So there's a start
21         video button.  There should be, like, a little "up"
22         button next to it.  And then there's a setting that
23         says choose for background, and that's where you can
24         turn it off at.
25              MR. ARBITRATOR:  Well done.  Perfect.  Okay.
```

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                      Page 38
 1          MR. KRASKA:  Mr. Arbitrator, before we begin, I

 2     just have one quick procedural kind of question here.

 3     As far as introducing evidence through the platform,

 4     will I just -- will Ms. Patterson share the screen or

 5     will I need to share the screen?

 6          MS. PATTERSON:  No, I will share the screen,

 7     assuming that I received all the exhibits from you.

 8          MR. KRASKA:  I sent you our numbered exhibits

 9     this morning.

10          MS. PATTERSON:  Yes.  I believe it's Company 1

11     through 5.

12          MR. KRASKA:  That's correct.

13          MS. PATTERSON:  Yep.  So I'll pull those up as a

14     reference them.

15          MR. KRASKA:  And then we have all the joint

16     exhibits here with us as well?

17          MS. PATTERSON:  That's correct.

18          MR. KRASKA:  Thank you.

19          MR. ARBITRATOR:  All right.  Why don't you swear

20     in Mr. -- I think it's muted.  Mr. Madison, say

21     something.

22          MR. MADISON:  Hey.

23          MR. ARBITRATOR:  Now we can see you.  Mr.

24     Madison, I just want to make sure.  There should be

25     nobody else in the room.  Is that correct?
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                      Page 39
 1              MR. MADISON:  Yes.

 2              MR. ARBITRATOR:  Okay.  Go forward.

 3                      DEXTER MADISON,

 4  having been first duly sworn, testified as follows:

 5                      DIRECT EXAMINATION

 6  BY MR. KRASKA:

 7  Q.  Morning, Mr. Madison.  Can you please state your name for

 8  the record?

 9  A.  Morning.  Dexter Madison.

10  Q.  Thank you.  And what is your position with the Company?

11  A.  Coating prep assistant.

12  Q.  And how long have you worked for the Company?

13              THE COURT REPORTER:  I'm sorry.  I didn't

14         understand his answer of his position.

15  A.  Coating prep assistant.

16  Q.  And how long have you worked for the Company?

17  A.  Eight years.

18  Q.  And do you know Linda Grays?

19  A.  Yes.

20  Q.  How do you know her?

21  A.  Through work.

22  Q.  How do you know Mrs. Grays?

23  A.  Through work.  Work.

24  Q.  And how long have you known Mrs. Grays?

25  A.  Probably (inaudible).
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                              v.

```
                                                    Page 40
 1              MR. ARBITRATOR:  We're not -- we're not hearing
 2         you.
 3    A.    The eight years I've been there.
 4              MR. CROSS:  Sorry.  That broke up a little bit.
 5         I couldn't hear hardly anything he said.
 6    Q.  Mr. Madison, just for -- so we can try to -- the Zoom
 7    stuff.  What I'm going to do, if I say the question, if you
 8    want to wait maybe like two or three seconds before you answer
 9    just in case there's some lag, if that's all right with the
10    arbitrator and everyone else just to --
11              MR. ARBITRATOR:  Of course.
12    Q.  Okay.  All right.  So correct me if I'm wrong.  You said
13    you've known Mrs. Grays for approximately eight years?
14    A.  Or longer.
15    Q.  Okay.  Thank you.  And do you know who Larry Simmons is?
16    A.  Yes.
17    Q.  And how do you know Mr. Simmons?
18    A.  Through work also.
19    Q.  And approximately how long have you known Mr. Simmons?
20    A.  Probably year-and-a-half or two years.
21              MR. ARBITRATOR:  Mr. Madison, I know it's hard to
22         do this because it's on Zoom, but if you could speak a
23         little bit louder, that would be really helpful.
24              THE WITNESS:  Okay.
25              MR. ARBITRATOR:  Go ahead.
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                    Page 41
 1   Q.  Okay.  Thank you.  Do you recall an event where you were
 2   present and Linda was talking with Justin White about some
 3   cooking oil?
 4   A.  Yes.
 5   Q.  And just to clarify, you were present at that event?
 6   A.  Yes.
 7   Q.  Do you remember approximately when this was?
 8   A.  Probably over a month before the incident happened.
 9            MR. ARBITRATOR:  Yeah, you're breaking up.
10   A.  Probably a month before Larry and Linda incident.
11   Q.  Okay.  Thank you.  And what did -- what did Linda say to
12   Justin?
13   A.  That he took the cooking oil.
14   Q.  Do you know why she said that?
15   A.  I guess because he did.
16   Q.  And did you say anything to Justin at this time?
17   A.  At the time, no.  She had said it before I got --
18   Q.  And after she said this comment, was she laughing about it
19   or boasting about making this comment?
20   A.  No.
21   Q.  Do you know if she told any other employees in the plant
22   about it?
23   A.  Well, I know that she told the relief at that point, the
24   evening, well, that morning we get off.
25   Q.  So she told other employees about what she said to Justin
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                              v.

```
                                                      Page 42
 1   White?

 2   A.   Not all.   Just two people.   That were relieving us.

 3   Q.   Okay.  But she told them that she told Justin White that

 4   Larry took the oil?

 5   A.   Yes.

 6   Q.   Were you in the control room when the incident between

 7   Linda and Larry occurred?

 8   A.   Yes.

 9   Q.   You remember approximately when that occurred?

10   A.   Talking about, like, what date it was or --

11   Q.   Sure.  Just a timeframe.

12   A.   Soon we got to work that evening.

13   Q.   Okay.  And how about, like, a date or a month?  Can you --

14   A.   It was -- it was in September.

15   Q.   Okay.

16              MR. ARBITRATOR:  What is the start -- excuse me.

17         So I understand you said it was at the start of your

18         shift.  Would you tell me what time of day that was?

19              THE WITNESS:  In the evening time.  5:45 to be

20         exact.

21              MR. ARBITRATOR:  Thank you very much.

22              THE WITNESS:  Okay.

23              MR. KRASKA:  Okay.  Thank you, Mr. Arbitrator.

24         That's what I was going to ask.

25              MR. ARBITRATOR:  Then I'll keep my mouth shut and
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

Page 43

1          give you the opportunity to do what you -- your job.

2     BY MR. KRASKA:

3     Q.   Real quick, Mr. Dexter -- Madison.  Sorry.  Mr. Madison,

4     when Linda was talking -- I want to back up a little bit.  When

5     Linda was talking to Justin White, did she say that Larry took

6     the oil like it was his?

7     **A.   Yes.**

8     Q.   Okay.  Now, let's fast-forward again.  Correct me if I'm

9     wrong.  You said the incident occurred approximately around

10    shift change, which was around 5:45 p.m.  Is that right?

11    **A.   Yes.**

12    Q.   Okay.  And you said it was in the control room.  Is that

13    correct?

14    **A.   Yes.**

15    Q.   Okay.  Ms. Patterson, can we put up Joint Exhibit Number

16    12, please.

17              MS. PATTERSON:  I'm here.  I'm just pulling it

18         up.  Does this have sound with it?

19              MR. KRASKA:  It does but the sound is just

20         background noise.  If the Union is all right with that,

21         I don't think we need to play the sound.  It's --

22         again, we can play it though.  It will just be loud.

23    BY MR. KRASKA:

24    Q.   All right.  Mr. Madison, do you recognize the room in this

25    video?

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                        Page 44
 1    A.  Yes.

 2    Q.  And can you verify that that is, in fact, the control room

 3    where the incident took place?

 4    A.  Yes.

 5              MR. KRASKA:  And Ms. Patterson, can we put up

 6              Joint Exhibit Number 11, please.  Okay.  And can you

 7              scroll just -- yeah, center on this picture please.

 8              Okay.  We'll mark this as Joint -- Joint 11A.  Is that

 9              all right?

10              MR. ARBITRATOR:  That's fine.

11    BY MR. KRASKA:

12    Q.  Okay.  Mr. Madison, can you also verify that this is an

13    accurate picture of the room where you were at where the

14    incident occurred?

15    A.  Yes.

16    Q.  Okay.  And is it possible for you to describe where you

17    were standing in the room when this incident occurred?

18    A.  Where was I sitting at the time when they -- when they

19    started?

20    Q.  Yeah, when it started.

21    A.  Okay.  I was sitting in that chair right there to your

22    left.

23    Q.  To the left?

24    A.  Yes.

25    Q.  Is that accurate?
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Page 45

1    **A.   Yes.**

2    Q.   Okay.  And can you tell me where Linda was?

3    **A.   Linda was behind the computers over there.**

4    Q.   Okay.  Behind there?  Okay.  And can you point out to where

5    Larry was?

6    **A.   Larry -- he was right there.  You see where those little**

7    **blue things are to your right?  He was standing in that area**

8    **right there.**

9    Q.   Okay.  Thank you.  And --

10             MR. ARBITRATOR:  Just -- if I may, just so it's

11        clear when I go back, we're really talking about

12        someone shortly to the right here, to the back of the

13        picture on some sort of a desk and it has three -- two

14        or three blue items beside it.  I just want to be

15        able -- when I go back and look at them, I'll know

16        exactly what we're talking about.  I apologize for

17        interrupting.

18             MR. KRASKA:  Mr. Arbitrator, if I may, can we

19        scroll through and let's just get these pictures

20        labeled?  Because I think there's a better picture in

21        here.  So can we scroll down to the next picture,

22        please?  I'd like to make this 11B.  Joint 11B.  If we

23        could go to the next picture, please.  Well, does the

24        Union accept that?

25             MR. VINCENT:  Yeah, we accepted all these as

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                          v.

```
                                                    Page 46
1          joint exhibits.
2               MR. KRASKA:  Just wanted to make sure you had the
3          numberings correct, Mr. Vincent.  And we'll have this
4          one be Joint 11C.  And then this will be Joint 11D.
5          And this will be E -- Joint 11E.  And if we could,
6          could we rotate this, Ms. Patterson, please.
7   BY MR. KRASKA:
8   Q.  Okay.  And this may be a little bit better description or a
9   little bit wider angle so you can see.  So Mr. Madison, can
10  you, again, describe where Larry was?
11  A.  He was right there beside the file cabinet right there.
12  No, not -- the other one.  Yes.  Right there.
13  Q.  Okay.  Thank you.  And what started the incident between
14  Linda and Larry?
15  A.  Larry had heard that Linda had told that he had got the
16  cooking oil.
17  Q.  Okay.  And what did Larry say to Linda?
18  A.  When Linda got there, he said, "Ms. Linda, I'd like for you
19  to keep my name out your mouth."
20          And then Linda said, "What are you talking about,
21  Larry?"
22          And he said, "You know what the hell I'm talking
23  about.  I'm talking about the damn cooking oil."
24  Q.  Okay.  And Linda, when she responded to him, was she
25  laughing at him or taunting him?
```

Ronda Dodd-Brown
Bushman Court Reporting                          501-372-5115

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                          Page 47
 1   A.  No, not at all.

 2   Q.  Did she ignore him at all when he was trying to talk to

 3   her?

 4   A.  Talking about in the time of the incident?

 5   Q.  Yes.

 6   A.  No.  She was just trying to tell him to get out because she

 7   saw how he was getting --

 8   Q.  Okay.  And --

 9   A.  -- loud with her and stuff.

10   Q.  Okay.  And when he first came in there and made that

11   comment, how did he make that comment?  Was he yelling or was

12   he calm?

13   A.  Well, at first, he was calm when he said, "Ms. Linda, I'd

14   like for you to keep my name out your mouth."

15           And then when Linda said, "What are you talking about,

16   Larry," that's when he got loud with her.

17   Q.  Okay.  And you mentioned that Larry was standing there

18   right where the cursor is by that file cabinet.  Did Larry move

19   at all after --

20   A.  Yes.

21   Q.  -- after the incident started?

22   A.  Okay.  At the time, he was over there where -- I was over

23   there at the computer, you know, where the desk -- where that

24   chair was.  He was over there telling me what he had going on,

25   because I was his relief.
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                              v.

```
                                                    Page 48
  1   Q.  Okay.
  2   A.  And then by the time when I had to get up to stop him, he
  3   was right there by the file cabinet.
  4   Q.  Okay.  And can you -- can we just make a note that Larry
  5   initially started over here on the left and then moved over to
  6   the right --
  7              MR. VINCENT:  I object.  I object.  That's a
  8         mischaracterization of Mr. Madison's testimony.  That's
  9         not what he said.
 10   Q.  Okay.  Mr. Madison, I'll ask you again.  You said earlier
 11   that Larry was standing over by you, telling you what was going
 12   on because you were his relief.  And then he moved -- you said
 13   that he moved over by the file cabinet.  Is that accurate of
 14   what you said?
 15   A.  Yes.  After they got to arguing and stuff, that's when he
 16   moved over there.
 17   Q.  Okay.  Thank you.  Did -- as they started arguing, did
 18   Larry get louder?
 19   A.  Very.
 20   Q.  Did Linda get louder?
 21   A.  No.
 22   Q.  Linda was arguing back with him though?
 23   A.  Well, she wasn't arguing.  She was just really telling him
 24   he needed to get out.  Because she saw -- I guess she saw a
 25   side that she'd never seen before and she was like, "You need
```

Linda Grays Arbitration 5/19/2021                                          v.

Page 49

1    to get out."

2    Q.  So when she asked what Larry meant by keeping her name out

3    of his -- or keeping his name out of her mouth, they weren't

4    arguing?

5    **A.  No, they weren't arguing at the time.  Well, he was just**

6    **saying, "You need to keep my name out your mouth."**

7            **And then when Linda said, "What are you talking**

8    **about," that's when he got loud.**

9    Q.  And then they stopped arguing?

10   **A.  I didn't say Linda was arguing.  I said he was yelling at**

11   **her.  Linda was calm, telling him to get out.**

12   Q.  Okay.  Did Linda have a can of Lysol in her hand during

13   this incident?

14   **A.  No.  I didn't see it.**

15   Q.  She never -- you never saw a can of Lysol in her hand?

16   **A.  No.**

17   Q.  Okay.  Did you see Linda make a call on a radio during this

18   time?

19   **A.  Yes.**

20   Q.  Okay.  And do you know who she called?

21   **A.  She called Justin White.**

22   Q.  Okay.  Did you hear her say anything on that call?

23   **A.  I heard her call Justin White name twice.**

24   Q.  That's all she said?

25   **A.  Yes.  That's all she was able to because how Larry was**

Linda Grays Arbitration 5/19/2021                                v.

```
                                                      Page 50
1    going, getting angry with her.

2    Q.  Okay.  And you mentioned earlier that you had to get up in

3    between Larry and Linda, and you mentioned that Larry had moved

4    over towards the file cabinet.  So when you got in between

5    Larry and Linda, Larry was at the file cabinet and Linda was

6    still behind the desk.  Is that accurate?

7    A.  Yes.

8    Q.  Okay.  And you got up to move in between them because the

9    argument was getting louder.  Is that correct?

10   A.  Well --

11           MR. VINCENT:  I object to the mischaracterization

12       of Mr. Kraska.  Mr. Madison has testified that there

13       was a one-sided argument.  He keeps saying argument,

14       which is a mischaracterization of his testimony.

15           MR. KRASKA:  Okay.  I would disagree with that

16       mischaracterization.  I'm going off of what the prior

17       testimony was.  But you know, I'll ask it again.

18   BY MR. KRASKA:

19   Q.  So when Larry and Linda -- during this incident between

20   Larry and Linda, as it got louder, did you move in between

21   them?

22   A.  I moved in between them when Larry started charging near

23   Linda.

24   Q.  Okay.  So you said that Larry started charging at Linda?

25   A.  Yes.
```

Linda Grays Arbitration 5/19/2021                              v.

Page 51

```
 1   Q.  Can you describe -- or I know the camera there might be a

 2   bad angle, but can you describe what charging is or what

 3   charging was?

 4   A.  Yes, I can.

 5   Q.  Okay.

 6   A.  Had his fists balled up like he was ready to attack her or

 7   something.  That's when I stepped in front of him.

 8   Q.  Okay.  And again, when he did that, he was back at this

 9   cabinet and you were sitting in the chair to the left?

10   A.  Sitting in the chair.  And then I slid over and got in

11   front of him in time.

12   Q.  Okay.  So you had the chair with you when you slid over?

13   A.  Yes.  It's a rolling chair, yes.

14   Q.  Gotcha.  And when you were in between them, can you

15   describe how you were standing in between them?  Or show us?

16   A.  I'm pushing Larry, you know, trying not to get to Linda.

17   Q.  Okay.  So you were -- you were physically pushing Larry?

18   A.  Yes.

19   Q.  And how tall are you?

20   A.  Six-five.

21   Q.  Okay.  This is, well, one more quick question.  So you slid

22   over and you were facing Larry with your hands out.  Is that

23   correct?

24   A.  Yes.

25   Q.  At no time were you standing in between Larry and Linda
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Page 52

1   with your arms extended, were you?

2   **A.  No.  I was just trying to push Larry out the way from**

3   **getting to Linda.**

4   Q.  Okay.  Ms. Patterson, can we take a look at the Company's

5   Exhibit 1, please?  Okay.  Mr. Madison, in this picture, do you

6   recognize the room here?

7   **A.  Yes.**

8   Q.  Okay.  Is that the control room where the incident

9   happened?

10  **A.  Yes.**

11  Q.  Okay.  And the person on the left standing, is that you?

12  **A.  Yes.**

13  Q.  Okay.  And the person on the right, is that Mr. Larry

14  Simmons?

15  **A.  Yes.**

16  Q.  Okay.  And let's see.  So when Larry made his movement

17  towards Mrs. Grays, had she pulled the knife at this time?

18  **A.  At the time, no, she hadn't.**

19          MR. VINCENT:  Objection.  Objection.  There's no

20          foundation.  And mischaracterization about pulling a

21          knife.

22          MR. KRASKA:  No foundation?

23          MR. VINCENT:  Ask for --

24          MR. ARBITRATOR:  Whoa, whoa, whoa.

25          MR. VINCENT:  Asking him to lay some foundation.

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                        Page 53

 1                MR. ARBITRATOR:  I don't understand the lack of

 2           this.  I mean, there is no question in this case that

 3           it relates to handling -- unless you're planning to

 4           argue, Mr. Vincent, that the grievant never took a

 5           knife.  Is that going to be your view?

 6                MR. VINCENT:  No, Mr. Arbitrator, that is not the

 7           Union's view.  But the Company keeps -- they're

 8           interjecting testimony that nobody has even testified

 9           to yet.  He should lay a foundation.  He called Mr.

10           Madison as his witness.  He should lay a foundation.

11                MR. ARBITRATOR:  Well, he was -- the question

12           was, to Mr. Madison, did you see "x."  Seems to me

13           that's an appropriate question for him to answer.  Go

14           forward.

15                MR. KRASKA:  Thank you, Mr. Arbitrator.

16      BY MR. KRASKA:

17      Q.  So just to clarify, Mr. Madison, when you got in between

18      Larry and Linda, did Linda have a knife in her hand?

19      A.  No.

20      Q.  Thank you.  At this time, can we go back to -- let me see,

21      Ms. Patterson.  I'm sorry.  Can we go back to Exhibit 11E,

22      please?  Or actually 11C.  And we'll have to rotate it again.

23      Sorry.  Okay.  Mr. Dexter, is this an accurate reflection of

24      the area behind the desk where Mrs. Grays was standing?

25      A.  Yes.
```

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                         Page 54
 1   Q.  And is this the area where she pulled the knife from?

 2              MR. VINCENT:  Objection.

 3              MR. ARBITRATOR:  Hold on.  No, no, no.  Ask the

 4         first question, "Did she?"

 5   Q.  Did she --

 6              MR. ARBITRATOR:  And then "When?"

 7   Q.  Yes.  Did she pull the knife?

 8   A.  Did she pull the knife?

 9   Q.  Yes.

10   A.  She grabbed the knife.

11   Q.  She grabbed a knife?  Is that what you said?

12   A.  Yes.

13   Q.  Okay.  Is this where she grabbed the knife from?

14   A.  Around the area, yes.

15   Q.  Okay.  Thank you.  Okay.  Can we go down to 11E, please,

16   Ms. Patterson?  Now, during this time, where were you standing?

17   A.  During what time?

18   Q.  During the time when Mrs. Grays -- you had just testified

19   that she had went over and grabbed a knife from the area kind

20   of directly straight back in this picture.

21              MR. ARBITRATOR:  Mr. Kraska, I don't think that

22         was the testimony.  The testimony -- there's no

23         testimony that she moved.  There was only testimony

24         that she picked up --

25              MR. KRASKA:  The testimony that came in earlier
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                      Page 55
 1            was that -- was asking if she moved -- the picture that

 2            I -- that I pulled up earlier was a picture -- I asked

 3            if this is the area where she was.  11C.  And it's a

 4            different angle but it's that angle right there.  It's

 5            that area.

 6                 MR. ARBITRATOR:  Right.

 7                 MR. KRASKA:  Which is a straight-on picture.  I

 8            asked if that's where she was.  He said yes.  I said,

 9            "Is this where she grabbed the knife?  He said yes.  So

10            what I'm asking is during that time, where was he and

11            where was Larry?  That's what I'm asking.

12                 MR. ARBITRATOR:  I'm sorry.  I misunderstood your

13            question.  Go ahead.

14       BY MR. KRASKA:

15       A.  In one of the pictures you just showed me Larry standing

16       in, that's where I was.

17       Q.  Okay.  Can we pull up Company Exhibit 1, please?  Okay.

18       And is it possible from this angle of this picture, Mr. Dexter,

19       to point out where Mrs. Grays was?

20       A.  See where that blue thing at?  Over.  Yeah, right in that

21       area right there.

22       Q.  Right there.  Okay.  Thank you.

23                 MR. ARBITRATOR:  Indicate what that area is.

24                 MR. KRASKA:  Excuse me?

25                 MR. ARBITRATOR:  Indicate it where that you say
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                          Page 56
 1          it's there.
 2                 THE WITNESS:  Right by the sink over there.
 3                 MR. ARBITRATOR:  Okay.
 4                 THE WITNESS:  Against the sink.
 5   BY MS. KRASKA:
 6   Q.  By the sink is an accurate reflection of where Mrs. Grays
 7   was at this time?
 8   A.  Yes.  Yes.
 9   Q.  Okay.  And at this time, when you got up and got in between
10   them, was this before or was it after Mrs. Grays called on the
11   radio?
12   A.  It was before she called.
13   Q.  So you got up in between them before she called on the
14   radio?
15   A.  Yes.
16   Q.  Okay.
17   A.  Well, it was after -- no, it was after.  She already called
18   when we standing right there right now.  She already had called
19   supervision, Justin White.
20   Q.  Okay.  Thank you.
21   A.  Yeah.
22   Q.  And while she was standing here, did you hear her say
23   anything?
24   A.  Only thing I heard her say, "Get out, Larry."
25   Q.  Did you hear her say, "Come at me inward"?
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                          Page 57
1    A.  No, not at all.

2    Q.  Did you hear her say, "You'll have to deal with my

3    husband"?

4    A.  I haven't -- I didn't hear it.

5    Q.  Okay.  So approximately how long were you standing here in

6    this position when Mrs. -- when Linda had the knife?

7    A.  There was a boom-boom.  I can't explain what time was

8    but --

9    Q.  Not specific -- I'm saying how long did you -- were you all

10   in this position as we have described?

11   A.  Probably 15 to 30 seconds, me pushing him out the door.

12   Q.  Okay.  And you just said that you pushed him out the door.

13   So if I'm hearing you correctly, you got in between them.  It

14   was about 15 seconds.  And the next thing you did was push

15   Larry out the door?

16   A.  It's not accurate, that 15 seconds, but around that time,

17   yeah.

18   Q.  Around -- okay.  So what -- how -- then go ahead and be as

19   accurate --

20   A.  I'm not -- I don't know the accurate.

21   Q.  Okay.

22   A.  It was boom-boom.  It was so quick.  I'm not for sure.

23   Q.  Okay.  And so also, just to clarify, you said this is all

24   occurring after the call on the radio.  Correct?

25   A.  Yes.
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                              Page 58
 1   Q.  The timeframe we're talking about.  And after she made the

 2   call on the radio, that's when she grabbed the knife?

 3   A.  It wasn't just soon as she grabbed the knife.  It was,

 4   like, when he was tousling and trying to get around.  I'm

 5   assuming that when she grabbed the knife.  Because I didn't see

 6   the knife until I was pushing Larry out the door.

 7           He said, "You pulled a mother-fucking knife on me."

 8           And that's when I looked back and saw that she had the

 9   knife and that's when I pushed him on out the door.

10   Q.  Okay.  Thank you.  And did she grab anything else that you

11   saw?

12   A.  Not that I know of.  I think she had a phone in her hand,

13   I'm thinking.

14   Q.  Okay.

15   A.  Not for sure.

16   Q.  You're not for sure?

17   A.  Like I said, it was boom-boom.

18   Q.  Thank you.  And you said that you had to push Larry out the

19   door.  Correct?

20   A.  Correct.

21   Q.  Okay.  And did you have to physically push him out of the

22   room?

23   A.  Yes.

24   Q.  Okay.  And when you say physically push him out of the

25   room, can you describe what that means?
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                          Page 59
 1    A.   Just pushed him out the room.  What's to describe with
 2    that?
 3    Q.   Well, can you, like, did you have to bear hug him?
 4    A.   No.  Just play offensive line.  I just pushed him out the
 5    way.
 6    Q.   Okay.  You say you played offensive line.  So was it more
 7    like just kind of like a touching like, "Hey"?
 8    A.   Yeah.  Like just, yeah, you know, no get physical, yeah.
 9    Q.   Okay.  Thank you.  And once you pushed him out the room,
10    what happened then?
11    A.   By that time, that when Justin White came and --
12    Q.   Oh.
13    A.   And that was it.
14    Q.   And who is Justin White, just to clarify?
15    A.   He was the supervisor.
16    Q.   Supervisor.  Okay.  And did you talk with him?
17    A.   I didn't talk with him.  But Larry -- soon he got out,
18    Larry said, "You better get that bitch.  She just pulled a
19    mother-fucking knife on me."
20    Q.   Okay.  And once Larry was outside the room, the supervisor
21    was there.  He talked to the supervisor.  What happened next?
22    A.   All I know -- I can't remember what happened next.  Well,
23    all I know that Larry went over to the -- to the breakroom.
24    Then he was still pitching a fit over there.  That's all I
25    know.
```

Linda Grays Arbitration 5/19/2021                              v.

```
                                                    Page 60
 1   Q.   Okay.  And do you know where Linda went after the --
 2   A.   No.  Linda stayed in the control room.
 3   Q.   Okay.  Did you go back into the control room?
 4   A.   Yes.
 5   Q.   Okay.  And did you talk to Linda at that time?
 6   A.   Well, talk to -- well, by that time, Justin White and
 7   Robert Chatham was coming to get her to tell her that she had
 8   to go home.
 9   Q.   Okay.  During this whole time when you were in the control
10   room and Linda was telling Larry to get out -- she was telling
11   Larry to get out.  Is that correct?  That's what you said
12   earlier.
13   A.   Yes.
14   Q.   And she never raised her voice during that time?
15   A.   No.  She was calm.  I could tell that she was scared.
16   That's what made me stand up when he started charging at her.
17   Q.   Okay.  And are you aware that the Company has a harassment
18   and workplace violence policy?
19   A.   Yes.
20   Q.   Okay.  And are you aware of the Company's mill rules?
21   A.   Yes.
22          MR. KRASKA:  Okay.  All right.  Mr. Arbitrator,
23       that's all the questions I have for this witness right
24       now.
25          MR. ARBITRATOR:  Okay.  I'm sorry.  Mr. -- Mr. --
```

Linda Grays Arbitration 5/19/2021                                      v.

```
                                                        Page 61
 1          where are you -- Mr. Vincent, what are you going to do?
 2                MR. VINCENT:  I'll go ahead and cross Mr. Madison
 3          while we've got him up here.
 4                MR. ARBITRATOR:  Okay.  Are you planning to call
 5          him as well or not?
 6                MR. VINCENT:  I'm just going to cross him now and
 7          if -- I might not -- I might not have a need to call
 8          him after while.
 9                MR. ARBITRATOR:  Okay.  That's fine.  Go ahead
10          and cross.
11                          CROSS-EXAMINATION
12     BY MR. VINCENT:
13     Q.  Mr. Madison, I want to back up a little bit and kind of
14     make things clearer and more up front and open.  So you
15     testified earlier about Justin White was looking for some
16     cooking oil, so I want you to back up to that timeframe.
17     A.  Okay.
18     Q.  When the supervisor, Justin White, came into the control
19     room, can you explain, like, what he was asking and what he was
20     looking for?  Kind of walk through the details of that?
21     A.  Well, he came in the control room through the door and went
22     straight to the closet that we have in there.  And he's opening
23     the door looking, looking.  Came out the closet and said, "Who
24     took my cooking oil?"
25                And so Linda, she like, "Dex, you gonna tell him?"
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                            Page 62
 1   And right before I fittin to tell him, that's when Linda said,

 2   "Larry Simmons took the cooking oil."  We said this together.

 3   Q.  Now, let me ask you this question:  Mr. White was in the

 4   role as a supervisor.  Is that correct?

 5   A.  Correct.

 6   Q.  And he was looking for something that was missing.  Is that

 7   correct?

 8   A.  Correct.

 9   Q.  And so when he asked you that question, there was, I mean,

10   honesty was, of course, what you were looking to do.  Right?

11   Be honest?

12   A.  Yes.

13   Q.  And did you -- when you said that you both said that Larry

14   Simmons took the cooking oil, did --

15            MR. KRASKA:  Objection, your Honor.  You're

16            interjecting.  He did not say that they both said it.

17            He just said that he did not say that.  He said that --

18            he specifically just said that, "Before I said

19            anything."  That means he didn't say it.  So again, I'm

20            going to object because you're interjecting his

21            testimony.  It's not what he said.

22            MR. ARBITRATOR:  Mr. Vincent?

23            MR. VINCENT:  Mr. Arbitrator, I'd like the court

24            reporter to go back and read actually what Mr. Madison

25            said.  Because he did, in fact, say that.
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

---

```
                                                        Page 63

 1                MR. ARBITRATOR:  Mrs. Brown?

 2     (WHEREUPON, the requested testimony was read back by the court

 3     reporter.)

 4                MR. KRASKA:  I think you need to clarify more

 5          again.  From his testimony, I mean --

 6                MR. ARBITRATOR:  Whoa, whoa.  One at a time.  One

 7          at a time.

 8                MR. VINCENT:  Mr. Madison -- the court reporter

 9          just read the official transcript.  He said, "We both

10          said it together."  I don't know how much clearer we

11          can make that.

12                MR. KRASKA:  Well, right before he said that, he

13          said, "before I said anything," and then he said that.

14          So I think you'd at least need to clarify and ask him

15          again whether or not he said it before you start

16          interjecting the testimony.

17                MR. VINCENT:  Mr. Barron, does Mr. Kraska need

18          Mrs. Brown to read that again where Mr. Madison said,

19          "We both" --

20                MR. KRASKA:  Do we need to go back and read the

21          testimony where he testified to me just a second ago

22          that he didn't say anything?  When I was on direct?  Do

23          we need to go back and read that?

24                MR. ARBITRATOR:  Mr. Kraska, what are you asking?

25                MR. KRASKA:  I'm asking him not to interject
```

---

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                         Page 64
  1        testimony.

  2             MR. ARBITRATOR:  And what -- no.  What is the

  3        testimony that you're referring to?

  4             MR. KRASKA:  I think he needs to clarify whether

  5        or not Mr. Madison said what he is saying in his

  6        question to Mr. White.  From the testimony that Mrs.

  7        Brown just read, he was at least very unclear of what

  8        he was saying.  So at least just clarify that and then

  9        we can move on.

 10             MR. ARBITRATOR:  What do you want to know?

 11             MR. KRASKA:  I want to know if he told -- if his

 12        testimony here today now on cross is that he did, in

 13        fact, say, with Linda together, that Larry took the

 14        oil.  That they said it together.

 15             MR. ARBITRATOR:  That's the question?

 16             MR. KRASKA:  That's the question.  Because he

 17        didn't say that to me and as my objection, as I stated,

 18        Mr. Vincent, the testimony earlier was unclear.  So at

 19        least just clarify it and then we can move on.

 20             MR. ARBITRATOR:  Mr. Vincent, I think the

 21        question is did they say what they were saying at the

 22        same time.  Is that correct, Mr. Kraska?

 23             MR. KRASKA:  Yes.  Or is he now saying that he

 24        did say that?  Because that's what I want to clarify.

 25             MR. ARBITRATOR:  It's unclear to me -- why don't
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                          Page 65
 1          we do this in a different way.  Mr. Vincent, why don't
 2          you describe what was going on at that point.  Okay?
 3          Just so we can move on.
 4                MR. VINCENT:  I'm fine.  I think the record
 5          speaks for itself.  I'll move on to the next question.
 6                MR. ARBITRATOR:  Okay.  Go for it.
 7   BY MR. VINCENT:
 8   Q.  So when Mr. White, the supervisor, was notified that Larry
 9   Simmons had came and got the oil, what did Mr. White say?
10   A.  He said that he was going to have a word with Larry.  Talk
11   to him about it -- getting that cooking oil.
12   Q.  But y'all didn't want Larry to get in trouble.  Is that
13   correct?
14   A.  Say what -- say it again.  I couldn't hear you.
15   Q.  You didn't want Mr. Simmons to get in trouble though.  Is
16   that correct?
17   A.  Correct.
18   Q.  You were just answering a supervisor's question.  Correct?
19   A.  Correct.
20   Q.  Let's move forward to the day of the incident that you
21   described earlier.  Can you pull up Joint Exhibit 11, please?
22   Is that 11A?  Mr. Madison, it was your testimony earlier that
23   you were sitting in that chair.  Is that correct?
24   A.  Correct.
25   Q.  When Mr. Simmons came in -- when he first came in the
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                              v.

Page 66

1    control room, is that when he explained to you what you were

2    going to be looking at for your shift as far as what he was

3    leaving or what you were coming into?

4    **A.  Yes.**

5    Q.  And after you had that conversation, where did Mr. Simmons

6    walk to then?

7    **A.  Well, as he told me what he had going on, he was walking**

8    **towards over here by the -- where the cabinet was.  I guess**

9    **that's where his backpack and stuff was.  And that's when he**

10   **was saying, "Ms. Linda, I appreciate it if you keep my name out**

11   **your mouth."**

12   Q.  Now, your testimony was that Larry Simmons was starting to

13   get loud.  Is that correct?

14   **A.  Correct.**

15   Q.  Was Mr. Simmons using profanity?

16   **A.  Yes.**

17   Q.  Was Mrs. Grays using any profanity?

18   **A.  No.  Only thing she was --**

19   Q.  Was Mrs. Grays -- sorry.  Was Mrs. Grays' voice raised or

20   elevated?

21   **A.  Not at all.  She was calm and actually scared, trying to --**

22   **just telling him to get out of there.**

23   Q.  How many times do you recall Mrs. Grays asking Larry

24   Simmons to get out of the room?

25   **A.  I'd say at least three times.**

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                        Page 67
1    Q.  At least three times?  Okay.

2    A.  Uh-huh.

3    Q.  So your testimony was that Mrs. Grays was behind the

4    computer.  Is that correct?

5    A.  Correct.

6    Q.  When you're back there, is there any way to get out of that

7    room?  Is there any doors back there?

8    A.  No.  Only thing back there is that window right there where

9    the air conditioner is.  That's the only way she could have got

10   out.

11   Q.  So if somebody is standing at the corner of that desk and

12   blocking that aisleway, is there any way to escape that area?

13   A.  No.

14   Q.  Would you -- would you say that you would be trapped if you

15   were standing back there?

16   A.  Yes.

17   Q.  So you -- oh, you described that you heard Mrs. Grays call

18   for the supervisor.  Is that correct?

19   A.  Correct.

20   Q.  Now, do you know, was she -- did she call him on the phone

21   or did she use a radio?  How did she do that?

22   A.  See that little phone area right there beside the computer?

23   Under the computer.

24   Q.  Can you say what color the phone is?

25   A.  Light brown.  Right there.
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                      Page 68

 1   Q.  That phone right there that the arrow is on?

 2   A.  Yes.

 3   Q.  Okay.  That's -- what is that called?

 4   A.  It's called the Gai-Tronics.

 5   Q.  Where does that phone dial to or call?  What can it do?

 6   A.  Well, it can intercom.  You know, it's just like,

 7   basically, an intercom.  It has like five lines on there.

 8   It -- you can get on there and say, "Justin White, Line 1."

 9   You know, just call somebody.

10   Q.  So when Mrs. Grays picked that phone up and called Justin

11   White, did Larry Simmons react to that?

12   A.  Yes.

13   Q.  And how -- what was his reaction?

14   A.  Like, he got even louder than what he was and got very,

15   very aggressive with her.  And that's when I had to step in.

16   Q.  Okay.  So it's your testimony that when Mrs. Grays called

17   for her supervisor to come -- to come there, Mr. Simmons become

18   even more agitated.  And that's when you had to come jump in

19   between the gap there?  Is that what your testimony is?

20   A.  Yes.

21   Q.  So you blocked that gap there.  Is that correct?

22   A.  Yes.

23   Q.  What -- was Mr. Simmons just standing there or was Mr.

24   Simmons actively trying to get around you?

25   A.  He was trying to get around me.
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                           Page 69

 1   Q.  Could -- I know you demonstrated this earlier.  Could you

 2   move the chair out of the way in the room that you're in and

 3   give us -- like, show us what Larry was doing again, please.

 4   How he was acting?

 5   A.  Facing that way forward and started charging at her with

 6   his fists doubled up.  And that's when I stepped in front of

 7   them.

 8   Q.  Okay.  How tall did you say you were earlier, Mr. Madison?

 9   A.  I couldn't hear you.  What did you say?

10   Q.  How tall did you say you were earlier?

11   A.  Six-five.

12   Q.  Could we put up the Company Exhibit 1?  Now, it's obvious

13   in this picture Mr. Simmons is not as big as you.  Is that

14   correct?

15   A.  Correct.

16   Q.  The day of this incident, you testified that Mr. Simmons

17   was engaged and very upset.  Were you scared that day?

18   A.  Well, I wasn't scared for myself.  I was squared for Linda

19   at the time.

20   Q.  If you had ahold -- but you had ahold of Mr. Simmons.  Is

21   that correct?

22   A.  Yes.

23   Q.  And he wanted to come around you.  Is that correct?

24   A.  Yes.

25   Q.  You said that you heard Mr. Simmons say something about she
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

Page 70

1    has a knife or something.  Is that -- did you hear that?

2    A.  Yes.

3    Q.  And you said that you looked back?

4    A.  I looked back and Linda she was back as far as she could

5    go.

6    Q.  She was -- when you say back as far as she could go, was

7    she up against the cabinet?

8    A.  Like, basically, like, towards the refrigerator.  Like,

9    over there.

10   Q.  Okay.  And when you looked back, you saw the knife in her

11   hand?

12   A.  Yes.

13   Q.  Where -- can you stand up and maybe just show us with your

14   hand where she had the knife at?  Where she was holding the

15   knife?

16   A.  Okay.  I turned around.  She had the knife right by her

17   side, down like this.

18   Q.  So she was holding the knife pointed down towards the

19   floor.  Is that correct?

20   A.  Correct.

21   Q.  Can we go to Joint Exhibit 12, please?  Can we pause it

22   right there?  Now, is this the chair that you were sitting in?

23   A.  Yes.

24   Q.  Okay.  Push play, Ms. Patterson.  Okay.  Push pause.

25   There, please.  Is that the phone that Mrs. Grays called her

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                          Page 71

  1    supervisor on?

  2    A.  Yes.

  3    Q.  Okay.  Push play, Ms. Patterson.  Please pause it there.

  4    Is that the refrigerator cabinet area where you just testified

  5    when you looked back Mrs. Grays was backed up to?

  6    A.  Yes.

  7    Q.  And is that gap between the desk and that cabinet where you

  8    were standing, blocking Mr. Simmons?

  9    A.  Yes.  That's where I was blocking him at, yeah.

 10    Q.  Push play, Ms. Patterson.  And push pause, please.  How

 11    many doors come into this room?

 12    A.  Two.

 13    Q.  And where are both of the doors at?

 14    A.  Right beside each other.  You got one going that way and

 15    the other one when the video started.

 16    Q.  Okay.  So there's a door here.  And can you -- and the

 17    other door would be to the right of this door?

 18    A.  Yes.

 19    Q.  And that's the only way that you can get out of the room.

 20    Is that correct?

 21    A.  Correct.

 22           MR. VINCENT:  Ms. Patterson, I'm not sure -- we

 23        sent you the Union's exhibits.  And I think it might be

 24        Exhibit 1, which will be Mr. Madison's statement that

 25        he wrote out on the 14th.  Is that correct, Ms.
```

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                        Page 72
 1          Patterson?

 2               MS. PATTERSON:  I do have Union exhibits.

 3          It's -- I think Linda Grays' statement is Exhibit 1.

 4               MR. VINCENT:  Okay.  Go to 2.

 5               MS. PATTERSON:  Okay.

 6               MR. VINCENT:  Is that Mr. Madison?  Yes.

 7  BY MR. VINCENT:

 8  Q.  Mr. Madison, can you look over that and tell me what that

 9  is?

10  A.  That's my statement.

11  Q.  Who asked you to write this statement?

12  A.  Supervisor/superintendent.

13  Q.  The Company asked you to write this?

14  A.  Yes.

15               MR. ARBITRATOR:  What was the answer?

16               THE WITNESS:  Yes.

17  Q.  And did you turn this in to the Company as part of their

18  investigation?

19  A.  Yes.

20               MR. KRASKA:  Object.  I'm going to object to

21          that.  Again, this is -- the only reason -- and we said

22          this in our emails earlier.  The only reason for

23          bringing this in -- it's not to prove the truth of the

24          matter.  This is just to say that it was there.  That's

25          all it can be used for.
```

Ronda Dodd-Brown
Bushman Court Reporting                              501-372-5115

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                            Page 73
 1              MR. ARBITRATOR:  I don't understand that
 2         argument.
 3              MR. KRASKA:  That is the email that I sent
 4         earlier.
 5              MR. ARBITRATOR:  No, I know your email.  I'm
 6         asking you, on the record, what's your argument?  He
 7         said that he said what he said and it's there.
 8              MR. KRASKA:  The objection is that he's saying
 9         this is part of the Company's investigation.  And
10         again, our objection to that was based upon what they
11         asked for in their request, and they're just assuming
12         that this is something that was used to make the
13         decision in this action.  And again, that's why we're
14         objecting to it.  We're fine with it coming in saying
15         yes, this is your statement.  It was given.  But he's
16         saying -- Mr. Vincent is trying to characterize it as
17         this is what the Company used, and that is why we're
18         objecting to it.
19              MR. ARBITRATOR:  Mr. Madison, did you -- what was
20         your view on the use of this document, whether it's
21         right or wrong?
22              THE WITNESS:  It was just what you said -- what
23         did they ask me to do?
24              MR. ARBITRATOR:  Yeah.
25              THE WITNESS:  They just told me to write a
```

Linda Grays Arbitration 5/19/2021                                v.

```
                                                    Page 74
 1          statement and turn it in.
 2               MR. ARBITRATOR:  Okay.  Are you satisfied, Mr.
 3          Vincent?
 4               MR. VINCENT:  Yeah, we'd like to enter that as
 5          Union's Exhibit 2.  I know we're out of order
 6          but that's --
 7               MR. ARBITRATOR:  Not a problem.  It's admitted
 8          unless you have an objection, Mr. Kraska.
 9               MR. KRASKA:  No objection.
10               MR. ARBITRATOR:  Okay.
11     (WHEREUPON, Union's Exhibit Number 2 was admitted into
12     evidence.)
13               MR. VINCENT:  No further questions.  I'll pass
14          the witness.
15               MR. ARBITRATOR:  Mr. Kraska?
16               MR. KRASKA:  Yes, your Honor.  I'd like to
17          redirect.  Let me just get situated here.
18                    REDIRECT EXAMINATION
19     BY MR. KRASKA:
20     Q.  Mr. Madison, you testified earlier about Justin White
21     coming in and looking around for the cooking oil and the
22     conversation you had.  Is that correct?
23     A.  Yes.  Correct.
24     Q.  Okay.  And you specifically testified that Justin White had
25     said that he was going to have a word with Larry.  Is that
```

Linda Grays Arbitration 5/19/2021                              v.

Page 75

1    right?

2    **A.  Yes.  He'd like to talk with him.**

3    Q.  I'm sorry?

4    **A.  Yes.  Like a word with, like, why he take the cooking oil.**

5    Q.  Right.  Okay.

6    **A.  Yes.  Uh-huh.**

7    Q.  But you don't know -- I'm sorry.  Did someone say

8    something?  Okay.  Sorry.  You don't know what Mr. White was

9    actually going to tell Larry, did you?

10   **A.  No.**

11   Q.  Okay.  And you also mentioned that you all -- and I say you

12   all.  I'm talking about you and Linda.  You had testified that,

13   you know, you weren't trying to get anyone in trouble.  Is that

14   correct?

15   **A.  Correct.**

16   Q.  Okay.  But if Larry would have took something, he could

17   have gotten disciplined.  Right?

18   **A.  Yeah, but yeah.**

19   Q.  Okay.  And next, you also testified to when Mrs. Grays was

20   standing in the back of the control room holding the knife.  Is

21   that correct?  You testified to that earlier?

22   **A.  Yes.**

23   Q.  Okay.  And you mentioned that she was holding the knife and

24   was pointed down at the floor.  Is that correct?

25   **A.  Yes.**

Linda Grays Arbitration 5/19/2021                                    v.

Page 76

1    Q.  Okay.  You testified earlier when you were talking to me

2    and you said that you were -- you were pushing or getting Larry

3    out of the room.  And that's when you turned around and looked

4    back at Mrs. Grays.  Correct?

5    **A.  Yes.  When Larry said, "You pulled a mother-fucking knife**

6    **on me," that's when I looked back and saw that the knife was**

7    **out on the -- pointed down.  And that's when I pushed Larry on**

8    **out the door.**

9    Q.  Okay.  So you were at the door at that time?

10   **A.  Yes.**

11   Q.  And that was the first time you looked back to see Mrs.

12   Grays?

13   **A.  That she had a knife.  Yes.  Uh-huh.**

14   Q.  So you don't know what -- how she was holding the knife

15   before that?

16   **A.  No, I really don't.**

17   Q.  Okay.  Thank you.  Next, finally, I just want to clarify.

18   You had mentioned earlier -- I just want to clarify.  When

19   Justin came in and asked you or asked Linda about the oil and

20   you were there, did you tell Justin that Larry had took the oil

21   or was it just Linda?

22   **A.  Okay.  Again, this is how it went down.  Justin came in,**

23   **asked both of us who had took the oil.  And I said -- and Linda**

24   **said, "Dex, you gonna tell him?"  And before I could say it,**

25   **Linda said, "Larry Simmons," but at the time, we said it**

                              Ronda Dodd-Brown
Bushman Court Reporting                              501-372-5115

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

Page 77

1    **together.**

2    Q.  So did you say it together?

3    **A.  You know what I'm saying?**

4    Q.  No, I guess I don't.  I'm asking --

5    **A.  Okay.  Listen.  Okay.  Let me say it like this.**

6    Q.  Let me ask the question.

7    **A.  Let me tell you.**

8    Q.  Let me ask the question, Mr. Madison.  No.  Let me ask the

9    question.

10   **A.  Uh-huh.  Yeah.  Yeah.**

11   Q.  You said, "Before I could say it"; "We said it together"?

12   **A.  Okay.  Just let me -- can I talk now?**

13   Q.  Did you say that earlier?  Yes or no?

14   **A.  What you mean?**

15   Q.  I'm asking you is that what your earlier statement was?

16   **A.  Said that, yeah, we said it at the same time.**

17   Q.  No.  Your earlier statement --

18   **A.  It was like --**

19   Q.  Hold on.  Let me ask the question.

20             MR. ARBITRATOR:  Slow it down.  Let the witness

21        answer, please.

22             MR. VINCENT:  I want to object.

23             MS. KRASKA:  I haven't asked a question.

24             MR. VINCENT:  I'm objecting to this line of

25        questioning.  It's been asked and answered.  I'm sorry

Linda Grays Arbitration 5/19/2021                                   v.

Page 78

1           Mr. Kraska cannot comprehend the testimony, but it's
2           been asked and answered about four times now.
3                MR. KRASKA:  Let me ask it one more time and then
4           we can move on.
5                MR. VINCENT:  No, I'm objecting to it.  Let the
6           arbitrator rule on the objection.
7                MR. ARBITRATOR:  Answer the question.
8    BY MR. KRASKA:
9    Q.  The question is did your earlier testimony -- did you say
10   that "Before I could answer, Linda answered it"; and "We
11   answered together"?  Is that what you said?  Yes or no?
12   **A.  Yes, it was like this.**
13   Q.  That's all I'm --
14   **A.  No, no.  I'm explaining.  "It was Larry," and then I said,**
15   **"Simmons."**
16                MR. ARBITRATOR:  Whoa, whoa, whoa.  Hang on.
17           I'll allow the witness to explain.  Go ahead.
18   **A.  Okay.  She said, "Larry," and I said his last name,**
19   **"Simmons."  That's basically the same time.  Right?  She said**
20   **it first and I said it second.**
21   Q.  All you said was "Simmons"?
22   **A.  Yes.  "Larry Simmons."  Yes.**
23   Q.  You testified that she said, "Larry took it like it was
24   his," and then you just said, "Simmons"?
25   **A.  No, I did not say that.**

                          Ronda Dodd-Brown
Bushman Court Reporting                              501-372-5115

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                            v.

```
                                                    Page 79
 1              MR. VINCENT:  I object, Mr. Arbitrator.
 2   Q.  I'm sorry.  Linda said that.  Linda said that.  That's my
 3   fault.  Yes, Linda said, "Larry took it like it was his."  And
 4   then you said, "Simmons."  That's what you're saying?
 5              MR. VINCENT:  I object.  That's not the
 6          testimony.
 7   A.  Exactly.  That's not right.
 8   Q.  Okay.
 9              MR. ARBITRATOR:  Well, why don't we do this:  Mr.
10          Madison, let's try and get this chronological
11          conversation that happened.  What did the grievant say
12          first?
13              THE WITNESS:  What did the grievant say?
14              MR. ARBITRATOR:  Yeah.  What did she say?  Mrs.
15          Grays.
16              THE WITNESS:  She said -- okay.  It was like a
17          boom-boom situation.  It was like --
18              MR. ARBITRATOR:  Yes.
19              THE WITNESS:  -- "Dex, you gonna tell him?"  And
20          before I said it, she said, "Larry," and then I said,
21          "Simmons."
22              MR. ARBITRATOR:  To say what?  What was she going
23          to say?
24              THE WITNESS:  What was she going to say?
25              MR. ARBITRATOR:  No, you've indicated that there
```

Page 80

```
1          was an interaction.  Not an interaction.  There was

2          statements by Mrs. Grays.  Right?  What was she -- what

3          was she saying before you could say something?

4               THE WITNESS:  She was saying his first name and

5          then I said the last.

6               MR. ARBITRATOR:  Okay.

7               MR. KRASKA:  Okay.  Thank you.  I have no further

8          questions.

9               MR. ARBITRATOR:  Mr. Vincent?

10               MR. VINCENT:  None at this time.

11               MR. ARBITRATOR:  Okay.  All right.  Mr. Madison,

12          he needs to hang around in case you're needed.  In

13          addition, you shouldn't be -- you shouldn't speak to

14          anybody about your testimony.

15               THE WITNESS:  Okay.

16               MR. ARBITRATOR:  Other than this.  Okay?

17               THE WITNESS:  All right.

18               MR. ARBITRATOR:  Thank you.

19               THE WITNESS:  You're welcome.

20               MR. ARBITRATOR:  Mr. Kraska, is this a good time

21          to take a short break for people?

22               MR. KRASKA:  Yes.  Can I just clarify one thing?

23               MR. ARBITRATOR:  Sure.

24               MR. KRASKA:  I just want to clarify that Dexter

25          Madison's written statement was in as Union Exhibit 2,
```

Linda Grays Arbitration 5/19/2021                                    v.

Page 81

```
1          just for my marking purposes.  Is that correct?

2                   MR. ARBITRATOR:  That's correct.

3                   MR. KRASKA:  Okay.  Yes, then this is a great

4          time for a short break, Mr. Arbitrator.

5                   MR. ARBITRATOR:  Five minutes?

6                   MR. KRASKA:  That works.

7                   MR. ARBITRATOR:  All right.  Let's take five

8          minutes.

9                   MR. KRASKA:  Thank you.

10                  MR. ARBITRATOR:  Go off the record.

11     (WHEREUPON, a break was taken.)

12                  MS. PATTERSON:  Mr. Kraska, is your next witness

13         going to be in the Company testimony room?

14                  MR. KRASKA:  Yes.  Should we get that person --

15         go ahead and get up?

16                  MR. ARBITRATOR:  Yeah, that's a good idea.  Why

17         don't we do that.

18                  MR. KRASKA:  Okay.  I'm going to call Larry

19         Simmons as my next witness, so Rose, you may have to

20         coordinate that.

21                  MS. GARRIDO-CALLOWAY:  Wait just one minute while

22         we get him connected on the computer.

23                  MR. ARBITRATOR:  Thank you.  Is there a problem

24         getting him?

25                  MS. GARRIDO-CALLOWAY:  No.  He's just on a
```

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                    Page 82
 1          different floor, so he's coming.  He'll be here in just
 2          a moment.
 3                   MR. ARBITRATOR:  Thank you.  Somebody is
 4          saying -- can everybody hear us?  Mr. Simmons?  Mr.
 5          Simmons, can you hear me?
 6                   MS. PATTERSON:  Mr. Simmons, can you hear us?
 7          Can you give a --
 8                   MR. SIMMONS:  Yes, I can.
 9                   MR. ARBITRATOR:  Okay.  The individual -- the
10          other person in the room with you --
11                   MR. SIMMONS:  Yes.
12                   MR. ARBITRATOR:  -- could you please exit the
13          room?
14                   UNIDENTIFIED SPEAKER:  Yes, sir.
15                   MR. ARBITRATOR:  Mr. Simmons, is there anyone
16          else in the room now other than --
17                   MR. SIMMONS:  No, sir.
18                   MR. ARBITRATOR:  -- you?
19                   MR. SIMMONS:  Just me.
20                   MR. ARBITRATOR:  Fine.  Go ahead.  Fine.  Thank
21          you.
22                            LARRY SIMMONS,
23     having been first duly sworn, testified as follows:
24                   MR. KRASKA:  May I proceed, Mr. Arbitrator?
25                   MR. ARBITRATOR:  Oh, yes.  I'm sorry.  Yes, of
```

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                        Page 83

 1         course.

 2                  MR. KRASKA:  Okay.  Thank you.

 3                      DIRECT EXAMINATION

 4   BY MR. KRASKA:

 5   Q.  Can you please state your name for the record?

 6   A.  Larry Simmons.

 7   Q.  And what is your position with the Company?

 8   A.  I work as assistant -- furnisher assistant in coating prep.

 9   Q.  And how long have you worked for the Company?

10   A.  Three years.

11   Q.  You know Linda Grays?

12   A.  Yes, sir.

13   Q.  How do you know Mrs. Grays?

14   A.  From working out here and being -- being on shift with her.

15   Q.  How long have you -- okay.  Thanks.  How long have you two

16   worked together?

17   A.  Off and on, for about two years.

18   Q.  Okay.  And can you tell me what it was like working with

19   Linda?

20   A.  Roller coaster.  Some days it was okay and then you have

21   some days where it's just -- just felt uneasy working with her.

22   Couldn't -- couldn't make her happy.

23   Q.  Okay.  And I just want to back up for one second.  You said

24   you know Linda through work and everything.  Are you a Union

25   member?
```

Linda Grays Arbitration 5/19/2021                              v.

Page 84

1    A.   Yes, sir.

2    Q.   Okay.  Thank you.  And do you feel like Linda did things

3    intentionally to try to stir the pot at work?

4    A.   Yes, sir, I do.

5    Q.   And can you explain?

6    A.   I'll give you an instance.  One time it was some overtime

7    that the other assistants didn't want the overtime.  They

8    didn't care who got the overtime, and I was able to get it.

9    But because of the line of progression and rules set in place,

10   Linda took it upon herself to make sure that I didn't get the

11   overtime and, you know, basically force one of the other people

12   to take the overtime when they didn't want it, you know.

13        And then I guess another example would be where she --

14   she will always say, "We really don't need him over here," you

15   know, because I'm over there jumping out for other operators --

16   for other guys to get trained as operators.  So she -- she

17   constantly says that I'm not needed over there.

18   Q.   Okay.  And did she ever spread a rumor about you cheating

19   on your wife?

20   A.   Yes, sir.  She accused me -- directly to my face, she

21   accused me of going to the -- another area of the job to see a

22   woman all the time that I wasn't.  We was just -- we just was

23   good friends.  And she know my wife and everything and she

24   basically said I'm a man and "I know how men are."

25        And I was like, "No, I don't do that.  I don't cheat

Ronda Dodd-Brown
Bushman Court Reporting                                501-372-5115

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                        Page 85

1    on my wife."

2    Q.  Okay.  And you said earlier she had mentioned something

3    about not needing you around or needing you at that particular

4    worksite or that work area, I guess.  Is that correct?

5    A.  Yes, sir.

6    Q.  Okay.  So did she ever get confrontational with you about

7    your job performance?

8    A.  She -- she's made comments before saying that I really

9    didn't know my job, that I didn't know what I was doing.  She

10   really just didn't lunge out at me about it but she -- she did

11   it in more of a sarcastic way.  You know, I felt like she mean

12   everything she say, but it was more like a sarcasm when she

13   says it.

14   Q.  Okay.  And do you have any issues with Linda not signing

15   you off on training tasks?

16   A.  Yes, sir, I did.  Once I -- once I completed all my

17   training tasks and it was time for operators to sign off on it,

18   which I was training on her shift as an assistant, so that will

19   be the operator I will go to.  She refused to sign the

20   paperwork.

21   Q.  Okay.  And to the best of your knowledge, did she do this

22   with other employees as well?

23   A.  Yes, sir.

24   Q.  Yeah.  And do you think Linda had it out for you?

25   A.  I feel like she had something personal against me.  I don't
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                      Page 86
 1   know -- I don't know what exactly, but I do feel -- she made me
 2   feel like she had something against me, personally.
 3   Q.  Okay.  And were you ever made aware of a conversation
 4   between Justin White and Linda and Dexter?
 5   A.  Yes, sir, I was.
 6   Q.  Okay.  And can you tell me about that conversation?  What
 7   you heard?
 8   A.  What I was told was that Justin White had came over looking
 9   for some cooking oil that was put up, at the time, over a year
10   ago.  And he couldn't find it.
11           And Ms. Linda asked -- well, said to Dexter, "Are you
12   not going to tell him where the oil is?"
13           And Dexter reply was, "I don't know.  I don't know
14   what you're talking about."
15           And then Linda was like, "Well, I'll tell him.  Larry
16   Simmons got the oil.  He took it."
17           And the next -- that next day, that morning, as the
18   reliefs came in, she was telling Alisha and Shane Rogers about
19   it and kind of in a, I guess, like, boasting or happy about
20   telling them.
21   Q.  Okay.  And Alisha and you said Chane?
22   A.  Shane Rogers, yes, sir.
23   Q.  Who are they, just to clarify?
24   A.  Alisha Wilson is operator and Shane Rogers, at the time,
25   was her assistant.
```

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                         Page 87
 1   Q.  Okay.

 2   A.  Furnisher assistant.

 3   Q.  They're other bargaining unit employees.  Is that correct?

 4   A.  Yes, sir.  To the best of my knowledge, yes, sir.

 5   Q.  Okay.  And so did you take the cooking oil?

 6   A.  No, sir.  I just moved it.

 7   Q.  Okay.  Can you explain to me what happened when you moved

 8   it?

 9   A.  Well, I was -- I had came in to borrow a grill from out

10   here, and I left some of my work boots up there in the closet.

11   And when I went to coating prep control room and went in the

12   closet area to get my work boots, I was stumbling through stuff

13   and noticed that the oil, it was a lot of stuff on top of it.

14   The box that it was in had busted open.  And I said to myself,

15   Well, if this gets popped open, it's going to mess up

16   everybody's stuff in here, if it was to get a hole punched in

17   it.  Because it wasn't protected by anything anymore.  So I

18   moved it to another area out of the control room in a closet

19   and put it next to the flammable liquids storage.

20   Q.  Okay.  So you didn't steal the oil?

21   A.  No, sir.

22   Q.  Okay.  And did you talk to your supervisor about that?

23   A.  Yes, sir.  I talked to Justin White after I became aware.

24   I waited until he got in and let him know.  I called him

25   directly and I told him where the oil was, and he went and got
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                        v.

```
                                                              Page 88
 1    it and used it.
 2    Q.  Okay.  So after that happened, when did you next see Linda?
 3    A.  It was that morning.  I want to say it may have been like a
 4    Monday morning, something like that.
 5    Q.  Okay.
 6    A.  And I --
 7    Q.  Go ahead.
 8    A.  Go ahead.  And yeah, it was Monday morning.  It was as I
 9    was coming in to work.
10    Q.  Okay.  And can you just explain how your shift and how
11    Linda's shift works so we can kind of understand?  You said it
12    was in the morning.  What -- just explain how your shifts work
13    and how you would have been passing each other -- seen each
14    other.
15    A.  Yes, sir.  So everybody comes in at different times.  And
16    once your relief comes and relieve you, you're allowed to
17    leave.  So our work schedule is 5:45 to 5:45, whether it be
18    a.m. or p.m.  And we -- we work rotations, so you may work
19    nights one week and you may work days the next week.  So I was
20    coming in, in the morning on dayshift to work.  And Ms. Linda
21    had been relieved and was leaving, and I was walking and passed
22    each other on the sidewalk.
23    Q.  Okay.  So you guys were on opposite 12-hour shifts then?
24    A.  Yes, sir.  At that time, we were.
25    Q.  Okay.  And real quick, just -- you mentioned, well, we'll
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

Page 89

1   go back to that.  So when you saw each other that morning, you

2   were coming on shift and she was going off shift.  Correct?

3   **A.  Yes, sir.**

4   Q.  Okay.  And did you say anything to her when you saw her?

5   **A.  No, sir, I didn't.**

6   Q.  Okay.  Did she say anything to you?

7   **A.  She spoke to me and I just kept walking.**

8   Q.  Okay.  And when she spoke to you, was she being sarcastic?

9   **A.  Not -- no, but then after that, she was like, "Hey, they**

10  **got some fish up there."  And I didn't, you know, like, she**

11  **hadn't said or done anything of accusing me, so I just -- I**

12  **just ignored her and kept walking.**

13  Q.  Okay.  And so then let's fast-forward to later in that day.

14  When did you see her next that day?

15  **A.  That evening when it was time for shift change again.**

16  Q.  Okay.  And where were you when you saw her?

17  **A.  In coating prep control room.**

18  Q.  Okay.  And you said you saw her -- it was at shift change.

19  Is that correct?  Is that what you said?

20  **A.  Yes, sir.**

21  Q.  Okay.  Ms. Patterson, can we please pull up the Joint video

22  Number 12?

23          MR. ARBITRATOR:  I want to make sure that -- Mr.

24      Simmons, can you see this?

25          THE WITNESS:  Yes, sir, I can.

Linda Grays Arbitration 5/19/2021                                      v.

```
                                                        Page 90
 1              MR. ARBITRATOR:  Okay.  Thank you.

 2   Q.  All right.  Mr. Simmons, can you tell me what that video is

 3   of?

 4   A.  Coating prep control room.

 5   Q.  Okay.  And is that where the alleged incidence took place?

 6   A.  Repeat that.  I didn't hear you.

 7   Q.  Is that where the alleged incident took place between you

 8   and Mrs. Grays?

 9   A.  Yes, sir.  Yes, sir.

10   Q.  And so this is where you were.  I'm sorry.  This is where

11   you were at the end of the shift?

12   A.  Yes, sir.

13   Q.  Okay.  Ms. Patterson, can we go to Joint Exhibit 11E?

14   Okay.  And so again, is this a -- do you know what this picture

15   is of?

16   A.  Yes, sir.  Coating prep control room.

17   Q.  Okay.  So can you explain where you were in this picture at

18   this time when Linda came in?

19   A.  At the time that she came in, I was sitting over back --

20   back behind where you see the computers and stuff.  I was

21   sitting over there to left in the corner.  The other computer.

22   Q.  So where this cursor is right here, the kind of lower left

23   corner, that's where you were sitting?

24   A.  Yes, sir.

25   Q.  And was anybody else in there with you at that time?
```

Linda Grays Arbitration 5/19/2021                                    v.

Page 91

1    A.  Yes, sir.  Dexter Madison was.

2    Q.  Okay.  And where was he at?

3    A.  He was sitting to the left of me in another chair.

4    Q.  Okay.  And then you said that Linda had come in.  Correct?

5    A.  Yes, sir.

6    Q.  And where was she at?

7    A.  She had walked through and she was on the back end, back

8    here over by the refrigerator and the air conditioning area

9    with some sanitizer -- some Lysol.

10   Q.  Is where that cursor is, that's an accurate description of

11   where she was at?

12   A.  Yes, sir.

13   Q.  Okay.  What happened next?

14   A.  I proceeded to get up and get my stuff together.  And I

15   told her -- I basically told her, I said, "Well, Ms. Linda, I

16   don't know what I've done to you, personally, or what you have

17   against me, personally, but I would appreciate it if you keep

18   your name out my mouth."

19   Q.  And why did you say that to her?

20   A.  Well, just I -- I had got, you know, I felt like it was

21   time for us to -- to talk and clear it up.  Because being

22   accused of stealing something, it's been several people out

23   here have gotten fired behind stuff like that.  So I felt like

24   it was a jab at my job, and I felt like I had every right to

25   speak up and, you know, have a conversation with her about it.

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                          Page 92
 1    Q.  Okay.  And so you said that the reason you brought it up to

 2    her was because you felt like she accused you of stealing.  Is

 3    that correct?

 4    A.  Yes, sir.  Yes, sir.

 5    Q.  And what was she accusing you of stealing?

 6    A.  Some cooking oil.

 7    Q.  Cooking oil?  Okay.  And just to back up again, how did you

 8    find out that she had made these accusations?

 9    A.  Through -- through Alisha Wilson.  She had -- she had told

10    me about it.

11    Q.  Okay.  And what exactly did Alisha Wilson say to you about

12    it?

13    A.  She just told me, she said, "Hey, Larry, I'm just trying to

14    let you know that Linda had told Justin White that you stole

15    some cooking oil and she was boasting about it."

16            I said, "Okay."  I said, "Well, I appreciate it," and

17    that was it.

18    Q.  Okay.  So Alisha had told you that Linda told Justin White.

19    Correct?

20    A.  Yes, sir.

21    Q.  Okay.  Did she tell you if anyone else told Justin White

22    the same story?

23    A.  No, sir.

24    Q.  Okay.  Now, let's fast-forward again back to the time of

25    the incident here.  So you had told -- you were talking earlier
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Page 93

1    you had told Linda, I believe, something to the effect of, you

2    know, "Please keep my name out of your mouth."  Is that

3    correct?

4    **A.  Yes, sir.**

5    Q.  Okay.  What did she say back to you at that time?

6    **A.  Her first response was, "Well, you keep my name out your**

7    **mouth."**

8    Q.  Okay.  And what happened next?

9    **A.  I asked her what was she talking about?  I said, "You not**

10   **even -- that's not even what I'm -- I'm talking about something**

11   **totally different."  I said, "Like I said, I don't know what**

12   **I've done to you."**

13           **And then her response was, "Well, learn your job."**

14   Q.  Okay.  And then what happened next?

15   **A.  I told her, I said, "Well, we're not talking about a job**

16   **right know.  I'm talking about the fact that you told Justin**

17   **White that I stole some cooking oil that I didn't steal."**

18   Q.  Okay.  And during this conversation, what was your tone of

19   voice like at this point?

20   **A.  It was -- it was little more like kind of, "Hey, don't --**

21   **you wrong for doing that."  You know, kind of like a little**

22   **more -- with a little more tone in it, you know, letting her**

23   **know the seriousness of what she, you know, what she accused me**

24   **of.**

25   Q.  Okay.  And you said she had said some things back to her.

Linda Grays Arbitration 5/19/2021                                        v.

```
                                                            Page 94

 1    What was her tone like?

 2    A.  Well, after I told her about the cooking oil, accusing me

 3    of it, she was over by the air conditioner, over by the window,

 4    spraying -- spraying something down -- some equipment over

 5    there.  And she turned around and bugged her eyes at me and

 6    say, "You did.  You did steal it."  And you know, and we

 7    proceeded from there.

 8    Q.  Okay.  And was she -- was she being loud?  Was her tone

 9    loud?

10    A.  With that response, it was, when she said, "Yeah, you did.

11    You did steal it."

12    Q.  Uh-huh.  And excuse me.  You also mentioned that Linda had

13    Lysol in her hand.  Is that correct?

14    A.  Yes, sir.

15    Q.  Okay.  And so at this time, did you start -- you said it

16    kind of went from there after that or that comment she made

17    back to you.  So what happened next after that?

18    A.  She -- I -- I told her she was a hypocrite and that she was

19    always talking about people and starting stuff.  And you know,

20    she -- we just got to going back and forth with her saying

21    things and I was saying things.  And she grabbed the intercom

22    that -- that phone looking -- that Gai-Tronics system right

23    behind the computer right there and called Justin White to come

24    to coating prep.

25    Q.  Okay.  And the Gai-Tronics is where the cursor is right
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                              v.

```
                                                      Page 95
 1    there on the screen.  Is that correct?

 2    A.  Yes, sir.

 3    Q.  Okay.  And so as this was going on, were you two both

 4    getting louder?

 5    A.  Yes, sir.

 6    Q.  And so you both were raising your voices?

 7    A.  Yes, sir.

 8    Q.  Okay.  Were you both cursing?

 9    A.  Yes, sir, we were.

10    Q.  Okay.  And you also mentioned earlier that Dexter was in

11    the room?

12    A.  Yes, sir.

13    Q.  Where was he at this time?

14    A.  He was sitting -- I was kind of standing over to the left

15    behind this -- behind the computer desk and stuff right there.

16    And Dexter was still kind of sitting in his chair at the

17    moment, kind of close to me over by the computer or whatever.

18    Q.  Okay.  So Dexter -- let me -- can we go to Joint Exhibit

19    11A, please?  Okay.  And Larry, is this an accurate picture,

20    again, of the control room?

21    A.  Yes, sir.

22    Q.  Okay.  And so again, just for clarity purposes, I think

23    this shows a little bit better angle.  Can you, at this time,

24    describe where everybody was in the room again, please?

25    A.  Okay.  Ms. Linda was behind the computer desk on this side.
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                          Page 96
 1    I was on the other end behind it right here and then Dexter.

 2    Q.  When you say right here, can you -- by the chair?  Like,

 3    where?  Can you describe what's in the picture, what you're

 4    talking about?

 5    A.  Okay.  You see where that door at the bottom of the

 6    computer is kind of gapped open right there?

 7    Q.  Yep.

 8    A.  Yes, sir.  I was standing -- I was standing kind of off in

 9    that area right there.  And Ms. Linda was on the other side

10    just maybe a little bit in front of that chair right there.

11    Q.  Okay.  And Dexter was where again?  I'm sorry.  I missed

12    that.

13    A.  Okay.  At that time, Dexter had -- Dexter had done moved

14    over by the computer where that black chair is sitting.  So he

15    was sitting beside me right there.

16    Q.  Okay.  And so you and Linda, at this time, are going back

17    and forth.  Correct?

18    A.  Yes, sir.

19    Q.  Okay.  And you said that you were both getting louder.

20    Correct?

21    A.  Yes, sir.

22    Q.  So you were getting louder.  Correct?

23    A.  Yes, sir.

24    Q.  And Linda was getting louder?

25    A.  Yes, sir.
```

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                         Page 97
1    Q.  Okay.  And were you -- did you start moving at all from
2    that position where you just described you were at?
3    A.  Yes, sir.  I kind of -- I kind of got to pacing, you know,
4    back and forth as we were talking to each other.
5    Q.  And can you --
6    A.  And I stayed -- I stayed behind the computer the whole
7    time, but I got to pacing because I was getting worked up a
8    little bit.
9    Q.  Okay.  Can you describe where you were pacing?
10   A.  From -- from where that door is open kind of to the -- kind
11   of to the side end of the computer right there.
12   Q.  Okay.  And can you do me a favor and can you just kind of
13   show us what your -- you might have to scoot back and stand up
14   a little bit here.  But can you show us what you mean by you
15   were pacing and what your body language kind of looked like?
16   A.  All right.  So I was, you know, going back and forth like
17   this and talking and telling her, "You know you wrong.  You
18   shouldn't have did that."
19   Q.  Okay.  And --
20   A.  "I haven't done nothing to you," you know, like that.  I
21   was pacing back and forth like this.
22   Q.  Okay.  And you said you're talking to her, and you were
23   showing us what you were doing there.  Are you moving your
24   hands at that time too?
25   A.  Yes, sir.  I was doing like this, pointing her -- telling
```

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                         Page 98
 1    her, "You wrong for what you did.  You shouldn't have did

 2    that."  You know, stuff like that.

 3    Q.  Okay.  And during this conversation, you also mentioned,

 4    too, that Linda was cursing.  Is that correct?

 5               MR. ARBITRATOR:  Hold on.  You can sit back down.

 6          Thank you.  Go ahead.

 7    Q.  Or you mentioned earlier, too, that during this time, that

 8    Linda was cursing.  Is that correct?

 9    A.  Yes.  Yes, sir.

10    Q.  Okay.  And you also had mentioned something about the -- I

11    believe you referred the radio or the Gai-Tronics.  Can you

12    tell me about that?  What happened with that?

13    A.  Well, it was -- it was right after she said that I did

14    steal the oil and we -- we kind of started arguing.  She picked

15    up the intercom and called Justin White to come to coating

16    prep.

17    Q.  Okay.

18    A.  And we -- so I was -- I was -- I stayed in there trying to

19    wait on him.

20    Q.  Okay.  So after she picked up the phone to call for the

21    supervisor, you stayed in there.  Why did you -- can you say

22    that again, why you stayed in there?  Can you explain why you

23    stayed in there?

24    A.  Well, I was happy that she called him because I said, Well,

25    by the time when he get in here, he'll be able to let her know
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

Page 99

1    that he got the oil.  He used the oil and I didn't steal it and

2    this will be resolved.  That was -- that was what I was looking

3    forward to happening.

4    Q.  Okay.  And so she makes the call.  What happened next?

5    A.  So I ended up kind of on the -- on the side where the

6    computer desk ends, and she was standing on the other side.

7    And we were arguing and she -- she had the Lysol and she just

8    sprayed a mist of it towards my face and --

9    Q.  Okay.  Let's go back for one second.  Can you point out or

10   describe in the picture again where you two were?

11   A.  So okay.  On where the computer desk ends to the -- to the

12   right side of the right, I was standing back behind right

13   there.  Kind of in that open spot.  Yes, sir.  And she was --

14   she was standing on the other side right here.

15   Q.  Okay.  Can we pull up Joint Exhibit 11D, please?  Okay.  So

16   is this, again, an accurate picture of what the control room

17   looks like, Larry?

18   A.  Yes, sir.

19   Q.  And from this angle, can you please describe for us, again,

20   where you two were?

21   A.  So on the back end, you see that box by the water fountain

22   right there?  That water fountain.

23   Q.  Is it right in front of the garbage can?

24   A.  Yes, sir.  So I was standing kind of center, kind of beside

25   the water fountain right there.

Linda Grays Arbitration 5/19/2021                              v.

```
                                                    Page 100
 1    Q.  Okay.  And where was Linda at?
 2    A.  So you see where the keyboard -- the black keyboard is
 3    right here sitting on that desk area?  She was standing off --
 4    off to the left of it right there.
 5    Q.  Okay.  So out there?
 6    A.  Just a little bit behind it.  Behind the desk right there.
 7    Q.  Behind the desk though?
 8    A.  Yes, sir.  Because she was -- at the time, she was
 9    spraying Lysol on the keyboard to sanitize it.
10    Q.  Okay.  And then you said earlier that she prayed Lysol at
11    you.  Is that correct?
12    A.  Yes, sir.
13    Q.  You know why she did that?
14    A.  No, sir, I don't.
15    Q.  Okay.  What happened next?  Well, actually, hold on.
16    Before -- well, where was Dexter at, at this time?
17    A.  Dexter had stood up and was just like, "Hey, man, y'all
18    calm down.  Calm down."  And he was -- he was still standing --
19    kind of standing on the side -- side of me talking to me and
20    both Linda, trying to get us to stop arguing or whatever.
21    Q.  And did Dexter stand up before or after Linda made the call
22    on the radio?
23    A.  It was after.
24    Q.  Okay.  And so okay.  Okay.  And what happened next after
25    that?  So she -- and just to make sure we're on the same page,
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Page 101

1   she sprayed the Lysol at you.  What happened next?

2   **A.   That's when I got loud.  After she sprayed the Lysol, I got**

3   **loud and started cussing.**

4   Q.   Okay.

5   **A.   And at that time, Dexter had kind of moved in and Ms. Linda**

6   **had reached and grabbed the knife over in the -- over in the**

7   **corner right here.  And Dexter had done got in between us.**

8   **Right there.  You see the white paper and that little cubbyhole**

9   **area right there?  That's where the green -- the knife was**

10  **sitting at.**

11  Q.   Is it on the left?  Where -- can you --

12  **A.   To the left.  To the left.  Come up.  You've got to come up**

13  **off in this cubby.  Right there.  Off in that cubbyhole in the**

14  **corner right there.**

15  Q.   Okay.  Did this frighten you?

16  **A.   Yes, sir, it did.**

17  Q.   Do you think that she would have used the knife on you?

18  **A.   Yes, sir.  If I -- if -- if I had of advanced on her or**

19  **anything like that, I feel like she would have.**

20  Q.   Did you advance on her?

21  **A.   No, sir.**

22  Q.   Did you lunge towards her at all?

23  **A.   No, sir.**

24  Q.   And during this time, did Linda ever ask you to leave the

25  room?

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

Page 102

1    A.   No, sir, she did not.

2    Q.   Did she say anything to you when she pulled the knife?

3    A.   She said to me, "Come on in," the N-word, and told me that

4    I was going to have to answer to her husband.

5    Q.   Okay.  Did she seem scared or afraid of you?

6    A.   I think she was more ready to attack if -- if, like I said,

7    if I advanced on her.  I don't -- I didn't see -- I didn't see

8    or think that she had any fear of -- of if I came towards her.

9    Q.   Okay.  And can you describe for us how she was holding the

10   knife?

11   A.   She had it up and pointed.  Just pointed at my direction

12   like that.

13   Q.   Okay.

14            MR. ARBITRATOR:  Actually, we can't see that.  Do

15       you want to show us?

16   A.   Okay.  She had it up like -- like this and pointed like,

17   "Come on."

18   Q.   And that's when she said, "Come at me N-word"?

19   A.   Yes, sir.

20   Q.   Okay.  And was -- Dexter was in the middle of you at this

21   time.  Correct?

22   A.   Yes, sir.

23   Q.   You also mentioned that she stated something about her

24   husband.  Is that right?

25   A.   Uh-huh.

Linda Grays Arbitration 5/19/2021                              v.

Page 103

1   Q.  And do you know what she -- what she meant by that?

2   **A.  I really don't.  I don't know if she meant that she was**

3   **going to tell him and he was going to confront me.  I don't**

4   **know.**

5   Q.  So do you think that she was threatening you with something

6   that her husband was going to do?

7   **A.  I took it as threat.**

8   Q.  Okay.  You mentioned that Dexter was standing in between

9   you two.  Can you stand up and show us how he was standing in

10  between you two?

11  **A.  All right.  So he was standing in between us with his arms**

12  **spreaded out like this.  Just constantly looking back and forth**

13  **with both of us, just talking to us, trying to calm us down.**

14  Q.  Okay.  Thank you.  You can sit down.  Ms. Patterson, can we

15  pull up Company Exhibit Number 1, please.  All right.  Larry,

16  can you tell me what room this picture was taken in?

17  **A.  Coating prep control room.**

18  Q.  Okay.  And can you identify who the person on the right in

19  this picture is?

20  **A.  Dexter Madison.**

21  Q.  The person on the right?

22  **A.  Oh, the person on the right, that's me.**

23  Q.  Okay.  And the person on the left, who is that?

24  **A.  It's Dexter Madison.**

25  Q.  Okay.  And is Dexter -- seems from this picture Dexter's

Linda Grays Arbitration 5/19/2021                                    v.

Page 104

1   bigger than you.  Correct?

2   **A.  Yes, sir.**

3   Q.  So when Dexter was standing in between you and Linda, do

4   you feel like you could have gotten around him?

5   **A.  No, sir.**

6   Q.  Okay.  So now we're at a point where Linda has made these

7   comments to you and she's holding a knife pointed at you.  What

8   happened next?

9   **A.  Dexter, like I said, was in between us, trying to calm us**

10  **down.  And he kind of, you know, tapped me on my chest a little**

11  **bit telling me, "Hey, man, go on and go.  Leave.  Just leave**

12  **out."  So I ran out of the -- not ran, but I walked out of the**

13  **control room.**

14  Q.  Okay.  Now, can you show -- you said Dexter tapped you on

15  the chest.  Can you show us what that looked like?  You might

16  have to back up a little bit.

17  **A.  Yes.  Yes, sir.  He was standing -- he had to kind of lean**

18  **towards me a little bit.  He was like, "Hey, man, just leave.**

19  **Just leave," you know, tapping me on my chest trying to calm me**

20  **down.  "Just leave, man.  Just go outside.  Just leave the**

21  **control room."**

22  Q.  Okay.  So did he ever have to bear hug you?

23  **A.  No, sir.**

24  Q.  Okay.  And did he ever have to manhandle you?

25  **A.  No, sir.**

Linda Grays Arbitration 5/19/2021                              v.

```
                                                    Page 105
 1   Q.  Okay.  Can we -- Ms. Patterson, can we pull up Company

 2   Exhibit Number 2, please?  Larry, do you know what this is a

 3   picture of or can you tell me what this picture is of?

 4   A.  Yes, sir.  That's the knife that Linda Grays had pulled had

 5   grabbed.

 6   Q.  Okay.  And that is the knife that was in the control room

 7   during the incident.  Correct?

 8   A.  Yes, sir.

 9   Q.  And that was the knife that was pointed at you.  Is that

10   correct?

11   A.  Yes, sir.

12   Q.  Okay.  So Dexter was kind of telling you to get out of the

13   room.  Did he -- did he push you out of -- you said he didn't

14   manhandle you or bear hug you, but did he push you out of the

15   room?

16   A.  No, sir.  He just gave -- he just kind of gave me a few

17   little taps, you know, just trying to encourage me to, you

18   know, walk out or whatever.

19   Q.  Okay.  And did this incident happen kind of fast?

20   A.  It seemed fast to me, you know.

21   Q.  Do you know approximately how long the entirety of this

22   incident lasted?

23   A.  If I had to take a guess, I would say between a minute and

24   thirty seconds to two minutes.

25   Q.  Okay.  So now you've exited the room.  Correct?
```

Linda Grays Arbitration 5/19/2021                                    v.

                                                              Page 106

1   **A.   Yes, sir.**

2   Q.   And where did you go when you -- or what happened when you

3   were outside the room?

4   **A.   Soon as I walked out the door, Justin White was walking up**

5   **and Jason Homestead was a few feet behind him.  And I told them**

6   **that she just had grabbed a knife on me and I proceeded over to**

7   **the breakroom area, another area of the workplace.**

8   Q.   Okay.  And you told them that Linda had pulled a knife on

9   you?

10  **A.   Yes, sir.  Justin White I told.**

11  Q.   Okay.  And were you excited at this time?

12  **A.   Yes, sir.  I was worked up.**

13  Q.   Okay.  And why were you worked up?

14  **A.   Just -- just felt threatened and, you know, was -- was just**

15  **upset about the entire situation.**

16  Q.   Okay.  And so you told them that.  I want to go back and

17  clarify something real quick too.  You said that the

18  conversation between you and Linda was kind of heating up.  Was

19  Dexter in between you two when she pulled the knife or did she

20  pull it before Dexter got in between you two?

21  **A.   I honestly don't remember because everything happened so**

22  **fast.  I just know when she had the knife in her hand, Dexter**

23  **was right there to where I couldn't go towards her and she**

24  **couldn't come towards me.**

25  Q.   Okay.  So you talked -- now, let's get back out in the

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                    Page 107
 1   hallway.  You talked to your supervisors and then what
 2   happened?
 3   A.  I went over to the breakroom area.
 4   Q.  Okay.
 5   A.  And Jason Homestead came over there when I was in -- Justin
 6   White went in coating prep control room.
 7   Q.  Okay.  And ultimately, what happened after that when you
 8   were in the breakroom?
 9   A.  I was still worked up.  I was talking loud, you know, doing
10   some cussing and just, you know, when Justin White finally
11   showed up over there, him and John Porter was there and it was
12   a couple more employees in there.  And I basically told them,
13   "Don't nobody pull a knife on me like that.  I don't -- I don't
14   mess with nobody.  I don't disrespect nobody.  I haven't done
15   anything to nobody.  I mind my business."  And I was like, "And
16   I don't play them games with anybody."  And I was just, you
17   know, like I said, worked up.
18   Q.  Okay.  And have you ever had a disagreement with another
19   employee at work before?
20   A.  Yes, sir, I have.
21   Q.  Okay.  And who was that?
22   A.  His name was Jacob Hayes.
23   Q.  Okay.  Can you explain to me what that issue -- just
24   explain to me about that issue.
25   A.  Yes, sir.  He had been giving me kind of a hard time about
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

Page 108

1    work, over there telling -- telling guys not to help me and

2    stuff like that.  And they had called a safety meeting, and we

3    had recently had some safety incidents.  And so we were

4    cleaning up and I stopped cleaning up to go to the safety

5    meeting.  And he -- he got to cussing and yelling at me.

6            And I turned around and told him, "Don't be cussing

7    and yelling at me."

8            And I went in the breakroom and I told Cal Wargo that

9    I wanted to have a meeting with me, him, and a Union

10    representative.

11    Q.  Okay.  The way you described that event, it sounds like it

12    was just an oral argument between you two?

13    A.  Yes, sir.

14    Q.  Okay.  And did either one of you pull a weapon on the

15    other?

16    A.  No, sir.

17    Q.  Okay.  Were there any other acts of violence between you

18    two during that event?

19    A.  No, sir.

20    Q.  Okay.  And that event ended up getting resolved, correct,

21    with your supervisor?

22    A.  Yes, sir.

23    Q.  Okay.  During that event, as well, you said there's no acts

24    of violence or anything.  Were there any threats or anything

25    made towards each other?

Linda Grays Arbitration 5/19/2021                                    v.

Page 109

1    A.  No, sir.  No threats.

2    Q.  Okay.  So would you describe that event different than the

3    event between you and Linda?

4    A.  Yes, sir.  Very different.

5    Q.  Do you know if Linda has ever pulled a knife on any other

6    employees in the bargaining unit?

7    A.  Yes, sir.  We had an employee that worked out here,

8    actually who trained me on the shift with Ms. Linda.  His name

9    is Terrell Smith (phonetic).  Had told me about an incident

10   where they had a misunderstanding about something -- I'm not

11   sure what -- and she pulled a knife on him.

12   Q.  Okay.  And do you know if you have a report of that to --

13   A.  No, sir.  He said he didn't report it.

14   Q.  And he no longer works at the Company?

15   A.  No, sir.

16   Q.  Okay.  And Larry, are you aware that the Company has a

17   harassment workplace violence policy?

18   A.  Yes, sir.

19   Q.  Okay.  And are you aware that the Company has mill rules as

20   well?

21   A.  Mill rules?

22   Q.  Mill rules.  Yes.

23   A.  Yes, sir.

24           MR. KRASKA:  Okay.  All right.  Mr. Arbitrator,

25           we'll pass the witness.

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                    Page 110
 1                MR. ARBITRATOR:  Okay.  Mr. Vincent?
 2                     CROSS-EXAMINATION
 3   BY MR. VINCENT:
 4   Q.  Yes.  Mr. Simmons, my name is Chad Vincent.  I'm the
 5   international staffer.  I've just got a few questions for you.
 6   Shouldn't take too long at all.
 7                MR. ARBITRATOR:  Mr. Vincent, could you talk just
 8           a little bit louder?
 9                MR. VINCENT:  Yes, I can talk louder.
10                MR. ARBITRATOR:  Okay.
11   Q.  Mr. Simmons, in your testimony earlier, you stated that
12   Mrs. Grays was hard to get along with and you recited an
13   incident where you were going to get to work overtime but she
14   stopped that.  Could that be because of the collective
15   bargaining agreement wasn't being followed and Mrs. Grays was
16   just trying to police the collective bargaining agreement?
17   A.  Yes, sir.  That's correct.  But like I said, the other
18   employees wasn't arguing or making a big deal about it -- the
19   actual people that would be getting overtime.  It wasn't going
20   to be overtime for her, and other employees had already been
21   contacted and said that they wasn't -- they -- they -- it
22   didn't matter to them who worked overtime because they didn't
23   want it.
24   Q.  But all she was doing is following the bargaining
25   agreement.  Is that correct?
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                              v.

```
                                                    Page 111
 1   A.  Yes, sir.

 2   Q.  You testified when you came into the control room to get

 3   some stuff -- your boots -- and you decided to move the oil,

 4   did you make Mrs. Grays or Mr. Madison aware that you were just

 5   moving the oil?  Or did you say anything to them?

 6   A.  I just moved it.

 7   Q.  So --

 8   A.  I just moved it.

 9   Q.  So would they have had any idea that you were moving it or

10   you were taking it?  They just saw you get it.  Is that

11   correct?

12   A.  Yes, sir.

13   Q.  You didn't get in any trouble for moving the oil, though,

14   did you?

15   A.  I'm sorry?

16   Q.  You didn't get into trouble for moving the oil, did you?

17   A.  No, sir, I didn't.

18   Q.  After the incident in the control room, did you get sent

19   home?

20   A.  Yes, sir.  I -- I had Justin White get back over and get my

21   bookbag that I left in coating prep control room and they told

22   me to go home.

23   Q.  And were you asked to submit to a drug test?

24   A.  Yes, sir, I was.

25   Q.  And did you receive any discipline for what happened in the
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                      Page 112

 1   control room?

 2   A.  Yes, sir.

 3   Q.  And could you tell the arbitrator what discipline you

 4   received?

 5   A.  I had three weeks' suspension and a last chance agreement.

 6   Q.  You testified that you had an incident earlier with another

 7   employee.  Is that correct?

 8   A.  Yes, sir.

 9   Q.  And to resolve that interaction, you sought a supervisor

10   out to have a conversation as a group.  Is that correct?

11   A.  Yes, sir.

12   Q.  In this situation here, why didn't you do the same thing?

13   A.  I felt like it could have been handled at the lowest level

14   possible, and I didn't expect for it to spiral into what it --

15   what it did.  I just more or less wanted her to understand

16   that, you know, don't accuse me of or say I'm doing something

17   that I'm not doing.  I didn't expect for it to -- to blow up

18   into the situation that it did.

19   Q.  All right.  I have no further questions at this time for

20   Mr. Simmons.

21               MR. ARBITRATOR:  Mr. Kraska?

22               MR. KRASKA:  No redirect at this time.

23               MR. ARBITRATOR:  All right.  Mr. Simmons, be sure

24        that you don't talk to any of the other witnesses until

25        this matter is over.  Okay?
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                    Page 113
1              THE WITNESS:  Yes, sir.
2              MR. ARBITRATOR:  You want to call your next
3         witness?
4              MR. KRASKA:  Yes.  Mr. Arbitrator, I'd like to
5         call Justin White.
6              MR. ARBITRATOR:  Okay.  You can -- you can leave,
7         Mr. Wilson -- Mr. Simmons.  I'm sorry.
8              THE WITNESS:  Yes, sir.
9              MS. GARRIDO-CALLOWAY:  Just a clarification for
10        everyone, do we need to hold onto Mr. Simmons to see if
11        we're going to need him again?
12             MR. ARBITRATOR:  Mr. Vincent?
13             MR. VINCENT:  I'm not going to need Mr. Simmons
14        any further.
15             MR. KRASKA:  We won't either.
16             MR. ARBITRATOR:  Okay.
17             MS. GARRIDO-CALLOWAY:  And just to clarify, who
18        is next, please?
19             MR. KRASKA:  Justin White.
20             MS. GARRIDO-CALLOWAY:  Okay.  Give me one moment.
21             MR. ARBITRATOR:  While we're waiting, Mrs. Brown,
22        we -- the parties and I have an agreement that we will
23        split the cost -- your costs into three.  So I would
24        appreciate it if you would send the bill for -- this
25        will be a third to me.
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                        Page 114

  1                THE COURT REPORTER:  Yes, sir.

  2                        JUSTIN WHITE,

  3      having been first duly sworn, testified as follows:

  4                        DIRECT EXAMINATION

  5      BY MR. KRASKA:

  6      Q.  Okay.  Please state your name for the record.

  7      A.  Justin White.

  8      Q.  And what is your position with the Company?

  9      A.  I'm the supervisor on the board machine on A shift.

 10      Q.  And how long have you worked for the Company?

 11      A.  15 years in July.

 12      Q.  And how do you know Linda Grays?

 13      A.  I've worked around Linda Grays since I've been on the board

 14      machine.

 15      Q.  So approximately, how long has that been?

 16      A.  12 years.

 17      Q.  And how is Linda as an employee?

 18      A.  Linda does her job.  She's always done her job well.  She

 19      just always seems to be an instigator and keep things stirred

 20      up amongst other employees.

 21      Q.  Okay.  And do you know who Larry Simmons is?

 22      A.  Yes.

 23      Q.  Okay.  And how do you know Larry?

 24      A.  He is coating prep assistant on the board machines.

 25      Q.  And have you ever supervised Larry?
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                        Page 115
 1   A.  Yes.

 2   Q.  And what is Larry like to work with?

 3   A.  Larry is a good dude.  He always seems to do his job.  I

 4   ain't ever had any problems with Larry.

 5   Q.  And from your viewpoint, does it seem like employees

 6   generally get along with Larry?

 7   A.  Yes.

 8   Q.  And have you ever had any issues with Larry's work

 9   performance or conduct?

10   A.  No, I haven't.

11   Q.  Did you have a conversation in September 2020 with Linda

12   about some cooking oil?

13   A.  Yes, I did.

14   Q.  Can you explain to me how that conversation went?

15   A.  Yes.  We were going to have a shift cooking and we were

16   making a list to see what we needed.  So I went to coating prep

17   operating room where I had placed the oil and looked for it.

18   And it wasn't there so I asked Linda if she had seen the

19   cooking oil, and she told me that Larry had taken the cooking

20   oil saying it was -- it was his.  She thought it was his.  And

21   she -- she just -- it -- it wasn't a long conversation.

22          She just said, "Larry took the oil.  I guess he took

23   it home," and kind of made a joke about it.

24          And we went on about our business and I said, "Well,

25   that wasn't his oil."
```

Linda Grays Arbitration 5/19/2021                           v.

Page 116

1          You know, that was the end of the conversation.

2     Q.   Okay.  And was anybody else there for that conversation?

3     A.   Dexter Madison was in there.

4     Q.   Okay.  And did Dexter -- did you -- did he make a response

5     when you asked that question?

6     A.   No, he really didn't say anything.  She -- Dexter is a real

7     quiet guy.  He didn't -- he just kind of sit there and --

8     Q.   Okay.  Did you receive a call from Larry after that

9     happened?

10    A.   Yes, I did.

11    Q.   Okay.  And what was that call about?

12    A.   He called the supervisor's office and said that he heard

13    that, well, actually told me that Alisha Wilson had told him

14    that Linda was spreading a rumor that he had stole cooking oil

15    and something happened --

16    Q.   You can continue.

17    A.   Can you see me?  Okay.

18    Q.   Yes.

19    A.   Okay.  And that he -- he said that he didn't steal no

20    cooking oil and told me that he moved the oil while he was

21    cleaning.  And he told me exactly where it was and that's where

22    it was.  I went and found it.

23    Q.   Okay.  So Larry called you to tell you where the cooking

24    oil was and it was --

25    A.   Yes.

Linda Grays Arbitration 5/19/2021                              v.

```
                                                    Page 117

 1    Q.   -- where Larry said it was?

 2    A.   Yes.

 3    Q.   And so Larry did not steal the cooking oil?

 4    A.   No.

 5    Q.   Is theft of property a violation of Clearwater policy?

 6    A.   Yes.

 7    Q.   And is it a terminable offense?

 8    A.   It is.

 9    Q.   Okay.  How did you learn about the incident in the control

10    room?

11    A.   At shift change, I was relieving and Linda called over the

12    Gai-Tronics a couple of times, "Justin White.  Justin White."

13    And I -- and I knew it was Linda's voice, so I picked it up.

14    And when I picked it up, I heard a lot of yelling and cussing

15    in the background.  I knew it was Linda's voice that had called

16    me, so I immediately went to the coating prep operating room.

17    Q.   Okay.  And you said you heard a lot of loud cursing when

18    you picked up the radio.  Is that correct?

19    A.   Yes, and hollering.  I couldn't make out what it was.  It

20    just --

21    Q.   Okay.

22    A.   -- a loud argument.

23    Q.   Could you -- could you make out the voices of who it was?

24    A.   Not really.  I just knew Linda had called me because she

25    was -- that's what you hear over the loud speaker.
```

Linda Grays Arbitration 5/19/2021                                    v.

Page 118

1    Q.  Okay.  And just to clarify her call, she just said your

2    name?

3    **A.  Yes.**

4    Q.  Okay.  What did you do next?

5    **A.  I immediately went to the coating prep control room.**

6    **Headed that direction, anyways.**

7    Q.  Okay.  And from -- you said you were in your office when

8    you heard the call over the radio?

9    **A.  Yes.**

10   Q.  Okay.  And how long would it -- did it take you to get from

11   your office to the coating prep room?

12   **A.  10 to 15 seconds maybe.**

13   Q.  Okay.  So I just want to -- want to go back and clarify one

14   more quick thing.  You heard Linda's voice call you on the

15   radio, and when you picked it up, you heard yelling.  And were

16   you able to or can you identify the yelling that you heard when

17   you picked it up?  Who was yelling?

18   **A.  I could just hear Linda saying something.  I couldn't**

19   **understand what they was saying.  I just heard a loud**

20   **commotion, but I could hear her voice.**

21   Q.  Okay.  So you said it took you how long to get from your

22   office to the coating prep room?

23   **A.  Probably 10 to 15 seconds.**

24   Q.  Okay.  And when you got there, what did -- what did you see

25   when you got there?

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                              v.

```
                                                    Page 119
 1   A.   What -- when I was approaching the coating prep control
 2   room, Larry came out the door and that's where I stopped.
 3   Larry come out and he was yelling.
 4   Q.   Okay.  And did you talk to Larry at that time?
 5   A.   Yes.
 6   Q.   Okay.  And what did he say to you?
 7   A.   He told me that Linda had pulled a knife on him.
 8   Q.   Anything else?
 9   A.   He was just upset and loud.
10   Q.   Okay.  Where did -- or so you talked to Larry and then what
11   happened next?
12   A.   Got Larry away from the situation and took him to the
13   breakroom where the clock was and tried to get him to clock out
14   and leave.
15   Q.   Okay.  Had Larry ever acted violently that you saw during
16   this time or was he just upset and mad?
17   A.   He wasn't violent.  He was upset and mad.  He never tried
18   any -- do anything to anybody.  He was -- it was just very loud
19   and he had his fists clinched up and he was just pacing around
20   yelling that she had pulled a knife on him.
21   Q.   Okay.  And what happened next?
22   A.   We went into the breakroom and he was pacing back and forth
23   and yelling loudly that she had pulled a knife on him --
24              MR. ARBITRATOR:  Just a second.  Just a second.
25              You said "we went."  It might be helpful --
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                      Page 120
1              THE WITNESS:  Me and -- me and Larry.  Me and

2         Larry went into the breakroom.  I was with him.

3              MR. KRASKA:  Did that satisfy you, Mr.

4         Arbitrator?

5              MR. ARBITRATOR:  Yeah, that's fine.

6    BY MR. KRASKA:

7    Q.  Okay.  Go ahead.  So can you describe for me -- you said

8    Larry was pacing back and forth.  Can you kind of back up and

9    show us what that looked like?

10   A.  Oh, you want me to act it out?

11   Q.  Yeah, please.

12   A.  Okay.  He -- I don't know if you can see.  He was just back

13   and forth, back and forth around the thing, had his fists

14   clinched up.

15   Q.  Okay.  So you -- is Larry -- you got him to the breakroom.

16   You got him calmed down and then what happened next?

17   A.  I got him clocked out and I escorted him to the stairwell

18   to leave.

19   Q.  Okay.  And where was Linda at, at this time?

20   A.  She was still in coating prep control room.

21   Q.  Okay.  And did you go back and talk to Linda?

22   A.  Yes.

23   Q.  And what did she tell you?

24   A.  She -- I walked in and asked what had happened and she

25   immediately told me that her and Larry got into it and into an
```

Ronda Dodd-Brown
Bushman Court Reporting                              501-372-5115

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                        Page 121
 1    argument and she thought Larry was going to come at him -- come
 2    at her.  So she showed me that she reached up on the shelf and
 3    grabbed the knife off the shelf and said, "I was going to get
 4    him if he was going to come at me."
 5    Q.  Okay.  So she said, "I was going to get him if he was going
 6    to come at me"?  That's what she told you?
 7    A.  Yes.  Yes.
 8    Q.  And what happened with Linda?  What did you end up doing
 9    with her?
10    A.  When Linda showed me that -- that she had grabbed a knife,
11    you know, I immediately said, you know, "This is in HR's hands.
12    We're going to have to go out front and she's going to have to
13    go home, pending investigation."
14    Q.  Okay.  So you sent her home --
15    A.  Yes.
16    Q.  -- in the investigation?
17    A.  Yes.
18    Q.  Okay.  And was Dexter Madison -- when you walked up, was
19    Dexter Madison around?
20    A.  Yes, he was in there.
21    Q.  Okay.  And where was he?
22    A.  He was just standing right there in the middle of a -- kind
23    of close to the door.
24    Q.  Okay.  And did you talk to Dexter?
25    A.  Yes.
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                              v.

```
                                                      Page 122
 1   Q.  Okay.  And what did he say?
 2   A.  He didn't really say much.  He just said, "I was" -- I
 3   asked him and he said, "I was just standing here.  He wasn't
 4   going to get by me," so and that was about it.
 5              MR. KRASKA:  Okay.  Mr. Arbitrator, I'll pass the
 6        witness.
 7              MR. ARBITRATOR:  Okay.  Mr. Vincent, cross?
 8              MR. VINCENT:  Yes.
 9                     CROSS-EXAMINATION
10   BY MR. VINCENT:
11   Q.  Mr. White, my name is Chad Vincent.  I'm the international
12   rep with steelworkers.  I have a few questions to ask you about
13   that evening and a few more besides that.  You testified that
14   you're a supervisor.  Is that correct?
15   A.  Yes.
16   Q.  How long have you been a supervisor?
17   A.  Four years maybe.
18   Q.  And so did you work in production or out on the floor and
19   then you moved into management?
20   A.  Yes, sir.
21   Q.  And did you receive any training from the Company when you
22   went to be a supervisor?
23   A.  Yes.
24   Q.  And was handling conflict -- was that -- was that one of
25   the trainings you received?
```

Linda Grays Arbitration 5/19/2021                                    v.

Page 123

1    **A.   Yes, sir.**

2    Q.   Let's talk about this cooking oil.  You were looking for

3    the cooking oil when you were in the coating prep room, and you

4    asked Linda Grays and Dexter Madison about where the cooking

5    oil was at.  You expected them to tell the truth, didn't you?

6    **A.   Yes.**

7    Q.   And so what they told you is that they saw Larry Simmons

8    get it.  That was the truth.  Was that correct?

9    **A.   Yes.**

10   Q.   Ms. Patterson, can you pull up Union Exhibit 3, please?

11   Mr. White, is this familiar to you?

12   **A.   Yes.**

13   Q.   This is -- can you tell me what this is?

14   **A.   That's my statement.**

15   Q.   And when did you write this statement?

16   **A.   The day of the incident.**

17   Q.   The what time did the incident occurred?

18   **A.   Right.  At shift change.**

19   Q.   Which is?

20   **A.   Around 5:45, 6:00.**

21   Q.   And when does it show that you sent this email?

22   **A.   7:49 p.m. is what it says.**

23   Q.   So the events was pretty fresh on your mind.  Would you

24   agree?

25   **A.   Yes.**

Ronda Dodd-Brown

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                          v.

```
                                                    Page 124
 1   Q.  I would like for you -- and I'm going to apologize, Mr.
 2   Arbitrator, about these highlights on here.  We only had one
 3   hard copy and it was electronically.  We could not get these
 4   highlights off.  If you go down about halfway down this
 5   photograph -- and I want you to read something for me and make
 6   sure I'm understanding what you're saying.  Middle ways down,
 7   it starts out, "I told Larry to clock out and go."  Do you see
 8   that?
 9   A.  Yes.
10   Q.  Can you read that sentence for me, please?
11   A.  "I told Larry to clock out and go because he was just
12   continuing to act crazy yelling and cussing."
13   Q.  All right.  Continue reading, please.
14   A.  "After Larry left I went to coating prep and asked Linda
15   Grays what happened and she told me that Larry had tried to
16   attack her and that she pulled a knife on him because she was
17   threatened and scared of him."
18   Q.  Stop right there.  So Larry was acting crazy, wasn't he?
19   A.  Yes.
20   Q.  When you went and spoke with Mrs. Grays, how was her
21   demeanor?
22   A.  She was upset.  She wasn't yelling.
23   Q.  How many females work at the paper mill in production?
24   Just a rough guess.
25   A.  I think there's four or five in the board machine.
```

Ronda Dodd-Brown

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                              v.

Page 125

1    Q.  Four or five out of how many total employees do you have?

2    **A.  70 probably.**

3    Q.  So less than 10 percent of your employees are females.

4    Would you say that's accurate?

5    **A.  Yeah, that's probably accurate.**

6    Q.  In your statement here, you said that Larry continued to

7    act crazy, yelling and cussing?

8    **A.  Okay.**

9    Q.  I mean, was that -- was that somewhat scary to you the way

10   he was acting?

11   **A.  He was just upset.  He was yelling and he was upset because**

12   **she had pulled a knife.  All he kept saying is, "She pulled a**

13   **knife on me and she's out to get me.  She's out to get me."**

14   **That's just what he kept saying.**

15   Q.  Okay.  Right there where you stopped reading, can you pick

16   up again where it says, "She told me" -- you see that?

17   **A.  Yeah.  "She told me that she had asked him several times to**

18   **leave because he was in such a rage and he continued to try to**

19   **approach her in a wild manner.  I told Linda to calm down, that**

20   **this was uncalled for in the workplace.  And I told her that**

21   **this was going to be in HR's hands; that she was going to have**

22   **to go home for further investigations." (As read)**

23   Q.  Would you agree working in a paper mill is a tough

24   environment?

25   **A.  Oh, yeah.**

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                v.

Page 126

1   Q.  Would you agree that if there was a small number of females

2   that worked in a paper mill, the employee acting in a rage and

3   yelling and cussing would be scary?

4   **A.  You know, in our environment, there's always a lot of -- a**

5   **lot of yelling and stuff going on.  It's just so loud.  But in**

6   **a control room, yeah, I would say that it -- it could have been**

7   **scary to Ms. Linda.**

8   Q.  Were you a part of the investigation that led to Mr.

9   Simmons being suspended and Mrs. Grays being terminated?

10  **A.  I gave my statement and answered any questions that anybody**

11  **asked.**

12  Q.  Who did you give your statement to?

13  **A.  The Union.**

14  Q.  And you gave it to HR?

15  **A.  Yeah.  It was -- Ms. Rosie and Robert Chatham were there.**

16  Q.  Can you identify what Ms. Rosie's last name is?

17  **A.  Garrido-something.**

18  Q.  And she's your HR at the facility?

19  **A.  Yes.**

20  Q.  And it was your understanding that she was running the

21  investigation.  She was the head of this investigation?

22  **A.  Yes.**

23              MR. KRASKA:  Objection.  It's speculative.

24              MR. VINCENT:  I asked him what his understanding

25          was.

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

Page 127

1               MR. ARBITRATOR:  That's correct.

2   Q.  What is your understanding?

3   **A.  My understanding was HR was handling it, which would be**

4   **her.  She's senior HR.**

5               MR. VINCENT:  Mr. Arbitrator, the Union would

6           move to enter Union Exhibit 3 into the record.

7               MR. KRASKA:  Object.  I want to make the same

8           objection I made before.  This is not, again, to prove

9           that, you know, the Company -- this was what the

10          Company used to make its determination, the same

11          objection that I made to Union Exhibit 2.  And I would

12          also object to it because of the highlighting --

13              MR. ARBITRATOR:  Well --

14              MR. KRASKA:  -- being copied.

15              MR. ARBITRATOR:  -- the highlighting was not used

16          in any way or pointed to.  It's been explained, so

17          those do not concern me.  The part that the Union was

18          interested in was simply to be read without high-

19          lighting, so the highlighting and their explanation

20          that they could not get a copy with one seems to me to

21          be reasonable.

22              In terms of the document being in, there was no

23          question that this was used in the investigation, so it

24          seems to me that when you brief this matter, you can

25          say that it wasn't used.  There's testimony as with the

Linda Grays Arbitration 5/19/2021                              v.

```
                                                        Page 128
 1          other one that there was -- was used in that way.

 2          Certainly, it's whatever Mr. White thought it was or

 3          didn't think it was, but I will admit the document.

 4                  MR. VINCENT:  Thank you, Mr. Arbitrator.

 5                  MR. KRASKA:  Thank you, Mr. Arbitrator.

 6  (WHEREUPON, Union's Exhibit Number 3 was admitted into

 7  evidence.)

 8                  MR. VINCENT:  The Union has no further questions

 9          for Mr. White at this time.

10                  MR. KRASKA:  The Company would like to redirect.

11                  MR. ARBITRATOR:  Sure.

12                       REDIRECT EXAMINATION

13  BY MR. KRASKA:

14  Q.  Mr. White, in your recent testimony, you mentioned that

15  Larry's behavior -- and you know, correct me if I'm wrong here

16  but that Larry's behavior could have been scary to Ms. Linda

17  when they were in the control room.  Is that correct?

18  A.  Could have been.

19  Q.  Okay.

20  A.  It depends on how you take situations.  I guess depends on

21  who you are.

22  Q.  And you also mentioned that Linda had shown you what she

23  did with the knife.  Is that correct?

24  A.  Yes.

25  Q.  Okay.  And do you think that could have been scary to
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                    Page 129
 1    Larry?

 2    A.  Yes.

 3    Q.  Okay.  No further questions.

 4              MR. VINCENT:  I have one -- one redirect, Mr.

 5         Arbitrator.

 6              MR. ARBITRATOR:  Recross.  Go ahead.

 7              MR. VINCENT:  Thank you, yes.

 8                   RECROSS-EXAMINATION

 9    BY MR. VINCENT:

10    Q.  Mr. White, could you -- I know you kind of demonstrated how

11    Larry was acting in the breakroom, but you had the chair in the

12    way.  Could you move that chair out of your way and stand up

13    and show us how Mr. Simmons had his fists clinched and how he

14    was pacing in the breakroom, please?

15    A.  I can try.  It's -- there's not very much room behind me,

16    so it's kind of -- but I'll do my best.  I don't know if you

17    can see this.

18              MR. ARBITRATOR:  We can.

19    A.  He just had his fists clinched and he was going back and

20    forth in the -- in the breakroom like -- like this and yelling

21    and saying that she pulled a knife on him and just going back

22    and forth.

23              MR. ARBITRATOR:  Thank you.

24              MR. VINCENT:  That's all I have, Mr. Arbitrator.

25              THE WITNESS:  Okay.
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                      Page 130
 1              MR. ARBITRATOR:  Company?

 2              MR. KRASKA:  Nothing more from the Company.

 3              MR. ARBITRATOR:  Okay.

 4              MR. KRASKA:  The Company would like to take a

 5      break though.

 6              MR. ARBITRATOR:  Sure.  Mr. White, please do not

 7      have any conversation with other witnesses.  Obviously,

 8      you can have a conversation with your representatives.

 9      Okay?

10              THE WITNESS:  Okay.

11              MR. ARBITRATOR:  All right.  How long a break

12      would you like?

13              MR. KRASKA:  Five, ten minutes if that's all

14      right.

15              MR. ARBITRATOR:  That's fine.

16              MR. KRASKA:  Okay.

17              MR. ARBITRATOR:  Hang on just a second so I'm

18      sure.  Do you have any sense of timing?  My question

19      really relates to whether or not we need to take a

20      lunch break.  I don't need one but if someone else

21      needs one, I'm happy to do that.  If, in fact, this is

22      going to go on for some period of time, it might --

23      that may make sense.  So do you have a sense of that?

24              MR. KRASKA:  Yeah, I think that we'll be fine

25      with skipping the lunch.  I don't think we've got much
```

Linda Grays Arbitration 5/19/2021                                    v.

Page 131

```
 1         more on our side so --

 2              MR. ARBITRATOR:  And then we've got Mrs. Grays.

 3              MR. KRASKA:  We'd like to push through, yeah.

 4              MR. ARBITRATOR:  Mr. Vincent?

 5              MR. VINCENT:  That sounds acceptable to me, Mr.

 6         Arbitrator.

 7              MR. ARBITRATOR:  Okay.  Let's take five to ten

 8         minutes.  Why don't we take ten minutes and then if you

 9         need any more time, let me know.

10              MR. VINCENT:  Thank you.

11              MR. KRASKA:  Thank you.

12              MS. GARRIDO-CALLOWAY:  Last clarification.  Do we

13         anticipate needing Justin any further?

14              MR. CROSS:  We'll talk about it.

15              MS. GARRIDO-CALLOWAY:  Okay.

16              MR. ARBITRATOR:  All right.

17              MR. KRASKA:  Thanks.

18              MR. ARBITRATOR:  Thank you.

19  (WHEREUPON, a break was taken.)

20              MS. PATTERSON:  All right.  People should be

21         coming back soon.  It's been about ten minutes.  Mr.

22         Kraska, are you ready?

23              MR. ARBITRATOR:  Ms. Patterson, you heard back

24         from -- oh, there he is.

25              MR. KRASKA:  Hello.
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                        Page 132
 1              MR. ARBITRATOR:  All right.  Who's going to be
 2         your next witness?
 3              MR. KRASKA:  Our next witness, we're going to
 4         call Rosie.
 5              MR. ARBITRATOR:  Hi, Rosie.  Nobody wants to say
 6         your name.  That's not nice.
 7              MS. GARRIDO-CALLOWAY:  It's not uncommon.
 8              MR. ARBITRATOR:  I'm just kidding.
 9              MS. GARRIDO-CALLOWAY:  It's not uncommon.
10              MR. KRASKA:  I'll butcher it.
11              MR. ARBITRATOR:  I'd like you -- I know you're in
12         your office and I'm sure there's no one else there, but
13         just so we're doing it all the same way, would you
14         please go into the testimony room.
15              MS. GARRIDO-CALLOWAY:  Sure.
16              MR. ARBITRATOR:  Thank you.
17              THE ARBITRATOR:  You want to swear her?
18                   ROSARIO GARRIDO-CALLOWAY,
19    having been first duly sworn, testified as follows:
20              MR. ARBITRATOR:  I just want to make clear that
21         you are in that room all by yourself.  There's no one
22         there.  Correct?
23              THE WITNESS:  That's correct.
24              MR. ARBITRATOR:  Okay.  Go ahead, Mr. Kraska.
25              MR. KRASKA:  Thank you, Mr. Arbitrator.
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

Page 133

1                          DIRECT EXAMINATION

2    BY MR. KRASKA:

3    Q.  Can you please state your name for the record?

4    **A.   Sure.   Rosario Garrido-Calloway.**

5    Q.  Thank you.  And what is your position with the Company?

6    **A.   Senior human resources manager.**

7    Q.  And how long have you worked for the Company?

8    **A.   Five years.**

9    Q.  And Ms. Patterson, can you please pull up Joint Exhibit

10   Number 1, please?  And Rosie, can you tell me what this

11   document is?

12   **A.   That's an electronic copy of our labor agreement.**

13   Q.  Okay.  And Ms. Patterson, can you scroll to page 6, please?

14   Yeah.  Then could you center on Article 5?  Rosie, can you tell

15   me what the article in front of you, what this does or what it

16   is?

17   **A.   Yep.   It establishes the Company's operating control.**

18   Q.  Okay.  And does this article give the Company the right to

19   enforce rules and policies?

20   **A.   Yes.**

21   Q.  And does it also give the Company the right to discipline

22   and discharge employees?

23   **A.   Yes.**

24   Q.  Okay.  And can we scroll to, Ms. Patterson, please, page

25   10 -- the bottom of page 10 and the top of page 11?  Actually,

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                              v.

Page 134

1    can you scroll up just a little bit more?  Can you tell me what

2    article we're looking at here?

3    **A.   Article 8.  Disciplinary action.**

4    Q.   Okay.  And specifically, if you could scroll down just a

5    little bit again, Ms. Patterson.  Can you read to me what

6    Subsection (c) of that article states?

7    **A.   Uh-huh.  Subsection (c) says, "The Union and Company agree**

8    **that the Company has the right to create or modify rules**

9    **designed to maintain discipline and proper personal standards**

10   **of conduct such as the Company's Mill Rules.  The employees**

11   **agree to comply with the Company's Mill Rules."**

12   Q.   Okay.  And Ms. Patterson, can I have you pull up Joint

13   Exhibit Number 9, please?  And can you tell me what this is?

14   **A.   That is a Company of the -- copy of the mill rules.**

15   Q.   Okay.  And are these the mill rules that are referenced in

16   the CBA?

17   **A.   Yes.**

18   Q.   Okay.  And --

19             MR. ARBITRATOR:  Rosie, could you just move

20        the --

21             THE WITNESS:  Oh, I'm sorry.  Yeah, I'm trying to

22        read the documents and be sure that I can hear you and

23        read.

24             MR. ARBITRATOR:  Okay.  Go ahead.

25   **A.   Yeah.  Ms. Patterson, maybe if you could make the document**

Ronda Dodd-Brown

Bushman Court Reporting                              501-372-5115

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                   Page 135
 1    just a tiny bit bigger.  Thank you.  Thank you.

 2    Q.  Good?

 3    A.  Uh-huh.

 4    Q.  Okay.  And Ms. Patterson, can you scroll to page 2, please?

 5    Little bit bigger.  Okay.  And that's good.  Rosie, under

 6    Section III, Subparagraph 3, can you read "f" for me?

 7    A.  Uh-huh.  "Violation of the Company's Harassment, Workplace

 8    Violence, and/or Handgun Policies is prohibited."

 9    Q.  So the mill rules reference the workplace violence policy.

10    Is that correct?

11    A.  That's right.

12    Q.  Okay.  And the mill rules are what is referenced in the

13    CBA.  Correct?

14    A.  Correct.

15    Q.  Okay.  And Ms. Patterson, can we go to Joint Exhibit Number

16    10, please?

17              MR. ARBITRATOR:  Make that a little -- yeah.  No,

18         no, no -- yeah, that's fine.

19    Q.  Okay.  And is this the Company's harassment policy?

20    A.  Yes.

21    Q.  And that was referencing the mill rules.  Correct?

22    A.  Correct.

23    Q.  Okay.  Can we go to page 2, please, Ms. Patterson?  Okay.

24    And can you tell me what this document is?

25    A.  It's the second page of that policy that has the workplace
```

Linda Grays Arbitration 5/19/2021                              v.

Page 136

1    **violence policy in it.**

2    Q.  Okay.  And can you read for me in the second paragraph

3    under the heading Workplace Violence, the last sentence that

4    starts with "Violence is" -- can you read that?

5    **A.  Uh-huh.  Yes.  "Violence is defined as any act of**

6    **aggression or any statement, which could be perceived as intent**

7    **to cause harm to the Company or an individual, whether**

8    **personal, such as physical or emotional, or impersonal, such as**

9    **property damage or theft."**

10   Q.  And can you read the sentence right below that kind of

11   stands alone?

12   **A.  "The following"?**

13   Q.  Yes.

14   **A.  "The following conduct is prohibited and may lead to**

15   **disciplinary action, up to and including termination."**

16   Q.  And can you specifically read Number 3 and Number 4 of

17   that -- those numbered paragraphs below that sentence?

18   **A.  Okay.  Number 3, "Fighting or assault on a co-worker,**

19   **customer, security staff, or visitor."  Number 4, "Threatening**

20   **or intimidating co-workers, security staff, customers, or**

21   **visitors."**

22   Q.  Okay.  And can we scroll down to the next page, please, and

23   under "Prohibited Conduct," can you read the second bullet

24   point?

25   **A.  "Making threatening remarks."**

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                          Page 137
 1   Q.   Yes.  And then can you also read the last bullet point in
 2   that rest as well?
 3   A.   "Aggressive or hostile behavior that results in a
 4   reasonable fear of injury and/or emotional distress."
 5   Q.   Okay.  Thank you.  And Ms. Patterson, I'm sorry to ask you
 6   this, but could we go back to Exhibit Number 9, please?  And
 7   could you scroll down to the bottom of this page.  I'm sorry.
 8   Keep going to the bottom of the next page, page 3, and the top
 9   of the last -- page 4, yeah, right.  Well, what is -- right
10   before the end of the page, what does that say?  The heading.
11   A.   Before the end of Page 3?
12   Q.   Yeah.
13   A.   Where it says "Important Note"?
14   Q.   Yes.  And then can you read that note that appears on page
15   4?
16   A.   Uh-huh.  "The above listed rules are not intended to be all
17   inclusive of an employee's required conduct, personal standards
18   or discipline.  With proper notice to all employees, management
19   may add to, take from or change these rules at any time."
20   Q.   Okay.  Thanks.  And Rosie, do you know, are these rules and
21   policies, are they given to the employees?
22   A.   They are.
23   Q.   Okay.  And Ms. Patterson, can you please pull up Company
24   Exhibit Number 3?  Okay.  And do you recognize this document?
25   A.   Yes.
```

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                    Page 138

 1   Q.  Okay.  And can you scroll down to the second page, please,

 2   Ms. Patterson?  And do you recognize this document?

 3   A.  Yes.

 4   Q.  Okay.  And whose name appears on this?

 5   A.  Linda Grays.

 6   Q.  And can you scroll down a little bit further, Ms.

 7   Patterson?  And can you read what's being acknowledged here on

 8   this document?

 9   A.  Uh-huh.  "I also acknowledge receipt of the following

10   handouts:  CB Substance Abuse Policy."  Do you want me to read

11   all of the lines?

12   Q.  No.  Can you just read -- or can you just verify that the

13   harassment workplace violence policy is on there?  And can you

14   also --

15   A.  Yep.  The Clearwater harassment and workplace violence

16   policy was in this packet.  The Clearwater Cypress Bend mill

17   rules was in this packet.

18   Q.  Okay.  Thank you.  So this document shows that receipt and

19   acknowledgment of those rules and policies by Mrs. Grays.

20   Correct?

21   A.  Yes.

22             MR. KRASKA:  Okay.  Mr. Arbitrator, I'd like to

23        introduce this into evidence as Company's Exhibit 3.

24             MR. ARBITRATOR:  Mr. Vincent?

25             MR. VINCENT:  I have no objections.
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                         Page 139
 1               MR. KRASKA:  Okay.
 2               MR. ARBITRATOR:  Admitted.
 3   (WHEREUPON, Company's Exhibit Number 3 was admitted into
 4   evidence.)
 5   BY MR. KRASKA:
 6   Q.  Okay.  How did you become aware, Rosie, of the incident
 7   that occurred between Linda Grays and Larry Simmons?
 8   A.  I received a call from John Porter, the board mill
 9   superintendent, after everything had happened that evening.
10   Q.  Okay.  And did you investigate this incident?
11   A.  I did.
12   Q.  Okay.  And did you conduct your own interviews?
13   A.  I did.  Uh-huh.
14   Q.  And now, you were on earlier and heard Dexter Madison's
15   testimony.  Is that correct?
16   A.  Yes.
17   Q.  And did his earlier testimony accurately reflect what he
18   told you during your investigation?
19   A.  No.
20   Q.  Okay.  When you spoke with him during your investigation,
21   did Dexter tell you that he believed that Linda was in danger
22   during that situation?
23   A.  He told me that he did not believe she was in danger.
24   Q.  So what he told you during his interview connects with what
25   he testified to today.  Is that correct?
```

Linda Grays Arbitration 5/19/2021                              v.

Page 140

1    **A.   Yes.**

2    Q.   And did Dexter tell you during your interview that he had

3    pushed Larry out of the room?

4    **A.   He did not push him.   He told me he did not push him.   He**

5    **told me that he tapped him towards the door.**

6    Q.   Okay.  And so did his testimony today conflict with what he

7    told you during your investigation?

8    **A.   Yes.**

9    Q.   And if you could -- and I know that the camera has been at

10   kind of a weird angle there, but could you show us or

11   demonstrate how he showed you he got Larry out of the room?

12   **A.   Uh-huh.   I'm going to move it back a little bit and can you**

13   **see me here?**

14   Q.   Yes.

15            MR. ARBITRATOR:  Yes.

16   **A.   He described holding his arms out like this with Larry at**

17   **his fingertips and then tapping him, tapping him, tapping him**

18   **towards the door.**

19   Q.   Okay.  And so from what you demonstrated and what Larry

20   demonstrated earlier, does that conflict with -- do those two

21   demonstrations conflict?

22   **A.   Yes.**

23   Q.   Did you -- you heard Larry's testimony earlier today as

24   well.  Correct?

25   **A.   Yes.**

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                    Page 141
 1   Q.  Okay.  And did Larry's testimony accurately reflect what he
 2   had said about Dexter getting him out of the room?
 3   A.  Yes.
 4   Q.  So Larry's testimony about how Dexter got him out of the
 5   room and what he told you in interview matched.  Correct?
 6   A.  Yes.
 7   Q.  Okay.  Dexter -- during your interview, did Dexter tell you
 8   that both Larry and Linda were raising their voices?
 9   A.  Yes.
10   Q.  Okay.  And does that reflect or does that match the
11   testimony that he gave here today?
12   A.  No.
13   Q.  During your investigation, did Dexter tell you that both
14   Larry and Linda were cursing at one another?
15   A.  Yes.
16   Q.  And does his testimony here today reflect what he told you
17   during his interview?
18   A.  No.
19              MR. VINCENT:  Mr. Arbitrator, I want to object to
20          this line of questioning.  I'm sure Mr. Kraska is a
21          trained enough lawyer to know he's asking leading
22          questions and he's just leading Ms. Calloway down the
23          golden path here.  If so, my objection is leading and
24          then if he wants Ms. Calloway to testify to the
25          discrepancies, he should ask her what was different
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                        Page 142
 1        today.
 2              MR. KRASKA:  Okay.  That's fine.
 3              MR. ARBITRATOR:  All right.
 4   BY MR. KRASKA:
 5   Q.  Rosie, as I mentioned earlier, you heard Dexter's testimony
 6   here today.  And other than what we already spoke about, are
 7   there any other discrepancies that you noted between his
 8   testimony here today and when you did your investigation with
 9   him?
10   A.  Yes.
11   Q.  Can you please explain those?
12   A.  Uh-huh.  One of the discrepancies that I noted was that
13   he -- when he first described how Linda -- and he told Justin
14   about the missing oil, he described that she said, "Larry," and
15   he said, "Simmons."  When he -- when I interviewed him, he said
16   he didn't say anything, that Linda did all of the speaking.  He
17   was there but he did not contribute to the discussion.  And in
18   that discussion, he said that she told Justin that Larry took
19   the oil like it was his and that she was boastful about it.
20   Q.  Okay.  And did he say -- is there anything else that was
21   inconsistent?
22   A.  The description of how he moved Larry out of the room,
23   which we talked about that.
24   Q.  Okay.
25   A.  The knife situation and how he was positioned between Linda
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

Page 143

1   and Larry was different as well.  So again, he demonstrated

2   being with his hand out, standing between them.  He told me

3   that he could see Linda.  He could see Larry.  And then when

4   Linda pulled the knife, that he could see her.  So that was

5   different.

6   Q.  Okay.  And anything else?

7   A.  I think those are the major points, yeah.

8   Q.  Okay.  And earlier, we talked about Larry Simmons.  So you

9   were here and you heard what Larry Simmons testified earlier

10  today.  Correct?

11  A.  Uh-huh.  Yes.

12  Q.  And you interviewed Larry as part of your investigation as

13  well.  Correct?

14  A.  Yes.

15  Q.  And were there any major discrepancies between his

16  testimony here today and the interview that you conducted with

17  him?

18  A.  No.  It was consistent.

19  Q.  Okay.  Did you also interview Linda Grays about the

20  incident?

21               MR. ARBITRATOR:  Excuse me.  Hang on a second.

22        Excuse me.  Go ahead.

23  A.  Yes.

24  Q.  Okay.  And can you describe what Linda told you in your

25  interview with her about the incident?

Linda Grays Arbitration 5/19/2021                                    v.

Page 144

1    A.    She described that she had come in for her shift and was

2    cleaning her workstation and that Larry and Dexter were

3    conducting their handoff and at that other desk.  So she was

4    cleaning her work area, getting it ready.  She said that Larry

5    called out to her and said, "I'd appreciate it if you would

6    keep my name out of your mouth."

7            Said she continued cleaning her workstation and said

8    to him, you know, "What are you talking about?"

9            And he said to her, "You know what I'm talking about."

10           To which then she said that she commented, "Well, if

11   you would do your job, you would be fine."

12           To which then he got upset about that, that she had

13   made that comment and that he said the other, "That's not what

14   I'm talking about and you know it.  It's about the oil."

15           She said that she told him in response, "Oh, yeah, the

16   oil.  Well, you know you took it.  You took it like it was

17   yours."

18           To which then Larry became more animated and basically

19   said to her that he didn't take the oil.  She knew he didn't

20   take the oil.  And then they had an exchange of words at which

21   point Larry came up to the front edge of the desk.  She then

22   stood, you know, stood back.  She went back to that air

23   conditioning and refrigerator area and grabbed her personal

24   cellphone what she described and came back up towards the edge

25   of the desk where the computers are and held it toward him.

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                              v.

```
                                                    Page 145
 1   Decided that might not be enough.

 2           She went back and put that phone back in her purse,

 3   came back up to the front of the desk.  Larry was still pacing

 4   back and forth in the front of the table.  She picked up the

 5   Gai-Tronics phone and called Justin and she said that she said,

 6   "Justin White.  Justin White."  Hung up.

 7           At that point, Dexter had come up to that gap between

 8   the edge of the table and those file cabinets and was standing

 9   there, and Larry was walking back and forth along the front.

10   They were both saying things to each other.  She said she told

11   him to leave, to get out of the room, to get out of the room,

12   and he didn't.

13           So at that point, she did -- she described that she

14   was scared but at that point, Dexter was already standing

15   there.  There wasn't any way that Larry was going to come

16   through.  But she did say, in her description, that Dexter was

17   bear hugging and holding onto Larry, and she demonstrated bear

18   hugging and shaking and holding him and that Larry was trying

19   to get away from Dexter.

20   Q.  Can you demonstrate what she demonstrated to you about the

21   bear hugging?

22   A.  Yeah.  So she demonstrated she put her arms out like this

23   and was shaking and doing like this, so Dexter was holding

24   Larry and Larry was trying to move away from Dexter.

25   Q.  Okay.
```

Linda Grays Arbitration 5/19/2021                                    v.

Page 146

1   A.   And so at that point, she said she reached over to the

2   cabinet area and pulled the knife out and had it in her hand

3   kind of showing it -- not showing it but showing it and that

4   she said to Larry that he would have to face her -- his --

5   basically, you know, see about it with her husband.  I did ask

6   her what that meant.  She says, "Well, you know, the men will

7   take care of it and so he'll have to meet up with my husband

8   and my husband will take care of it."

9        After that, she described that Larry left the room.

10  Justin came in and talked to her, and that really was it about

11  that.  But then she did talk some about the background history

12  about why Larry may have acted that way.  She's incited an

13  example again where Larry has had outburst with employees

14  before and she was aware of those.

15       She also talked about his work performance and she

16  talked about the situation where she had been asked to sign off

17  on his records and that she had refused to do that, that her

18  supervisor, Cal Wargo, basically had to come and tell her to

19  sign off on the documents, which she -- she did.  She said she

20  did and that.  She had noted that she signed them under duress.

21  She said that Larry was slack.  I asked her what that meant.

22  She basically was saying that he was not a good performer, so

23  she called him slack a few times.  That's it.

24  Q.   Is there anything else that stood out to you in her

25  interview?

Linda Grays Arbitration 5/19/2021                                    v.

Page 147

1   A.   She said that she was calm during the exchange with Larry,

2   which is consistent with what others said.  But the triggering

3   events -- so again, telling Justin about the oil and how she

4   had shared that with Alisha and Shane.  I asked her, you know,

5   whether she felt like she was doing that at Larry's expense.

6   She asked me what I meant.  I clarified that.  So she did agree

7   that, yeah, yes, you know, she had said several times that

8   Larry took the oil like it was his and she -- she laughed about

9   that.  She thought that part was funny and, you know, was

10  almost giddy about some of those comments.

11          When she talked about the prior outbursts of Larry,

12  you know, she -- I said to her, "I don't recall ever hearing

13  about that in HR."

14          And she said to me, "There's a lot of problems that

15  don't make it up to HR, Rosie.  We take care of it between the

16  supervisors and the Union, so you'll never know."

17          And so we've been, you know, when she made those

18  comments, it was also with a little bit of sarcasm in there.

19  But basically, you know, there had been other instances that I

20  didn't know about.

21  Q.   And during her testimony, did she say whether or not she

22  was cursing or yelling during the incident?

23  A.   She -- she did not.  Yeah, she said that her voice was calm

24  and that Larry was the one cussing.  But she did say that she

25  did threaten him with her husband.

Ronda Dodd-Brown

Bushman Court Reporting                              501-372-5115

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

Page 148

1   Q.  Okay.

2   **A.  Uh-huh.**

3   Q.  Okay.  And you mentioned that during your conversation with

4   her, she brought up something about Alisha?

5   **A.  Uh-huh.**

6   Q.  Did you also interview Alisha Wilson?

7   **A.  I did.**

8   Q.  And what did she say?

9   **A.  Alisha told me that she called and told Larry that Linda**

10  **had told Justin and them, being Alisha and Shane, that Larry**

11  **had taken the oil and that he had taken it like it was his and**

12  **didn't want Larry to come into the shift not knowing what**

13  **people were saying about him.**

14  Q.  Okay.  And did you -- there was another person too.  Shane,

15  I think, was his name?

16  **A.  Right.  Shane Rogers.**

17  Q.  Did you interview him?

18  **A.  I did.**

19  Q.  And what did he say?

20  **A.  He said pretty much the same thing, that Linda had told him**

21  **and Alisha -- that Larry had taken the oil like it was his and**

22  **that she was laughing about it like it was funny.**

23  Q.  Okay.  Next, Ms. Patterson, if we could, can you pull up

24  Company Exhibit Number 4, please?  Okay.  And Rosie, can you

25  identify what this document is?

Linda Grays Arbitration 5/19/2021                                    v.

Page 149

1  **A.  It's an unemployment form -- unemployment intake sheet.**

2  **Ms. Patterson, would you mind making it just a tiny bit bigger,**

3  **please.  Thank you.**

4  Q.  Okay.  And who is it for?

5  **A.  The claimant, Linda Grays.  Uh-huh.**

6  Q.  And who is the employer?

7  **A.  Clearwater Paper.**

8  Q.  Okay.  And is this a document that you would receive

9  regularly during the course of business as the employer?

10  **A.  Yes.  Yes.**

11           MR. KRASKA:  Mr. Arbitrator, I'd like to submit

12           this as Company Exhibit Number 4.

13           MR. VINCENT:  The Union's going to object.  The

14           Union has no part or no role in whether Mrs. Grays gets

15           unemployment or doesn't get unemployment.  We're

16           strictly here to represent Mrs. Grays and her

17           termination, not in an unemployment case.

18           MR. KRASKA:  Yeah, this isn't going to prove her

19           unemployment.  This, number one, is a business record.

20           And number two, it's also a statement made by Mrs.

21           Grays and she's, you know, here and available for

22           direct and cross so --

23           MR. ARBITRATOR:  What was -- I'm trying to under-

24           stand the purpose of this document.

25           MR. KRASKA:  To show some of the points -- again,

Linda Grays Arbitration 5/19/2021                              v.

```
                                               Page 150

 1          this is a statement by Mrs. Grays.  And statement

 2          Number 16, specifically, is what we're getting in here

 3          to show --

 4              MR. ARBITRATOR:  Pull it up so we can see.  Is

 5          this it?

 6              MR. KRASKA:  Yes.

 7              MR. ARBITRATOR:  And what, in particular?

 8              MR. KRASKA:  This goes to the -- what Mrs. Grays

 9          said to Rosie during her investigation.

10              MR. ARBITRATOR:  Well, I'm not sure that I

11          understand the relevance of this.  If the relevance is

12          that she's not a truthful person, is that your

13          argument?  Or only that this indicates that one thing

14          that she had said at one point and what she said later?

15          I'm trying to understand the point of this.

16              MR. KRASKA:  Yeah.  It's -- that's right, Mr.

17          Arbitrator.  It's showing that, you know, what she, you

18          know, what she said before is inconsistent with what

19          she's saying here.

20              MR. ARBITRATOR:  Okay.  I'll admit it.

21              MR. KRASKA:  Thank you.

22              MR. VINCENT:  Mr. Arbitrator, I want the record

23          to know that the Union still maintains its objection to

24          this document.

25              MR. ARBITRATOR:  Certainly.
```

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                        Page 151
 1   (WHEREUPON, Company's Exhibit Number 4 was admitted into

 2   evidence.)

 3   Q.   Okay.  And can we scroll back up to the, yeah, Number 1

 4   there?  And under Number 1, Rosie, can you tell me which box is

 5   checked?

 6   A.   "Arguing with employer."

 7   Q.   And what does Number 1 say?

 8   A.   "Information indicates you are discharged for."

 9   Q.   Okay.  And then can we scroll down to Number 11?  And what

10   does Number 11 say?

11   A.   "Did you violate company policy?"

12   Q.   And which box is checked?

13   A.   It's marked -- it's marked "yes."

14   Q.   Okay.  And what policy?  Can you read Number A?

15   A.   Uh-huh.  It says "violent coworker."

16   Q.   I meant letter A also and --

17   A.   I'm -- or sorry.  Yes, letter A.  "What policy did you

18   violate?"

19           "Violent coworker."

20   Q.   I was just cleaning that up for myself.  And then letter B?

21   Can you read that one?

22   A.   Letter B, yes.  "Were you aware of the policy?"  And it is

23   marked "no."

24   Q.   Okay.  And earlier, though, we had submitted an

25   acknowledgment form.  Is that correct?
```

Linda Grays Arbitration 5/19/2021                              v.

---

                                                    Page 152

1   **A.  Yes.**

2   Q.  Okay.  Can we scroll down to umber 16, please?  And can you

3   read what Number 16 says and then the comments below?

4   **A.  Uh-huh.  "Please explain, in your own words, why you are no**

5   **longer working."**

6          **"Theft by coworker.  Supervisor wanted to know so my**

7   **assistant Dexter Madison and myself told the truth and named**

8   **the thief (our coworker)" I think it says "Then" -- or "Then L.**

9   **Simmons came to our control room ready to fight, so the company**

10  **said violent work place and terminated me."**

11  Q.  Thank you.  That's all we have for that document.  Thanks.

12  Okay.  So going back to your -- your interview questions, when

13  you interviewed employees after the incident, everything that

14  we went over that you talked about here based off of that

15  information, what conclusion -- well, actually, let's hold on

16  for one second.  I want to go back.  Did you also talk to

17  Justin White during the investigation?

18  **A.  Yes.**

19  Q.  And did you hear him testify earlier?

20  **A.  Yes.**

21  Q.  And were there any inconsistencies with what he testified

22  to compared to your investigation?

23  **A.  No.**

24  Q.  Okay.  All right.  So based on the information that you

25  gathered during that investigation, what conclusion did you

---

Linda Grays Arbitration 5/19/2021                                    v.

Page 153

1    come to?

2    **A.   Came to the conclusion that Linda had pulled a knife and**

3    **that it violated our workplace violence policy.**

4    Q.   Okay.  So based on her violation of that policy, what level

5    of discipline was imposed?

6    **A.   She was separated from employment.**

7    Q.   Okay.  Oh, and also, based on the investigation, did you

8    also find that it warranted discipline for any other employees

9    that were involved?

10   **A.   Yes.**

11   Q.   What other employee did you discipline?

12   **A.   Discipline was issued to Larry Simmons.**

13   Q.   And what level or form of discipline did the Company issue

14   to Larry Simmons?

15   **A.   Larry was issued a suspension with time served, which I**

16   **believe at that time that we issued it was about three weeks of**

17   **time and he was given a last chance agreement.**

18   Q.   Okay.  And again, based off of your investigation, you

19   know, why did Larry receive that level of discipline?

20   **A.   Larry didn't pull a knife.  They were -- they were both**

21   **arguing.  Larry didn't pull the knife.  Linda did.**

22   Q.   Okay.  And is there anything else relevant from your

23   investigation that you'd like to add?

24   **A.   No.**

25               MR. KRASKA:  Okay.  I'll pass the witness, Mr.

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                         Page 154

 1          Arbitrator.

 2                  MR. ARBITRATOR:  Mr. Vincent?

 3                       CROSS-EXAMINATION

 4   BY MR. VINCENT:

 5   Q.  Make sure I'm pronouncing this right because is it Ms.

 6   Calloway?

 7   A.  You can call me Ms. Calloway.  That's fine.  Thank you.

 8   Q.  Okay.  Ms. Calloway, in your investigation, did you collect

 9   witness statements from various people?

10   A.  They were already written before I became involved.

11   Q.  Did you review those statements?

12   A.  Did I review them?

13   Q.  Yes.  Review those statements?

14   A.  I did review them.

15   Q.  Okay.  Could we pull up Union Exhibit 2, please?  Are you

16   familiar with this statement, Ms. Calloway?

17   A.  Yes.

18   Q.  And can you tell me the date that this statement was

19   provided?

20   A.  I'd have to look at a calendar, but when I came in my --

21   when I came in on --

22   Q.  When was this -- when was it written in?  What is the date

23   on the bottom of the letter?  When was it written?

24   A.  Sure.  It's 9/14 there.

25   Q.  And what time?
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

Page 155

1    A.  9:20 p.m.

2    Q.  Would that have been the same night of the incident?

3    A.  I believe so.

4    Q.  When did you interview Mr. Madison?

5    A.  When did I interview him?

6    Q.  When did you interview Mr. Madison?

7    A.  I interviewed him, I believe, on the 16th or 17th.  Well,

8    that's not -- that's not right.  I don't have those dates and

9    notes right in front of me, but I believe I interviewed him on

10    the 15th or 16th, yeah.

11    Q.  Now, earlier when your counsel was questioning you, it

12    appeared that you were trying to impeach Mr. Madison's

13    testimony and say that he didn't tell the truth today.  Is that

14    what you were getting at?

15    A.  I was only noting the differences.

16    Q.  Did you take notes in this meeting that you conducted this

17    interview in?

18    A.  Did I take notes?

19    Q.  Did you take notes when you interviewed Mr. Madison?

20    A.  Yes.

21    Q.  And so those notes would reflect what was said in this

22    meeting.  Is that correct?

23    A.  Yes.

24    Q.  Union Exhibit 2 is a note from Mr. Madison though.  Is that

25    correct?

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                              v.

Page 156

1   **A.   Yes.**

2   Q.   Let me ask you this:  If somebody asked you to leave -- if

3   they ask you to get out of here; go, does that sound aggressive

4   to you in your role as an HR person?  Does saying "Get out of

5   here"; "Go on"; "Leave," does that sound aggressive to you?

6   **A.   It might, depending on the tone that was used to say it.**

7   Q.   If I asked you, "Ms. Calloway, please leave this room," up

8   to at least maybe three or four times, would you think I was

9   being aggressive if I asked you the leave the room?

10  **A.   If you said it in that tone, perhaps not; but in a**

11  **different tone, perhaps yes.**

12  Q.   If your training as an HR -- senior HR, as you stated

13  earlier, would that also be viewed as maybe trying to diffuse a

14  volatile situation?  Asking somebody to leave, to separate?

15  **A.   Yes.**

16  Q.   Okay.  Could we put Union 2 back up on the board, please?

17  Can you see that, Ms. Calloway?

18  **A.   Uh-huh.**

19  Q.   You can?

20  **A.   Yes.**

21  Q.   And we've all agreed that this is Mr. Madison's statement

22  that he turned in to the Company.  Is that correct?

23  **A.   Yes.**

24  Q.   And we agree that he wrote this statement on the very night

25  that it happened.  Is that correct?

Linda Grays Arbitration 5/19/2021                                    v.

Page 157

1    **A.  Yes.**

2    Q.  And in your training as a senior HR, would you say that the

3    closest you are to an incident, the more accurate that your

4    memory would be?

5    **A.  Yes.**

6    Q.  In this statement -- let me read this and make sure you

7    tell me if I'm reading this right.  "Linda told Larry to get

8    out about three times and Larry wouldn't leave so she call

9    Justin."  Am I reading that right?

10   **A.  Uh-huh.  Yes.**

11   Q.  Why was somebody that's the aggressor wanting a supervisor

12   there for?  Did that ever strike you odd?

13   **A.  Up until that point, she had not pulled the knife.**

14   Q.  Exactly.  That's a very good point you're making.  Let's

15   get -- finish this statement here.  "Justin to come to coating

16   prep.  Larry was very angry"?

17   **A.  Uh-huh.**

18   Q.  Let's pull up Union Exhibit 3, please.  Is this statement

19   familiar, Ms. Calloway?

20   **A.  Yes.**

21   Q.  And who wrote this statement?

22   **A.  Justin White.**

23   Q.  And who is Mr. White?

24   **A.  He is a supervisor in the board mill.**

25   Q.  When did Mr. White write this statement?

Linda Grays Arbitration 5/19/2021                                    v.

Page 158

1   A.   **According to that email, it was sent at 7:49 p.m. on**

2   **September 14.**

3   Q.   And September 14, that's the night of the incident.

4   Correct?

5   A.   **Yes.**

6   Q.   Who was the operator that night?

7   A.   **On which shift?**

8   Q.   He's writing this statement about what happened and it says

9   "Operator called for Justin White."  Who is the operator?

10  A.   **That was Linda.**

11  Q.   So Mrs. Grays was the operator?

12  A.   **Right.**

13  Q.   So he wrote this the same night that it happened, just like

14  Mr. Madison.  Is that correct?

15  A.   **Yes.**

16  Q.   So down here towards the bottom, about four lines from the

17  bottom, it says this:  Make sure I'm reading correctly.  "She

18  told me that she had asked him several times to leave because

19  he was in such a rage and he continued to try to approach her

20  in a wild manner."

21  A.   **Uh-huh.**

22  Q.   Did I read that right?

23  A.   **As far as I can tell, yes.**

24  Q.   Can we put up Joint Exhibit 9, please?  These are the mill

25  rules that you testified to earlier.

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

Page 159

1   **A.  Are you asking me?  Yes.**

2   Q.  Yes.  Can you turn to page 2, please?  On 5a, what does

3   that say?

4   **A.  5a.  "The following behaviors, actions and activities are**

5   **prohibited:**

6          **"Flagrant disrespectful conduct towards management or**

7   **a co-worker."**

8   Q.  Why do you think Mrs. Grays repeatedly asked Mr. Simmons to

9   leave the control room that night?

10  **A.  Well, the dialogue between the two of them had become**

11  **escalated.  They were both cussing each other out and saying**

12  **things to each other.**

13  Q.  Who's testifying to them cussing each other out?

14  **A.  I'm sorry?**

15  Q.  You just said they were cussing each other out.  In your

16  investigation, who testified or who told you during the

17  investigation that they were cussing each other out?  Because

18  there's only one person that's testified to that today.

19  **A.  Yeah.  Larry told me that and Dexter told me that.**

20  Q.  Let's go back up to Union Exhibit 2, please, Ms. Patterson.

21  In this statement, do you see anywhere where Mr. Madison says

22  that they were cussing each other out?

23  **A.  Not on this statement, but his verbal to me said that they**

24  **were.**

25  Q.  Do you see -- but do you see in this statement where it

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                        Page 160
 1   says that I jumped in between them to stop Larry?  You see
 2   that?
 3   A.  Uh-huh.  I do.
 4   Q.  So I'm trying to -- I'm trying to get the reasoning on your
 5   investigation.  So Mrs. Grays is calling for her supervisor
 6   to get to the control room.  Mr. Madison, in his statement,
 7   says that he had to jump in between them to stop Larry.  Who's
 8   the aggressor right now?  Let's just stop and who's the
 9   aggressor in the control room at this moment?
10   A.  As written, it indicates that Larry was.  However, what
11   Dexter said did not match that.
12   Q.  But you haven't introduced your notes from those interviews
13   to even substantiate.  You're just -- you're just -- we've got
14   a statement here, a factual statement here, and you're
15   expecting us just to believe that you've sat here and listened
16   to testimony all day and it's all wrong, but we haven't seen
17   the note produced?
18   A.  Uh-huh.
19   Q.  Can you pull up Joint Exhibit 2, please?  Are you familiar
20   with this document, Ms. Calloway.
21   A.  Yes.
22   Q.  Did you produce this document?
23   A.  Yes.
24   Q.  And did you sign this document?
25   A.  Scroll down.  I did not.
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                              v.

Page 161

1  Q.  But you prepared this document?

2  **A.  Yes.**

3  Q.  Can you tell me whose signature that is as far as the

4  supervisor manager goes?

5  **A.  That is John Porter.**

6  Q.  And was he involved in the investigation?

7  **A.  No.**

8  Q.  So you cited -- just leave it right there.  So you prepared

9  this document.  And the only rule that you cited that Mrs.

10  Grays violated was the Clearwater Paper workplace violence

11  policy.  Violence is defined as verbal or physical acts of

12  aggression which are perceived to be hostile, abusive or

13  intimidating.  Is that correct?

14  **A.  That's right.**

15  Q.  And that she possessed a copy.  And so you're saying that,

16  I mean, that's all you cite in her termination.  So anything

17  outside of that is piling on at this point.  Would you agree?

18  **A.  I'm not clear.**

19           MR. KRASKA:  Objection.  Mischaracterization.

20           MR. VINCENT:  Let me retract that question.

21           MR. KRASKA:  Okay.

22  BY MR. VINCENT:

23  Q.  Let me retract that question.  We agree the incident

24  happened September 14.  Is that correct?

25  **A.  Yes.**

Linda Grays Arbitration 5/19/2021                                    v.

Page 162

1   Q.  And you prepared this document on October 2.  Is that

2   correct?

3   **A.  Yes.**

4   Q.  And so you felt like the Company had sufficient time to

5   investigate this incident?

6   **A.  Yes.**

7   Q.  And you only cited in this document that she violated one

8   policy.  Is that correct?  One part of a policy?

9   **A.  The workplace violence portion of it, yes.**

10  Q.  The possession of a weapon.  That's what you cited.  Is

11  that correct?

12  **A.  Yes.**

13  Q.  Okay.  Can you pull back up Joint Exhibit 10, please?  And

14  can you turn to the workplace violence page, please.  And we

15  agree, Ms. Calloway, from your testimony, that you only cited

16  one thing.  Is that correct?

17  **A.  Yes.**

18  Q.  Did you cite -- but you didn't cite Number 1, the use of

19  profanity or abusive language, did you?

20  **A.  I did not.**

21  Q.  Well, so through your investigation, you said that both of

22  them were cussing and screaming at each other, so why didn't

23  you cite that if that's what you found in your investigation?

24  **A.  I took the most elevated item and noted it versus creating**

25  **a laundry list as you mentioned earlier.**

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                   v.

```
                                                    Page 163
 1   Q.  So fighting or assault on a coworker, customer, security,
 2   staff, or visitor, that didn't make it in either, did it?
 3   A.  It's referenced.  The policy is referenced.
 4   Q.  No, you specifically identified a portion of the policy,
 5   not the whole policy.  You didn't say you violated the whole
 6   policy.  You identified one infraction.
 7          Now, let's turn the page to the next page, please,
 8   where it says "Prohibited Conduct."
 9          "Aggressive or hostile behavior that results in a reasonable
10   fear of injury and/or emotional distress."  Do you see that?
11   A.  Yes.
12   Q.  Do I need to pull back up Union Exhibit 3 so you can read
13   what your supervisor, Mr. White, stated, or do you recall it?
14   Let's pull it back up.  Let's pull up Union's Exhibit 3,
15   please, Ms. Patterson.  Down toward the bottom, this is Mr.
16   White's words:  "She was threatened and scared of him."  Do you
17   see that?
18   A.  I don't right off, Mr. Vincent.  Would you point to that
19   line, please.
20   Q.  Four sentences up from the bottom.
21   A.  One, two, three, four.
22   Q.  It says, "She pulled a knife on him because she was
23   threatened and scared of him."  Do you see that?
24   A.  Oh, now I do.  Yes.  Sorry.
25              MR. KRASKA:  I'm going to object to that.  That
```

Linda Grays Arbitration 5/19/2021                                    v.

Page 164

1          statement is not for what it's being used.  That

2          statement is Linda's statement that she made to Justin.

3          It is not Justin's statement.  It is Justin saying what

4          Linda said to him.  That is all.

5                    THE WITNESS:  Uh-huh.

6                    MR. KRASKA:  I'm going the object to that

7          characterization.

8                    MR. VINCENT:  Mr. Arbitrator, the statement

9          speaks for itself.  Mr. White produced the statement on

10         the same night that it happened.  There's no getting

11         around the statement.  It says what it says.

12                   MR. KRASKA:  But you're trying to characterize it

13         as it's what Mr. White said.  It's what Linda told Mr.

14         White.

15                   MR. VINCENT:  It is what Mr. White said.

16                   MR. ARBITRATOR:  Well, folks, it says what it

17         says and if there's a difference in terms of what it

18         means, you gentlemen can raise that in your briefs.

19                   MR. KRASKA:  Thank you.

20    BY MR. VINCENT:

21    Q.  Ms. Calloway, during your investigation, did you ask how

22    long this particular knife had been in this control room?

23    **A.  Yes.**

24    Q.  And how long did -- how long had it been in there?

25    **A.  Depending on who I asked, it had been there anywhere from**

Ronda Dodd-Brown

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                              v.

Page 165

1    **15 to 20 years.**

2    Q.  So this knife had been there that long.  So they used it as

3    a -- as a tool.  Right?  It was a work object?

4    **A.  Everybody claimed it was not.**

5    Q.  When you say everybody, can you -- can you tell me what

6    everybody is, please?

7    **A.  Linda, Dexter, Larry.**

8    Q.  And they said it was -- it was not -- it was not used to

9    perform work?

10   **A.  Right.**

11   Q.  So this knife just laid around on the counter for two

12   decades, but nobody did anything with it?  Is that your

13   testimony right now?

14   **A.  That's what they said.**

15   Q.  I'm not -- I'm asking you when you did the investigation,

16   you were the chief person that made the decision to terminate

17   Mrs. Grays.  What you say is very important.  In your

18   investigation, you found that the knife had been in there for

19   15 to 20 years.  Now, is it your testimony that that knife just

20   laid there and nobody ever used it to perform any type of work-

21   related task?

22   **A.  You're asking me whether I believe that it was used for**

23   **work purposes.  Is that right?**

24   Q.  That's correct.

25   **A.  I do believe it was used for some work tasks.**

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                      v.

```
                                                        Page 166
 1   Q.  That's what I asked you to start with when you said no.  So
 2   if you look at why you terminated Mrs. Grays, she didn't
 3   possess this weapon.  The weapon had been there for years.  She
 4   simply picked it up when the coworker -- an enraged coworker
 5   backed her in the corner, according to statements by the people
 6   that were directly involved.  And you didn't find those
 7   credible?
 8   A.  The statements?  I'm not following you.
 9   Q.  Let me back up a second.  So Mr. Madison turned in a
10   statement to you.  You were investigating.  Then you claimed
11   that you called Mr. Madison to your office and you did another
12   investigation.  And then today, you testified and you're saying
13   the statement and what he said in your office and what he said
14   today, none of it -- none of it match up.  I mean, is that your
15   testimony?
16   A.  Yes.
17   Q.  What does Mr. Madison have to gain by lying?
18   A.  You would have to ask him that.
19   Q.  You're the one that investigated this.  So if you tell me
20   that Union Exhibit 2, Mr. Madison's handwritten statement of
21   the events that night, doesn't match the interview that you did
22   in your office and you're saying that he lied to you, he was
23   untruthful to you because you had a statement -- his statement.
24   Is that your testimony?  That he sat in your office and lied to
25   you about what happened?  Because you're saying, "I have
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                              v.

Page 167

1   differed from this statement."

2   **A.  I mean, what he verbally told me was true.  I do not**

3   **believe that what he wrote on the statement had everything on**

4   **it.**

5   Q.  Can we pull up Joint Exhibit 9, please, and can we turn to

6   page 2, please?  Or right there.  Just hold it right there.

7   Under "Work Practice Rules," do you see that, Ms. Calloway?

8   **A.  Yeah.**

9   Q.  Number 1, can you read that, please?

10  **A.  Number 1?  "Engaging in conduct which damages the**

11  **reputation of the Company, including making false and**

12  **slanderous accusations against the Company or any employee, is**

13  **prohibited."**

14  Q.  Would you say that would be similar to making a false

15  statement or giving false testimony?

16  **A.  I would.**

17  Q.  So it's your position that you're telling the truth and Mr.

18  Madison is not telling the truth today?

19  **A.  It's my position that what he said today does not match**

20  **what he told me on the day I spoke to him.**

21  Q.  But you have notes to prove what he's told you on that day.

22  Correct?

23  **A.  I have my personal notes.**

24  Q.  But you didn't use those notes in order to determine what

25  level of discipline that you were going to apply to Mrs. Grays?

Page 168

1   **A.   I didn't use the statements.**

2   Q.   Did you use the notes that you took the day that you

3   interviewed Mr. Madison to form your opinion that Mrs. Grays

4   deserved to be terminated?

5   **A.   Yes, my personal notes.**

6   Q.   Well, we requested all documents that the Company used in

7   order to determine that Mrs. Grays deserved to be terminated.

8   I just asked you did you use those notes in making that

9   determination and you said you did.  Why weren't those notes

10  provided to the Union?

11  **A.   I did not interpret those as part of the request.  And the**

12  **request had things noted on there with a list and those items**

13  **were provided.**

14  Q.   You just responded that you used your notes from that

15  meeting --

16  **A.   Uh-huh.**

17  Q.   -- to determine that Mrs. Grays deserved to be terminated.

18  Did I misunderstand you and is that not what you said?

19  **A.   It is.**

20  Q.   Okay.  So why didn't you provide those notes when the Union

21  sent you a wrongful information request, requesting all

22  documents that you used to determine Mrs. Grays deserved to be

23  terminated?  Why didn't you provide those notes?

24  **A.   As I just said, I did not interpret to mean my personal**

25  **notes.**

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                           v.

```
                                                  Page 169
 1   Q.  Sitting here today, you're saying that you used those to

 2   make a decision.  And then you're also saying that you didn't

 3   think it was important that the Union were able the review

 4   those.  See how I'm having a hard time following you, Ms.

 5   Calloway?

 6                    MR. ARBITRATOR:  Is there a question here?

 7                    MR. VINCENT:  Yeah, there is.

 8                    MR. KRASKA:  I also object to this line of

 9            questioning.  It's been asked and answered.  Move on.

10                    MR. VINCENT:  No further questions at this time

11            for Ms. Calloway.

12                    MR. KRASKA:  I would like to redirect, please.

13                    MR. ARBITRATOR:  Sure.

14                         REDIRECT EXAMINATION

15   BY MR. KRASKA:

16   Q.  Rosie, during that cross-examination, the Union

17   representative had brought up, I guess, some differences

18   between the level of discipline that was imposed on Larry and

19   Linda.  Is that correct?

20   A.  Yes.

21   Q.  Okay.  And again, based off your investigation, why were

22   different levels of discipline imposed?

23   A.  Linda pulled a knife.  That was the difference.

24   Q.  Okay.  And did Linda admit to you that she pulled a knife?

25   A.  She did.
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

Page 170

1    Q.  Yeah.  Ms. Patterson, can we pull up Joint Exhibit Number

2    2, please?  Okay.  Now Ms. Calloway, you were also questioned

3    on cross-examination, I guess about the second paragraph,

4    talking about the workplace violence policy.  Is that correct?

5    **A.  Yes.**

6    Q.  Okay.  Can you read the first sentence of that paragraph

7    for me?

8    **A.  "These actions and the role played by Linda in this**

9    **situation are unacceptable behavior and are violations of the**

10   **company's Mill Rules, Non-harassment policy and Workplace**

11   **Violence policy and Code of Conduct policy."**

12   Q.  Okay.  So it wasn't just the workplace violence policy that

13   you cited to as being violated in this form.  Correct?

14   **A.  That's right.**

15   Q.  So it also included the mill rules.  Is that right?

16   **A.  Right.**

17   Q.  And the non-harassment policy?

18   **A.  Right.**

19   Q.  And the code of conduct policy.  Is that correct?

20   **A.  Correct.**

21   Q.  And during -- that's good, Ms. Patterson.  You can take

22   this exhibit down, please.  Also in your investigation -- when

23   you were talking with Linda earlier, we talked about going back

24   to the whole oil incident.  Do you remember that?

25   **A.  Yes.**

Linda Grays Arbitration 5/19/2021                              v.

```
                                                     Page 171
 1   Q.  And you recall what Linda said about that or how this whole
 2   incident kind of came to be?
 3   A.  Yes.
 4   Q.  Okay.  So in your investigation, did it reveal, I mean,
 5   exactly what was the, I guess, the triggering factor based on
 6   your investigation of what really started everything with this
 7   incident?
 8   A.  Well, the oil started with Justin asking if they knew where
 9   the oil was.  They were getting ready for a department fish
10   fry.
11   Q.  Okay.  And the -- so yeah, Justin came in and asked.  But
12   did your investigation also reveal any actions that were taken
13   with related to the conversation that Justin and Linda had?
14   A.  Well, Linda said that she told Justin that Larry had taken
15   the oil and that he had taken it like it was his.
16   Q.  And when the incident occurred between Linda and Larry and
17   you interviewed Larry, did he tell you why he had confronted --
18   the reason he confronted Linda?
19   A.  It was about the oil.
20   Q.  Okay.
21   A.  And the comments about the oil.
22   Q.  Okay.  And what were the comments that Linda made about
23   Larry and the oil?
24   A.  That he had taken it like it was his.  She was telling
25   people that he had taken it.
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Page 172

1           MR. KRASKA:  Okay.  Mr. Arbitrator, that's all

2      the questions I've got.

3           MR. ARBITRATOR:  Mr. Vincent, anything more?

4           MR. VINCENT:  I have a few questions now, Mr.

5      Arbitrator Barron.

6           MR. ARBITRATOR:  Go ahead.

7                     RECROSS-EXAMINATION

8  BY MR. VINCENT:

9  Q.  Ms. Calloway, Counsel was just questioning you about the

10 Justin White and the oil issue.  Did the Company not want Mrs.

11 Grays to tell the truth?  I'm confused here.

12 **A.  I guess I don't understand what you're asking me.**

13 Q.  When a supervisor asks an employee, "Did you see this," do

14 you want the employee just to say, "Nope, I didn't see a

15 thing."  Is that what the Company's advocating here?

16 **A.  I don't think that Justin asked her or Dexter, "Did you see**

17 **this?"  It was more of, "Do y'all know where it is?"  In which**

18 **case, yeah, you know, they shared with him --**

19 Q.  Okay.

20 **A.  -- what they thought.**

21 Q.  Asking -- so Justin White asked a question, as a member of

22 management, and they said, "I saw Larry Simmons take it out of

23 here."  Is that correct?

24 **A.  "Like it was his," yes.**

25 Q.  "Like it was his."  Who cares how they said it?  It's the

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                              v.

```
                                                    Page 173

 1   response that Mr. White was asking for.

 2          They said, "This is who took the oil."  They don't

 3   know if it's his or not his.

 4          He asked, "Where's my oil?"  Is that correct?

 5   A.  But to your point, they don't know if it was his or not.

 6   Q.  But he asked, "Where's my oil?"

 7   A.  Uh-huh.  And they said, "Larry Simmons took it like it was

 8   his."

 9   Q.  Ms. Calloway, this isn't grade school.  This is a grown

10   woman's job of 33 years we're talking about here.  Mr. White

11   asked her a question?

12   A.  Uh-huh.

13   Q.  And she said, "Larry Simmons took it like it was his."

14          Who cares what she said?  She said, "Larry Simmons

15   took it."

16          Now, let's turn to -- let's pull back up Joint Exhibit

17   10, please.  Can you scroll up, Ms. Patterson, to the

18   "Reporting Procedures"?  Right there.  Stop, please.  On this

19   first paragraph, second sentence, can you read that, please?

20   A.  "Reports can be made anonymously."

21   Q.  The second sentence.

22   A.  That is the second sentence.

23          MR. ARBITRATOR:  I think you mean the third.

24   Q.  The third.  Excuse me.  I didn't see the period there.

25   A.  "All reported incidents will be investigated."
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                      Page 174
 1   Q.   Okay.  What's the next sentence say?

 2   A.   "Reports or incidents warranting confidentiality will be

 3   handled appropriately and information will be disclosed to

 4   others only on a need-to-know basis."

 5   Q.   And a supervisor asks Mrs. Grays a question.  Is that

 6   correct?

 7   A.   Yes.

 8   Q.   And to the best of her knowledge, she responded to that

 9   supervisor.  Is that correct?

10   A.   Yes.

11   Q.   She told the truth the best she knew it.  Is that correct?

12   A.   Yes.

13   Q.   No further questions at this time.

14              MR. KRASKA:  I'm just going to -- I've got one

15         more quick redirect.

16              MR. ARBITRATOR:  Sure.

17              MR. KRASKA:  Thank you.

18                       REDIRECT EXAMINATION

19   BY MR. KRASKA:

20   Q.   Your investigation with Linda, too, also indicated what she

21   did after she told Justin about the oil.  Is that right?

22   A.   Yes.

23   Q.   And what did she tell you about that?

24   A.   She told Alisha and Shane on the incoming shift what she

25   had told Justin.
```

Linda Grays Arbitration 5/19/2021                              v.

Page 175

1    Q.  And was she -- did it seem like she was making light of

2    that?

3    **A.  She did seem as she was making light of it.**

4    Q.  How so?

5    **A.  She was, you know --**

6              MR. VINCENT:  I object.  That's leading.  He can

7         ask Ms. Calloway how she thought Mrs. Grays was acting

8         but he can't tell her.

9              MR. KRASKA:  Okay.  Okay.

10             THE WITNESS:  Uh-huh.

11             MR. KRASKA:  That's fine.

12   BY MR. KRASKA:

13   Q.  How did Linda tell you she was acting when she was telling

14   other employees about the Larry oil issue?

15   **A.  She repeated how she had said that Justin had asked about**

16   **the oil and that she had said that Larry took the oil like it**

17   **was his.  And when she would say that part, the "like it was**

18   **his," she was giddy about saying that.**

19   Q.  And is that the way it was told to other employees?

20   **A.  Yes.  That's how Alisha described it and how Shane**

21   **described it and how Dexter described it.**

22   Q.  Okay.  Thank you.  That's all I've got.

23             MR. ARBITRATOR:  Mr. Vincent?

24             MR. VINCENT:  Nothing else, Mr. Arbitrator, for

25         this witness.

Linda Grays Arbitration 5/19/2021                              v.

```
                                                      Page 176
 1              MR. ARBITRATOR:  Okay.  Does the Company have
 2         another witness?
 3              MR. KRASKA:  We do not have anymore witnesses.
 4              MR. ARBITRATOR:  So okay.  So you're done subject
 5         to rebuttal.  Is that correct?
 6              MR. KRASKA:  Yes, Mr. Arbitrator.
 7              MR. ARBITRATOR:  Okay.  Mr. Vincent, do you need
 8         some time before you call your witnesses?
 9              MR. VINCENT:  I just need a few minutes to kind
10         of get my paperwork straightened back up on my table
11         here.  About ten minutes?
12              MR. ARBITRATOR:  How long?
13              MR. VINCENT:  About ten minutes?
14              MR. ARBITRATOR:  No problem.  Fine.
15              MR. VINCENT:  All right.  Thank you.
16     (WHEREUPON, a break was taken.)
17              MR. ARBITRATOR:  Mrs. Grays, why don't you go
18         ahead and get into the Union testimony room if you
19         would.
20              MR. RANEY:  Can y'all hear Linda?
21              MRS. GRAYS:  Can you hear me?
22              MR. ARBITRATOR:  Mrs. Grays, are you alone in
23         that room?
24              MRS. GRAYS:  Yes, sir.
25              MR. ARBITRATOR:  Okay.  You're going to need to
```

Linda Grays Arbitration 5/19/2021                              v.

```
                                                    Page 177
1          speak up a little louder.

2                 MRS. GRAYS:  Yes, sir.

3                 MR. ARBITRATOR:  All right.  Are you all ready to

4          go forward?  Go ahead.

5                          LINDA GRAYS,

6     having been first duly sworn, testified as follows:

7                        DIRECT EXAMINATION

8     BY MR. VINCENT:

9     Q.  Mrs. Grays, I know it's been a very long day.  We're going

10    to try to get through this as quickly as possible.  Can you

11    state your name for the record and spell it, please?

12    A.  Linda Grays, G-R-A-Y-S.

13    Q.  And Mrs. Grays, who was your employer?

14    A.  Clearwater Paper.

15    Q.  And how long have you been employed at Clearwater Paper?

16    A.  33 years.

17    Q.  And what was your job at Clearwater Paper?

18    A.  Machine furnisher.

19    Q.  And how long --

20    A.  I'm sorry.

21    Q.  And how long have you held that position?

22    A.  Since 2015.  Operator, yes.

23    Q.  It takes a long -- does it take a long time to work up to

24    being an operator?

25    A.  Oh, yes, sir.
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                v.

Page 178

1    Q.  And so you -- how many years, just guesstimate, did it take

2    you to become an operator?

3    **A.  Probably 20 years.**

4    Q.  You heard what's going on today.  You've sat in here

5    this -- today during this hearing.  Let's just go right to

6    September 12 and let's start there.  Can you just start and

7    describe what happened on September 12, please?

8    **A.  Yes, sir.  Supervisor called safety meeting about 6:00 that**

9    **evening.  We made it to work at 5:45 p.m.  Safety meeting about**

10   **6:00 p.m.  And we talked about safety and the COVID-19.  And**

11   **then Justin White, my supervisor, stated that we were going to**

12   **have a fish fry on the 13th, which would be the next date, that**

13   **evening, on Sunday.**

14           **And he also stated that "I have cooking oil he hid out**

15   **in coating prep," which is my department -- my control room**

16   **area.  He say, "I got some hid out, so we gonna have a fish**

17   **fry."**

18           **And we took down, you know, as a potluck, who all was**

19   **bringing what.  After the safety meeting was over, I went back**

20   **to my department, to my control room, and started doing my job.**

21   **Dexter Madison was already there.  My relief, Bobby Brown, he**

22   **told me what was going on behind the computers and everything,**

23   **what all I had.  And he walked out.  Mr. Simmons walked in.**

24   Q.  I'm going to -- let's go back to after the safety meeting

25   on the 12th.  Did anything happen that day on the 12th after

Linda Grays Arbitration 5/19/2021                              v.

Page 179

1    the safety meeting?

2    A.  Justin White -- after Bobby Brown left, Justin -- Justin --

3    well, see, Justin came in.  You right.  Justin came in

4    looking -- as he had stated in safety meeting, he had some

5    cooking oil hid out over there.  He came I think maybe five or

6    ten minutes later.  He came to our control room, looked in the

7    back compartments.

8             Came out, "Where my cooking oil?"  Me and Dex didn't

9    say anything.

10             He say, "Y'all, who got my cooking oil?"

11             I asked, "Dex, you gone tell him?"  Dex turned around

12    to tell Justin White.

13             When he opened his mouth, we both said, "Larry

14    Simmons."

15             He say -- Justin White, "Larry Simmons?  That wasn't

16    his cooking oil."

17             And I was like, "Well, he came and got that cooking

18    oil six, eight weeks ago."

19             And Justin say, "Well, it wasn't his.  I sent him over

20    to get that cooking oil from Ms. MeMe awhile back, but it

21    wasn't his."

22             And I said, "Well, we thought it was his.  He came in

23    and got it."

24             And Dex say, "Yeah, we thought it was his."

25             And so Justin said, "Well, I'm just going to buy some

Linda Grays Arbitration 5/19/2021                                      v.

```
                                                            Page 180
 1   more.  But when I see him, I'm gonna tell him about it."  And

 2   Justin walked out of the control room.

 3   Q.  Okay.

 4   A.  That's on the 12th.

 5   Q.  And then -- so when did your shift end?

 6   A.  At 5:45 a.m. that Sunday morning.  Alisha and Shane walked

 7   in.  Dexter and I had brought it up again, outdone that Larry

 8   Simmons had made us witnesses to a theft.

 9           And Alisha said, "What?  What?"  And we started

10   telling her -- Dexter and I -- telling her and Shane.

11           But in the end, we say, "Well, Justin say he gonna buy

12   some more cocking oil, so it's over.  He was going to tell

13   Larry about it when he saw him."

14           And that was it.  We thought that was over.  We left.

15   Came back in Sunday evening to work and we had the fish fry.

16   The next -- Alisha didn't say anything about it.  So when we

17   got off Monday morning 5:45 a.m., I met Mr. Simmons walking

18   down the sidewalk approaching me.

19           I say, "Hey, Larry."  He wouldn't speak.

20           I say, "Hey, Larry."  He still wouldn't speak.

21   Stepped off the sidewalk.

22           And I turned, "Larry, I just wanted to tell you we had

23   fish fries and fish left in the breakroom."

24           He never said anything.  Just wet on in.  I'm like,

25   What's wrong with Larry?  I didn't know what.  He's mad at me,
```

Ronda Dodd-Brown
Bushman Court Reporting                                      501-372-5115

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                      Page 181
 1    you know.  Walked on to the parking lot.  I did text the lady

 2    that worked with me that night, Tran (phonetic).

 3            I said, "I just passed Larry Simmons and he's mad at

 4    me.  He wouldn't say anything to me.  I spoke three times."

 5            So she said, "Well, maybe he had his earbobs in."

 6            And I'm like, "Maybe so."  That was it.  Went home.

 7    Went to bed.  Come back that Monday morning 5:45.

 8    Q.  And what was the date the 5:45?  What was the date?

 9    A.  That Monday evening, which was September 14.

10    Q.  Okay.

11    A.  2020.  I walked in.  Dexter Madison was already there

12    seated.  My relief, Bobby Brown, operator that I relieved, was

13    there.  He told me what was going on about, you know, my

14    computer kiosk and then he left.  I took control of the

15    controls.  By that time, Larry walked in.

16    Q.  Let me stop you right here, Mrs. Grays.  I'm going to have

17    Ms. Patterson pull up Joint Exhibit I think it's 11B.  Go to A.

18    A will be fine.  Sorry.  Go to A, Ms. Patterson.  Sorry.  Is

19    this the control room where you and Dexter were working at?

20    A.  Yes, it is.

21    Q.  And can you show -- kind of show or tell us where Mr.

22    Madison was seated at when you got there?

23    A.  That black chair over to your left.

24    Q.  That right there where the cursor is at?

25    A.  Yes.
```

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                   Page 182
 1   Q.  And where did you walk to when you relieved Mr. Brown?

 2   A.  Around to the computer desk, that other black chair in the

 3   background by the fridge.  Yeah, over in there.

 4   Q.  Okay.  Continue on.

 5   A.  Mr. Simmons walked through the door.  He said a few

 6   words over to the left of Larry -- to Dexter.  I started taking

 7   my stuff out of my purse, opening up glass, do what I do when I

 8   get to work.  Just preparing to work.

 9         And Mr. Simmons, "Hey, Ms. Linda, from now on, you

10   just keep my name from out of your mouth."

11         I'm like, "What are you talking about, Larry?  What

12   are you talking about."

13         "Just from now on, just keep -- just keep my damn name

14   out of your mouth.

15         "What?  I don't know what you talking about, Larry.

16   What are you talking about?

17         "You told Justin White I stole his cooking oil,

18   jeopardizing my M-F-ing job."

19         By this time, he had stepped over in the middle where

20   you see my computer and the Gai-Tronics sitting.  Yeah, right

21   along in there.  He stepped over there.  Yes.

22         And I said, "Larry" -- I'm standing up at this point.

23   I said, "Larry" --

24   Q.  Mrs. Grays, let me stop you.  Where are you standing at, at

25   this point?
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                        Page 183
 1   A.   In the front.  Directly in front.  Right there.  Right

 2   there.

 3   Q.   Behind your kiosk though?

 4   A.   Behind my kiosk.  My desk, yeah.  I'm sorry.  Pardon me?

 5   Q.   So you're testifying that you were standing up?

 6   A.   Yes.  I had just -- I had just got through putting my food

 7   in the refrigerator and everything, so I was standing.

 8           And, "You jeopardize my M-F-ing job."

 9           I say, "Larry, get out of here."  And I sat down.

10           He just, you know, "You don't tell me where to go.

11   You tell -- that's not tell" -- just belligerent.

12           I say, "Larry, get out of here.  You need to leave.

13           "I ain't going nowhere," you know.

14           So I reached and grabbed the Gai-Tronic up under that

15   computer in the middle.

16   Q.   Stop right here.  Identify the Gai-Tronics.

17   A.   That brown thing.  Right here.

18   Q.   Up there?

19   A.   Right there.

20   Q.   So you were --

21   A.   I had to reach --

22   Q.   You reached.  And describe how you grabbed it.

23   A.   I reached under that computer there and grabbed the

24   phone -- the Gai-Tronics.  And I told him again, "Larry, if you

25   don't get out of here, Imma call Justin White.
```

Linda Grays Arbitration 5/19/2021                              v.

```
                                                        Page 184
    1              "I don't give a" -- he just cursing me, profanity
    2    laden.
    3              I say, "Justin White.  Justin White."
    4              When I said that, he went to another level.  I mean,
    5    irate.  He screamed.  I made a motion to come to my direction
    6    to the right.  Dexter Madison jumped up and caught him.  I
    7    retreated to the back all the way to the refrigerator.  He was
    8    still cursing.  Irate.  Said I was trying get him fired.
    9    Jeopardizing, you know, about the cooking oil, you know.  You
   10    know, it just went on.  It -- he tried to let -- Dexter got him
   11    but not in a bear hug.  Larry was going from the left to the
   12    right trying to get around Dexter.  I'm not saying anything.
   13    Q.  Let me stop you --
   14    A.  Okay.
   15    Q.  -- right there, Mrs. Grays.
   16    A.  Okay.
   17    Q.  So when Dexter -- you say Dexter was trying to keep Mr.
   18    Simmons back.  Where was that taking place at?
   19    A.  Right along in this location.  Right along in this --
   20    Q.  Right there where the cursor is at?
   21    A.  Yes.
   22    Q.  Between -- just to make sure, between the edge of that desk
   23    and the other side?  Is that where?
   24    A.  That's right.  Right along in here.
   25    Q.  Where were you standing when this was going on?
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                         Page 185
 1   A.  Back up -- back far as I could go to the wall back to the

 2   refrigerator.

 3   Q.  So more to the left or to the right?

 4   A.  More to the -- on the -- on the screen, it would be to the

 5   right.

 6   Q.  Okay.  Towards the --

 7   A.  Microwave.

 8   Q.  You were standing right in there?

 9   A.  Right.

10   Q.  Okay.  Let me ask you this:  How many -- how many exits are

11   there in this room?

12   A.  There's only two exit doors.

13   Q.  And was both exits blocked at this time?

14   A.  Yes, sir.  That's where they were.

15   Q.  Now, explain -- kind of back up a little bit.  Explain to

16   me after you called -- and maybe you could stand up if you --

17   if you could get your chair out of the way and show me.  When

18   you said, "Justin White.  Justin White," can you show the

19   arbitrator what Mr. Simmons started doing at that time?

20   A.  I said --

21   Q.  Can you stand up and demonstrate it, please?

22   A.  When I said, "Justin White.  Justin White" and made the

23   motion, I rolled back.  Dexter jumped up and grabbed him.  And

24   I rolled back, came to my feet with my phone in my hand going

25   back all the way far as I can.  And Larry is ranting and
```

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                        Page 186
 1   cursing saying I'm jeopardizing his job; saying I was -- I
 2   don't know what all he was saying.  I was just self-
 3   preservation.  I don't know.  You know, he's breaking a loose
 4   from Dexter, trying to get to me.
 5            I stood up the rest of the time -- I never sat back
 6   down -- as far as I could go backwards.  And that's as far as I
 7   could go.  And Dexter was talking to him trying to calm him
 8   down.  But Larry was just irate from the left to the right
 9   trying to get around.
10            "You thought you a GD Christian.  You're a GD
11   hypocrite," you know, just, "you M-F-ing my job."  Just on and
12   on and on.  I mean, he was just unbelievable.
13   Q.  So Mrs. Grays, after you had backed up as far as you could
14   go and Mr. Simmons continued to try to break free of Mr.
15   Madison, did you -- did you do something after that?
16   A.  Yeah.  Yeah, I called the radio.
17   Q.  It's okay if you need a minute.  It's okay.  Just take a
18   minute.
19   A.  Okay.  I was scared for my life.  I looked over to my left.
20   Company radio was there but it was also a knife right by the
21   sink.
22            MR. ARBITRATOR:  Could we stop a second?  Is it
23        okay if Mrs. Grays sits down?
24            THE WITNESS:  Sure.
25   Q.  Yeah, please sit down, Mrs. Grays, and just take a minute.
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                              v.

```
                                              Page 187

 1   A.   Okay.

 2   Q.   Do you need a few more minutes or are you ready?

 3   A.   I'm ready.

 4   Q.   We can take a few more minutes, Mrs. Grays, if you need it.

 5   A.   I'm ready.

 6              MR. ARBITRATOR:  Ms. Calloway, are you there?

 7        How far away are you from that room and do you have

 8        some water you could --

 9              MS. GARRIDO-CALLOWAY:  We're not in the same

10        building.

11              MR. ARBITRATOR:  Oh, okay.

12              MS. GARRIDO-CALLOWAY:  Unfortunately.

13              MR. VINCENT:  Mr. Raney will take some water to

14        her.

15              MR. ARBITRATOR:  Okay.  Let's wait until she gets

16        it.

17              MR. VINCENT:  Okay.

18              MR. ARBITRATOR:  Did that help?

19              THE WITNESS:  I'm ready.

20              MR. ARBITRATOR:  Mr. Vincent, you want to move

21        forward?

22   BY MR. VINCENT:

23   Q.  Mrs. Grays, I want to try to get through this.  And so when

24   you were -- when you were backed up against the cabinets, can

25   you kind of walk us through, like, what was going through your
```

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                        Page 188
 1    mind, what you were thinking, and then what you saw?
 2    A.  I saw Larry was trying to get away from Dexter.  This
 3    caused me physically some physical harm or bodily harm.  And
 4    the profanity.  And Dexter had been -- and all going through my
 5    mind, he had been going to the chiropractor.  He had been in a
 6    car wreck.  He hadn't been able to hardly move.  And I don't
 7    know how long we can hold this man.  This man is trying to get
 8    to me.  And I feared for my life, and it happened so fast.  And
 9    that's what was going through my mind, self-preservation.
10    Tried to keep him from killing me or whatever.  He was so
11    angry.  He was so outraged.  Murder.  He was murder man.
12    That's what he was.
13    Q.  And so did you see something that you thought you could
14    maybe protect yourself?
15    A.  Yes, sir.  I looked to my left.  I saw the Company radio.
16    And there was a knife laying there and I grabbed that, backed
17    up to the cabinets with the knife down by my side.  And Larry
18    looked up.  Dexter had him by the exit doors at this time.
19           Larry looked up and screamed, "You pull a knife on me?
20    You pull a knife on me?"
21           That's when Dex turned around and just pushed him on
22    out the exit doors.  I laid the knife right back down.  And
23    then Justin -- I guess couple minutes, Justin White, my
24    supervisor, and Jason Homestead, the day supervisor, walked in.
25    And Justin asked me what happened, and I was telling him what
```

Linda Grays Arbitration 5/19/2021                                v.

```
                                                    Page 189

 1   happened.

 2           And Jason was asking me, "Are you all right, Linda?

 3   Are you okay?"  Because I guess I was shaking or whatever.

 4           But I say, "Yeah, yeah.  Where Larry?  Where's Larry?"

 5           And they said -- Justin White said, "Well, he stormed

 6   off."  That's what he said.

 7           And they left out.  Pardon me.  And they left out.

 8   And I guess a minute or two later, here come the Union

 9   president, Robert Channel (phonetic), and Justin White, my

10   supervisor, and they told me that I had to go home.

11           And I asked them, "Why I got to go home?"

12           And they said, "Well, John Porter witnessed Larry

13   Simmons over there kicking walls and doors and screaming and

14   cussing and irate saying that I pulled a knife on him -- she

15   pulled a knife on me."  So they said I had to go home and had

16   to submit to a drug test and a alcohol test.

17           And I was like, "Well, I hadn't did anything.  Larry

18   came over here to me to cause me bodily harm because I told the

19   supervisor the truth when he asked.  When asked, I told the

20   truth."  And I went -- took me out.  They said Larry stormed

21   off.  Justin White walked me to the nurse's station and I had

22   the urine -- the blood test -- the drug and alcohol test.  I

23   asked Justin, "Where is Larry?

24           "He's gone."

25           I was concerned he'd be out in the room waiting on me.
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                        Page 190
 1   I didn't know.  And they wasn't concerned.  And I said, "Well,

 2   when he gonna do a drug test?"

 3           And they said, "We'll give him in the morning when he

 4   comes back to work."

 5           And I went home and I hadn't been back since Rosie

 6   called me on the 15th of September and my suspension me.

 7   Q.  Well, so let's stop right here, Mrs. Grays.  Let's back up

 8   a little bit and I -- Ms. Patterson, could you put Union

 9   Exhibit 1 up on the screen, please?  Mrs. Grays, do you

10   recognize this document?

11   A.  Yes, sir.

12   Q.  Ms. Patterson, can you scroll up through there so she can

13   verify that it's all there?

14   A.  Yes.

15   Q.  And I believe there's nine pages?

16   A.  Yes.

17   Q.  Should be nine pages.  And that is your statement that --

18   A.  That's --

19   Q.  -- you wrote out, Mrs. Grays?

20   A.  Yes, sir.

21   Q.  Who asked you to write this statement out?

22   A.  Justin White and Robert Chatham, the Union president and

23   the supervisor.

24   Q.  Okay.  And so who did you give this statement to?

25   A.  Who did I give to it?  I brought it in to Rosie and Hunter.
```

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                    Page 191
 1   HR.

 2   Q.  So you turned this statement in to the Company.  Is that

 3   correct?

 4   A.  Yeah.  I gave to it the Company when they called me in on

 5   the 15th for --

 6   Q.  Okay.

 7   A.  -- a meeting.

 8   Q.  Okay.

 9   A.  Suspension meeting.

10              MR. VINCENT:  The Union would move to enter this

11          into the record as Union Exhibit 1.

12              MR. KRASKA:  No objection.

13              MR. ARBITRATOR:  Admitted.

14   (WHEREUPON, Union's Exhibit Number 1 was admitted into

15   evidence.)

16   BY MR. VINCENT:

17   Q.  Mrs. Grays, let me ask you this:  Did you have anything

18   personal against Mr. Simmons?

19   A.  No, sir.  Larry and I got along fine.  We worked together

20   on September 4.  Larry has the told me that, you know, when he

21   get mad, he just can't control it.  He just -- he just --

22   that's why he don't like getting mad.  He told me personal --

23   we were close.  Me and Larry never had a problem with one

24   another.

25   Q.  You wouldn't have any problems going back and working
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                        v.

Page 192

1   around him, would you?

2   **A.  Of course not.  I never had a problem with Larry.**

3   Q.  Just on this particular day, something happened and Mr.

4   Simmons was different?

5   **A.  Yes.  Yes.**

6   Q.  Okay.

7   **A.  I guess maybe they had passed it along on the day he worked**

8   **and he had premeditated it and jawing at him or whatever.**

9   Q.  Right.  Let me ask you this about the knife that you picked

10  up.  How long has that knife been there in that room?

11  **A.  About 20 years.  Probably passed 20 years.**

12  Q.  And what was the purpose of that knife in the room?  Did

13  y'all use to it perform work?

14  **A.  Yes, to change out the paper towel receptacle.  Everybody**

15  **did.  Cut rags, watermelon, cantaloupe.  Just wash it up over**

16  **the years and everybody used it.**

17  Q.  You didn't want to hurt Larry Simmons that day, did you?

18  **A.  No, sir.  That was self-preservation.  Larry wanted to hurt**

19  **me.**

20  Q.  But you weren't going to let Larry hurt you, were you?

21  **A.  No, sir, not if I could help it.**

22  Q.  Thank you, Mrs. Grays.  I pass the witness.

23                           CROSS-EXAMINATION

24  BY MR. KRASKA:

25  Q.  Thank you.  Good afternoon, Mrs. Grays.  I've just got a

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                              v.

Page 193

1   few questions for you.  In your testimony to the Union

2   representative, you obviously went over the details of the

3   event.  And so I just wanted to ask you from when you -- when

4   the event started until when Larry exited the control room,

5   approximately how long was that time?

6   **A.   Two to three minutes at the most.**

7   Q.  And you also mentioned in your testimony earlier that you

8   had made a call on the radio or the Gai-Tronics to Justin White

9   during that two to three minutes.  Is that correct?

10  **A.   Yes.**

11            MR. ARBITRATOR:  You have to answer verbally,

12       please.

13  Q.  Did you say yes?

14  **A.   Yes.**

15  Q.  Okay.  Thank you.

16  **A.   Yes.  In those two to three minutes, yes.**

17  Q.  Okay.  Sorry.  We just didn't hear you.  Thank you.

18  **A.   I'm sorry.**

19  Q.  And so from when you made the radio call to when Dexter and

20  Larry exited the room, how long was that length of time?

21  **A.   Would you say that again?**

22  Q.  How long was the length of time between when you made the

23  radio call and when Larry and Dexter went out of the control

24  room?

25  **A.   Probably not a minute.**

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                         Page 194
 1   Q.  Did you say probably --
 2   A.  Maybe a minute.  30 seconds to a minute.
 3   Q.  Okay.  Thank you.  And you also talked about Larry making
 4   advances towards you and Dexter having to hold him back.  Is
 5   that correct?
 6   A.  After I called the supervisor, yes.
 7   Q.  Okay.  And can you describe how Dexter held Larry back?
 8   A.  Got in front of Larry and pulling him back.  Larry
 9   coming -- to try to make him walk back, you know, trying to get
10   him to leave.  And Larry's coming from on his left side and on
11   his right side trying to get past Dex and just cursing and
12   profanity laden, MF and all kinds of verbal abuse, trying to
13   get to me.
14   Q.  Okay.  And you mentioned that Larry may have broken free
15   from Dexter.  Do you know how many times that happened?
16   A.  He tried every -- each time.  I -- I don't remember the
17   times.
18   Q.  Okay.
19   A.  I'm scared to death.  I'm don't -- all I know he's
20   resisting.  He's resisting.
21            MR. KRASKA:  Okay.  All right.  That's all the
22         questions I have, Mr. Arbitrator.
23            MR. ARBITRATOR:  Mr. Vincent?
24            MR. VINCENT:  Mr. Arbitrator, at this time, the
25         Union rests unless the Company has a rebuttal.
```

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                      Page 195
 1              MR. KRASKA:  No rebuttal, Mr. Arbitrator.

 2              MR. ARBITRATOR:  Okay, folks.  Thank you all, by

 3        the way.  Mrs. Brown indicated that she thought she

 4        would have the transcript by June 3.  Is that correct?

 5              THE COURT REPORTER:  Yes, sir.

 6              MR. ARBITRATOR:  Okay.  I assume we're going to

 7        have briefs, so how much time after that, folks, do you

 8        need?

 9              MR. KRASKA:  To write the briefs?  Is that what

10        you're asking?

11              MR. ARBITRATOR:  Yes.  Yes.

12              MR. KRASKA:  30 days is what we had proposed if

13        the Union is agreeable to that.

14              MR. ARBITRATOR:  Let me take a look at my

15        calendar.

16              MR. VINCENT:  The Union is agreeable to 30.

17              MR. ARBITRATOR:  That would -- the 3rd is a

18        Thursday.  Why don't we talk about, just so it's clear,

19        July 9th.  Is that okay?

20              MR. KRASKA:  That's acceptable to the Company.

21              MR. VINCENT:  Works for the Union.

22              MR. ARBITRATOR:  Let me just write it down.

23              MR. VINCENT:  Mr. Arbitrator, can I ask one

24        question?

25              MR. ARBITRATOR:  Sure.
```

Page 196

1          MR. VINCENT:  If either of the parties finish the
2       brief early, would it be a problem to send it to you
3       and you hold it?  And when you get both of them --
4          MR. ARBITRATOR:  Sure.  And that was -- that was
5       my expectation, that each of you would send your briefs
6       whenever you send them to me.  And when I have both of
7       them, then I will then exchange them at that point.
8          MR. VINCENT:  Okay.  Good.
9          MR. KRASKA:  And Mr. Arbitrator, I had just one
10       more housekeeping item I wanted to clean up.
11          MR. ARBITRATOR:  Sure.
12          MR. KRASKA:  I just wanted to make sure that you
13       were going to take notice of all the Company exhibits
14       that were presented today, especially Exhibits 1 and 2.
15       I just wanted to make sure that -- I know for sure 3 we
16       got entered in with no objections and 4.  But exhibits
17       1 and 2, I just wanted to make sure that those got
18       entered into the record and there was no objections.
19          MR. ARBITRATOR:  They are.
20          MR. KRASKA:  Okay.  Thank you.
21   (WHEREUPON, Company Exhibit Numbers 1 and 2 were admitted into
22   evidence.)
23          MR. ARBITRATOR:  Anything further, folks?  Mrs.
24       Brown, any questions you have?
25          THE COURT REPORTER:  No, sir.  Just confirming

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                  Page 197
 1        that you are going to get me a style for the case and
 2        Ms.  Patterson is going to get me the exhibits.
 3            MR. ARBITRATOR:  Yeah.  Ms. Patterson, when yo
 4        send them to -- I've gotten all of them but they're in
 5        different emails.  It would be helpful when you send
 6        that list and all of them to Mrs. Brown, please send me
 7        that same email.
 8            MS. PATTERSON:  Sure thing.  I'll cc you on the
 9        email to Mrs. Brown and I'll include all the exhibits
10        that were introduced.
11            MR. ARBITRATOR:  Sounds good.  All right.
12        Anything further from the Company?
13            MR. KRASKA:  No, Mr. Arbitrator.
14            MR. ARBITRATOR:  Anything from the Union?
15            MR. VINCENT:  No, Mr. Arbitrator.  I just
16        appreciate your time and everybody else's time today to
17        hear this case.
18            MR. ARBITRATOR:  Thank you very much to all of
19        you.  Mrs. Grays, thank you.  I always ask this
20        question at the end.  Is there anything that you need
21        to say that you've not already been able to say?
22            MRS. GRAYS:  You're asking me that, Mr.
23        Arbitrator?
24            MR. ARBITRATOR:  Yes.  Yes, I am, ma'am.
25            MRS. GRAYS:  Well, that's not in my statement and
```

Linda Grays Arbitration 5/19/2021                                    v.

```
                                                   Page 198
 1           it will probably be objected, but Justin White left the
 2           control room and went over to our breakroom and
 3           announced it to six or seven guys, "Well --
 4                MR. ARBITRATOR:  Whoa, whoa, whoa, whoa, whoa,
 5           whoa.  Were you there?
 6                MRS. GRAYS:  Pardon me?
 7                MR. ARBITRATOR:  Were you there?
 8                MRS. GRAYS:  No, sir.
 9                MR. ARBITRATOR:  All right.
10                Mrs. Grays:  I was there when he -- when he
11           admitted it to Rosie, I was there.
12                MR. ARBITRATOR:  Whoa, whoa.  Were you there when
13           he did that?  No, I'm asking.  All of this, you're
14           telling me that these happened, did you hear him say
15           that to you so that you --
16                MRS. GRAYS:  No, sir.  No, sir, Mr. Arbitrator, I
17           did not.
18                MR. ARBITRATOR:  Okay.  Anything else you'd like
19           to add?
20                MRS. GRAYS:  No, sir.  No, sir, Mr. Arbitrator.
21                MR. ARBITRATOR:  All right.  Are you satisfied
22           with the representation you've received from the Union
23           in this matter?
24                MRS. GRAYS:  Yes, sir, Mr. Arbitrator.
25                MR. ARBITRATOR:  Okay.  I think we are done.  And
```

Linda Grays Arbitration 5/19/2021                                    v.

Page 199

```
 1          I thank everyone.  I know how difficult it is to do
 2          this virtually.  And my guess is that this is the last
 3          time you're going to have to do this unless you have
 4          something coming up fairly soon.  I don't think I'm
 5          going to have to worry, since I've been vaccinated, to
 6          do any of these anymore unless the parties want.  All
 7          right.  Thank you all again.  Ms. Patterson, you want
 8          to stay on for a moment?  And the rest of you can
 9          leave.
10     (WHEREUPON, the hearing was concluded.)
11                              *  *  *  *  *
12                                 *  *  *
13                                    *
14
15
16
17
18
19
20
21
22
23
24
25
```

Ronda Dodd-Brown
Bushman Court Reporting                              501-372-5115

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

Linda Grays Arbitration 5/19/2021                                    v.

Page 200

1                          CERTIFICATE

2       I, Ronda Brown, Court Reporter for Bushman Court Reporting,

3  Inc., certify that I recorded the proceedings by machine

4  shorthand recording in the case of Clearwater paper Corporation

5  and USW Local 1532, Federal Mediation and Conciliation Service

6  and FMCS No. 21218-02453, May 19, 2021, before Arbitrator Paul

7  Barron, via videoconference; that said recording has been

8  reduced to a transcription by me, and the foregoing pages

9  numbered 1 through 200 constitute a true and correct transcript

10  of the excerpt of proceedings held, to the best of my ability.

11      WITNESS MY HAND AND SEAL as such Court Reporter on this 2nd

12  th day of June, 2021.

13

14                     _____

15                     RONDA BROWN

16                     SUPREME COURT CERTIFIED REPORTER NO. 385

17                     BUSHMAN COURT REPORTING, INC.

18

19

20

21

22

23

24

25

Ronda Dodd-Brown
Bushman Court Reporting                              501-372-5115

bbb96ae7-0c68-4c70-9fc7-7e66a9f79ba9

# EXHIBIT E

# IN THE MATTER OF ARBITRATION BETWEEN:

| | |
|---|---|
| CLEARWATER PAPER CORPORATION | § |
| | § |
| | § |
| | § |
| COMPANY, | § |
| | § |
| v. | § |
| | § |
| | § |
| USW LOCAL 1532 | § |
| | § |
| | § |
| UNION. | § |

FMCS 211218-02453
Arbitrator Paul L. Barron
Professor of Law

## POST-HEARING BRIEF OF
## CLEARWATER PAPER CORPORATION, EMPLOYER

Respectfully submitted,

J. Bruce Cross
Joe M. Kraska
**CROSS, GUNTER, WITHERSPOON &
GALCHUS, P.C.**
500 President Clinton Avenue, Suite 200
Little Rock, AR 7220
(501) 371-9999 (o) | (501) 371-0035 (f)
bcross@cgwg.com
jkraska@cgwg.com
**COUNSEL FOR CLEARWATER**



EXHIBIT
E

## I.   STATEMENT OF THE CASE

The analysis of this case begins and ends with Clearwater Paper Corporation's responsibility to ensure a safe workplace free of violence.

On September 14, 2020, Grievant Linda Grays (Grievant) pulled a knife on coworker Larry Simmons (Simmons) in an argument on Clearwater premises during a shift change. When management learned of the incident, Clearwater opened an investigation. Witnesses provided written statements and were interviewed in person shortly thereafter by the Senior Human Resources Manager Rosario Garrido-Calloway (Garrido-Calloway).

During the course of Garrido-Calloway's investigation, she determined that, after Grievant falsely accused Simmons of stealing cooking oil from Clearwater, Simmons confronted Grievant and an argument ensued. During the argument, Grievant pulled a knife on Simmons, taunting him to "come on, [n-word]!", and threatening Simmons that he would have to answer to her husband.

On October 2, 2020, Clearwater determined that the behavior of both Simmons and the Grievant violated Clearwater work rules and warranted discipline. Simmons received a three-week suspension without pay and a last chance agreement for his role in the incident. The Grievant was terminated. Simmons and the Grievant received different levels of discipline because, as Garrido-Calloway testified, "they were both arguing. Larry didn't pull the knife. Linda did."

On October 5, 2020, Grievant filed her Grievance Form, alleging that she was terminated "after having a conflict with another employee" in violation of Article 8, Sections (a), (b), and "all other applicable language" of the Collective Bargaining

2

Agreement (CBA). After Clearwater considered and denied the grievance, the Union Staff Representative requested arbitration pursuant to Article 7(c) of the CBA.

On May 19, 2021, the Parties appeared at a hearing conducted before Arbitrator Paul Barron. During the hearing, Clearwater produced exhibits and testimony from Simmons, Madison, Garrido-Calloway, and Shift Supervisor Justin White (White). The Union, represented by Chad Vincent, presented exhibits and testimony from the Grievant. Finally, the Parties agreed to jointly submit post-hearing briefs to Arbitrator Barron on July 9, 2021.

Accordingly, this case is now ready for resolution. For the reasons set forth in more detail below, and given Clearwater's responsibility to provide a safe environment for its employees, Clearwater respectfully requests that the Arbitrator find that Clearwater appropriately exercised its legitimate management rights under the CBA when it terminated the Grievant for violating its properly promulgated rules and policies against workplace violence.

## II.    RELEVANT CONTRACT PROVISIONS AND POLICIES

### A. Contract Provisions

#### Article 1, General Purpose of Agreement

The general purpose of the Agreement is, in the mutual interest of the employer and employee, to provide for the operation of the Pulp and Paperboard Mill at McGehee, Arkansas, under methods which will further, to the fullest extent possible, **the safety, health, and welfare of the employees**, economy of operation, quality and quantity of output, cleanliness of plant, and protection of property. It is recognized by this Agreement to be the duty of the Company, the Union, and the employees to cooperate fully, individually, and collectively for the advancement of said conditions.

#### Article 5, Operating Control

. . . The Company . . . retains the right to . . . discipline, and suspend employees, **and to discharge employees** for just cause[.]

<u>Article 7, Adjustment of Complaints</u>

The arbitrator's authority shall be limited to the terms of this Agreement or any written supplemental agreement. He shall have no authority to add to, take from, nullify or modify any terms of this Agreement or any written supplemental agreement, **and he shall consider and render a decision concerning _only_ such issues as are directly raised in the written grievance, which shall not be in any way materially changed or amended after it is presented to the Company**[.]

<u>Article 8, Disciplinary Action</u>

(b) If a regular employee claims to have been discharged . . . in violation of this Agreement during the term of this Agreement, such person must within three (3) calendar days refer the matter to the Local Union, which may within four (4) additional calendar days file a written grievance under Step 3 of the grievance procedure in Article 7 of this Agreement and it shall be processed as provided in that Article.

(c) **The Union and the Company agree that the Company has the right to create or modify rules designed to maintain discipline and proper personal standards of conduct such as the Company's Mill Rules. The employees agree to comply with the Company's Mill Rules**.

<u>Article 23, Safety</u>

The Company and the Union recognize the desirability and importance of a safe work place. To further this . . . **The Company retains the right to take unilateral action to ensure workplace safety whenever necessary**.

**Exhibit JT-1** (Emphasis added).

**B. Mill Rules**

Violation of the Company's Harassment, Workplace Violence, and/or Handgun Policies is prohibited.

. . .

The following behaviors, actions and activities are prohibited: . . .

Flagrant disrespectful conduct toward management or a co-worker; . . .
Immoral or indecent conduct, including but not limited to vulgarity, use of profane, abusive or threatening language[;]
Theft[;]
Fighting, inciting or participating in physical violence of any nature on Company property or threatening the use of physical violence.

Possession of . . . weapons . . . on mill property is prohibited. All employees are to comply with the Company's Harassment, Workplace Violence, and Handgun Policies.

The above listed rules are not intended to be all inclusive of an employee's required conduct, personal standards or discipline. With proper notice to all employees, management may add to, take from or change these rules at any time.

4

**Exhibit JT-9**.

### C. **Workplace Violence Policy**

It is the policy of the Company that rules and regulations regarding behavior in the workplace are necessary for the efficient operation of the Company and for the benefit and safety of all employees. Management cannot prevent violence in our workplace alone. This must be a joint effort by every employee. The Company encourages all employees to report possible problems to management.

Conduct that interferes with operations . . . or is offensive to . . . co-workers will not be tolerated[.] Any act of violence which impacts the workplace will be cause for investigation and subject to action by the Company. Violence is defined as an act of aggression or any statement, which could be perceived as intent to cause harm to . . . an individual[.]

The following conduct is prohibited and may lead to disciplinary action, up to and including termination:

1. The use of profanity or abusive language;

. . .

3. Fighting or assault[1] on a co-worker[;]
4. Threatening or intimidating co-workers[.]

This list is illustrative of the type of behavior that will not be permitted. It is not intended to be an all-inclusive listing. Any violation of the Company's policies . . . may, at management's discretion, subject the employee to disciplinary action, up to and including termination.

Prohibited Conduct

We do not tolerate any type of workplace violence committed by or against employees. Employees are prohibited from making threats or engaging in violent activities.

The following list of behaviors provides examples of conduct that is prohibited. It is not exhaustive.

- Causing physical injury to any other person
- Making threatening remarks

. . .

- Possession of a weapon while on company property or while on company business

. . .

- Aggressive or hostile behavior that results in a reasonable fear of injury and/or emotional distress[.]

---

[1] "Assault" is defined as "[t]he threat or use of force on another that causes that person to have a reasonable apprehension of imminent harmful or offensive contact." Black's Law Dictionary (11th ed. 2019).

. . .

Threats, threatening conduct and any other acts of aggression or **violence in the workplace will not be tolerated**. Any employee determined to have committed such acts will be subject of disciplinary action up to and including termination[.]

**Exhibit JT-10** (emphasis added).

### III.   STATEMENT OF THE ISSUE

The statement of issue in this matter was disputed by the parties at the arbitration hearing. The Company has framed the Statement of the Issue as follows:

Did the Grievant violate Company policy when she pulled a weapon on a co-worker?

The Union framed its Statement of the Issue as follows:

Did the Company have just cause to terminate Grievant? If not, what is the proper remedy?

"The grievance statement filed at the initial step of the internal dispute resolution process may define the issue or issues, especially if . . . the parties fail to agree on a statement of the issue." ELKOURI & ELKOURI, Ch. 7, Pg 6 (8th Ed.). Here, the Union defined the nature of the grievance as: "Employee was terminated after having a conflict with another employee." *See Grievance*, **Exhibit JT-3**. The provision of the CBA that was allegedly violated was Article 8, Sections "a,b and all other applicable language." *Id*. The arbitrator's authority is limited to "consider and render a decision concerning **only such issues as are directly raised in the written grievance, which shall not be in any way materially changed or amended after it is presented to the Company**." *Ex. JT-1* at Art. 7, p.9.

Thus, the arbitrator is bound by the lawful CBA provisions here to consider and render his decision only on the issue directly raised in the written grievance. The

6

Company's statement of the issue conforms to the employee's statement set forth in the grievance. The termination resulted from a conflict with another in which there was undisputed evidence that Grievant pulled a knife on a coworker. Such conduct is a clear violation of the Company's Mill Rules and Workplace Violence Policy with which employees are required to comply and, under the terms of the CBA, the Company has the right and discretion to determine the appropriate level of discipline. *See* Article 8(c). Therefore, the Company's statement of the issue should be applied in this case.

## IV.    STATEMENT OF FACTS

Clearwater is a national pulp and paper product manufacturer and operates the Cypress Bend Mill in Arkansas City, Arkansas. Grievant is a member of the USW Local 1532 (Union). Accordingly, this matter is governed by the terms of the CBA as well as the properly promulgated Mill Rules and Workplace Violence Policy referenced above. Under Article 8(c) of the CBA, the Union and Clearwater agree that Clearwater has the right to create or modify rules designed to maintain discipline. *Ex. JT-1* at 10. Exercising that right, Clearwater promulgated its Mill Rules which explicitly prohibit workplace violence and also incorporates by reference Clearwater's more specific Workplace Violence Policy. *Ex. JT-9* at § III(3); *Ex. JT-10*. The Workplace Violence Policy explicitly provides that assaulting a coworker with a weapon is prohibited and may lead to disciplinary action, *at management's discretion*, up to and including termination. *Ex. JT-10* at 2.

On March 29, 2018, Grievant acknowledged in writing that she received and, thus, was aware of Clearwater's Mill Rules and Workplace Violence Policy. **Exhibit C-3**.

### a.    Grievant Falsely Accused Simmons of Theft at Work.

On the evening of September 12, 2020, Grievant and her Assistant Madison were working the night shift in the Company's Coating Prep Room (Coating Prep). *Testimony*

7

*of Grievant*, Trans. at 177-179. During the shift, Supervisor White walked into Coating Prep to get some cooking oil that he had placed in a closet a couple of months earlier. *Testimony of White*, Trans. at 115.[2] White did not see the oil in the closet and asked if Grievant or Madison had seen the cooking oil. *Id.* Grievant responded that "Larry [Simmons] took the oil. I guess he took it home," and kind of made a joke about it, stating "he took it like it was his." *Id.* White said, "well, that wasn't his oil." *Id.*

According to White, Madison did not say anything during the exchange. *Id.* at 116. According to Madison's testimony at the hearing, he: (1) "did not say anything at the time," which is what White remembers and what Madison told Garrido-Calloway after the incident; or (2) said, "Larry Simmons took the cooking oil"; or (3) said "Simmons" after Grievant said, "Larry"; or (4) said "Larry Simmons" at the same time Grievant did. *Testimony of Madison*, Trans. at 41, 61-62, 77-78; *Testimony of Garrido-Calloway*, Trans. at 142. The record demonstrates Madison could never keep his story straight, even for the brief amount of time he was under oath.

In any event, theft is a violation of Clearwater policy and a terminable offense. *Testimony of White*, Trans. at 117; *Ex. JT-9* at §§ I, III(5)(k).

At shift change, in the early morning of September 13, 2020, Grievant eagerly boasted to oncoming dayshift employees, Operator Alisha Wilson (Wilson) and Assistant Shane Rogers (Rogers), that "Larry Simmons had made us witnesses to a theft. And Alisha said, What? What? And we started telling her – Dexter and I – telling her and Shane." *Testimony of Grievant*, Trans. at 180. Grievant telling Wilson and Rogers was completely

---

[2] Earlier in the shift at an employee safety meeting, the Company announced that it would hold a fish fry the following evening for the employees.

inappropriate and confirms White's testimony regarding Grievant's character: "she just always seems to be an instigator and keep things stirred up amongst other employees." *Testimony of White*, Trans. at 114.[3]

When Wilson left her shift, she called Simmons and told him that Grievant was spreading the rumor that Simmons had stolen cooking oil: "Hey, Larry, I'm just trying to let you know that Linda . . . told Justin White that you stole some cooking oil and she was boasting about it." *Testimony of Simmons*, Trans. at 92.

At the beginning of the evening shift on September 13, 2020, Simmons called the supervisor's office knowing White would be there to begin his evening shift and explained to White that he had moved the oil to another location in the mill. *Testimony of White*, Trans. at 116-117. White went to the area where Simmons said he put the oil and found the very oil that Grievant was adamant Simmons had stolen the month before. *Id.* Simmons had not stolen the oil. *Id.*

### b.    Simmons Confronted Grievant About Her False Accusation.

On September 14, 2020, at the morning shift change, which was the first time Simmons had reported to work since Grievant had wrongfully accusing him of theft to his supervisor and coworkers, Simmons passed Grievant on the sidewalk. *Testimony of Grievant*, Trans. at 180. In a clear attempt to goad Simmons, she said "Larry, I just wanted

---

[3] Additional evidence of Grievant's reputation as a troublemaker came directly from Simmons who testified that, during a prior shift in which they worked together, Grievant accused him of infidelity. *Testimony of Simmons*, Trans. at 84. Furthermore, after Simmons completed his training to be an assistant on the night shift, the Grievant refused to sign off on his training. *Id.*, Trans. at 85. Undoubtedly because her refusal was unsupported by any facts to demonstrate that Simmons had not completed the required training, a superior had to order the Grievant to sign the requisite papers.

to tell you we had . . . fish left in the breakroom." *Id.* at 180. Simmons rightfully ignored the comment and kept walking. *Id.*

Later that day, at the evening shift change, Simmons was completing his handoff to Madison in Coating Prep, who was relieving him as coating prep assistant. As Simmons gathered his things to go, he told Grievant something to the effect of "Please keep my name out of your mouth." *Testimony of Simmons*, Trans. at 93; *Testimony of Madison*, Trans. at 46. Grievant snapped back, "Well, you keep my name out your mouth" and "learn your job." *Id.* According to the testimony, Simmons was standing in front of a large computer desk and Grievant was behind the desk disinfecting her workspace when the two began arguing. **Exhibit JT-11**, at 1.

When Simmons clarified that he was talking about her accusation to White, Wilson, and Rogers that he had stolen cooking oil, Grievant "bugged her eyes out" at Simmons and said "You did. You did steal it." *Testimony of Simmons*, Trans. at 94. Simmons told Grievant that "she was a hypocrite and that she was always talking about people and starting stuff." *Id.* Simmons paced in front of the desk, upset and cursing that Grievant had put his job in jeopardy, then moved further away from the Grievant near the filing cabinet. *Testimony of Madison*, Trans. at 48; *Ex. JT-11* at 5. Simmons testified that both of them began raising their voices at one another at this point. According to the Grievant, she remained calm throughout the whole incident, never cursed, and moved to the corner of the room by the refrigerator approximately twenty feet away from Simmons. *Id.* at 1, 5. Madison testified consistent with Grievant up on this point at the arbitration hearing. However, during his interview with Garrido-Calloway shortly after the incident, Madison said that both Simmons and Grievant were arguing loudly with one another. *Testimony of Garrido-Calloway*, Trans. at 141.

Grievant grabbed the intercom and called out two times for "Justin White" to come to Coating Prep. *Testimony of* Grievant, Trans. at 183. Up to this moment, neither Grievant or Simmons had verbally or physically threatened the other. White arrived at Coating Prep no more than 10-15 seconds after the call. *Testimony of White*, Trans. at 118. As explained more fully below, *Infra IV.c.*, the outcome of this matter rests in the actions taken by the parties in this 10-15 second time frame.

Simmons waited for White to arrive to get the issue straightened out, explaining, "he'll be able to let her know that he got the oil. [White] used the oil and I didn't steal it and this will be resolved." *Id*. at 98-99. At this point, Simmons had moved over by the file cabinet which, although there is a space to walk through to get behind the desk where Grievant was located, it was also much further from the Grievant. *Ex. JT-11* at 5; *Testimony of Madison*, Trans. at 50.

### c.    The Grievant Assaulted Simmons with a Knife.

Madison was present for the entire incident between Simmons and Grievant. According to Madison, after Grievant called for White, Simmons continued pacing by the filing cabinet with his fists clinched and cursing Grievant for accusing him of being a thief. Madison claimed in his written statement that Simmons "started charging at Linda so I jumped in between them." **Exhibit U-2**. However, Madison testified that he was able to interrupt the alleged charge by simply rolling his chair in between the two and then standing up between them. *Testimony of* Madison, Trans. at 51. As evident from the hearing and photograph of Madison and Simmons standing together, Madison is much larger in stature and, at six foot five inches tall, a whole head taller than Simmons. **Exhibit C-1**.

Madison told Garrido-Calloway during his interview following the incident that he did not believe that Grievant was in danger at any point during the argument in Coating Prep. *Testimony of Garrido-Calloway*, Trans. at 139. Madison also told Garrido-Calloway that he did not have to push or manhandle Simmons to get him out of the room (as is claimed by Grievant) but that he simply "tapped him towards the door." *Id.*, Trans. at 139-140. Grievant, on the other hand, told Garrido-Calloway that Madison had to "bearhug" Simmons to keep him off of her. *Id.*, Trans. at 145.

In any event, it is undisputed that Simmons was no closer than the file cabinet and approximately 20 feet away from Grievant, with the much larger Madison escorting him out the door, when the Grievant exercised the profoundly poor judgment of grabbing a knife with an 8 ½" serrated blade from the counter. **Exhibit C-2**; *Ex. JT-11* at 5.[4]

Simmons testified that Grievant pointed the knife at him from across the room and challenged him to "come on, [n-word]"! *Testimony of Simmons*, Trans. at 102. Grievant then threatened Simmons that he would have to answer to her husband. *Id.*, Trans. at 102-103. She admitted this to Garrido-Calloway in her interview, stating "Well, you know, the men will take care of it and so he'll have to meet up with my husband and my husband will take care of it." *Id.*, Trans. at 146.

---

[4] The knife had apparently been there for 20 years and used by the employees to cut fruit for snacking. Regardless, the Union made much of the fact that it was used as a tool from time to time. This is not a case where an employee frequently uses a knife in the normal course of her duties, has it in her hand and incidentally gestures with it at a coworker instinctively during an argument. Rather, Grievant walked over to a counter, intentionally picked up a knife, and intentionally assaulted Simmons.

Madison testified that he had his back turned from Grievant when he heard Simmons say, "You pulled a motherfucking knife on me!"[5] Madison then turned around and saw Grievant holding the knife and "that's when I pushed [Simmons] out the door." *Id.*, Trans. at 58.[6]

Simmons exited Coating Prep just as White arrived to see Simmons upset, cursing, and yelling about Grievant pulling the knife on him. *Testimony of White*, Trans. at 119. As explained above, the entirety of this event took only approximately 10-15 seconds, certainly no more than 30 seconds, which was the time it took White to arrive at Coating Prep after being called over the radio by the Grievant. *Id.* at 118.

_____

[5] Madison's bias in favor of Grievant, with whom he apparently had a long working relationship, was made clear over and over again during his testimony. One example was the following hostile yet unfounded testimony he gave on cross:

    Q. Did she pull the knife?
    A. Did she *pull* the knife?
    Q. Yes.
    A. She *grabbed* the knife.

*Testimony of Madison*, Trans. at 54 (emphasis added). Although he quibbled with the characterization during cross-examination as to whether she "pulled" or "grabbed" the knife, Madison later admitted that he had his back to her and did not see her holding the knife until after Larry exclaimed, "You pulled a motherfucking knife on me. And that's when I looked back and saw she had the knife and that's when I pushed him on out the door." *Id.*, Trans. at 58.

[6] The Grievant claimed at the Arbitration Hearing, for the first time ever, that Madison had been to the chiropractor recently, insinuating that he was not physically capable of doing anything. Madison never made in any statement or testified to that fact. Indeed, Madison never testified that he struggled in any way to get Simmons out the door. And while his statements to Garrido-Calloway that he simply tapped Simmons on the chest to get him to leave the office did not match up with his testimony at the hearing that he had to push Simmons out of the office, Madison was proud to testify that he was an offensive lineman and had little trouble blocking and escorting Simmons out of the office. *Testimony of Madison*, Trans. at 58-59. This is simply another example of Grievant changing and embellishing her story to the detriment of her credibility.

### d.    Grievant's Termination

Immediately following the incident, Garrido-Calloway received a call from Superintendent John Porter (Porter) who learned of the events from White. *Testimony of Garrido-Calloway*, Trans. at 139. Porter directed Garrido-Calloway to open an investigation. *Id.* Calloway reviewed the written statements of the witnesses and then conducted in-person interviews with Grievant, Madison, Simmons, and White. *Id.*, Trans. at 154.

On October 2, 2020, Grievant received a Memo of Record from Clearwater terminating her employment, explaining that she violated Clearwater's "Mill Rules, Non-harassment policy and Workplace Violence policy and Code of Conduct policy":

> The Memo of Record announcing the decision states as follows:

>> On September 14, 2020[,] at the evening shift change, Linda Grays (oncoming shift) and another employee [Simmons] had an altercation between them in the coating prep control room that resulted in escalated arguments between parties, with threats of bodily harm and Linda pulling a large knife out during the argument. A witnessing employee [Madison] in the control room stepped in between the two to buffer them to help diffuse the situation. A supervisor [White] was called to the area and took steps to help diffuse the situation as well, leading to the separation of both employees into different spaces. A Union Rep, along with the Board Mill Superintendent, were engaged in determining next steps to regain control of the situation, separating the employees, and resuming operations.

>> These actions and the role played by Linda in this situation are unacceptable behavior and are violations of the company's Mill Rules, Non-harassment policy and Workplace Violence policy and Code of Conduct policy. As per Clearwater Paper's Workplace Violence policy, "violence" is defined as verbal and physical actus of aggression which are perceived to be hostile, abusive or intimidating [sic]. The possession of weapons includes the use of objects intended for the use of harm and making threats to others. Employees are expected to conduct themselves appropriately in work interactions.

14

As a result of her actions, Linda has been on an unpaid investigatory suspension from September 14 through October 2, 2020. Her employment with the company is terminated effective today, October 2, 2020.

**Exhibit JT-2**.

e.    **Grievant Sets Forth Shifting Reasons for Termination Demonstrating a Lack of Credibility and Believability to Grievant's Testimony and Claims.**

1.  **Grievant's Petition for Unemployment Benefits**

On or about October 14, 2020, Grievant filed a form seeking unemployment benefits with the Arkansas Division of Workforce Services. The form asked Grievant: "Did you violate company policy?" Grievant checked "Yes." "What policy did you violate?" Grievant responded, "violent coworker." Grievant explained her termination as follows: "theft by coworker [which at this point Grievant knew or should have known was false], supervisor wanted to know so my asst dexter madison and myself told the truth and named the theif [sic] (our coworker) then L simmons came to our control room ready to fight, so the company said violent work place and terminated me." *See* **Exhibit C-4**. Not surprisingly, she completely omitted any explanation of her assault on Simmons with the knife.

2.  **EEOC Charge and Recently Filed Lawsuits**

Although the CBA explicitly states that all claims of race, age, and sex discrimination under federal and state law "shall be subject to the grievance and arbitration procedures" set out in Article 7 of the CBA, Grievant has surprisingly never asserted those claims here.

Instead, on March 18, 2021, six months after the incident, she filed an EEOC Charge alleging that Clearwater discriminated against her based on race and age. *See*

15

Grievant's EEOC Charge, attached as **Supplemental Exhibit C-5**. In the Charge, she alleges that "On September 14, 2020, I had an altercation with a Coworker. During the altercation, I picked up a knife. On September 14, 2020, I was placed on suspension. I was discharged on October 2, 2020." She made <u>no</u> allegation in her EEOC Charge that she acted in self-defense. If she did act, in fact, in self defense when she "picked up a knife," it simply defies credulity to believe it simply slipped her mind to allege that fact in her EEOC Charge.

On June 17, 2021, after receiving her right-to-sue letter, Grievant filed a complaint in federal court, alleging that she was discharged based on her race and age. She alleges that she was "almost physical[ly] assaulted by male employee; had witness not been there to intervene and physically restrain him." Importantly, however, she admits that she pulled the knife, and further, she admits the two were "over 20 feet apart" at the time she did so. *See* **Supplemental Exhibit C-6**, Plaintiff's Complaint, *Grays v. Clearwater*, Case No. 2:21-cv-00064-DPM (E.D. Ark).

On June 18, 2021, the day after she filed her complaint in federal court, Grievant filed a separate complaint in state court claiming that she was "assaulted" by Simmons, but alleging that her termination was actually in retaliation for a grievance she filed in 2017, "Plaintiff has been discriminated against on the basis of her engaging in protected activity, based on her gender, and based on her age." *See* **Supplemental Exhibit C-7**, Plaintiff's Complaint, *Grays v. Clearwater*, Chicot County Cir. Case No. 09cv-21-42-4.

Obviously, Grievant alleges whatever she thinks benefits her at the time. The Arbitrator should be aware of these various conflicting actions and varying allegations in assessing the credibility of Grievant's testimony before him, and Grievant should be estopped from asserting inconsistent positions in her judicial and administrative

16

proceedings. *See Edwards v. Aetna Life Insurance Co.*, 690 F.2d 595 at n.3 (6th Cir. 1982) (noting that judicial estoppel is applicable in administrative proceedings just as it is in a court). Of course, her shifting allegations only serve to enhance the lack of credibility to her testimony. It is undisputed that she pulled a knife on a black coworker in clear violation of Clearwater's Mill Rules and Workplace Policy.

## V.    ARGUMENT

### a.    The Grievant Violated Clearwater's Mill Rules and Workplace Violence Policy When She Admittedly Pulled a Knife on Simmons.

Under Article 5 of the CBA, management has the right to "promote, transfer, demote, discipline, and suspend employees, and to discharge employees for just cause[.]" Under Article 8(c) of the CBA, the Union and Company assented and agreed that the Company has the right to create or modify rules designed to maintain discipline. *Ex. JT-1* at 10. Accordingly, Clearwater properly promulgated its Mill Rules, which both explicitly prohibits workplace violence and also incorporates Clearwater's more specific Workplace Violence Policy by reference. *Ex. JT-9* at § III(3); *Ex. JT-10*. The Workplace Violence Policy explicitly states that assaulting a coworker with a weapon is prohibited and may lead to disciplinary action, *at management's discretion*, up to and including termination. *Ex. JT-10* at 2.

The Arbitrator should not casually substitute his judgment for that of management. As explained in *Stockham Pipe Fittings Co.*, 1 LA 160 (McCoy, 1945):

> "Where an employee has violated a rule or engaged in conduct meriting disciplinary action, it is primarily the function of management to decide upon the proper penalty. If management acts in good faith upon a fair investigation and fixes a penalty not inconsistent with that imposed in other like cases, an arbitrator should not disturb it. . . . The only circumstances under which a penalty imposed by management can be rightfully set aside by an

arbitrator are . . . [instances] in which there has been abuse of discretion[.]"

As demonstrated above, while there are many facts in dispute, most are not credible disputes. This case is very straightforward. Grievant admits to pulling the knife on Simmons as he was being escorted out the door on the other side of the room by a man much larger than him. Furthermore, Simmons's credible testimony establishes that Grievant taunted him with a racial slur before threatening him that she planned to have her husband "take care of this."

Accordingly, Clearwater had just cause, under any analysis, to discipline Grievant. Clearwater properly exercised its discretion to terminate her under its Workplace Violence Policy. Under the CBA, the parties agreed in Article 8 that the Company has the right to make rules and set discipline, including those referenced in the Mill Rules. Finally, Article 7 of the CBA allows no modification by the Arbitrator in this regard: "The arbitrator's authority shall be limited to the terms of this Agreement or any written supplemental agreement . . . [h]e shall have no authority to add to, take from, nullify or modify any terms of this Agreement or any written supplemental agreement [.]"

This analysis is in line with the Company's proposed statement of the issue and can only result in termination, as Grievant admittedly violated the Company's properly promulgated policy under which the Company had the right and discretion to set the disciplinary penalty upon conclusion of its investigation.

However, even if the Arbitrator applied a just cause analysis to the facts at issue, which the Company opposes and is not appropriate given the fact that the Arbitrator's review of the matter is limited to only the issues directly raised in the written grievance, the decision to terminate Grievant must still be sustained.

18

The just cause analysis considers: (1) whether the employee could be expected to know that his conduct would subject him to discipline; (2) whether the rule violated is reasonably related to the safe, efficient, and orderly operation of the enterprise; (3) whether the employer made a reasonable effort to discover and determine if the employee violated the rule; (4) whether the employer made a fair and objective investigation; (5) whether the burden of proof on the issue of guilt has been met; (6) whether the employer's action was non-discriminatory; and (7) whether the penalty is reasonably related to the seriousness of the offense and/or the employee's record with the employer. *Dep't of Correctional Servs.*, 116 LA 142 (Babiskin, June 29, 2001). "The seven questions first propounded in 1966 in *Enterprise Wire Co.*, 46 LA 359 (March 28, 1966) by Arbitrator Carroll R. Daugherty have become the traditional source for explaining just cause." *Oak Hills Local Schools*, 128 LA 475, 485 (Szuter, Aug. 26, 2010). "Those questions are applied more as a checklist to assure that no stone was left unturned rather than a rigorous test in which the questions become elements necessary for a cause of action." *Id.*

As to the first factor, some rules are so very obvious that no employee can claim ignorance of them or their consequences. *Westvaco Corp.*, 105 LA 180, 185. Nevertheless, Clearwater put forward uncontroverted evidence, without objection, that Grievant received Clearwater's Mill Rules and Workplace Violence Policy that were in place when she pulled the knife on Simmons. *Ex. C-3*. The Mill Rules, in addition to stating that threatening the use of physical violence is prohibited, specifically incorporates the Company's Workplace Violence Policy which explicitly states any act of violence which impacts the workplace will be cause for investigation and subject to action by the Company. *Ex. JT-9*. The Policy defines violence to include any act of aggression or any statement, which could be perceived as intent to cause harm to an individual.

19

Furthermore, the Policy explicitly prohibits assaulting or threatening coworkers and makes clear that such conduct may lead to termination. Accordingly, the first factor is easily met and Grievant cannot credibly argue otherwise.

As to the second factor, the Company rules at issue here are directly related to the safe, efficient, and orderly operation of Clearwater's operation. Without question, assault with a deadly weapon is one of the most serious infractions of work rules that an employee can commit, short of perhaps actually stabbing a coworker, and is just cause for immediate termination.

Turning to the third and fourth factors, Clearwater made a reasonable effort to discover and determine whether a rule was violated and conducted a full and fair investigation as to the violation. Here, Grievant admits that she pulled a knife on Simmons during an argument. The only question is whether Grievant was justified in doing so.

Although Clearwater obtained written statements from the employees involved, the written statements from Madison and White were far too cursory and fell woefully short of providing sufficient detail from which Garrido-Calloway could make any substantive determination as to what actually occurred between Simmons and Grievant. *Written Statement of Madison*, *Ex. U-2*; *Written Statement of Justin White*, **Exhibit U-3**. Accordingly, Garrido-Calloway interviewed each of the employees in person. After considering the written statements and conducting in-person interviews to fill out the details and assess the credibility of those involved, Garrido-Calloway concluded that Grievant's conduct was not justified and violated the Mill Rules and Workplace Violence Policy. Grievant was provided ample opportunity to put forth her case and explain her side of the story, both in her written statement and her interview. Simply put, Garrido-

20

Calloway did not find the Grievant's written account or her statements in her interview to be credible in light of what she learned from White, Madison, and Simmons.

As to the fifth factor, Clearwater has met its burden of proof. Grievant freely admits that she picked up the knife with the intention of using it on Simmons. She simply claims that she was justified in doing so. The credible evidence clearly and convincingly demonstrates that: (1) Grievant engaged in a loud argument with Simmons in Coating Prep; (2) Simmons never verbally threatened Grievant during the argument; (3) Madison, who substantially outsized Simmons, put himself between the two while they were arguing and escorted Simmons out of Coating Prep; (4) Simmons never threatened, fought with, or attempted to fight with Madison; (5) Simmons was twenty feet away from Grievant and across the room when Grievant picked up the knife and threatened Simmons. It simply defies credulity to believe that a reasonable person in such a situation would decide she was in such imminent danger of being physically attacked that she had no option but to wield a deadly weapon. These facts, along with her taunts "come on, [n-word]!" and "you can answer to my husband," conclusively refute her claims of self-preservation.

As to the sixth factor, Grievant's termination was non-discriminatory. Clearwater acknowledges that Simmons received the lesser punishment of a three-week suspension without pay and a last chance agreement. That punishment was commensurate with his involvement, *i.e.*, arguing, yelling, and cursing with a coworker. However, Simmons never picked up a knife and never uttered one threat of physical violence to Grievant. *Service Employees International Union, Local 82*, 97-05953, 1997 BNA LA Supp. 103092 (finding no disparate treatment where employee who verbally abused coworker received warning but coworker who brandished knife during argument was terminated); *Genie*

21

*Co.*, 97 LA 542, 549 (Dworkin, 1991) (not sufficient that an employee was treated differently than others; the circumstances surrounding the offense must be substantively the same as those who received lesser penalties). "They were both arguing. Larry didn't pull the knife. Linda did." *Testimony of Garrido-Calloway*, Trans. at 153. Furthermore, there are no like comparators because, thankfully, Clearwater is aware of no employee, aside from Grievant, who has ever threatened to stab a coworker.

As to the seventh and final factor, the penalty of termination is reasonably related to the seriousness of the offense. The decision to terminate was within the discretion of Clearwater management, whose judgment should not lightly be overturned. Short of actually stabbing or shooting a coworker, there is no more serious infraction of work rules than assault with a deadly weapon. An employee wielding a knife and threatening to stab a coworker is as serious a threat as exists to employee safety and the operation of Clearwater. Arbitrators routinely enforce and sustain the discharge of employees who are violent or threaten violence in the workplace. *Canteen Company*, 1992 BNA LA Supp. 106919 (arbitration panel upheld termination of employee for allegedly threatening a coworker with a knife during working hours); *Champion Int'l Co.*, 115LA 27 (Weston, 2000) (employee discharged for threatening coworker); *Southwest Airlines*, 114 LA 1797 (Jennings, 2000); *Michigan Milk Producers Ass'n*, 114 LA 1024 (McDonald, 2000).

Considering all of the above factors, Clearwater properly exercised its discretion in deciding to terminate Grievant.

**b.    The Grievant Does Not Deserve Another Chance, and Reinstatement Would Violate Public Policy.**

The Union will likely argue that, although some level of discipline may have been called for, her termination is too severe for her actions. However, reinstatement in this

case is simply out of the question. "The stakes are too high, and the problem too serious, for arbitrators to treat workplace violence like any other type of misconduct and reinstate offenders in the workplace. Johns, *Action Should Follow Words: Assessing the Arbitral Response to Zero Tolerance Workplace Violence Policies*, 24 Ohio St. J. on Disp. Res. 263, 284 (2009).

At the hearing, Simmons testified to Grievant's propensity to assault coworkers with a deadly weapon. Simmons testified that this incident was at least the second time that Grievant has threatened a coworker with a knife. *Testimony of Simmons*, Trans. 109. More specifically, Simmons testified that Grievant pulled the same knife on Terrell Smith, who did not report the assault to management. *Id*.

Grievant gave plenty of self-serving testimony at the hearing. However, she never disputed Simmons's testimony that she pulled the same knife on a different coworker less than a year earlier. That disturbing fact is now uncontroverted and both Clearwater and the Union are on notice of Grievant's propensity to assault coworkers with a deadly weapon. Accordingly, it would exceed gross negligence to reinstate Grievant at this point.

For proof of the broad public policy concerns related to workplace violence, one need look no further than Ark. Code Ann. § 11-5-115, which explicitly provides that if an employee has been a victim of violence, received a threat of violence at the worksite, the employer may seek a temporary restraining order or other injunction in addition to or instead of filing criminal charges.

Equally, OSHA's General Duty Clause clearly prohibits retention of a violent employee. D.O.L. News Release, USDL 17-0056OSHA (fining hospital $32,158 for exposing employees to workplace violence under General Duty Clause); *see also* D.O.L. Letter Re OSHA Enforcement Policy Regarding Workplace Violence, 2006 WL 4093048,

23

at *1-2 (noting that OSHA was one of the first federal agencies to issue guidance on workplace violence to employers and employees, and to supplement this guidance with an appropriate enforcement policy). Indeed, OSHA cites employers for violating the General Duty Clause, where (1) the employer failed to keep the workplace from a hazard to which its employees are exposed; (2) the hazard is recognized; (3) the hazard was likely to cause death or serious physical harm; (4) there was a feasible and economically viable way to correct the hazard. *See Safeway, Inc. v. Occupational Safety & Health Review Comm'n*, 382 F.3d 1189, 1195 (10th Cir. 2004). Reinstatement of Grievant would easily violate the General Duty Clause because Grievant would be working with others at Clearwater, her propensity to threaten coworkers with a deadly weapon is now well-documented, and it has proven feasible to have other employees, who do not threaten coworkers with deadly weapons, to do the job Grievant was performing when she was terminated.

Finally, Arbitrators should recognize that the sort of threatening and violent behaviors exhibited by Grievant are regarded by mental health professionals as "early warning signs" for further, more serious incidents. *See Golden State Foods Corp.*, 108 LA 705, 707-708 (Gentile, 1997).

For all of these reasons, reinstatement is in no way appropriate, would endorse Grievant's disturbing conduct, violate well established public policy, subject both Clearwater and the Union to serious liability in the future, and leave Clearwater's employees in unnecessary peril.

## V.   CONCLUSION

As explained at the outset, this case begins and ends with Clearwater Paper Corporation's duty to ensure a safe workplace free of violence. There is no place at

24

Clearwater for an employee so quick to assault a coworker with a deadly weapon. Any decision in Grievant's favor would be a danger to the employees at Clearwater and a clear violation of the parties Collective Bargaining Agreement, Mill Rules & Policies, and public policy.

Clearwater respectfully requests that the Arbitrator find that Clearwater appropriately exercised its legitimate management rights under the Collective Bargaining Agreement when it terminated the Grievant for violating its properly promulgated rules and policies against workplace violence.

### CERTIFICATE OF SERVICE

I, Joe Kraska, hereby certify that a copy of the foregoing Post-Arbitration Brief was simultaneously served via electronic mail on July 9, 2021, on the following:

**ARBITRATOR**
Paul L. Barron, Professor of Law
Tulane Law School
6329 Freret Street
New Orleans, LA 70118
pbarron@tulane.edu

*/s/ Joe M. Kraska*
Joe M. Kraska

25

# EXHIBIT F

CORRECTED OPINION

**IN THE MATTER OF ARBITRATION BETWEEN**  .

                                                          .

**Clearwater Paper Corporation**           .

                                                      .

           **and**                                       .          **OPINION**

                                                      .

**The Steelworkers International Union**   .
**(USW) Local N0. 1532**               .

                                                     .

**FMCS 211218-02453**                  .

---

**BACKGROUND**

Clearwater Paper Corporation (Company) and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial, and Service Workers International, on behalf of Locals 13-1532 and 13-1533 (Union) were parties to an extended Collective Bargaining Agreement (Contract) that was due to expire on July 31, 2021. It was applicable at the time of the incident. The Union represents all production and maintenance employees including truck drivers, but excluding office clerical employees, professional employees and supervisors, as defined in the National Labor Relations Act. (Article 2 of the Contract.)

This matter relates to the discharge of Linda Grays (Grievant). The Grievant was terminated on October 2, 2020 (Termination Memo is Joint Exhibit 2.) The Union grieved that decision (Grievance is Joint Exhibit 3). The parties were unable to resolve this matter through the Grievance process (Article 7 Adjustment of Complaints.) A hearing before Paul Barron, Arbitrator, was held by Zoom on May 19, 2021. On July 9, 2021, briefs were submitted, and the hearing was closed.

**ISSUE**

The parties were unable to agree on the statement of the issue in this matter. They have agreed that I may frame the issue.



The Company's statement of the issue is:

> Did the Grievant violate Company policy when she pulled a weapon on a co-worker?

The Union's statement of the issue is:
> Did the Company have just cause to terminate Grievant? If not, what is the appropriateremedy?

I have formulated the issue in this matter as follows:

1. Leaving aside the fact that the Grievant grabbed the knife, did the Grievant's interaction with Mr. Simmons on September 14, 2020 merit discipline?
2. If the answer to Question 1 is "no," did grabbing the knife, merit discipline?
3. If the answer to Question 2 is "yes," what level of discipline is proper?

## CONTRACT, MILL RULES AND WORKPLACE VIOLENCE POLICY CITED BY THE COMPANY

### CONTRACT
**Article 1**
General Purpose of Agreement

(a) The general purpose of the Agreement is, in the mutual interest of the employer and employee, to provide for the operation of the Pulp and Paperboard Mill at McGehee Arkansas, under methods which will further, to the fullest extent possible, the safety, health, and welfare of the employees, economy of operation, quality and quantity of output, cleanliness of plant, and protection of property. It is recognized by thisAgreement to be the duty of the Company, the Union, and the employees to cooperate fully, individually, and collectively for the advancement of said conditions.

**Article 5**
Operating Control

. . . . The Company also retains the right to know transfer mode, discipline, and suspend employees, and to discharge employees for just cause, . . .

**Article 7**
Adjustment of Complaints

(c)

. . . .

1.  The arbitrator's authority shall be limited to the terms of this Agreement or any
    written supplemental agreement. He shall have no authority to add to, take from,
    nullify or modify any terms of this Agreement or any written supplemental
    agreement, and he shall consider and render a decision concerning *only* such issues as
    are directly raised in the written grievance, which shall not be in any way materially
    changed or amended after it is presented to the Company in Step 2 above.


### Article 8,
### Disciplinary Action

. . . .

(b) If a regular employee claims to have been discharged . . . in violation of this
Agreement during the term of this Agreement, such person must within three (3) calendar days refer
the matter to the Local Union, which may within four (4) additional calendar days file a written
grievance under Step 3 of the grievance procedure in Article 7 of this Agreement and it shall be
processed as provided in that Article.

(c) The Union and the Company agree that the Company has the right to create or modify
rules designed to maintain discipline and proper personal standards of conduct such as the
Company's Mill Rules. The employees agree to comply with the Company's Mill Rules.


### Article 23
### Safety

The Company and the Union recognize the desirability and importance of a safe work
place. To further this:

## Section A – Obligations

1.  . . . The Company retains the right to take unilateral action to ensure workplace safety
    whenever necessary.


# Mill Rules


III.  <u>WORK PRACTICE RULES</u>

. . . .

3. Violation of the Company's Harassment, Workplace Violence, and/or
Handgun Policies is prohibited.

. . . .

5. The following behaviors, actions and activities are prohibited:

a.  Flagrant disrespectful conduct toward management or a co-
    worker;

. . . .

j.  Immoral or indecent conduct, including but not limited to
    vulgarity, use of profane, abusive or threatening language or
    indecent exposure;

. . . .

i.  Fighting, inciting or participating in physical violence of any
    nature on Company property or threatening the use of physical
    violence.

. . . .

## IV.   SECURITY
　　1.　Possession of or bringing firearms (excluding concealed handguns locked in a storage compartment within a private vehicle on a Company parking lot), weapons or explosives on mill property is prohibited. All employees are to comply with the Company's Harassment, Workplace Violence, and Handgun Policies.

. . . .

The above listed rules are not intended to be all inclusive of an employee's required conduct, personal standards or discipline. With proper notice to all employees, management may add to, take from or change these rules at any time.


# WORKPLACE VIOLENCE POLICY

　　It is the policy of the Company that rules and regulations regarding behavior in the workplace are necessary for the efficient operation of the Company and for the benefit and safety of all employees. Management cannot prevent violence in our workplace alone. This must be a joint effort by every employee. The Company encourages all employees to report possible problems to management.

　　Conduct that interferes with operations, discredits the Company, or is offensive to customers or co-workers will not be tolerated whether conduct is that of an employee, customer or visitor. Any act of violence which impacts the workplace will be cause for investigation and subject to action by the Company. Violence is defined as any act of aggression or any statement, which could be perceived as intent to cause harm to the Company or an individual, whether personal, such as physical or emotional, or impersonal, such as property damage or theft.

　　The following conduct is prohibited and may lead to disciplinary action, up to and including termination

　　1.　The use of profanity or abusive language;
　　. . . .
　　3.　Fighting or assault[1] on a co-worker, customer, security staff, or visitor;
　　4.　Threatening or intimidating co-workers, security staff, customers, or visitors;

　　This list is illustrative of the type of behavior that will not be permitted. It is not intended to be an all-inclusive listing. Any violation of the Company's policies or any conduct considered inappropriate or unsatisfactory may, at management's discretion, subject the employee to disciplinary action, up to and including termination.

---

　　[1] "Assault" is defined as "[t]he threat or use of force on another that causes that person to have a reasonable apprehension of imminent harmful or offensive contact." Black's Law Dictionary (11th ed. 2019).

. . . .

## Prohibited Conduct

　　We do not tolerate any type of workplace violence committed by or against employees. Employees are prohibited from making threats or engaging in violent activities.

The following list of behaviors provides examples of conduct that is prohibited. It is not exhaustive.

- Causing physical injury to another person
- Making threatening remarks
- Possession of a weapon while on Company property or while on Company business
- Committing acts motivated by, or related to, sexual harassment or domestic violence
- Aggressive or hostile behavior that results in a reasonable fear of injury and/or emotional distress

**Reporting Procedures**

. . . .

Threats, threatening conduct and any other acts of aggression or violence in the workplace will not be tolerated. Any employee determined to have committed such acts will be subject to disciplinary action up to and including termination and the incident will be reported to proper authorities if warranted. Non-employees engaged in violent acts on the employer's premises will be reported to the proper authorities and fully prosecuted.

## UNDISPUTED FACTS

1. There was an incident between the Grievant and Larry Simmons on September 14, 2020 in the Coating Prep Control Room.

2. Dexter Madison was also in the Control Room.

3. The Grievant told Justin White (supervisor on the board machine on A shift) that Mr. Simmons had stolen some cooking oil prior to the incident on September 14, 2020. Mr. White determined that this was not true. Mr. Simmons learned of this accusation.

4. The interaction between the Grievant and Mr. Simmons was initiated by Mr. Simmons.

   [There are references to locations in the Coating Prep Control Room by my analysis and by the testimony of Mr. Madison, Mr. Simmons, and the Grievant. Joint Exhibit 11 contains seven photographs of the room. As a result, these locations can be found in one or more of those photographs.]

5. When the incident occurred, Mr. Madison was sitting in the desk beside the printer. The Grievant was behind the computer console, and Mr. Simmons was in front of the console.

6. Mr. Simmons became heated during the interaction.

7. At some point, the Grievant call "Mr. White, Mr. White" on the Gai-Tronics. The Gai-Tronics is located on the table with the computers.

8. At some point, Mr. Madison stood up and stood between the Grievant and Mr. Simmons. Mr. Madison was facing Mr. Simmons and close to him. This was in front of the opening between the console. The Grievant was standing against the back wall.

9. There was a knife on a table. The table was near the sink at the corner of the side of the Console Room wall in the back wall. The knife had been there for many years. The knife was 15 inches long. The blade was 9 inches long.

10. The Grievant picked up the knife near the end of the incident.

11. The duration of the incident was short. It took two minutes according to Mr. Simmons and 2 to 3 minutes according to the Grievant.

12. Mr. Simmons received a three-week suspension without pay and a last chance agreement as a result of his involvement in the incident.

## DISCUSSION AND FINDINGS OF THE INDEPENDENT ARBITRATOR

**Question 1: Leaving aside the fact that the Grievant grabbed the knife, did the Grievant's interaction with Mr. Simmons on September 14, 2020 merit discipline?**

This is an appropriate question to ask. As noted above, Mr. Simmons was given a three-week suspension without pay and a last chance agreement for the same incident. Ms. Rosario Garrido-Calloway is the Senior Human Resources Manager at the facility. Ms. Garrido-Calloway conducted the investigation regarding this incident. On cross-examination, Ms. Garrido-Calloway testified as to why there was a different level of discipline between Mr. Simmons and the Grievant. She testified as follows:

> Q. Okay. Oh, and also, based on the investigation, did you also find that it warranted discipline for any other employees that were involved?
> **A. Yes.**
>
> Q. What other employee did you discipline?
> **A. Discipline was issued to Larry Simmons.**

Q. And what level or form of discipline did the Company issue to Larry Simmons?
**A. Larry was issued a suspension with time served, which I believe at that time that we issued it was about three weeks of time and he was given a last chance agreement.**

Q. Okay. And again, based off of your investigation, you know, why did Larry receive that level of discipline?
**A. Larry didn't pull a knife. They were -- they were both arguing. Larry didn't pull the knife. Linda did.**
(Tr. Page 153)

\*\*\*

Q. Rosie, during that cross-examination, the Union representative had brought up, I guess, some differences between the level of discipline that was imposed on Larry and Linda. Is that correct?
**A. Yes.**

Q. Okay. And again, based off your investigation, why were different levels of discipline imposed?
**A. Linda pulled a knife. That was the difference.**
(Tr. Page 169)

To determine whether the Grievant's actions on September 14, 2020 merited discipline, it is necessary to look at the testimony given at the hearing. There were only three people in the Control Room that night, Mr. Simmons, Mr. Madison and the Grievant.

There was a sharp disagreement as to the demeanor of the Grievant. Below is the testimony by each of them describing the Grievant's demeanor.

Mr. Simmons' relevant testimony is as follows:

Q. Okay. And so at this time, did you start -- you said it kind of went from there after that or that comment she made back to you. So what happened next after that?
**A. She -- I -- I told her she was a hypocrite and that she was always talking about people and starting stuff. And you know, she -- we just got to going back and forth with her saying things and I was saying things. And she grabbed the intercom that -- that phone looking -- that Gai-Tronics system right behind the computer right there and called Justin White to come to coating prep.**

\* \* \* \*

Q. Okay. And so as this was going on, were you two both getting louder?
**A. Yes, sir.**

Q. And so you both were raising your voices?

A. Yes, sir.

Q. Okay.   Were you both cursing?
**A.  Yes, sir, we were.**
(Tr. Pages 94-95)

\*\*\*\*

Q. Did she say anything to you when she pulled the knife?
**A. She said to me, "Come on in," the N-word, and told me that I was going to have
to answer to her husband.**
(Tr. Page 102)

Not surprisingly, the Grievant did not testify that she was loud or was
cursing. Further, she was not asked on cross-examination whether she used the n-
word and that her husband would take care of the problem.

Mr. Madison's relevant testimony is as follows:

Q. Okay.   Thank you.   And what started the incident between Linda and Larry?
**A.   Larry had heard that Linda had told that he had got the cooking oil.**

Q. Okay.   And what did Larry say to Linda?
**A.  When Linda got there, he said, "Ms. Linda, I'd like for you to keep my name
out your mouth." And then Linda said, "What are you talking about, Larry?"
And he said, "You know what the hell I'm talking about.   I'm talking about the
damn cooking oil."**

Q. Okay.   And Linda, when she responded to him, was she laughing at him or
taunting him?
**A.  No, not at all.**

Q. Did she ignore him at all when he was trying to talk to her?
**A.  Talking about in the time of the incident?**

Q. Yes.
**A.  No.   She was just trying to tell him to get out because she saw how he was
getting –**
(Tr. Pages 46-47)

\* \* \*

Q. Okay.   Mr. Madison, I'll ask you again.   You said earlier that Larry was standing
over by you, telling you what was going on because you were his relief.   And then he
moved -- you said that he moved over by the file cabinet.   Is that accurate of what you
said?
**A.  Yes.   After they got to arguing and stuff, that's when he moved over there.**

Q.  Okay.  Thank you.  Did -- as they started arguing, did Larry get louder?
**A.  Very.**

Q.  Did Linda get louder?
**A.  No.**

Q.  Linda was arguing back with him though?
**A.  Well, she wasn't arguing.  She was just really telling him he needed to get out. Because she saw -- I guess she saw a side that she'd never seen before and she was like, "You need to get out."**

Q.  So when she asked what Larry meant by keeping her name out of his -- or keeping his name out of her mouth, they weren't arguing?
**A.  No, they weren't arguing at the time.  Well, he was just saying, "You need to keep my name out your mouth." And then when Linda said, "What are you talking about," that's when he got loud.**

Q.  And then they stopped arguing?
**A.  I didn't say Linda was arguing.  I said he was yelling at her. Linda was calm, telling him to get out.**
(Tr. Pages 48-49)

\* \* \*

Q.  And while she was standing here, did you hear her say anything?
**A.  Only thing I heard her say, "Get out, Larry."**

Q.  Did you hear her say, "Come at me inward"?
**A.  No, not at all.**

Q.  Did you hear her say, "You'll have to deal with my husband"?
**A.  I haven't -- I didn't hear it.**
(Tr, Pages 56-57)

\*\*\*


Q.  Okay.  During this whole time when you were in the control room and Linda was telling Larry to get out -- she was telling Larry to get out.  Is that correct?  That's what you said earlier.
**A.  Yes.**

Q.  And she never raised her voice during that time?
**A.  No.  She was calm.  I could tell that she was scared. That's what made me stand up when he started charging at her.**
(Tr. Page 60)

\*\*\*

Q.  Was Mr. Simmons using profanity?
**A.  Yes.**

Q.  Was Mrs. Grays using any profanity?
**A.  No.  Only thing she was --**

Q.  Was Mrs. Grays -- sorry.  Was Mrs. Grays' voice raised or elevated?
**A.  Not at all.   She was calm and actually scared, trying to -- just telling him to get out of there.**

Q.  How many times do you recall Mrs. Grays asking Larry Simmons to get out of the room?
**A.  I'd say at least three times.**
(Tr. Page 67)

Mr. Madison wrote a statement the same evening as the incident (Union Exhibit 2). It was very short. The only part of the statement that related to the Grievant's demeanor was: "So they exchange word and Linda told Larry to get out about three times and Larry wouldn't leave."

The final piece of testimony regarding the Grievant's demeanor came from Ms. Rosario Garrido-Calloway. She recounted her interviews with the three individuals. Her relevant testimony is as follows:

Q.  Okay.   Dexter -- during your interview, did Dexter tell you that both Larry and Linda were raising their voices?
**A.  Yes.**

Q.  Okay.   And does that reflect or does that match the testimony that he gave here today?
**A.  No.**

Q.  During your investigation, did Dexter tell you that both Larry and Linda were cursing at one another?
**A.  Yes.**

Q.  And does his testimony here today reflect what he told you during his interview?
**A.  No.**
(Tr. Page 141)

Ms. Garrido-Calloway testified that Mr. Simmons' testimony was consistent with what he told her in the interview.

Ms. Garrido-Calloway testified as to her interview with the Grievant.

Q.  Is there anything else that stood out to you in her interview?

**A. She said that she was calm during the exchange with Larry, which is consistent with what others said.**

* * *

Q. And during her testimony, did she say whether or not she was cursing or yelling during the incident?
**A. She -- she did not.   Yeah, she said that her voice was calm and that Larry was the one cussing.   But she did say that she did threaten him with her husband.**
(Tr, Pages 146-147)

The only testimony that the Grievant became loud and was cussing, other than Mr. Simmons, was in the testimony by Ms. Garrido-Calloway that Mr. Madison told her so in his interview with her. I have concluded that this is not sufficient evidence that would merit discipline if one does not take the grabbing of the knife into account. The evidence supports the fact that the Grievant did not want there to be an altercation. Contrary to Mr. Simmons, Mr. Madison testified that the Grievant requested Mr. Simmons to leave three times. Mr. Madison's statement states that as well. Ms. Garrido-Calloway indicated to the contrary in her interview with Mr. Madison.

Even more important is the fact that when things became difficult, the Grievant called for Mr. White. Rather than escalating the interaction she wanted to end it. Based on these facts, the answer to Question 1 is no.  The argument for the Grievant meriting discipline irrespective of the grabbing of the knife, was Ms. Garrido-Calloway's testimony. There is no reason for me to disbelieve Ms. Garrido-Calloway's testimony that Mr. Madison stated in his investigatory meeting that the Grievant became loud and was cussing. Nevertheless, while a close question, I find that these facts do not merit disciplining the Grievant, leaving aside the fact that the Grievant grabbed the knife.

One could argue that Mr. Simmons received discipline for the same actions. Thus, the Grievant should also merit discipline as well. However, by his own admission, Mr. Simmons became very angry and more disruptive than the actions of the Grievant.

Mr. Madison's testimony describes this difference.

Q. Okay.  Did you see Linda make a call on a radio during this time?
**A. Yes.**

Q. Okay.  And do you know who she called?

**A.  She called Justin White.**

Q.  Okay.  Did you hear her say anything on that call?
**A.  I heard her call Justin White name twice.**

Q.  That's all she said?
**A.  Yes.  That's all she was able to because how Larry was going, getting angry with her.**

Q.  Okay.  And you mentioned earlier that you had to get up in between Larry and Linda, and you mentioned that Larry had moved over towards the file cabinet.  So when you got in between Larry and Linda, Larry was at the file cabinet and Linda was still behind the desk.  Is that accurate?
**A.  Yes.**

***

Q.  So when Larry and Linda -- during this incident between Larry and Linda, as it got louder, did you move in between them?
**A.  I moved in between them when Larry started charging near Linda.**

Q.  Okay.  So you said that Larry started charging at Linda?
**A.  Yes.**

Q.  Can you describe -- or I know the camera there might be a bad angle, but can you describe what charging is or what charging was?
**A.  Yes, I can.**

Q.  Okay.
**A.  Had his fists balled up like he was ready to attack her or something.  That's when I stepped in front of him.**
(Tr. Pages 49-51)

## Question 2: If the answer to Question 1 is "no," did grabbing the knife, merit discipline?

It is possible to contend that simply grabbing a knife merits discipline irrespective of the Grievant's motive. There are two provisions of the Mill Rules that might support that concept. One is found in the Security provision. It states:

> Possession of or bringing firearms (excluding concealed handguns locked in a storage compartment within a private vehicle on a Company parking lot), weapons or explosives on mill property is prohibited. All employees are to comply with the

Company's Harassment, Workplace Violence, and Handgun Policies.

The other is found in the Prohibited Conduct provision. It states: "Possessing of a weapon while on Company property."
I believe that neither were intended to cover this situation.

However, one could argue that grabbing the knife was so dangerous that such an employee should not be allowed to remain on Company's premises. I have concluded, in this case, the mere fact of grabbing and holding the knife is not enough. Rather, the reason why the Grievant grabbed the knife is critical.

If the Grievant's reason was to use the knife to attack Mr. Simmons, that would violate numerous provisions of the Mill Rules and the Company would have the right, and likely the obligation, to terminate the Grievant.

On the other hand, if the Grievant's reason was to protect herself and instinctively grabbed the knife, there would be no basis for discipline. Not surprisingly, Mr. Simmons testified that while he was angry, he never tried to attack the Grievant. Conversely, the Grievant testified that she was frightened and grabbed the knife to protect herself. In this case, it does not matter whether Mr. Simmons was planning to attack the Grievant. Rather, the question is whether a reasonable person in the Grievant's position would have been afraid and the knife was for protection.

I need not recount the Grievant's testimony at the hearing that she was afraid and that she was in danger. It well could have been self-serving. However, the Grievant's account of what happened which she gave the evening of the incident, supports her version of how she felt.

First, is her statement that she wrote that night. (Union Exhibit 2). It states in part:

> So I called Justin White on the Gai-Tronics 2 times I called Justin White' Justin White. Larry made the motion to come around the kiosk/computers were I'm sitting and I grabbed my phone for protection. Dexter jumped up and grabbed him before Larry could reach me, Larry is still yelling, cursing, fist balled up to physically assault me. I back up to the refrigerator, Larry still yelling and cursing trying to break free from Dexter Madison to get to me! Larry is still ranting and raving, I didn't have time to wait on Justin White to answer the Gai-tronics because Larry was coming around to cause me bodily harm, but Justin said he heard Larry yelling etc. Dexter still trying to restrain Larry, but Larry is out of control and he's still trying to come after me. I grabbed the radio for protection, Larry's still having to be physically restrained by Dexter Madison. Larry broke away from Dexter and I picked up the knife we keep up by the radio I grabbed and backed up to the refrigerator again.

Second, the Grievant also recounted the same facts that occurred to Mr.
White. His statement, written the night of the incident, reads in part:

> [A]fter is still talking she Larry left I went to coating prep and asked
> Linda Grays what happened and she told me that Larry had tried to
> attack her and that she pulled a knife on him because she was threatened
> and scared of him. She told me that she had asked him several times to
> leave because he was In such a rage and he continued to try to approach
> her in a wild manner[.]

Finally, Mr. Madison testified that Mr. Simmons became very angry and that
the Grievant retreated to the back wall.

> Q.  The day of this incident, you testified that Mr. Simmons was engaged and very
> upset.  Were you scared that day?
> **A.  Well, I wasn't scared for myself.  I was scared for Linda at the time.**
>
> Q.  If you had ahold -- but you had ahold of Mr. Simmons.  Is that correct?
> **A.  Yes.**
>
> Q.  And he wanted to come around you.  Is that correct?
> **A.  Yes.**
>
> Q.  You said that you heard Mr. Simmons say something about she has a knife or
> something.  Is that -- did you hear that?
> **A.  Yes.**
>
> Q.  And you said that you looked back?
> **A.  I looked back and Linda she was back as far as she could go.**
>
> Q.  She was -- when you say back as far as she could go, was she up against the
> cabinet?
> **A.  Like, basically, like, towards the refrigerator.  Like, over there.**
> (Tr. Pages 69-70)

All of the above, convinces me that a reasonable person in the Grievant's
situation would have been afraid that she was in danger. Nevertheless, one could
argue that grabbing a knife for protection was inappropriate. The fact that the
Grievant grabbed something for protection which happened to be a knife should
not be controlling. The real question is whether it was appropriate for the Grievant
to grab anything for protection. There could have been a hammer or a large wrench
on the table rather than a knife.

Clearly, the Grievant's action was not premeditated. Rather, it was instinctual. Further, this happened in a very short amount of time. If there had been more time, she would have had been able to think through her action and not grab the knife. But she did not.

Based on all of the evidence above, I have concluded that the Grievant's action to grabbing the knife was not a basis for discipline and the grievance must be sustained. Obviously, there is no need to answer Question 3 in the stated Issue.

## AWARD

The grievance is sustained. The Grievant should be reinstated within 10 days of the date of this Award. The Grievant is entitled lost pay including reasonable overtime, any lost benefits, and lost seniority.

The Union is not entitled to attorney's fees.

Per the agreement of the parties, I will retain jurisdiction over this matter for 60 days solely to resolve any question as to the meaning or implementation of this award.

Paul Barron                                                  Dated: October 23, 2021

Paul Barron
Arbitrator